1   JOHN B. BULGOZDY, Cal Bar No. 219897
    Email: bulgozdyj@sec.gov
2   NICHOLAS S. CHUNG, Cal Bar No. 192784
    Email: chungni@sec.gov
3   MORGAN B. WARD DORAN, Cal. Bar No. 246107
    Email: warddoranm@sec.gov
4
5   Attorneys for Plaintiff
    Securities and Exchange Commission
    Rosalind R. Tyson, Regional Director
6   Andrew G. Petillon, Associate Regional Director
    John M. McCoy III, Regional Trial Counsel
7   5670 Wilshire Boulevard, 11th Floor
    Los Angeles, California 90036-3648
8   Telephone:  (323) 965-3998
    Facsimile:  (323) 965-3908
9

10

11                  **UNITED STATES DISTRICT COURT**

12                  **CENTRAL DISTRICT OF CALIFORNIA**

13                        **SOUTHERN DIVISION**

14  SECURITIES AND EXCHANGE          Case No.   **SACV09-818 DOC(RNBX)**
    COMMISSION,
15                                    **MEMORANDUM OF POINTS AND**
                Plaintiff,            **AUTHORITIES IN SUPPORT OF**
16                                    *EX PARTE* **APPLICATION BY**
         vs.                         **PLAINTIFF SECURITIES AND**
17                                    **EXCHANGE COMMISSION FOR**
    MEDICAL CAPITAL HOLDINGS,         **TEMPORARY RESTRAINING**
18  INC.; MEDICAL CAPITAL            **ORDER AND ORDERS:**
    CORPORATION; MEDICAL             **(1) FREEZING ASSETS,**
19  PROVIDER FUNDING                  **(2) APPOINTING A TEMPORARY**
    CORPORATION VI; SIDNEY M.         **RECEIVER, (3) PROHIBITING**
20  FIELD; and JOSEPH J.             **THE DESTRUCTION OF**
    LAMPARIELLO,                      **DOCUMENTS, (4) GRANTING**
21                                    **EXPEDITED DISCOVERY, AND (5)**
                Defendants.           **REQUIRING ACCOUNTINGS;**
22                                    **AND ORDER TO SHOW CAUSE**
                                      **RE PRELIMINARY INJUNCTION**
23                                    **AND APPOINTMENT OF A**
                                      **PERMANENT RECEIVER**
24

25

26

27

28

# **TABLE OF CONTENTS**

Page

I.  INTRODUCTION ................................................................. 1

II. STATEMENT OF FACTS ..................................................... 3

    A.  The Defendants .......................................................... 3

    B.  Related Entities .......................................................... 4

    C.  MCHI's Business and SPC Note Offerings ......................... 5

    D.  Misrepresentations in the Offer and Sale of MP VI .............. 6

        1.  Misappropriation of Offering Proceeds to Pay
            Fees to MCC ...................................................... 6

        2.  Misrepresentation Regarding Defaults of Other SPCs ........... 8

    E.  Defendants Field's and Lampariello's Role in the Fraud .......... 9

III. ARGUMENT .................................................................. 11

    A.  The Court Should Issue a Temporary Restraining Order
        Prohibiting Violations of the Federal Securities Laws ........... 11

    B.  Defendants Violated the Federal Securities Laws ................ 12

        1.  The Investments Offered and Sold Were Securities ............ 12

        2.  Defendants Violated the Antifraud Provisions ................ 13

            a)  Defendants Made Material Misrepresentations .............. 14

            b)  Defendants' Misrepresentations Were Made
               in Connection with the Sale of Securities ................ 15

            c)  Defendants Acted with Scienter ......................... 15

    C.  The Court Should Grant the Relief Sought by the Commission ........ 16

i

1.     A Temporary Restraining Order and Preliminary
       Injunction Are Warranted ........................................................ 16

2.     The Court Should Order an Immediate Asset
       Freeze of MCHI, MCC, and MP VI to Protect
       Remaining Investor Funds ....................................................... 17

3.     Appointment of a Receiver over MCHI, MCC, and
       MP VI Is Necessary and Appropriate ..................................... 18

4.     Orders Prohibiting Destruction of Documents, Granting
       Expedited Discovery, and Requiring Accountings Are
       Necessary and Appropriate ...................................................... 19

IV.    CONCLUSION ............................................................................ 20

# TABLE OF AUTHORITIES

Page

## CASES

*Aaron v. SEC*
    446 U.S. 680 (1980).............................................................. 15

*Basic Inc. v. Levinson*
    485 U.S. 224 (1988).............................................................. 14

*Ernst & Ernst v. Hochfelder*
    425 U.S. 185 (1976).............................................................. 15

*FSLIC v. Sahni*
    868 F.2d 1096 (9th Cir. 1989) ......................................... 12, 18

*FTC v. Affordable Media, LLC*
    179 F.3d 1228 (9th Cir. 1999) ............................................. 17

*FTC v. H.N. Singer, Inc.*
    668 F.2d 1107 (9th Cir. 1982) ............................................. 12

*Hanon v. Dataproducts Corp.*
    976 F.2d 497 (9th Cir. 1992) ............................................... 14

*Herman & MacLean v. Huddleston*
    459 U.S. 375 (1983).............................................................. 15

*Hollinger v. Titan Capital Corp.*
    914 F.2d 1564 (9th Cir. 1990) ............................................. 15

*Reves v. Ernst & Young*
    494 U.S. 56 (1990)................................................................ 12

*SEC v. Burns*
    816 F.2d 471 (9th Cir. 1987) ............................................... 15

*SEC v. Cavanagh*
    155 F.3d 129 (2d Cir. 1998).................................................. 16

*SEC v. Dain Rauscher*
    254 F.3d 852 (9th Cir. 2001) ............................................................. 14

*SEC v. Fehn*
    97 F.3d 1276 (9th Cir. 1996) ...................................................... 14, 16

*SEC v. Fifth Ave. Coach Lines, Inc.*
    289 F. Supp. 3 (S.D.N.Y. 1968), *aff'd* 435 F.2d 510 (2d Cir. 1970)............ 18

*SEC v. First Jersey Securities, Inc.*
    101 F.3d 1450 (2d Cir. 1996)............................................................ 14

*SEC v. GLT Dain Rauscher*
    254 F.3d 852 (9th Cir. 2001) ............................................................. 15

*SEC v. Hickey*
    322 F.3d 1123 (9th Cir. 2003) .......................................................... 17

*SEC v. International Swiss Investments Corp.*
    895 F.2d 1272 (9th Cir. 1990) ..................................................... 17, 19

*SEC v. Koracorp Industries, Inc.*
    575 F.2d 692 (9th Cir. 1978) ............................................................ 17

*SEC v. Management Dynamics, Inc.*
    515 F.2d 801 (2d Cir. 1975).............................................................. 11

*SEC v. Manor Nursing Ctrs., Inc.*
    458 F.2d 1082 (2d Cir. 1972)....................................................... 16, 17

*SEC v. Murphy*
    626 F.2d 633 (9th Cir. 1980) .................................................. 13, 16, 17

*SEC v. Musella*
    578 F. Supp. 425 (S.D.N.Y. 1984)..................................................... 18

*SEC v. R.G. Reynolds Enters.*
    952 F.2d 1125 (9th Cir. 1991) .......................................................... 13

*SEC v. Rana Research, Inc.*
    8 F.3d 1358 (9th Cir. 1993)............................................................... 14

*SEC v. Unique Fin. Concepts, Inc.*
    196 F.3d 1195 (11th Cir. 1999) ....................................................... 11

*SEC v. United Financial Group, Inc.*
    474 F.2d 354 (9th Cir. 1973) ......................................................... 11

*SEC v. Universal Financial*
    760 F.2d 1034 (9th Cir. 1985) ....................................................... 18

*SEC v. W.J. Howey Co.*
    328 U.S. 293 (1946).................................................................. 13

*SEC v. Wencke*
    622 F.2d 1363 (9th Cir. 1980) ........................................... 17, 18, 19

*SEC v. Wencke*
    783 F.2d 829 (9th Cir. 1986) ......................................................... 18

*TSC Indus., Inc. v. Northway, Inc.*
    426 U.S. 438 (1976).................................................................. 14

*United States v. Nutri-Cology, Inc.*
    932 F.2d 394 (9th Cir. 1992) ......................................................... 12

*United States v. Odessa Union Warehouse Coop*
    833 F.2d 172 (9th Cir. 1987) ......................................................... 17

*Vernazza v. SEC*
    327 F.3d 851 (9th Cir. 2003) ......................................................... 15

## FEDERAL STATUTES

**Securities Act of 1933**

Section 17(a)
    [15 U.S.C. § 77q(a)]........................................................... 2, 13, 14

Section 17(a)(1)
    [15 U.S.C. § 77q(a)(1)] ............................................................... 15

Section 2(a)(1)
    [15 U.S.C. § 77b(a)(1)] ................................................................. 12

**Securities Exchange Act of 1934**

Section 3(a)(10)
    [15 U.S.C. § 78c(a)(10)] ............................................................... 12

Section 10(b)
    [15 U.S.C. § 78j(b)] ........................................................ 2, 13, 14, 15

Section 21(d)
    [15 U.S.C. § 78u(d)] ..................................................................... 11, 16


# **FEDERAL REGULATIONS**

Rule 10b-5
    [17 C.F.R. § 240.10b-5] .................................................. 2, 13, 14, 15


# **FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 30 ............................................................................... 19

Fed. R. Civ. P. 33 ............................................................................... 19

Fed. R. Civ. P. 34 ............................................................................... 19

Fed. R. Civ. P. 65(b) ............................................................................ 2

1  **I.    INTRODUCTION**

2      By its *Ex Parte* Application, Plaintiff Securities and Exchange Commission

3  ("Commission") seeks a temporary restraining order and other emergency relief to

4  halt the securities fraud being perpetrated by defendants Medical Capital Holdings,

5  Inc. ("MCHI"), Medical Capital Corporation ("MCC"), Medical Provider Funding

6  Corporation VI ("MP VI"), Sidney M. Field, and Joseph J. Lampariello.  MP VI is

7  a special purpose corporation ("SPC") that is issuing securities in the form of notes;

8  MCHI and its operating subsidiary, MCC, are MP VI's administrator; Field is the

9  CEO and a director of MCHI, MCC, and MP VI; and Lampariello is the COO,

10  president, and a director of MCHI, MCC, and MP VI.

11      The Defendants are committing fraud in the offer and sale of MP VI notes.

12  Through June 19, 2009, Defendants have misappropriated approximately $18.5

13  million of investor funds, out of $76.9 million raised by MP VI, through excessive

14  administrative fee payments to MCC.  Payment of these administrative fees from

15  investor proceeds is contrary to representations made to investors in MP VI's

16  original August 5, 2008 private placement memorandum ("PPM"), which stated

17  that such administrative fees would not be paid out of the offering proceeds.  In

18  addition, in a May 27, 2009 supplemental PPM, Defendants falsely stated that, as

19  of February 28, 2009, less than $4 million of MP VI's offering proceeds had been

20  used for commission and other expenses.  In fact, as of that date, defendants had

21  paid themselves a total of $21.7 million in administrative fees, $16.9 million of

22  which was paid from offering proceeds.  The supplemental PPM also falsely

23  represented that over $65.6 million of investor funds had been used to purchase

24  receivables when in fact only $48.8 million of offering proceeds were used in that

25  manner.  Defendants misrepresented the use of offering proceeds to investors and

26  misappropriated millions of dollars of investor funds by paying themselves fees

27  from offering proceeds.

28  ///

1

1    Defendants also misrepresented to investors, in the PPM, that SPCs affiliated
2  with MP VI which had conducted similar offerings had not defaulted on, or been
3  late in making payments of, principal and or interest.  In fact, two MP VI-affiliated
4  SPCs began defaulting on interest and/or principal payments in the same month
5  that Defendants began the MP VI offering.  Subsequently, two other affiliated
6  SPCs have made interest payments belatedly.  Nonetheless, Defendants continued
7  to solicit investors using the false PPM through at least May 2009.

8    By engaging in this conduct, the Defendants have violated, or aided and
9  abetted, and unless enjoined will continue to violate, or aid and abet, the antifraud
10  provisions of the federal securities laws, specifically Section 17(a) of the Securities
11  Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the
12  Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule
13  10b-5 thereunder, 17 C.F.R. § 240.10b-5.  Accordingly, the Commission seeks a
14  temporary restraining order, and preliminary and permanent injunctions, enjoining
15  each of the Defendants from violating the antifraud provisions; a temporary
16  restraining order and preliminary injunction freezing the assets of MCHI, MCC,
17  and MP VI; appointment of a receiver over defendants MCHI, MCC, and MP VI,
18  and their subsidiaries and affiliates; an order prohibiting the Defendants from
19  destroying documents; an order granting expedited discovery; and an order
20  requiring that the Defendants provide accountings.  The Commission further seeks
21  an order to show cause why a preliminary injunction should not be granted and
22  why a permanent receiver should not be appointed.

23    The Commission requests, pursuant to Fed. R. Civ. P. 65(b), that the Court
24  consider its *Ex Parte* Application for emergency relief without prior notice to the
25  defendants, in order to prevent further misappropriation and dissipation of investor
26  funds by the Defendants before the Commission's Application is considered.

27    For these reasons and as explained below, the Commission's *Ex Parte*
28  Application should be granted.

2

## II.    STATEMENT OF FACTS

### A.    The Defendants

**Medical Capital Holdings, Inc.** is a Nevada corporation with its principal place of business in Tustin, California. (Chung Dec., ¶ 7, Ex. 4, p. 95)  Through various wholly-owned operating subsidiaries and SPCs, MCHI provides financing to healthcare providers by purchasing their accounts receivables and making secured loans to them. (Chung Dec., ¶ 20, Ex. 13, pp. 263-64, 277)  MCHI uses the special purpose corporations to raise money from investors to fund the financings. (Chung Dec., ¶ 20, Ex. 13, p. 247)  MCHI uses operating subsidiaries to underwrite, monitor, administer, and service these financings. (Chung Dec., ¶ 20, Ex. 13, p. 263)  In February 2001, the California Department of Corporations issued a Desist and Refrain Order against MCHI from the further offer or sale of securities in the State of California. (Chung Dec., ¶ 33, Ex. 25)

**Medical Capital Corporation** is a Nevada corporation and wholly-owned subsidiary of MCHI, with its principal place of business in Tustin, California. (Chung Dec., ¶ 20, Ex. 13, pp. 263-64; Chung Dec., ¶ 7, Ex. 4, p. 95)  MCC is the administrator for each of the SPCs, providing management, underwriting, and administrative services, such as bookkeeping, payroll, and accounting services, including administration of all investor promissory notes and interest payments. (Chung Dec., ¶ 20, Ex. 13, pp. 263-64; Chung Dec., ¶ 26, Ex. 19, p. 416)

**Medical Provider Funding Corporation VI** is a Nevada corporation and wholly-owned special purpose subsidiary of MCHI that was formed in April 2008. (Chung Dec., ¶ 20, Ex. 13, pp. 247, 253-54)  From August 2008 to the present, MP VI has conducted a note offering, raising as of June 19, 2009, $76.9 million through the issuance of notes to about 700 investors. (Chung Dec., ¶ 30, Ex. 23; Boudreau Dec., ¶¶ 6-7, Ex. 1-2)  By May 2009, MP VI was late on interest payments to investors by several days. (Chung Dec., ¶ 21, Ex. 14, p. 320; ¶ 22, Ex. 15, pp. 324, 332)  MP VI's offering is ongoing. (Chung Dec., ¶ 22, Ex. 15)

3

1    **Sidney M. Field**, age 63, resides in Villa Park, California. (Chung Dec., ¶
2    7, Ex. 4, p. 88)  Field has been the CEO and a director of MCHI and its
3    subsidiaries, including MCC and MP VI, during the relevant period. (Chung Dec.,
4    ¶ 20, Ex. 13, pp. 276-77)

5    **Joseph J. Lampariello**, age 55, resides in Huntington Station, New York
6    and Newport Beach, California. (Chung Dec., ¶ 5, Ex. 1, pp. 21-22)  Lampariello
7    has been the president and COO and a director of MCHI and its subsidiaries,
8    including MCC and MP VI, during the relevant period. (Chung Dec., ¶ 5, Ex. 1,
9    pp. 23, 25-26; Chung Dec., ¶ 20, Ex. 13, pp. 276-277)

10    **B.    Related Entities**

11    **Medical Provider Financial Corporation I** ("MP I") is a wholly-owned
12    SPC of MCHI that conducted a note offering, raising approximately $554.9 million
13    through the issuance of about 3,821 notes to investors. (Chung Dec., ¶ 13)  As of
14    about May 31, 2009, MP I had repaid all but $375,000 of its investors' principal.
15    (Chung Dec., ¶ 28, Ex. 21, p. 438)

16    **Medical Provider Financial Corporation II** ("MP II") is a wholly-owned
17    SPC of MCHI that conducted two series of note offerings, raising approximately
18    $251.7 million through the issuance of about 3,458 notes to investors. (Chung
19    Dec., ¶ 13)  As of May 27, 2009, MP II had $88 million in outstanding notes and
20    had defaulted in paying $43 million in principal and $1.3 million in interest.
21    (Chung Dec., ¶ 20, Ex. 13, p. 264)

22    **Medical Provider Financial Corporation III** ("MP III") is a wholly-owned
23    SPC of MCHI that conducted two series of note offerings, raising a total of about
24    $522.7 million by issuing 5,318 notes to investors. (Chung Dec., ¶ 13)  As of
25    March 31, 2009, MP III had $109.4 million in outstanding notes, and as May 27,
26    2009, MP III had defaulted in paying principal on $26.5 million in outstanding
27    notes. (Chung Dec., ¶ 20, Ex. 13, pp. 264-65; Chung Dec., ¶ 32, Ex. 24, p. 446)
28    ///

**Medical Provider Financial Corporation IV** ("MP IV") is a wholly-owned SPC of MCHI that conducted two series of note offerings, raising a total of $401.3 million by issuing 4,222 notes to investors. (Chung Dec., ¶ 13)  As of May 27, 2009, MP IV had $400 million in outstanding notes and defaulted in interest payments in January 2009 and since March 2009. (Chung Dec., ¶ 20, Ex. 13, pp. 264-65)

**Medical Provider Funding Corporation V** ("MP V") is a wholly-owned SPC of MCHI that conducted a note offering, raising $401.8 million by issuing 4,323 notes that begin to mature in November 2009. (Chung Dec., ¶ 13)  As of March 31, 2009, MP V had $401.1 million in outstanding notes issued to 4,270 investors. (Chung Dec., ¶ 32, Ex. 24, p. 446)  In May 2009, interest payments to investors were delayed by several days. (Chung Dec., ¶ 21, Ex. 14, p. 320)

C.     **MCHI's Business and SPC Note Offerings**

MCHI provides financing to healthcare providers by purchasing their accounts receivables and making secured loans to them. (Chung Dec., ¶ 20, Ex. 13, p. 263)  MCHI has funded these financings by raising about $2.2 billion through the SPCs' note offerings to over 20,000 investors since December 2003. (Chung Dec., ¶¶ 13 & 30; Boudreau Dec., ¶ 7)  MCHI uses its operating subsidiary, MCC, to administer each of the SPCs, providing management, underwriting, and administrative services, such as bookkeeping, payroll, and accounting services (including administration of all investor promissory notes and interest payments). (Chung Dec., ¶ 20, Ex. 13, p. 263)

The SPCs sold the notes through registered broker-dealers to accredited investors under Rule 506 of Regulation D. (*See* Chung Dec., ¶ 20, Ex. 13, pp. 249, 253, 257)  In the offerings, the SPCs sold notes with various maturities (from one to seven years) and interest rates (8.5% to 10.5%). (Chung Dec., ¶ 10)  In their PPMs, the SPCs represented that after paying offering expenses (including commissions) of 4% to 8%, they would use the net offering proceeds to purchase

healthcare receivables and make investments in other businesses. (Chung Dec., ¶¶ 10 & 20, Ex. 13, p. 262)

The Defendants used substantial amounts of the SPCs' offering proceeds to purchase healthcare receivables and make loans to or investments in businesses. (Chung Dec., ¶¶ 11-12, Ex. 6-7)  As of March 31, 2009, MCC, as administrator of the SPCs, controlled receivables, loans, or investments owned by the SPCs with a purported total value of over $1.2 billion. (Chung Dec., ¶ 12)

### D.    Misrepresentations in the Offer and Sale of MP VI

#### 1.    Misappropriation of Offering Proceeds to Pay Fees to MCC

In MP VI's original PPM dated August 5, 2008, the Defendants disclosed that MCC would be its administrator, providing management, underwriting of receivables, and administrative services, such as bookkeeping, payroll, and accounting services. (Chung Dec., ¶ 9, Ex. 5, pp. 160, 168)  The Defendants also disclosed in the PPM that MCC received a fee for such services, which was equal to the difference between what MP VI expected to receive from its receivables and loans less operating costs and the notes' aggregate outstanding principal balance. (Chung Dec., ¶ 9, Ex. 5, p. 168)  The PPM stated that MCC was an affiliate and that the administrative agreement was not made through independent arm's length negotiations. (Chung Dec., ¶ 9, Ex. 5, p. 175)

The original MP VI PPM represented, under the heading "Restrictions on Use of Proceeds," that MP VI would not use "any proceeds from the sales of notes to pay administrative fees to [MCC] for the services it provides as administrator" and that that such fees would rather be "paid out of amounts collected from the accounts receivable and proceeds from other investments." (Chung Dec., ¶ 9, Ex. 5, p. 159)  Defendants also represented in the PPM that MP VI believed that the administrative fees paid to MCC would be "no greater than those an independent third-party would charge for providing similar services." (Chung Dec., ¶ 9, Ex. 5, p. 175)  MP VI's PPM stated that the offering proceeds would be used to:

purchase account receivables; make secured loans; pay sales commissions and other operating costs; provide funds for general operating purposes; and pay principal and interest on the notes. (Chung Dec., ¶ 9, Ex. 5, p. 159)

In a supplemental PPM dated May 27, 2009, the Defendants made specific representations to investors concerning the use of offering proceeds:

> As of February 28, 2009, we have issued notes in the face amount of
> $69,331,558.90. We have used $65,558,703.02 of the proceeds to
> finance accounts receivable. We have applied $3,264,410.12 to
> commissions and other expenses. The balance is on deposit in our
> trust account awaiting additional accounts receivable financing.
> (Chung Dec., ¶ 20, Ex. 13, p. 254)

In fact, contrary to the representations made to investors, Defendants have misappropriated millions of dollars of investor funds to pay themselves administrative fees. (Chung Dec., ¶ 30; Boudreau Dec., ¶ 13) Contrary to the statements in the supplemental PPM, as of February 28, 2009, Defendants had paid themselves a total of $21.7 million in administrative fees, which exceeded the amounts collected on notes by $16.9 million which amount was paid from investor proceeds. (Boudreau Dec., ¶ 13) Defendants also had not used $65.5 million to finance accounts receivable, but rather only $48.8 million of investor funds had been used to purchase receivables. (Boudreau Dec., ¶¶ 9-10) Through June 19, 2009, Defendants had paid themselves approximately $25 million in administrative fees from the MP VI offering. (Chung Dec., ¶ 30) Defendants used at least $18.5 million in investor proceeds to pay these fees, in contravention of representations to investors, and thus misappropriating approximately 24% of the offering proceeds. (Chung Dec., ¶ 30)

The chart below graphically shows that the Defendants have not used MP VI's offering proceeds as represented and instead have misappropriated a substantial amount of the investors' funds to pay administrative fees to MCC.

| Date | Collections on Receivables | Administrative Fees Paid to MCC | Excess Administrative Fees[1] |
|---|---|---|---|
| Actual as of 2/28/09 | $4.8 million | $21.7 million | $16.9 million |
| Actual as of 6/19/09 | $6.5 million | $25 million | $18.5 million |

(Boudreau Dec., ¶¶ 11, 13; Chung Dec., ¶ 30)

### 2.   Misrepresentation Regarding Defaults of Other SPCs

In MP VI's original PPM dated August 5, 2008, the Defendants disclosed that MP VI had no operating history. (Chung Dec., ¶ 9, Ex. 5, p. 151) The Defendants further represented that MP VI had "several experienced affiliates that [had] completed offerings of debts securities backed by accounts receivable," that the affiliates had, since 1994, financed over $5 billion in accounts receivable, and that the "affiliates [had] never defaulted in the payment of their obligations on those debt securities, and all interest payments on those securities were made when due." (Chung Dec., ¶ 9, Ex. 5, p. 151)

In fact, during the MP VI offering, several of the affiliated SPCs defaulted on their obligations. (Chung Dec., ¶ 5, Ex. 2, pp. 50-52) Since August 2008 (the same month that the MP VI offering began), MP II has defaulted on $43 million in principal payments and $1.3 million in interest payments, and MP III has defaulted on $26.5 million in principal payments. (Chung Dec., ¶ 20, Ex. 13, pp. 264-65) MP IV missed interest payments in January 2009 and since March 2009. (Chung Dec., ¶ 20, Ex. 13, pp. 264-65) MP V has also recently made interest payments a few days late. (Chung Dec., ¶ 21, Ex. 14, p. 320)

///

---

[1]   Excess administrative fees are those fees above the amount collected on receivables and paid with offering proceeds.

1    Although the Defendants notified MP II and MP III investors about the
2    defaults beginning in August 2008, the Defendants did not notify purchasers of
3    MP VI notes about MP VI's affiliates' defaults until about June 2009. (Chung
4    Dec., ¶ 5, Ex. 2, p. 52-54; Chung Dec., ¶ 14, Ex. 8) On or about June 8, 2009,
5    the Defendants sent to the broker-dealers who had sold MP VI notes a
6    supplement to the PPM dated May 27, 2009, that disclosed the above
7    information about the principal and interest payment defaults by MP II, MP III,
8    and MP IV. (Chung Dec., ¶ 20, Ex. 12, p. 242; Chung Dec., ¶ 20, Ex. 13, pp.
9    264-65) MP VI's note offering is ongoing as MCC has not instructed broker-
10    dealers to discontinue sales to investors. (Chung Dec., ¶ 23, Ex. 16)

11    **E.    Defendants Field's and Lampariello's Role in the Fraud**
12    Field and Lampariello both reviewed and approved MP VI's PPM. (Chung
13    Dec., ¶ 5, Ex. 1 pp. 27-28, 41; Chung Dec., ¶ 7, Ex. 4, pp. 99-100) They also both
14    directly or indirectly supervise MCC's private capital markets department, which
15    administers broker-dealer relations. (Chung Dec., ¶ 5, Ex. 2, pp. 25, 29) They
16    therefore knew, or were reckless in not knowing, of the representations in the PPM
17    that investor funds would not be used to pay fees to MCC and that affiliates of MP
18    VI had never defaulted or been late on payments to noteholders.

19    Field and Lampariello also knew, or were reckless in not knowing, that MP
20    VI was, contrary to the representations made to investors in the PPM, using
21    millions of dollars of investor funds to pay administrative fees to MCC. Field and
22    Lampariello are two of only four persons authorized to sign certifications required
23    to release money from MP VI's trust account, including requests for the payment
24    of fees to MCC. (Chung Dec., ¶ 5, Ex. 1, pp. 39-40; Chung Dec., ¶ 7, Ex. 4, pp.
25    129-30; Chung Dec., ¶ 26, Ex. 18, p. 394) Moreover, Lampariello determined the
26    amount of administrative fees MCC withdrew from each MP entity and signed at
27    least one document authorizing the transfer of administration fees from MP VI to
28    MCC. (Chung Dec., ¶ 6, Ex. 3, pp. 71-72, 75; Chung Dec., ¶ 29, Ex. 22, p. 441)

Field and Lampariello are also senior officers and directors of MCHI and its

subsidiaries, including MCC and MP VI, and, directly or indirectly, supervise MP

VI's and MCC's CFO. (Chung Dec., ¶ 5, Ex. 1, pp. 23-26; Chung Dec., ¶ 7, Ex. 4,

pp. 90-92; Chung Dec., ¶ 20, Ex. 13, p. 277)  In agreements between MP VI and

broker-dealers offering the securities, which were signed by Field, the Defendants

represented with regard to the original MP VI PPM, that:

> On the date hereof, the Confidential Memorandum is true, complete
> and correct and does not contain any untrue statement of a material
> fact or omit to state a material fact required by any applicable law or
> regulation or necessary in order to make the statements contained
> therein, in light of the circumstances under which they are made, not
> misleading[.]  (Chung Dec., ¶ 34, Ex. 26, pp. 462)

Field and Lampariello also knew, or were reckless in not knowing, that,

contrary to the representations made to investors in the PPM, MP VI's affiliates

had defaulted on interest and principal payments to their investors.  E-mails to and

from Lampariello indicate that he knew about delays in MP III's principal

repayments by no later than July 31, 2008. (Chung Dec., ¶ 17, Ex. 9, p. 221-25)

From August to October 2008, Field and Lampariello participated in sending

letters to MP II and MP III investors, and broker-dealers who sold those offerings,

advising them of the defaults. (Chung Dec., ¶ 5, Ex. 2, pp. 56-59; Chung Dec., ¶ 7,

Ex. 4, pp. 118-19, 122-26; Chung Dec., ¶ 14, Ex. 8; Chung Dec., ¶ 19, Ex. 11, 240)

Indeed, on or about August 5, 2008, Field, as CEO of MCC, signed a letter to

broker-dealers informing them about untimely principal repayments by affiliated

SPCs – the same date of the original MP VI PPM. (Chung Dec., ¶ 7, Ex. 4, pp.

118-19; Chung Dec., ¶ 19, Ex. 11, p. 240; Chung Dec., ¶ 9, Ex. 5, p. 147)  By no

later than November 12, 1008, both Field and Lampariello had received by e-mail

a notice issued by Wells Fargo Bank, as trustee for MP III, Series I, to investors

that an "event of default," as defined in an agreement between MP III and Wells

1  Fargo Bank, had occurred. (Chung Dec., ¶ 18, Ex. 10)

2       Despite this knowledge of MP VI's improper and excessive payment of fees

3  to MCC and of MP II's and MP III's defaults, Field and Lampariello continued to

4  raise money from investors through MP VI's PPM that misrepresented how they

5  were using investor funds and that MP VI's had never defaulted or been late on a

6  payment. (Boudreau Dec., ¶ 13; Chung Dec., ¶ 30; Chung Dec., ¶ 9, Ex. 5, p. 151)

7  Moreover, even when the Defendants issued the May 27, 2009 supplemental PPM

8  that finally disclosed the defaults in prior affiliated offerings, Field and

9  Lampariello continued to misrepresent how MP VI was using the investor funds.

10  (Chung Dec., ¶ 20, Ex. 13, p. 254)

11 **III.  ARGUMENT**

12      **A.    The Court Should Issue a Temporary Restraining Order**

13             **Prohibiting Violations of the Federal Securities Laws**

14       Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of

15  the Exchange Act, 15 U.S.C. § 78u(d), provide that the Commission may obtain a

16  permanent or temporary injunction or restraining order without a bond on a proper

17  showing. To obtain such relief, the Commission must demonstrate: (1) a *prima*

18  *facie* case that a violation of the securities laws has occurred; and (2) a reasonable

19  likelihood that the violation will be repeated. *See SEC v. Unique Fin. Concepts,*

20  *Inc.*, 196 F.3d 1195, 1199 n.2 (11th Cir. 1999); *SEC v. United Fin. Group, Inc.*,

21  474 F.2d 354, 358-59 (9th Cir. 1973).

22       The Commission appears before this Court "not as an ordinary litigant, but

23  as a statutory guardian charged with safeguarding the public interest in enforcing

24  the securities laws." *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d

25  Cir. 1975). The need for temporary relief is of great importance where, as here, the

26  Commission acts to protect the public interest and the investing public. "[W]hen

27  'the public interest is involved in a proceeding of this nature, [the district court's]

28  equitable powers assume an even broader and more flexible character than when

11

1  only a private controversy is at stake.'" *FSLIC v. Sahni*, 868 F.2d 1096, 1097 (9th

2  Cir. 1989) (*quoting FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112 (9th Cir. 1982)).

3       For these reasons, the Commission faces a lower burden than a private civil

4  litigant when seeking a temporary restraining order or other pretrial relief. Unlike

5  private litigants, if the government can show a probability of success on the merits,

6  the courts presume irreparable injury in Commission enforcement actions in which

7  injunctive relief is sought. *United States v. Nutri-Cology, Inc.*, 982 F.2d 394, 398

8  (9th Cir. 1992) ("[i]n statutory enforcement cases . . . passage of the statute is itself

9  an implied finding by Congress that violations will harm the public"). In the Ninth

10 Circuit, an injunction is authorized "solely upon a showing of a statutory

11 violation." *Id.* at 398.

12      The evidence submitted by the Commission in this case establishes that the

13 defendants are violating the federal securities laws, and that it is reasonably likely

14 they will continue to do so unless enjoined. It is thus appropriate and necessary for

15 the Court to grant the Commission's *Ex Parte* Application for temporary

16 emergency relief.

17     **B.**    **Defendants Violated the Federal Securities Laws**

18         **1.**    **The Investments Offered and Sold Were Securities**

19      The notes sold by Defendants were securities under the federal securities

20 laws. Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), and Section

21 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), define the term "security" to

22 include any "note" or "investment contract." Under *Reves v. Ernst & Young*, 494

23 U.S. 56, 65-67 (1990), there is a "presumption that every note is a security," which

24 may be rebutted only by a showing that the note bears a strong "family

25 resemblance" to instruments that are not recognized as securities. Here, there can

26 be little question that the notes are securities. The Defendants identified the notes

27 as "securities" in the PPM and supplemental PPM. MP VI was selling the notes to

28 fund its business of financing receivables, and the note purchasers were motivated

1  to purchase the note for the high rate of interest they would pay, both of which

2  indicate the notes are securities. *Id.* at 66-68. The notes' plan of distribution –

3  selling to hundreds of investors through broker-dealers – indicate that the notes are

4  securities. *Id.* The reasonable expectations of the investing public were that the

5  notes were securities as evidenced by the fact that the notes were sold only to

6  accredited investors. *Id.* at 66-69. Finally, there is no other regulatory scheme that

7  governs the notes. *Id.*

8       *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946), defines an investment

9  contract as (1) an investment of money; (2) in a common enterprise; (3) with the

10  expectation of profits to come solely from the efforts of others. *SEC v. W. J.*

11  *Howey Co.*, 328 U.S. 293, 298-99 (1946); *SEC v. Murphy*, 626 F.2d 633, 640-41

12  (9th Cir. 1980). Here, the MP VI notes satisfy the *Howey* test. The investors

13  purchased the notes by investing money. MP VI was a common enterprise because

14  it pooled the investors' funds. *SEC v. R.G. Reynolds Enters.*, 952 F.2d 1125, 1130-

15  31 (9th Cir. 1991) (common enterprise element satisfied by showing of horizontal

16  commonality, *i.e.*, pooling of investors' funds and interests). Finally, the investors'

17  expectation of profit came solely from the Defendants' ability to invest their funds

18  in profitable receivables, investments, and loans. Thus, there can be no dispute

19  that the notes were securities for the purposes of the federal securities laws.

20       **2.    Defendants Violated the Antifraud Provisions**

21       Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), prohibits fraud in the

22  offer or sale of securities, and Section 10(b) of the Exchange Act, 15 U.S.C. §

23  78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, prohibit fraud in

24  connection with the purchase or sale of any security. Fraudulent conduct

25  prohibited by these provisions includes making "any untrue statement of a material

26  fact or [] omit[ting] to state a material fact necessary in order to make the

27  statements made, in the light of the circumstances under which they were made, not

28  misleading."

1    To establish a *prima facie* case under Section 17(a) of the Securities Act and

2    Section 10(b) of the Exchange Act, and Rule 10b-5, the Commission must prove

3    by a preponderance of the evidence three basic elements: (1) a material

4    misrepresentation, omission of material fact, or other fraudulent device; (2) in

5    connection with the purchase, offer, or sale of a security; and (3) with the requisite

6    mental state. *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993); *SEC*

7    *v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996).

8                    **a)    Defendants Made Material Misrepresentations**

9    Violations of the antifraud provisions require that the misstatements and

10   omissions made by the defendants concern material facts. *Basic Inc. v. Levinson*,

11   485 U.S. 224, 231-32 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438,

12   449 (1976).  A fact is material if there is a substantial likelihood that a reasonable

13   investor would consider it important in making an investment decision. *See TSC*

14   *Indus., Inc.*, 426 U.S. at 449.  Liability arises not only from affirmative

15   representations but also from failures to disclose material information. *SEC v.*

16   *Dain Rauscher*, 254 F.3d 852, 855-56 (9th Cir. 2001).  The antifraud provisions

17   impose "'a duty to disclose material facts that are necessary to make disclosed

18   statements, whether mandatory or volunteered, not misleading.'" *SEC v. Fehn*, 97

19   F.3d 1276, 1290 n.12 (9th Cir. 1996) (quoting *Hanon v. Dataproducts Corp.*, 976

20   F.2d 497, 504 (9th Cir. 1992)).

21   Here, Defendants defrauded MP VI investors by misappropriating offering

22   proceeds and misrepresenting material facts concerning the use of offering

23   proceeds.  Contrary to the PPM's stated limitation on the use of proceeds, the

24   Defendants misappropriated $18.5 million, or 24% of the amount raised from

25   investors, to pay fees to MCC.  The May 27, 2009, supplemental MP VI PPM

26   falsely states that less than $4 million of amounts raised from investors had been

27   used for purposes other than purchasing receivables.

28   ///

                                                    14

1    Defendants also misrepresented in the PPM that the MP VI affiliated SPCs

2  had never defaulted, or been late on a payment, of interest or principal.  In fact, MP

3  II and MP III defaulted on principal and/or interest payments at about the same

4  time that MP VI began its offering, MP IV has defaulted on interest payments

5  since March 2009, and MP V has been late a few days in making the last few

6  monthly interest payments.  These misrepresentations were material because

7  reasonable investors would consider the proposed defendants' misappropriation of

8  offering proceeds to pay fees to MCC and defaults in similar offerings important

9  facts in making their investment decision.

10    **b)    Defendants' Misrepresentations Were Made in**

11    **Connection with the Sale of Securities**

12    Defendants' material misrepresentations were made in connection with the

13  sale of securities in the form of notes and investment contracts, thus satisfying the

14  second element of a *prima facie* violation of the antifraud provisions.

15    **c)    Defendants Acted with Scienter**

16    Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1), and Section

17  10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R.

18  § 240.10b-5, also require a showing of scienter.[2]  *Aaron v. SEC*, 446 U.S. 680, 701-

19  02 (1980).  Scienter is defined as a "mental state embracing intent to deceive,

20  manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12

21  (1976).  In the Ninth Circuit, scienter may be established by a showing of

22  recklessness. *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir.

23  1990); *Vernazza v. SEC*, 327 F.3d 851, 860 (9th Cir. 2003).  Further, recklessness

24  may be inferred from circumstantial evidence. *Herman & MacLean v. Huddleston*,

25  459 U.S. 375, 390-91, n.30 (1983); *SEC v. Burns*, 816 F.2d 471, 474 (9th Cir. 1987).

26

27  _____

[2]    Violations of Sections 17(a)(2) and (3) require a showing of negligence. *See*
28  *SEC v. GLT Dain Rauscher*, 254 F.3d 852, 856 (9th Cir. 2001).

1    Here, the Defendants acted with scienter. Field and Lampariello knew, or

2    were reckless in not knowing, that MP VI was using millions of dollars of investor

3    funds to pay administrative fees to MCC and that such use of investor funds was

4    contrary to the limitations on the use of proceeds stated in the MP VI PPM. They

5    also knew, or were reckless in not knowing, that MP II and MP III had defaulted

6    on its payments to investors and that the MP VI PPM stated that no such defaults

7    had occurred. Despite this knowledge, Field and Lampariello continued to use the

8    false PPM to raise millions of dollars from investors. Moreover, even when the

9    Defendants issued the May 27, 2009 supplemental PPM, Field and Lampariello

10   continued to misrepresent how MP VI had used the investor funds. MCHI, MCC,

11   and MP VI are equally culpable because Field's and Lampariello's mental states

12   are imputed to entities that they control. *SEC v. Manor Nursing Ctrs., Inc.*, 458

13   F.2d 1082, 1089 n.3, 1096 n.17 (2d Cir. 1972) (stating that an individual's

14   "knowledge is imputed to the corporations which he controlled").

15       **C.    The Court Should Grant the Relief Sought by the Commission**

16           **1.    A Temporary Restraining Order and Preliminary**

17                 **Injunction Are Warranted**

18       In light of defendants continuing efforts, at least through June 19, 2009, to

19   raise and misappropriate investor funds, emergency relief in the form of a

20   temporary restraining order is appropriate. Section 20(b) of the Securities Act and

21   Section 21(d) of the Exchange Act provide that the Commission may, upon a

22   proper showing, obtain a temporary restraining order. Here the Commission has

23   made a substantial showing of likelihood of success as to both: (1) a *prima facie*

24   showing of securities law violations; and (2) the wrongs are ongoing or will be

25   repeated. *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998); *United Financial*

26   *Group*, 474 F.2d at 358-59. Whether a likelihood of future violations exists

27   depends upon the totality of the circumstances. *See Murphy*, 626 F.2d at 655;

28   *Fehn*, 97 F.3d at 1295-96. The existence of past violations may give rise to an

16

1  inference that there will be future violations. *See Murphy*, 626 F.2d at 655; *see*
2  *also SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 698 (9th Cir. 1978). Courts also
3  consider factors such as the degree of scienter involved, the isolated or recurrent
4  nature of the violative conduct, the defendant's recognition of the wrongful nature
5  of the conduct, the likelihood that, because of the defendant's occupation, future
6  violations may occur, and the sincerity of defendant's assurances (if any) against
7  future violations. *Murphy*, 626 F.2d at 655.

8       Because the Defendants' violations here are egregious, because Defendants have
9  misappropriated investor funds, because Defendants have misrepresented material
10  facts to investors throughout the offering, and because further dissipation of assets is
11  imminent, imposition of a temporary restraining order, together with an order to show
12  cause why a preliminary injunction should not be entered, is appropriate and necessary.

13       **2.    The Court Should Order an Immediate Asset Freeze of**
14            **MCHI, MCC, and MP VI to Protect Remaining Investor**
15            **Funds**

16       Federal courts have inherent equitable authority to issue a variety of
17  ancillary relief measures in Commission injunctive actions. *SEC v. Wencke*, 622
18  F.2d 1363, 1369 (9th Cir. 1980). Included in these powers is the authority to
19  freeze assets, of both parties and nonparties. *SEC v. Hickey*, 322 F.3d 1123, 1131
20  (9th Cir. 2003); *SEC v. Int'l Swiss Invs. Corp.*, 895 F.2d 1272, 1276 (9th Cir.
21  1990). Courts use freeze orders to prevent waste and dissipation of assets and to
22  ensure their availability for disgorgement for the benefit of victims of the fraud.
23  *See, e.g., Hickey*, 322 F.3d at 1132 (affirming imposition of asset freeze over
24  nonparty brokerage firm controlled by the defendant to effectuate disgorgement
25  order against defendant); *Manor Nursing Ctrs., Inc.*, 458 F.2d at 1105-06. Indeed,
26  the Ninth Circuit specifically has found that "the public interest in preserving the
27  illicit proceeds [of a defendant's fraud] for restitution to the victims is great." *FTC*
28  *v. Affordable Media, LLC*, 179 F.3d 1228, 1236 (9th Cir. 1999). Courts have

17

1    similarly recognized that a disgorgement order will often be rendered meaningless

2    unless an asset freeze is imposed prior to the entry of final judgment. *See SEC v.*

3    *Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990).

4        To obtain an asset freeze, the Commission need only establish the mere

5    possibility that dissipation of assets exists. *Sahni*, 868 F.2d at 1097. It is

6    unnecessary for the Court to find that dissipation of funds is likely. *Id.* Here, the

7    Defendants have misappropriated investor funds to pay themselves fees. This

8    conduct demonstrates more than a mere possibility that dissipation of assets will

9    occur absent an asset freeze order, but rather that it is highly probable that

10    dissipation will occur absent emergency relief.

11        Through MCHI, MCC, and MP VI, Defendants control all the proceeds of

12    the offering. Moreover, MCHI and MCC caused MP VI to pay administrative fees

13    using investor funds, and MCC was the direct beneficiary of the improper

14    payments, while MCHI indirectly benefitted. Accordingly, an asset freeze over

15    MCHI, MCC, and MP VI is necessary to preserve remaining investor assets.

16          **3.**     **Appointment of a Receiver over MCHI, MCC, and MP VI Is**

17                 **Necessary and Appropriate**

18        The Court has broad discretion to appoint an equity receiver in Commission

19    enforcement actions. *See Wencke*, 622 F.2d at 1365. A receiver plays a crucial

20    role in preventing further dissipation and misappropriation of investors' assets.

21    *SEC v. Wencke*, 783 F.2d 829, 836-37 n.9 (9th Cir. 1986).[3] Factors such as the

22    integrity of management and the likelihood of future misuse of assets are critical in

23    determining whether a receiver should be appointed. *See SEC v. Fifth Ave. Coach*

24    *Lines, Inc.*, 289 F. Supp. 3, 42 (S.D.N.Y. 1968), *aff'd* 435 F.2d 510 (2d Cir. 1970).

25

26

27

28

---

[3]     Because posting of a bond by the receiver would only serve to deplete further the resources available to investors, the Commission requests that the Court not require the receiver to post a bond. *See SEC v. Universal Fin.*, 760 F.2d 1034, 1039 (9th Cir. 1985).

1    Defendants have raised $76.9 million from investors through a fraudulent

2    offering and have misappropriated almost a quarter of the investor funds to pay

3    themselves fees. A receiver over MP VI is necessary to prevent further dissipation

4    of investor funds. MCHI and MCC control MP VI and orchestrated the

5    misappropriation of investor funds to pay themselves fees and have directly or

6    indirectly received the misappropriated funds. Consequently, the Court should

7    appoint a receiver over Defendants MCHI, MCC, and MP VI to ensure that the

8    remaining investor's funds are quickly marshaled and protected from further

9    misappropriation or dissipation.

10    **4.    Orders Prohibiting Destruction of Documents, Granting**

11    **Expedited Discovery, and Requiring Accountings Are**

12    **Necessary and Appropriate**

13    An order prohibiting the destruction of documents is necessary because of the

14    possibility that the Defendants may destroy evidence of their violations and ongoing

15    fraud. An order expediting discovery will facilitate efforts to determine the scope and

16    magnitude of the Defendants' fraud and locate their ill-gotten gains. An order

17    requiring accountings is necessary to identify all available assets to help ensure that

18    funds and assets are frozen properly and kept available to satisfy any future order of

19    disgorgement or civil penalties against the Defendants. *See Int'l Swiss Invs. Corp.*,

20    895 F.2d at 1276. The Court's broad equitable powers in Commission enforcement

21    actions include the ability to order ancillary relief to require an accounting and

22    prohibit document destruction. *See Wencke*, 622 F.2d at 1369.

23    Expedited discovery is authorized by Rules 30, 33, and 34 of the Federal Rules

24    of Civil Procedure and a court's broad equitable powers in Commission enforcement

25    actions to order all necessary ancillary relief. *See Wencke*, 622 F.2d at 1369. The

26    Commission seeks expedited discovery to develop additional evidence regarding the

27    Defendants' wrongdoing and to ensure that any asset freeze is fully implemented.

28    ///

IV.    **CONCLUSION**

For the foregoing reasons, the Court should grant the Commission's *Ex Parte* Application.

Dated:  July 16, 2009                    Respectfully submitted,


_John B Bulgozdy_
John B. Bulgozdy
Nicholas S. Chung
Morgan B. Ward Doran
Attorneys for Plaintiff
Securities and Exchange Commission