1  MANATT, PHELPS & PHILLIPS, LLP
   JOHN F. LIBBY (Bar No. CA 128207)
2  Email: jlibby@manatt.com
   SIRENA P. CASTILLO (Bar No. CA 260565)
3  Email: scastillo@manatt.com
   11355 West Olympic Boulevard
4  Los Angeles, CA  90064-1614
   Telephone:  (310) 312-4000
5  Facsimile:  (310) 312-4224

6  *Attorneys for Defendants*
   MEDICAL CAPITAL HOLDINGS, INC.; MEDICAL
7  CAPITAL CORPORATION; MEDICAL PROVIDER
   FUNDING CORPORATION VI; SIDNEY M. FIELD; and
8  JOSEPH J. LAMPARIELLO

9

10             UNITED STATES DISTRICT COURT

11            CENTRAL DISTRICT OF CALIFORNIA

12                SOUTHERN DIVISION

13

14  SECURITIES AND EXCHANGE          Case No.  SACV09-818 DOC (RNBx)
    COMMISSION,
15                                   **SUPPLEMENTAL DECLARATION
              Plaintiff,             OF JOSEPH J. LAMPARIELLO IN
16                                   OPPOSITION TO APPLICATION
          vs.                        FOR TEMPORARY RESTRAINING
17                                   ORDER**

    MEDICAL CAPITAL HOLDINGS,
18  INC.; MEDICAL CAPITAL            Complaint Filed:      July 16, 2009
    CORPORATION; MEDICAL
19  PROVIDER FUNDING
    CORPORATION VI; SIDNEY M.
20  FIELD; and JOSEPH J.
    LAMPARIELLO,
21
              Defendants.
22

23

24

25

26

27

28

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41412575.2

## DECLARATION OF JOSEPH J. LAMPARIELLO

I, Joseph J. Lampariello, declare as follows:

1.     I am the President and Chief Operating Officer of Defendants Medical Capital Holdings, Inc. ("MCH"), Medical Capital Corporation ("MCC") and Medical Capital Funding Corporation VI ("MPFC VI") (collectively "Medical Capital Entities").  I make this declaration in Opposition to the *Ex Parte* Application by the Securities and Exchange Commission for Temporary Restraining Order as to 1) Freezing Assets, 2) Appointing A Temporary Receiver, 3) Prohibiting the Destruction of Documents, 4) Granting Expedited Discovery, and 5) Requiring Accountings.  I have personal knowledge of the matters set forth herein, except as to those matters which are alleged on information and belief; and as to those matters I believe them to be true.  I could and would competently testify to all such matters, if called upon to so.

## General Description of the Medical Capital Entities Business

2.     MCC and its affiliated entities have been in business since 1994. Since their founding, and up to the unprecedented economic and financial crisis that began last year, the Medical Capital Entities have raised over $2 billion in funds from investors, invested those funds in real assets consisting of medical receivables and other assets, and returned investors principal to them, with interest.  Medical Capital has provided much needed financing to a variety of medical providers across the country, including physicians, hospitals, imaging centers and physical therapists.  The Medical Capital Entities and their affiliates currently employ approximately 113 people in their offices in Tustin, Las Vegas, Scottsdale and New York; they finance both  physician and hospital clients and have approximately 11,500 active investors with over  $1 billion under management.

3.     Despite the challenges of the last year, I believe Medical Capital and its affiliates will emerge from its current difficulties as strong as ever, and well-positioned to provide an important receivables financing service to the health care

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

41412575.2

1

SUPPLEMENTAL DECLARATION OF JOSEPH
LAMPARIELLO IN OPPOSITION TO APPLICATION
FOR TRO

1    community.  Medical Capital and its affiliates have more than sufficient assets to

2    pay all noteholders their interest and principal and to cure the existing unfortunate

3    defaults.  I believe the appointment of a Receiver to essentially liquidate the

4    company will destroy this possibility and damage the ability of the investors to

5    fully recover their principal and interest.  Furthermore, as more fully set forth

6    below, Medical Capital's investors are already adequately protected by independent

7    financial institution trustees.

8          4.    The primary business of the Medical Capital Entities is to purchase

9    medical receivables from physicians, hospitals, and other medical providers.  In

10   addition to the purchase of medical receivables, certain Special Purpose Vehicles

11   ("SPVs") – but not MPFC VI – have purchased or financed non-receivable assets,

12   including health care related entities and real estate.  The receivable assets are

13   referred to as "core assets" and the non-receivable assets are referred to as "non-

14   core" assets.  Once again, there are no non-receivable assets in MPFC VI.

15         5.    The funds used to purchase these receivables and other investments are

16   raised by sales of notes to note holders in various SPVs called either Medical

17   Provider Financial Corporation or Medical Provider Funding Corporation (hereafter

18   referred to as "MPFC").  The notes are sold as private placements to qualified

19   investors pursuant to the provisions of SEC Regulation D and provide for the

20   payment of fixed interest at regular intervals (except for floating rate notes issued

21   by MPFC II) and repayment of principal at the end of the note term (typically 1, 3,

22   5 or 7 years).

23         6.    Defendant MPFC VI is one such SPV.  MPFC VI is currently

24   performing well and there have been no defaults in this fund.

25         7.    The purchases of receivable portfolios only takes place after a rigorous

26   underwriting process to ensure that note holders and the Medical Capital Entities

27   will collect on the receivables more than the amount paid for the purchase of those

28   receivables.  This underwriting process includes the calculation of an Expected Net

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41412575.2

2    SUPPLEMENTAL DECLARATION OF JOSEPH
LAMPARIELLO IN OPPOSITION TO APPLICATION FOR
TRO

1    Receivable ("ENR") which is the amount that Medical Capital expects to collect

2    from a particular receivable portfolio.  Typically, Medical Capital affiliates will pay

3    approximately 80% of the ENR, and will book some portion of the remaining 20%

4    of the ENR (depending on the timing of the collections) in profits on collections on

5    the receivables.  Any remainder of the ENR accrues to the benefit of the receivable

6    seller.

7          8.    The SEC alleges that neither MCH, MCC nor any of the SPV's

8    prepare financial statements according to Generally Accepted Accounting

9    Principles ("GAAP").  This is not entirely correct.  GAAP financial statements are

10   prepared on a consolidated basis for MCH and its subsidiaries and affiliate SPVs.

11   Those financial statements are provided only to the small group of shareholders in

12   MCH.  Over 15 years of successful operation we have not found it necessary to

13   prepare GAAP financial statements for the individual SPVs since the value of the

14   assets in those SPV's has always, and continues, to exceed the interest and principal

15   obligations to noteholders.

16   **Sales Of Receivable Portfolios From One SPV To Another Benefit The**

17   **Investors In Both SPVs**

18         9.    The SEC has alleged that Medical Capital is simply "rolling"

19   worthless receivable portfolios from one SPV to another in order to use later

20   investor funds to pay off earlier investors.  This is a fundamental misunderstanding

21   of Medical Capital's business model.  The sales of receivable portfolios benefit the

22   investors in both the selling and buying SPVs.  Medical Capital is not, as suggested

23   by the SEC, a Ponzi scheme.

24         10.   As the SPVs reach the end of their term, with the longest term notes

25   reaching maturity, the SPV usually has assets (in the form of purchased receivables

26   still within their normal collections lifespan) but needs to generate cash in order to

27   pay off investors in that SPV.  In addition, new SPVs that are starting up need to

28   obtain receivable portfolios as assets to start the process of collection and earning of

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

41412575.2                          3          SUPPLEMENTAL DECLARATION OF JOSEPH
                                               LAMPARIELLO IN OPPOSITION TO APPLICATION FOR
                                               TRO

1   discount fees (essentially, the difference between the amount paid for a receivable

2   portfolio and the ENR value of that portfolio).  Therefore, in order to generate cash

3   for the SPV that is shutting down, and an asset for the new SPV, a sale is arranged

4   between the old and new SPV.  Typically, the purchasing SPV will purchase the

5   receivable portfolio at a discount from ENR (but not less than the actual advance

6   paid to the medical provider), resulting in an immediate accrual profit on its books.

7   At the same time, while the selling SPV will book an accrual loss on the sale, it will

8   generate more than sufficient cash to cover its existing obligations to pay interest

9   and repay principal to investors.

10          11.    The asset portfolios that are sold from earlier SPV's to later SPV's are

11  not – as characterized by the SEC – "non-performing assets" but rather represent

12  properly performing receivables as well as ongoing and valuable client

13  relationships.  These sales benefit not only the earlier SPV's, by generating cash at

14  a time when those earlier SPV's need cash, but also benefit the later SPV's (and

15  their noteholders) by allowing those later SPV's to continue a client relationship

16  that has a track record and thus reducing the expense to that later SPV of having to

17  develop and underwrite an entirely new client relationship.

18  **<u>Investor Funds Are Controlled By An Independent Trustee</u>**

19          12.    I do not believe that a Receiver is necessary to protect investors in the

20  Medical Capital Entities.  Each of the SPV's have financial institution trustees who

21  control the investor funds.  No investments of those funds, and no payments of

22  expenses, including payments of administrative fees to Medical Capital, can be

23  made without the approval of the appropriate trustee.  In the case of MPFC III and

24  V, the trustee is Wells Fargo Bank ("WFB"), and in the case of MPFC I, II, IV and

25  VI, the trustee is Bank of New York Mellon ("BNYM").

26          13.    A true and correct copy of the trust agreement between MPFC VI and

27  BNYM, entitled "Note Issuance and Security Agreement" ("MPFC VI Trust

28

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

41412575.2

4

SUPPLEMENTAL DECLARATION OF JOSEPH
LAMPARIELLO IN OPPOSITION TO APPLICATION FOR
TRO

1    Agreement") is attached as Exhibit 18 to the Declaration of Nicholas S. Chung

2    dated July 16, 2009 ("Chung Declaration").

3          14.     For the last several months, BNYM as trustee has been monitoring all

4    transactions in MPFC II, IV, and VI. (MPFC I is closed and all noteholders entitled

5    to repayment have received the interest and principal due). In addition, consultants

6    for trustee WFB have been on site at the Medical Capital Entities for the last several

7    weeks auditing its financial affairs. Medical Capital management has been fully

8    and completely cooperative with this audit.

9          15.     In addition, MCC provides administrative services to each of the

10    SPV's pursuant to an administrative services agreement. A true and correct copy of

11    the Administrative Services Agreement between MCC and MPFC VI ("MPFC VI

12    ASA") is attached as Exhibit 19 to the Chung Declaration.

13    **Payment of Administrative Fees by SPVs to MCC**

14          16.     The SEC has alleged that the Medical Capital Entities, as well as Mr.

15    Field and myself, have "misappropriated" investor funds from noteholders in

16    MPFC VI. Nothing could be further from the truth. The funds the SEC is referring

17    to are in fact the administrative fee – or revenue -- that MCC is entitled to earn on a

18    monthly basis under the MPFC VI ASA and is paid with the approval of the trustee,

19    BNYM, under the MPFC VI Trust Agreement.

20          17.     Pursuant to Section 2.02 of the MPFC VI ASA (Chung Decl., Exhibit

21    19, page 418), the administrative fee is calculated on a monthly basis as the amount

22    of assets in the MPFC VI Trust Account in excess of liabilities. In other words, the

23    administrative fee which may be paid to MCC must be such that the Collateral

24    Coverage Requirement ("CCR"), as defined under the MPFC VI Trust Agreement,

25    remains in excess of 100%. According to the MPFC VI Trust Agreement, the CCR

26    is calculated by adding the cash in each fund to the ENR value of existing

27    receivable portfolio to calculate the total assets in the fund, and then dividing the

28    total assets by total liabilities (existing interest and principal repayment

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

41412575.2

5    SUPPLEMENTAL DECLARATION OF JOSEPH
LAMPARIELLO IN OPPOSITION TO APPLICATION FOR
TRO

1    obligations).  (Trust Agreement, Definition of "Collateral Coverage Requirement"

2    and Section 3.05(h), Chung Decl., Exhibit 18 pages 350, 370.)

3        18.    This process is also fully disclosed in the Private Placement

4    Memorandum ("PPM") for MPFC VI.  (Chung Decl. Exhibit 5, page 168.)

5        19.    Pursuant to the ASA and Trust Agreement, MPFC VI calculates the

6    CCR on a monthly basis and submits these calculations to BNYM.  True and

7    correct copies of the CCR calculations for MPFC VI for August 2008 (the inception

8    of the SPV through March 2009 are attached as Exhibit 6 to the Chung Declaration.

9    As those CCR worksheets demonstrate, for that eight month time period MCC was

10   entitled to a total maximum administrative fee of $17,994,225.86.

11       20.    Attached as Exhibit 1 to this declaration are true and correct copies of

12   the CCR worksheets for April, May and June of 2009, demonstrating that for that

13   period MCC was entitled to an additional maximum administrative fee of

14   $3,010,468.14, for a total over the life of MPFC VI (through June 30) of

15   $21,004,694.00.

16       21.    The SEC has alleged that MCC took approximately $25 million in

17   administrative fees.  This figure improperly includes other expenses of MPFC VI

18   which are properly payable under the ASA Agreement, including broker

19   commissions and other expenses.  (*See* ASA Agreement, Sections 1.15 and 2.04,

20   Chung Decl. Exhibit 19 pages 417-418.)  All of these expenses were categorized as

21   part of the administrative fee at the request of BNYM.

22       22.    In addition, the trustee, BNYM, must approve all payments of

23   administrative fees to MCC upon certification that, after payment of the

24   administrative fee, the CCR remains at or above 100%.  A true and correct copy of

25   one of the requests by MCC to BNYM for funds is attached to the Chung

26   Declaration as Exhibit 22, page 441.

27       23.    Thus to the extent that MCC has been paid administrative fees in cash

28   from MPFC VI, it was clearly allowed to do so under the trust agreements and

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
LOS ANGELES

41412575.2

6      SUPPLEMENTAL DECLARATION OF JOSEPH
LAMPARIELLO IN OPPOSITION TO APPLICATION FOR
TRO

1    pursuant to the CCR then in effect.  Moreover, any such fees were earned under the

2    applicable trust agreements, were transferred with the approval of the trustees, and

3    were not "misappropriated" as claimed by the SEC.

4    **Defaults in Affiliated SPVs Due to the Recession and Economic Crisis**

5        24.    As described above, other SPVs, but not MPFC VI, also invested in

6    non-receivable assets, which were primarily real estate financings for health care

7    entities.  MPFC VI has only invested in receivable assets.

8        25.    The original private placement memo that was provided to investors

9    included a statement that MPFC VI's affiliates, which included the SPVs, had never

10   defaulted on the payment of those debt securities.  (Chung Decl. Exhibit 5, page

11   151.)  This statement was true as of August 5, 2008, but the first default in an

12   affiliated SPV occurred shortly thereafter.  In addition, these defaults were in non-

13   core, non-receivable assets.

14       26.    The defaults began occurring in mid-August 2008.  Several of the non-

15   core assets were maturing and were expected to re-finance in order to replace the

16   Medical Capital Entities with other financing sources and to generate cash for the

17   SPVs holding those assets.  However, the ongoing recession and the crisis in the

18   credit markets made it difficult or impossible for our clients to refinance and

19   remove themselves from our program.  We have been working diligently since that

20   time – in an extremely challenging financial and economic environment -- in an

21   effort to sell or refinance these assets in order to generate sufficient cash to cure the

22   defaults in these other SPVs.  The assets have more than enough value to cover

23   existing interest and principal repayment obligations to the note holders in those

24   SPVs.

25       27.    Once I became aware of the defaults in the other SPVs I prepared a

26   revised PPM for MPFC VI which removed the reference to no defaults in other

27   SPVs.  A  true and correct copy of the revised PPM is attached to this declaration as

28   Exhibit 2.  However, this PPM was never provided to our broker dealers, and sales

Manatt, Phelps &
Phillips, LLP
Attorneys At Law
Los Angeles

41412575.2

7

SUPPLEMENTAL DECLARATION OF JOSEPH
LAMPARIELLO IN OPPOSITION TO APPLICATION FOR
TRO

1   continued based on the earlier PPM. I do not have an explanation for this error but
2   at no time did Medical Capital or any of its officers or employees intend to defraud
3   investors by using the old PPM.

4        28.    In late May to early June of this year I became aware for the first time
5   that the revised PPM removing the statement about no defaults had not been
6   provided to our broker-dealers. I immediately directed Medical Capital staff to
7   instruct our broker dealers to cease sales of notes in MPFC VI.

8        29.    The sale stoppage was confirmed in a letter for broker dealers, which
9   was dated July 14, 2009, and sent to them over the next several days. All brokers
10   were notified on or before July 17, 2009. A true and correct copy of the letter is
11   attached hereto as Exhibit 3. At the time that the July 14 letter was sent to brokers
12   I was not aware that the SEC had filed this lawsuit.

13        30.    Over 75% of MPFC VI's sales to note holders took place in August,
14   September and October 2008, and sales of notes in MPFC VI have now ceased.

15        31.    Medical Capital is in the process of preparing a rescission offer to
16   MPFC VI investors.

17        I declare under penalty of perjury under the laws of the United States
18   of America that the foregoing is true and correct.

19        Executed this 22nd day of July, 2009, at Tustin, California.

20

21

22                                      JOSEPH J. LAMPARIELLO

23

24   41413292.1
    7/22/09 4:49 PM
25

26

27

28

    41412575.2              8    SUPPLEMENTAL DECLARATION OF JOSEPH
                                      LAMPARIELLO IN OPPOSITION TO APPLICATION FOR
                                      TRO

**Exhibit 1**

**MEDICAL PROVIDER FUNDING CORPORATION VI**
**WORKSHEET**
**CALCULATION AND COMPUTATION**
**OF NET COLLATERAL COVERAGE RATIO**
as of:  **April 30, 2009**

**CASH AND RECEIVABLES**

| | | |
|---|---|---:|
| EXPECTED NET RECEIVABLE OF ALL ELIGIBLE RECEIVABLES OWNED, ALL OTHER RECEIVABLES, SUPPORTING RECEIVABLES, ALL REAL AND PERSONAL PROPERTY.................. ........................................... | $ | 72,728,156.56 |
| TRUSTEE ACCOUNTS AT THE BANK OF NEW YORK................................ | | 95,839.33 |
| SUBSCRIPTION ACCOUNT AT CITY NATIONAL BANK................................ | | 610,000.00 |
| LOCKBOX ACCOUNTS IN TRANSIT TO TRUSTEE ACCOUNTS.................... | | 69,933.98 |
| **TOTAL CASH AND RECEIVABLES**............................................... | $ | **73,503,929.87** |

**LIABILITIES**

| | | |
|---|---|---:|
| BALANCE OF NOTES PAYABLE ISSUED........................................... | $ | 71,890,629.90 |
| INTEREST DUE OF NEXT INTEREST PAYMENT DATE ................................ | | 467,082.55 |
| TRUSTEE FEES ACCRUED (Next Period)........................................... | | 0.00 |
| LOCKBOX BANK FEES ACCRUED................................................. | | 4,200.00 |
| SERVICING COMPANY FEES ACCRUED........................................... | | 24,000.00 |
| **TOTAL LIABILITIES**.......................................................... | $ | **72,385,912.45** |

| | | |
|---|---|---:|
| **COLLATERAL RATIO (CASH & RECEIVABLES/LIABILITIES)** | | **101.54%** |

| | | |
|---|---|---:|
| TOTAL CASH AND RECEIVABLES.......................................... | $ | 73,503,929.87 |
| REQUIRED CASH AND RECEIVABLES........................................... | | 72,385,912.45 |
| MAXIMUM AMOUNT OF ADMINISTRATOR'S FEE DUE ................................. | $ | **1,118,017.42** |

**MEDICAL PROVIDER FUNDING CORPORATION VI**
**WORKSHEET**
**CALCULATION AND COMPUTATION**
**OF NET COLLATERAL COVERAGE RATIO**
as of:  **May 31, 2009**

## CASH AND RECEIVABLES

| | | |
|---|---|---:|
| EXPECTED NET RECEIVABLE  OF ALL ELIGIBLE RECEIVABLES OWNED, ALL OTHER RECEIVABLES, SUPPORTING RECEIVABLES, ALL REAL AND PERSONAL PROPERTY............... ......................................... | $ | 75,442,786.91 |
| TRUSTEE  ACCOUNTS AT THE BANK OF NEW YORK.................................. | | 36,539.50 |
| SUBSCRIPTION ACCOUNT AT CITY NATIONAL  BANK................................. | | 0.00 |
| LOCKBOX ACCOUNTS IN TRANSIT TO TRUSTEE ACCOUNTS.................... | | 36,064.69 |
| **TOTAL CASH AND RECEIVABLES**................................................ | **$** | **75,515,391.10** |

## LIABILITIES

| | | |
|---|---|---:|
| BALANCE OF NOTES PAYABLE ISSUED......................................................... | $ | 73,758,629.90 |
| INTEREST DUE OF NEXT INTEREST PAYMENT DATE ................................. | | 479,659.29 |
| TRUSTEE  FEES ACCRUED (Next Period)...................................................... | | 0.00 |
| LOCKBOX  BANK FEES ACCRUED.................................................................. | | 4,200.00 |
| SERVICING COMPANY FEES ACCRUED......................................................... | | 23,086.00 |
| **TOTAL LIABILITIES**.......................................................................... | **$** | **74,265,575.19** |

| | | |
|---|---|---:|
| **COLLATERAL RATIO (CASH & RECEIVABLES/LIABILITIES)** | | **101.68%** |

| | | |
|---|---|---:|
| TOTAL CASH AND RECEIVABLES........................................................... | $ | 75,515,391.10 |
| REQUIRED CASH AND RECEIVABLES......................................................................... | | 74,265,575.19 |
| MAXIMUM AMOUNT OF ADMINISTRATOR'S FEE DUE .................................. | $ | **1,249,815.91** |

**MEDICAL PROVIDER FUNDING CORPORATION VI**
**WORKSHEET**
**CALCULATION AND COMPUTATION**
**OF NET COLLATERAL COVERAGE RATIO**
as of:  **June 30, 2009**

<u>**CASH AND RECEIVABLES**</u>

| | | |
|---|---|---:|
| EXPECTED NET RECEIVABLE  OF ALL ELIGIBLE RECEIVABLES OWNED, ALL OTHER RECEIVABLES, SUPPORTING RECEIVABLES, ALL REAL AND PERSONAL PROPERTY.............. ............................................. | $ | 75,442,786.91 |
| TRUSTEE  ACCOUNTS AT THE BANK OF NEW YORK................................. | | 34,876.21 |
| SUBSCRIPTION ACCOUNT AT CITY NATIONAL  BANK................................ | | 0.00 |
| LOCKBOX ACCOUNTS IN TRANSIT TO TRUSTEE ACCOUNTS.................... | | 51,962.97 |
| **TOTAL CASH AND RECEIVABLES...............................................** | **$** | **75,529,626.09** |

<u>**LIABILITIES**</u>

| | | |
|---|---|---:|
| BALANCE OF NOTES PAYABLE ISSUED........................................... | $ | 74,360,860.90 |
| INTEREST DUE OF NEXT INTEREST PAYMENT DATE ................................ | | 514,824.88 |
| TRUSTEE  FEES ACCRUED (Next Period)........................................ | | 0.00 |
| LOCKBOX  BANK FEES ACCRUED.............................................. | | 4,200.00 |
| SERVICING COMPANY FEES ACCRUED........................................ | | 7,105.50 |
| **TOTAL LIABILITIES........................................................** | **$** | **74,886,991.28** |

| | | |
|---|---|---:|
| **COLLATERAL RATIO (CASH & RECEIVABLES/LIABILITIES)** | | **100.86%** |

| | | |
|---|---|---:|
| TOTAL CASH AND RECEIVABLES.................................................... | $ | 75,529,626.09 |
| REQUIRED CASH AND RECEIVABLES............................................................. | | 74,886,991.28 |
| MAXIMUM AMOUNT OF ADMINISTRATOR'S FEE DUE ................................. | $ | **642,634.81** |

**Exhibit 2**

Confidential Private Placement Memorandum

# MEDICAL PROVIDER FUNDING CORPORATION VI

### A Nevada Corporation



Series I
Redeemable Secured Notes
Minimum Investment - $50,000
Two-, Three- and Six-Year Notes

We are a special purpose subsidiary of Medical Capital Holdings, Inc., created to finance[1], hold and collect accounts receivable and other financial assets. We are initially selling up to $400,000,000 in aggregate principal amount of the redeemable secured notes described in this Private Placement Memorandum. This is a continuous offering of notes.[2] There is no minimum amount of notes that must be sold before we use any of the proceeds. Even if we sell less than all of the $400,000,000 in notes being offered, the notes that we sell will be issued, and the proceeds of those note sales will be invested as described in this Private Placement Memorandum. The proceeds from the sales of the notes will be paid directly to us promptly following each sale and will not be placed in an escrow account. The minimum purchase amount is $50,000 in principal amount of notes, per investor. Additional amounts may be purchased in any amount greater than $50,000. The notes will be sold in classes and will have the following terms:

| Class | Term* | Adjustable Interest Rate - Spread over Prime** | Minimum Annual Interest Rate** | Frequency of Interest Payments |
|---|---|---|---|---|
| B1 | 2 years | 1.50% | 9.00% | monthly |
| B2 | 2 years | 1.50% | 9.00% | quarterly |
| B3 | 2 years | 1.50% | 9.00% | annually |
| B4 | 2 years | 1.50% | 9.00% | at maturity date*** |
| C1 | 3 years | 1.75% | 9.25% | monthly |
| C2 | 3 years | 1.75% | 9.25% | quarterly |
| C3 | 3 years | 1.75% | 9.25% | annually |
| C4 | 3 years | 1.75% | 9.25% | at maturity date*** |
| F1 | 6 years | 2.0% | 9.50% | monthly |
| F2 | 6 years | 2.0% | 9.50% | quarterly |
| F3 | 6 years | 2.0% | 9.50% | annually |
| F4 | 6 years | 2.0% | 9.50% | at maturity date*** |

---

[1] Throughout this Private Placement Memorandum, the phrase "finance accounts receivable" or variations thereof shall mean both purchasing, and making loans collateralized by, accounts receivable.

[2] When the notes mature, we intend to sell additional notes upon the same terms. As a result, over time, the aggregate amount of notes offered pursuant to this Private Placement Memorandum may exceed $400,000,000. The total amount of Series I Redeemable Secured Notes outstanding at any one time, however, will not exceed $400,000,000.

REV/9-9-08

Confidential Treatment Requested by Medical Captial Holdings, Inc.          MCH0127009

\* For a description of the exact maturity date of each class of notes, see the section entitled "Description of the Notes - Interest Rate and Maturity" in this Private Placement Memorandum.

\*\* The annual interest rate will be adjusted on each January 1 and July 1 during the term of each note, to a rate that is equal to the prime rate, as reported in *The Wall Street Journal* on that date, plus the spread stated for the applicable class of notes, subject to the stated minimum annual interest rate.

\*\*\* The Class B4, C4 and F4 notes will not pay interest currently. Interest on these classes of notes will accrue, compounding annually, and will be payable together with principal at their respective maturity dates.

|  | Per $1,000 in Note Face Amount (1) | Total if All Notes are Sold |
|---|---|---|
| Offering price | $ 1,000 | $400,000,000 |
| Sales commissions (2) | $52.50 | $21,000,000 |
| Maximum proceeds to Medical Provider Funding Corporation VI (before expenses) | $947.50 | $379,000,000 |

(1)  Minimum investment is $50,000 per investor. Notes will be issued in amounts of $50,000 or more.
(2)  Assumes an average sales commission of 5.25%. Sales commissions will range from 4.5% to 6.0% depending on the class of note sold. You will not incur a direct sales commission because the notes earn interest without deduction for sales commissions or other expenses.

YOU SHOULD CAREFULLY CONSIDER THE RISK FACTORS BEGINNING ON PAGE 8 OF THIS PRIVATE PLACEMENT MEMORANDUM.

THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES REGULATING AUTHORITY OF ANY STATE, AND NEITHER THE COMMISSION NOR ANY SUCH AUTHORITY HAS PASSED ON OR ENDORSED THE SECURITIES, THIS OFFERING, OR THE ACCURACY OR ADEQUACY OF THIS PRIVATE PLACEMENT MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

The date of this Private Placement Memorandum is August 5, 2008.

REV 9-9-08

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**    **MCH0127010**

It is anticipated that our secured notes will be offered and sold on a best efforts basis by broker-dealers registered with the Financial Industry Regulatory Authority (FINRA). Up to 6.0% of the initial proceeds plus an organizational and administrative fee not to exceed $500,000 will be charged against initial proceeds. All offering expenses will be paid from the organizational and administrative fee. Fees or commissions will not be paid if such payment would cause the collateral coverage ratio (as defined below under the heading "Business – Administration and Servicing of Assets – Administration of Operations") to fall below 100%. The trustee will be entitled to rely conclusively on each calculation of the collateral coverage ratio provided by the administrator in making any distribution of fees or commissions, and will be held harmless by the trust in the event a calculation is inaccurate and a distribution should not have been made.

INVESTMENT IN OUR NOTES INVOLVES SIGNIFICANT RISK. THE NOTES ARE SUITABLE ONLY FOR PERSONS WHO HAVE SUBSTANTIAL FINANCIAL RESOURCES AND HAVE NO NEED FOR LIQUIDITY IN THIS INVESTMENT. NO ONE SHOULD INVEST IN OUR SECURED NOTES WHO IS NOT PREPARED TO LOSE YOUR ENTIRE INVESTMENT. PROSPECTIVE INVESTORS SHOULD CONSIDER CAREFULLY THE "RISK FACTORS" SECTION OF THIS PRIVATE PLACEMENT MEMORANDUM.

THIS PRIVATE PLACEMENT MEMORANDUM HAS BEEN PREPARED SOLELY FOR USE IN CONNECTION WITH THE PRIVATE PLACEMENT OF NOTES OFFERED HEREBY AND MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE. YOU, AS THE OFFEREE, AGREE, UPON OUR REQUEST, TO RETURN TO US THIS PRIVATE PLACEMENT MEMORANDUM AND ALL ATTACHMENTS AND RELATED DOCUMENTATION IF YOU DO NOT SUBSCRIBE TO PURCHASE NOTES IN THE OFFERING. THIS PRIVATE PLACEMENT MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT PERMITTED UNDER APPLICABLE LAW OR TO ANY FIRM OR INDIVIDUAL THAT DOES NOT POSSESS THE QUALIFICATIONS DESCRIBED IN THIS PRIVATE PLACEMENT MEMORANDUM.

NO PERSONS OTHER THAN AS EXPRESSLY AUTHORIZED BY US ARE AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY STATEMENT OTHER THAN THOSE CONTAINED IN THIS PRIVATE PLACEMENT MEMORANDUM, INCLUDING THE EXHIBITS HERETO. NO INFORMATION OR STATEMENT OTHER THAN THOSE CONTAINED HEREIN MAY BE RELIED UPON AS HAVING BEEN AUTHORIZED BY US. THIS PRIVATE PLACEMENT MEMORANDUM HAS BEEN PREPARED FOR THE BENEFIT OF PERSONS INTERESTED IN THE PROPOSED PRIVATE OFFERING OF OUR NOTES AND CONTAINS CONFIDENTIAL INFORMATION AND MAY NOT BE USED OR REPRODUCED FOR ANY PURPOSE.

THE NOTES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("SECURITIES ACT"). THE NOTES OFFERED HEREBY ARE BEING OFFERED IN A PRIVATE PLACEMENT TO A LIMITED NUMBER OF INVESTORS.

THE NOTES OFFERED HEREBY MAY NOT BE RESOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAWS, OR AN OPINION OF COUNSEL SATISFACTORY TO US THAT SUCH REGISTRATION IS NOT REQUIRED. ANY PURPORTED DISPOSITION OF THESE NOTES WITHOUT SATISFACTION OF THESE CONDITIONS WILL BE VOID.

THE SALE OF NOTES IN THIS OFFERING HAS NOT BEEN QUALIFIED WITH ANY STATE SECURITIES COMMISSIONER, AND THE ISSUANCE OF OUR NOTES OR PAYMENT OR RECEIPT OF ANY CONSIDERATION THEREFOR IS UNLAWFUL UNLESS AN EXEMPTION FROM QUALIFICATION IS PERFECTED. THE RIGHTS OF ALL PARTIES TO THIS TRANSACTION ARE EXPRESSLY CONDITIONED ON PERFECTION OF SUCH EXEMPTION(S).

YOU SHOULD NOT CONSTRUE THE CONTENTS OF THIS PRIVATE PLACEMENT MEMORANDUM OR ANY COMMUNICATION, WHETHER WRITTEN OR ORAL, FROM US, OUR OFFICERS, EMPLOYEES, OR AGENTS, AS LEGAL, TAX, ACCOUNTING OR OTHER EXPERT ADVICE. YOU SHOULD CONSULT YOUR OWN COUNSEL, ACCOUNTANT, AND OTHER PROFESSIONAL ADVISORS AS TO THE LEGAL, TAX ACCOUNTING AND RELATED MATTERS CONCERNING YOUR INVESTMENT AND ITS SUITABILITY FOR YOU.

OUR NOTES ARE DEEMED RESTRICTED SECURITIES AND ARE NOT TRANSFERABLE UNLESS THE NOTES ARE REGISTERED UNDER THE SECURITIES ACT OR UNLESS THE TRANSFER IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT. NO PUBLIC MARKET FOR THE NOTES EXISTS OR IS LIKELY TO DEVELOP.

REV 9-9-08

Confidential Treatment Requested by Medical Captial Holdings, Inc.        MCH0127011

THE STATEMENTS IN THIS PRIVATE PLACEMENT MEMORANDUM ARE MADE AS OF THE DATE HEREOF, UNLESS ANOTHER TIME IS SPECIFIED, AND NEITHER THE DELIVERY OF THIS PRIVATE PLACEMENT MEMORANDUM NOR ANY SALE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE FACTS HEREIN SET FORTH SINCE THE DATE HEREOF.

PRIOR TO THE CONSUMMATION OF THE SALE OF THE NOTES OFFERED HEREBY, WE WILL PROVIDE TO YOU AND YOUR AUTHORIZED REPRESENTATIVES THE OPPORTUNITY TO ASK QUESTIONS OF, AND RECEIVE ANSWERS FROM, OUR OFFICERS CONCERNING THIS OFFERING TO THE EXTENT THE OFFICERS POSSESS SUCH ADDITIONAL INFORMATION OR CAN OBTAIN IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

The notes will be issued under a Note Issuance and Security Agreement. This Private Placement Memorandum is qualified in its entirety by the terms of that agreement. To the extent of any inconsistency between this Private Placement Memorandum and the Note Issuance and Security Agreement, the Note Issuance and Security Agreement shall prevail. You may review a copy of the Note Issuance and Security Agreement upon request. A copy is available for inspection at the office of the trustee. You may also make a request to review the Note Issuance and Security Agreement by contacting our administrator, Medical Capital Corporation.

The Trustee did not participate in the preparation of this Private Placement Memorandum and makes no representations concerning the notes, the collateral or any other matter stated in this Private Placement Memorandum. The trustee has no duty or obligation to pay the notes from its own funds, assets or corporate capital or to make inquiry regarding, or investigate the use of, amounts disbursed from the Trust Account.

REV 9-9-08

Confidential Treatment Requested by Medical Captial Holdings, Inc.          MCH0127012

## INVESTOR SUITABILITY STANDARDS (WHO MAY INVEST)

Purchase of the notes involves a high degree of risk and is suitable only for persons having substantial financial resources who understand the long-term nature of the purchase of the notes as well as the risk factors associated with such a purchase. (See "Risk Factors" in this Private Placement Memorandum). Each person purchasing the notes must meet certain "suitability" requirements set forth below and must represent in writing, among other things, that the investor (1) either (a) has a pre-existing relationship with one or more of our officers to enable the investor to be aware of the character, business acumen, and general business and financial circumstances of our officers or directors or (b) either alone or together with his or her investor representative or advisors ("Purchaser Representative"), has sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of investing in our notes; (2) has sufficient net worth, or net worth and income, to be able to bear the economic risk of the investment for an indefinite period of time; and (3) is purchasing for the investor's own account for investment and not with a view to or for sale in connection with any distribution of our notes. Any Purchaser Representative must have sufficient knowledge and experience in financial and business matters to be capable of evaluating, whether alone, with other Purchaser Representatives, or with the investor, the merits and risks of investment in the notes and must represent that he or she is familiar with the financial position and plans of the investor.

**The notes are being offered to "accredited investors," i.e. persons who meet the financial or other requirements for accredited investors established by the Securities and Exchange Commission in Regulation D promulgated under the Securities Act and the regulations thereunder.** In general, the requirements for being considered an accredited investor, for individuals, are:

- natural persons whose net worth, individually or jointly with spouse, currently exceeds $1,000,000; or

- natural persons whose individual income (exclusive of that of spouse) exceeded $200,000 in each of the immediately preceding 2 years, and who reasonably expects his or her individual income to exceed $200,000 in the current year; or

- natural persons whose joint income with that of his or her spouse exceeded $300,000 in each of the immediately preceding 2 years, and who reasonably expects such joint income to exceed $300,000 in the current year.

If the investor is a trust, it will be an accredited investor if the trust is any of the following:

- a trust that has total assets in excess of $5 million, whose purchase is directed by someone who, either alone or together with his or her Purchaser Representative, has sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of investing in the notes, and that was established for a bona fide purpose, and not specifically to purchase the notes; or

- a trust that has a bank or other similar institution as its trustee; or

- a revocable trust (such as an inter vivos or "living trust," if the grantor has not yet died), with a grantor who meets the standards for an individual who is an accredited investor, as summarized above.

## HOW TO SUBSCRIBE

You must read the Private Placement Memorandum and must complete, execute and return the Subscription Agreement to Medical Provider Funding Corporation VI (documents to be completed, including signature pages, are in a separate subscription package; copies are attached as Exhibit A for an investor's file) and a bank draft payable to the order of "Medical Capital Funding Corporation VI" equal to the amount you wish to loan Medical Provider Funding Corporation VI.

You must meet the suitability requirements, and your subscription is subject to acceptance by Medical Provider Funding Corporation VI. All information provided is confidential and will be disclosed only to the officers of Medical Provider Funding Corporation VI or of its affiliate and administrator, Medical Capital Corporation, Medical Provider Funding Corporation VI's legal counsel, and if required, to governmental authorities and self-regulatory organizations or as otherwise required by law.

The subscription materials and the bank draft should be delivered to your broker-dealer, who will deliver it to Medical Provider Funding Corporation VI at the following address:

Medical Provider Funding Corporation VI
2100 S. State College Blvd.
Anaheim, CA 92806

REV 9-9-08

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**        **MCH0127013**

## SUMMARY OF PRIVATE PLACEMENT MEMORANDUM

*This Summary highlights the key information contained in this Private Placement Memorandum. Because it is a summary, it does not contain all of the information you should consider before making your investment decision. You should read the entire Private Placement Memorandum carefully, including the section titled "Risk Factors" and the Financial Statements and the notes related to those statements.*

## Medical Provider Funding Corporation VI

**Background**

Medical Provider Funding Corporation VI (referred to in this Private Placement Memorandum as "we," "us," and "our," as appropriate) was formed on April 23, 2008. Therefore, we currently have a limited operating history. Our ability to successfully implement our business plan depends in part on us obtaining adequate financial resources through this offering.

**Our Company**

We were formed primarily to finance healthcare accounts receivable and other assets related to the healthcare sector. An example of a healthcare account receivable would be the amounts owed to a doctor's office by insurance companies for medical services performed by the doctors. We acquire these healthcare receivables at a discount to the face amount of the receivable, that is, an amount that is less than we believe to be the fully collectible amount of the receivable. We then attempt to collect the full face amount of the receivable and retain any profit resulting from the difference.

We also intend to make loans or extend credit lines to companies, secured by assets of the borrower. The assets that are collateral for these loans and credit lines may include accounts receivable, real and personal property. Most of the borrowers on these loans or credit lines are expected to be in the healthcare business, but some may be in other businesses.

The objective of our company is to successfully operate a healthcare financing business for a profit. If this goal is achieved, it will allow us to provide you interest income and a return of the funds that you loan us. However, we may not achieve these objectives. We also intend to expand our business into other areas of business.

As a new company, we have no operating history, and a nominal amount of capital.

**Use of Note Proceeds**

The net proceeds from the sale of our notes may be used to:

- purchase accounts receivable;

- make loans collateralized by accounts receivable;

- make loans or extend credit lines secured by assets;

- provide funds for general operating purposes, including paying the fees of the trustee and fees associated with maintaining the lockbox accounts (as described below); and/or

- pay principal and interest on the notes.

**Our Affiliates**

While Medical Provider Funding Corporation VI is a new business with no operating history, we do have several experienced affiliates that have completed offerings of debt securities backed by accounts receivable. Our affiliates have, since 1994, financed accounts receivable having an aggregate face amount of over $5 billion

Confidential Treatment Requested by Medical Captial Holdings, Inc.          MCH0127014

In addition, one of our affiliates provides receivables underwriting services to us in connection with our financing of accounts receivable. One of our other affiliates also acts as the servicer for the accounts receivable we finance and tracks the payments made on our purchase agreements and loan agreements. These affiliates receive compensation from us for providing those services.

## SUMMARY OF THE TERMS OF THE OFFERING

| | |
|---|---|
| Notes………………………………….. | We are offering up to $400,000,000 in principal amount of our redeemable secured notes. To buy notes, you must purchase at least $50,000 in principal amount of notes although we will sell notes in any amount greater $50,000. The notes will sold on a continuous basis and be issued in the form of registered physical certificates without coupons. |
| Interest payments……………………... | We will pay interest only on the notes monthly, quarterly, annually or at the maturity date, depending on the class of notes that you purchase. Interest payments on classes other than B4, C4 and F4 will be on the tenth day of the month (or if the tenth day is not a business day, then on the next succeeding business day) to the holder of record as of the last day of the month preceding the month in which the payment date occurs. Interest will be paid without any compounding. Interest on classes B4, C4 and F4 will compound annually, and will be paid along with principal at the maturity date. The interest rate is adjusted twice a year, effective as of January 1 and July 1, based on the prime rate of interest, as reported in *The Wall Street Journal* on that date, plus a spread, subject to a minimum annual rate. The spread and the minimum rate both differ for the classes of notes, as shown on the cover page of this private placement memorandum. |
| | Interest will accrue from the effective date of the note. If the effective date is on or before the fifteenth day of a month, your first interest payment will be on the tenth day of the following month. If the effective date is after the fifteenth day of a month, your first interest payment will be on the tenth day of the second month following the purchase (if you purchase a class of notes that pays interest monthly), on the tenth day of the fourth month following the purchase (if you purchase a class of notes that pays interest quarterly) or the tenth day of the thirteenth month following the purchase (if you purchase a class of notes that pays interest annually). Your first payment of interest will include interest for the partial month in which the purchase occurred. If any interest payment is to be made on a day that is not a business day, then that payment will be made on the succeeding business day. |
| Principal payments…………………… | As a holder of a note, you may receive payment at maturity, or may renew the note subject to limitations described below. If you do not notify us to the contrary, we will automatically renew your note, but not for longer than six years from the initial effective date. The renewal will be for the same term, or, if shorter, for a term that extends until a maturity date that is six years from your initial note effective date. That is, if your existing note is for two years, the automatic renewal will be for a second or third two-year term (as the case may be), and if your existing note is for three years, the automatic renewal will be for a second three-year term. If your existing note is for six years, it is not renewable. |
| Prepayment……………………………. | We may prepay the outstanding principal balance and accrued and unpaid interest of any or all of the notes in whole or in part at any time without any penalty or premium. |
| Collateral………………………………. | The notes will be secured by the assets that we acquire using the proceeds from this offering. The notes will also be secured by the proceeds of the accounts receivable and other assets previously pledged that are paid before the maturity of the notes. We will also pledge other funds to secure the notes, including cash held from time to time by The Bank of New York Mellon, the trustee, in various accounts under the note agreement and our rights under the agreements we use to acquire accounts receivable and make secured loans. |

REV 9-9-08

7

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**          **MCH0127015**

The collateral will be pledged to the trustee for your benefit. The value of the pledged collateral can fluctuate. It is an event of default under the note agreement if the following ratio (called the collateral coverage ratio) is less than 100% of the outstanding principal amount of the notes as of the beginning of any month, and continues to be below 100% for a period of five consecutive days following our report to the trustee that the ratio is below this level. The collateral coverage ratio, which will be calculated by us and reported to the trustee monthly, is the ratio of (A) the expected net receivables amount, or ENR, of all eligible accounts receivable[3] included in the collateral, plus the value of other assets included in the collateral (which, in the case of loans secured by real or personal property, will be the lesser of the amount owing on the loan or the value of the property securing the loan), plus funds and investments in the lockbox accounts and the trust account (including funds loaned by Medical Capital Corporation, as administrator, on a nonobligatory basis, and deposited into a special account to pay the monthly trustee fee and periodic interest payments under the notes, to the extent amounts in the trust account are insufficient) to (B) the aggregate outstanding principal amount of all notes.

## RISK FACTORS

AN INVESTMENT IN THE NOTES INVOLVES A HIGH RISK OF LOSS AND LACK OF LIQUIDITY THAT MAKE IT SUITABLE ONLY FOR THOSE PERSONS WHO HAVE A CONTINUING HIGH ANNUAL INCOME AND/OR SUBSTANTIAL NET WORTH, WHO CAN AFFORD TO BEAR SUCH RISK, AND WHO HAVE NO NEED FOR LIQUIDITY OR CURRENT INCOME FROM SUCH INVESTMENT AND CAN AFFORD LOSS OF THE ENTIRE INVESTMENT. SEE "INVESTOR SUITABILITY STANDARDS (WHO MAY INVEST)."

Among other factors, the following risks and considerations are relevant to your investment decision.

### RISKS RELATED TO LIMITATIONS ON TRANSFERABILITY

**You may not be able to sell your notes to another investor.** The notes are not and most likely will not be registered under the Securities Act, or registered or qualified under any state securities law in reliance on exemptions from such registration or qualification. The notes may not be resold, except in conformance with an exemption from registration under the Securities Act. Each investor will be required to represent that he or she is acquiring the notes for his or her own account for investment purposes only and not with a view to or in connection with any distribution or resale. Investors may have to hold the notes for an indefinite period of time and risk losing their entire investment. A legend, in substantially the following form, will be placed on all documents reflecting the purchase of notes and states as follows:

"THE SECURITY EVIDENCED HEREBY WAS ISSUED PURSUANT TO REGULATION D IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, (THE "1933 ACT"), AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF REGISTRATION UNDER THE 1933 ACT OR AN APPLICABLE EXEMPTION THEREFROM. THE HOLDER OF THE SECURITY EVIDENCED HEREBY AGREES FOR THE BENEFIT OF THE COMPANY THAT THE SECURITIES MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 OR RULE 144A UNDER THE 1933 ACT, OR PURSUANT TO ANOTHER EXEMPTION FROM THE

---

[3] The Note Issuance and Security Agreement defines "eligible receivable" as any receivable that (i) a certain approved payor is directly obligated to pay, which obligation is valid, binding, and enforceable against such approved payor in accordance with its terms (subject to certain exceptions); (ii) is not subject to any dispute, offset, counterclaim or defense; (iii) is denominated and payable in U.S. dollars in the United States and that is acquired by us pursuant to a purchase document; (iv) constitutes an "account" or a "general intangible" as defined in the Uniform Commercial Code as in effect in the jurisdiction in which we are is required to perfect a security interest therein; (v) is true and correct with respect to our representations and warranties set forth therein; (vi) the approved payor of which (other than a Receivable payable by Medicare or Medicaid) has received written notice of the sale of the receivable to us; (vii) with regard to which the claim for payment has been submitted to the approved payor not more than one hundred eighty (180) days prior to the purchase thereof by us (if the receivable is part of the first batch purchased from a receivable seller); (viii) will be subject to a first priority perfected lien held by The Bank of New York Mellon as trustee upon its purchase with funds from the trust account and the filing of any applicable financing statement pursuant to the UCC; (ix) the claim for payment has been acknowledged by the approved payor (other than a receivable payable by Medicare or Medicaid) and such approved payor has received written notice that payments with respect thereto are to be sent solely to a lock box account; and (x) is set forth in a certificate, a form of which is attached thereto, and delivered by us to the trustee.

Confidential Treatment Requested by Medical Captial Holdings, Inc.    MCH0127016

REGISTRATION REQUIREMENTS OF THE 1933 ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT AND IN EACH CASE, IN ACCORDANCE WITH THE APPLICABLE SECURITIES LAWS OF ANY STATE, AND THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH ABOVE."

**You may not be able to sell your notes due to the absence of an established trading market.** We do not anticipate listing the notes for trading on a securities exchange. There is no trading market for the notes and it is not anticipated that an active market will develop. We are not obligated to redeem your notes until they mature. Because you may be unable to sell your notes prior to the maturity date, you should consider your need to be able to liquidate your investment prior to its maturity before investing in the notes and you should be prepared to hold any notes purchased in this offering until their maturity.

## RISKS RELATED TO MEDICAL PROVIDER FUNDING CORPORATION VI

**We are a new entity.** Medical Provider Funding Corporation VI is a new company, formed on April 23, 2008. It has no operating history.

**Our lack of diversified operations and investments increases our exposure to adverse events occurring in the healthcare sector or with any one seller of healthcare accounts receivable or borrower.** We anticipate that the majority of our investments will be made in, and a majority of our income will be derived from, financing and collecting healthcare receivables. This lack of diversification in our operations increases our exposure to the risks of this industry. In addition, our portfolio will initially be concentrated in receivables financed from a limited number of clients. As we sell additional notes and raise additional proceeds, we will attempt to diversify our portfolio by increasing the number of clients for whom we finance receivables. However, if we are unable to raise sufficient funds to increase our investments, we may be unable to achieve an acceptable diversification of our receivables portfolio. This lack of diversification in the portfolio increases our dependence on the performance of any one client. This increases the risk that inadequate performance by an individual client will materially affect our profitability and our ability to make principal and interest payments on the notes.

**We have limited experience outside the healthcare sector.** While we have a great deal of experience in the financing of healthcare accounts receivable, we have less experience in making loans, especially loans that are secured by property other than healthcare receivables. We will limit our investment in assets other than accounts receivable to not more than approximately 40% of the total amount of notes sold (not to exceed approximately $160 million). Nevertheless, our relative inexperience in investments other than healthcare receivables could result in higher default rates than we anticipate. This might result in our inability to earn enough on our investments to pay you the interest and principal that we owe you under the notes.

**We have limited experience making loans and extending credit lines.** While we have a great deal of experience in the financing of healthcare accounts receivable, and in the course of gaining that experience have developed knowledge of the healthcare business, and especially the valuation of healthcare accounts receivable that could serve as collateral for loans or credit lines, we have only limited experience originating and collecting on loans and extending credit lines. To the extent that the process of collecting on loans or credit lines, including foreclosing on collateral, differs from the purchase of accounts receivable, we lack substantial experience. If we conduct our origination and servicing activities in ways that make it expensive or impossible to realize on the value of collateral, and if our borrowers do not pay their debt obligations when due, we may be unable to collect repayment in full on the loans or credit lines. We will limit our use of proceeds for activities other than the financing of accounts receivable to not more than approximately 40% of the total amount of notes sold (not to exceed approximately $160 million). Nevertheless, our relative inexperience in lending could result in our inability to earn enough on our lending activities to pay you the interest and principal that we owe you under the notes.

**We may become subject to legal requirements when we make loans or extend credit lines.** Many states impose licensing requirements on entities that are in the business of making loans or extending credit lines, or specified types of loans. In addition, state usury laws restrict the rate of interest that can be collected on loans, credit lines or specified types of loans. We intend to become licensed to the extent that our lending operations require us to do so, and to comply with the regulatory requirements of the licenses that we obtain. We also intend to charge interest on our loans and credit lines at rates that do not exceed the applicable usury limits. We will incur costs, including legal fees for attorneys who advise us in these matters and licensing fees. We may also incur costs of compliance. These expenses will reduce the funds that we have available to pay you the interest and principal that we owe you under the notes.

**If a seller's business fails and the seller declares bankruptcy, we may be unable to collect some or all of the accounts receivable that we purchased from that seller and proceeds from the collection or sale of other assets purchased from that seller or taken as security for that seller's obligations.** In the past, our affiliates focused their accounts receivable financing business on small and middle market healthcare sellers. Some of these sellers may be unable to obtain financing from more traditional credit sources or otherwise have limited financial resources. If a seller were to declare bankruptcy in the future, the bankruptcy judge might not deem

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**                MCH0127017

Medical Provider Funding Corporation VI to be the "owner" of the receivables it has "purchased" or deem, alternatively, our security interest to be a legally binding lien on the accounts receivable or other assets. While we and our affiliates use underwriting criteria and monitoring procedures to attempt to reduce the higher risks inherent in purchases of accounts receivable and financing other assets, the criteria or procedures we use may not offer adequate protection against the risk of possible financial instability of a seller. As a result, collection of amounts due under our accounts receivable purchase agreement or financing agreement could be less than we anticipate.

**Similarly, if a borrower's business fails and the borrower declares bankruptcy, we may be unable to collect some or all of the loan that we have made to that borrower if the value of the collateral is insufficient.** If a borrower were to declare bankruptcy in the future, Medical Provider Funding Corporation VI, as a secured creditor with a legally binding lien on the accounts receivable and other assets as collateral, would be able to foreclose on the collateral. The liquidation of the collateral might not yield as much in net proceeds as we anticipate. In that case, we might not collect enough money to pay off the loan. Also, there might be delays in foreclosing on and liquidating the collateral, as a result of the automatic stay that goes into effect upon a bankruptcy filing, and if other creditors of that borrower challenge our lien in the bankruptcy proceeding.

**There may be times when our investments in assets other than accounts receivable exceed 40% of the total amount of notes sold.** Although we intend to invest not more than approximately 40% of the total amount of notes sold (not to exceed approximately $160 million) in assets other than accounts receivable, there may be occasions when the amount invested in these assets other than accounts receivable exceeds 40%. For example, as we begin to acquire assets, our initial investments in assets other than accounts receivable may represent more than 40% of the total amount of notes sold as of that date. Moreover, from time to time, we may make a significant investment in an asset other than accounts receivable that by itself or together with existing assets represents more than 40% of the total amount of notes sold as of that time.

**If a borrower becomes the subject of a fraud and abuse claim under federal and/or state regulations that affects the borrower's viability as a going concern, we may likewise be unable to collect some or all of the loan that we have made to that borrower if the value of the collateral is insufficient.** If a borrower becomes the subject of a significant fraud and abuse claim, its cash from operations could be limited as such borrower may be required to refund certain amounts as a result of such claims. Consequently, these claims could impair the borrower's ability to timely repay its obligations under the loan made by Medical Provider Funding Corporation VI. If we foreclose on the collateral and the liquidation proceeds are less than we anticipate, the loan may not be fully repaid.

**If all of the remedies for recovering a defaulted receivable or loan are inadequate, we may not have sufficient funds available to pay the notes as they become due.** We may fail to collect funds from the patients' insurance companies, government agencies or other payors required to pay an account receivable or a loan. Our ability to fully recover amounts due under our account receivable purchase and financing agreements and loan and security agreements may be adversely affected by, among other things:

- the financial failure of the payor of the accounts receivable or loan;

- the purchase or financing of fraudulent accounts receivable from a seller, misrepresentations of a seller or a conversion of account proceeds by a seller;

- the purchase or financing of accounts receivable that are made uncollectible by government regulations;

- third-party payor disputes;

- third-party claims with respect to security interests; and

- erroneous assessment, valuation or estimate of the expected value of an account receivable or other asset.

Any of these events could force us to reduce the reserve accounting balance we maintain for each seller, or seek enforcement of other contractual remedies against the seller or borrower, all of which could prove to be inadequate to fully collect the accounts receivable and proceeds from other asset financing.

In our purchases of accounts receivable, we hold back from each seller a portion of the purchase price of each receivable purchased and allocate that amount to that seller's reserve accounting, but the reserve accounting for each seller is not a cash balance held as a reserve. Further, the contractual remedies against a seller typically are available only if there has been fraud, and do not unconditionally guarantee the payment of any account receivable or guarantee against default by the payor of that account receivable. Therefore, we could experience losses on the purchased accounts receivable in the future. These potential future losses may be significant, may vary from current reserve estimates and could exceed the amount of the balance allocated to a seller's reserve

REV 9-9-08                                          10

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**                    MCH0127018

accounting. We do not maintain insurance covering credit losses. In addition, the amount of provisions for losses and the withheld portion of the purchase price of the accounts receivable may be either greater or less than actual future chargeoffs of any accounts receivable relating to these provisions. If all of the remedies for recovering a defaulted or uncollected account receivable are inadequate, we may not have sufficient funds available to pay interest and principal on the notes as they become due.

**We are dependent on key personnel and may be required to hire additional employees.** Medical Provider Funding Corporation VI is dependent on a few key individuals employed by Medical Capital Corporation, who may not perform their duties as we expect or who may leave our company. These key individuals include Mr. Sidney Field, Medical Capital Corporation's Chief Executive Officer and Director, Mr. Joseph J. Lampariello, its President and Chief Operating Officer, and Mr. Alan J. Meister, its Chief Financial Officer. Although Medical Capital Corporation has employment agreements with these individuals, under the terms of these agreements, the employees may terminate employment at any time and for any reason by giving 30 days' advance notice. We do not maintain key man life insurance on any officers. If we are unable to hire and retain the necessary employees, our business could be adversely affected.

**We have conflicts of interest that may result in us taking actions that are not in your best interest.** A common management group directs the activities of the companies in the affiliated group that provide services to us. These companies have also engaged in financing transactions similar to the sale of the notes. One of our affiliates, Medical Capital Corporation, as our administrator, determines which affiliate will fund the financing of accounts receivable and other assets from a given seller or borrower, or make loans, based on various factors including transaction size relative to the size of the purchasing, financing or lending affiliate and amounts currently committed by each affiliate versus each affiliate's funds available for the financing of accounts receivable and other assets or making of loans. Another criterion is maintaining diversification within each affiliate's portfolio. From time to time, these criteria may cause Medical Capital Corporation to direct the sale of accounts receivable and other assets or loans from one affiliate to another. In the case of accounts receivable and other assets, sales among affiliates are generally priced at the sum of the total amount advanced on the outstanding receivables or assets as of the date the portfolio of assets is purchased or financed by such affiliate, less any collections already received on the accounts receivable, or in the case of a transfer of a debt obligation owed by a borrower, the principal amount outstanding under the related financing agreement.

As a result of these affiliated relationships, conflicts of interests may exist or may arise in the future. Although Medical Capital Corporation attempts to maximize the profitability of each affiliate, any conflicts which arise may not be resolved in our best interests or the best interests of the note holders.

Medical Capital Corporation acts as our administrator managing our day to day operations and underwriting our accounts receivable or other assets, for which it receives an administrative fee. The administrative fee consists of any amount in the trust account that exceeds the amount needed for the collateral coverage ratio to equal 100%, after all required payments of trustee, servicer and lockbox fees and all principal and interest then due on the notes. For an explanation of the collateral coverage ratio, see "Business – Administration and Servicing of Assets – Administration of Operations," below. In addition, another one of our affiliates, Medical Tracking Services, or "MediTrak," acts as the servicer for our accounts receivable, for which it receives a fee of $3.00 per claim item in addition to a monthly minimum fee of $200.00 per provider, a one-time setup fee of $2,000 for each seller, and a one-time data interface fee of up to $2,000 for each seller. There may now, or may in the future, be unrelated businesses that might be able to provide similar services to us in a more efficient, competent and less costly manner. Further, our affiliates may not be able to continue to provide services to us. In the event that one of our affiliates is not able to perform its services, we may not be able to obtain a suitable replacement without incurring substantial expense, and any replacement obtained may not provide an acceptable quality of services to us.

**If the notes you purchase are characterized as equity instead of debt for tax purposes, it would increase our taxes.** We believe the notes are structured in a way to constitute debt. Based on current federal tax laws and various aspects of our company and the notes, including the fact that securities senior to the notes can be issued without substantial limitation, there is a possibility that the IRS could challenge our characterization of the notes as debt and deem the notes to be equity. We do not intend to seek a ruling from the IRS on the characterization of our notes. If the notes were characterized as equity, we would not be able to deduct the interest payments we make on the notes from our taxable income. If we operate our business at a profit, this would result in an increase in our federal income tax liability and expense, which would have an adverse affect on our business and thus on our ability to make principal and interest payments on the notes. For a description of the federal tax considerations relating to the notes, see the section entitled "Material Federal Income Tax Considerations" in this Private Placement Memorandum.

**If the notes are characterized as equity instead of debt for ERISA purposes, it might affect our business.** Our notes are available for purchase by 401(k) plans and other employee benefit retirement plans that are covered by the Employee Retirement Income Security Act (ERISA). While the notes owned by these plans are considered "plan assets," we believe that the receivables and other assets that we own are not considered "plan assets." We base this conclusion on our belief that the notes constitute debt and not equity securities. If, however, the notes were characterized as equity, and if more than 25% of any class of our notes were owned

Confidential Treatment Requested by Medical Captial Holdings, Inc.          MCH0127019

by benefit plan investors, this could cause our assets to be considered "plan assets." In that case, we may be considered fiduciaries of the investing plans, and required to conduct our business in accordance with the fiduciary standards of ERISA. These standards could impose restrictions upon the conduct of our business, including the avoidance of transactions with parties that are affiliated with the investing plans and certain types of transactions. For a more detailed description of the ERISA plan asset regulations, see the section entitled "ERISA Considerations" in this Private Placement Memorandum.

## RISKS RELATED TO THE HEALTHCARE SECTOR

**Changes in government healthcare policy, laws and regulations could adversely affect our ability to collect receivables or reduce the availability of receivables for purchase.** The healthcare sector is subject to evolving political and economic regulatory constraints that may affect the operations of healthcare organizations and providers of goods and services, and their profitability. These include proposed legislation periodically advanced by the state legislatures and Congress, and regulations issued by federal and state regulatory agencies, the effect of which could significantly limit reimbursement under government healthcare programs. This could ultimately impair our ability to find receivables suitable for purchase.

**Existing government regulation may restrict our ability to collect the full amount of our healthcare receivables.** Existing government regulation has the potential to reduce the amount of reimbursement paid to the healthcare sellers that sell us accounts receivable and borrowers that borrow from us. During the past decade, federal and state governments have implemented legislation designed to control the increase in healthcare costs and it is anticipated that these legislative initiatives will continue. Federal regulation of reimbursement rates for medical services has increased. In addition, the requirements and procedures for Medicaid reimbursement, as implemented by state Medicaid program administrators, differ from state to state. We may also be subject to applicable federal and state billing and credit collection agency laws and regulations. Also, the laws and regulations pertaining to Medicare and Medicaid reimbursement impose substantial criminal and civil penalties for the submission of inaccurate or false claims for billing, for which our sellers may be held liable. Current or future government regulations or healthcare reform measures could have a material adverse effect on our ability to collect our receivables or the timing of our collections.

**We may have liability under the HIPAA laws on patient privacy.** The Health Insurance Portability and Accountability Act (HIPAA) requires us and the companies we deal with to preserve the privacy of patient information. The administrator executes a business associate agreement with each seller and borrower, covenanting to maintain and protect the privacy and confidentiality of medical records, in compliance with this law. If, however, a governmental or regulatory agency should change its rules or challenge the compliance of this agreement with HIPAA, we could suffer impaired ability to collect our accounts receivable, resulting in losses. If we, our sellers and borrowers, or the obligors under the accounts receivable should fail to preserve this privacy and confidentiality, we could become involved in a lawsuit, and could have liability to patients, sellers or clients, or be subject to governmental enforcement actions that could impair our ability to continue in business.

## RISKS OF AN INVESTMENT IN THE NOTES

**Principles of equity applied in a bankruptcy proceeding could permit a bankruptcy court to disregard our entitlement to the accounts receivable as "owners" and also to disregard the first priority claim of the notes on the assets securing the notes, which could cause you to receive less than the full amounts we owe you on your notes.** We believe the notes are structured in a manner that entitles them to a first priority claim on the assets securing the notes, even in the event we file bankruptcy (except for funds that we then hold). However, bankruptcy proceedings are generally subject to principles of equity that could permit a court to disregard the priority of the notes' claim to the assets securing the notes. Therefore, it is possible that a court could treat the assets securing your notes as general assets of our company, subject to claims of our other creditors as well as the noteholders. If this occurs, the proceeds from the receivables may be divided among the noteholders and other creditors, if any, according to the bankruptcy court's direction. To the extent that the assets are not sufficient to pay all of these amounts, you may not receive the full amounts we owe you on your notes.

**Our use of debt financing could limit our ability to pay principal and interest on the notes when due.** Our business is structured to use primarily debt as a source of funds. A business structured in this way is more vulnerable to changes in the financial markets than are businesses that rely on equity financing. For example, our reliance on debt financing could:

- make it more difficult for us to satisfy our obligations to pay principal and interest payments on the notes;

- make it more difficult for us to acquire receivables to replace those pledged to the note holders as they are paid;

- increase our vulnerability to general adverse economic and industry conditions;

Confidential Treatment Requested by Medical Captial Holdings, Inc.          MCH0127020

- limit our ability to obtain additional financing for future working capital, capital expenditures, acquisition of accounts receivable and other general corporate requirements;

- increase our vulnerability to interest rate increases if future debt must be incurred at higher rates of interest than currently exist;

- require us to dedicate a substantial portion of our cash flow to payments on our debt, which will reduce the availability of cash flow for operations, new investment and other purposes; and

- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate.

**The lack of a sinking fund or any requirement to maintain financial ratios increases the risk that we will be unable to repay the principal and interest on the notes when due.** The note agreement does not require us to maintain a sinking fund for payment of the notes or that we maintain any specified financial ratios. Generally, a sinking fund would be a separate account that would be funded on a regular basis in order to set aside sufficient funds to pay the notes at maturity. The lack of a sinking fund increases the risk that we will not have sufficient cash on hand to pay the principal amount of the notes due at maturity. Since there is no sinking fund for the notes, we will be required to use available cash flow, sell assets or borrow additional funds to pay the principal due on the notes at maturity. The lack of a requirement to maintain specified financial ratios allows us to operate our business in a relatively unrestricted manner. This increases the risk that our method of operation could turn out to be financially imprudent and could result in a decline in collateral value below the amount of the notes outstanding. If that condition were to exist as of the beginning of any month, and continue for a period of five consecutive days following our report to the trustee, there would be an event of default, which could accelerate the maturity of the notes, resulting in an early payment of principal to you, in an amount that might be less than your original investment.

**Some of our investments may not provide current cash flow, which may affect our ability to pay interest and principal on a timely basis.** Although accounts receivable will constitute a majority of our assets, we may invest up to approximately 40% of the total amount of notes sold (not to exceed approximately $160 million) in loans. If our cash flow from all investments proves insufficient to cover interest and principal on the notes, we may be unable to pay interest and principal when they become due.

**Some of our investments may lose value, which may affect our ability to pay interest and principal on the notes.** We will generally be able to generate cash either by collecting proceeds of our assets or by selling assets. While we expect to generate funds for the payment of principal and interest mainly by collecting proceeds of accounts receivable and interest payments from borrowers, in the case of some assets other than accounts receivable, a sale may be a useful way to realize funds. The value of those assets could, however, decline based on external factors, such as interest rates and credit quality. Such a decline in value would reduce our ability to generate cash by selling those assets.

**If we or any of our affiliates should become subject to a bankruptcy proceeding, any funds that we hold could become unavailable to cover interest and principal on the notes.** Funds that we receive from the trustee for payment of principal and interest will not be held in trust. If, therefore, a bankruptcy occurs between the time when the trustee releases funds to us and the time when we make payments of interest and principal, it is possible that the funds could become unavailable to make those payments. To the extent that the assets remaining in trust are insufficient to cover all principal and interest on the notes, you would be an unsecured creditor.

**We may be required to rescind sales of some notes.** We are offering the notes without registering them with the Securities and Exchange Commission, in reliance on exemptions from registration that apply to private placements of securities, where the purchaser is an accredited investor. If the exemptions from registration that we have relied upon for this offering are not available, we may be obligated to return any amount invested by an investor who demands rescission. We may have insufficient funds to do so. Even if we have sufficient funds, the return of these amounts could reduce the availability of funds for us to pay interest and principal to other investors in the notes, as they become due.

## FORWARD-LOOKING STATEMENTS

Some of the statements in this Private Placement Memorandum that are not historical facts are "forward-looking" statements. Forward-looking statements can be identified by the use of words like "believes," "could," "possibly," "probably," "anticipates," "estimates," "projects," "expects," "may," "will," "should," "intend," "plan," "consider" or the negative of these expressions or other variations, or by discussions of strategy that involve risks and uncertainties. We based these forward-looking statements on our current expectations and projections about future events and information currently available to us. Although we believe that the assumptions for these forward-looking statements are reasonable, any of the assumptions could prove to be inaccurate. Some of the risks, uncertainties and assumptions are identified in the risk factors discussed above.

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**                    MCH0127021

We wish to caution you that the forward-looking statements in this Private Placement Memorandum are only estimates and predictions. Our actual results could differ materially from those anticipated in the forward-looking statements due to risks, uncertainties or actual events differing from the assumptions underlying these statements. These risks, uncertainties and assumptions include, but are not limited to, those discussed in this Private Placement Memorandum.

## USE OF PROCEEDS

If all of the notes that we are offering in this Private Placement Memorandum are sold, we expect proceeds to total $400,000,000 before deducting sales commissions and other expenses. We may not be able to sell any or all of the notes. For notes that are renewed by issuing a note offered under this Private Placement Memorandum, we will not receive any new proceeds. Offering expenses are estimated to be approximately $500,000 and sales commissions will not exceed 6.0% of the principal amount of the notes sold.

### Intended Use of Proceeds

We currently intend to use the proceeds received from the sale of notes to purchase accounts receivable, make loans collateralized by accounts receivable, make loans or extend credit lines secured by assets, pay sales commissions and other offering costs, provide funds for general operating purposes, including paying the fees of the trustee and fees associated with maintaining the lockbox accounts and pay principal and interest on the notes.

There is no limit on the amount of proceeds that may be used to purchase or lend against accounts receivable as described in the section titled Accounts Receivable Characteristics. Ineligible receivables that do not conform to the section titled "Accounts Receivable Characteristics" below as well as loans (other than loans secured by receivables) to businesses are collectively limited to approximately 40% of the total amount of notes sold (see risk factor titled "There may be times when our investments in assets other than accounts receivables exceed 40% of the total amount of notes sold" above). In the future, it may be more convenient to use the proceeds of this offering, rather than income from operations, to pay interest on series I notes, and to repay principal of series I notes as they come due; provided, however, that we will only use the proceeds of this offering for such purposes if it would not cause the collateral coverage ratio to fall below 100%. We may also use some of the proceeds of sales of notes to pay sales commissions on other notes that are renewed at maturity. We anticipate that some of the proceeds from this offering, not used for the financing of accounts receivable or other assets, will be invested in money market funds, bank repurchase agreements, commercial paper, U.S. Treasury Bills and similar securities investments while awaiting use as described above.

Since we do not know the total principal amount of notes that will be sold, we are unable to accurately forecast the total net proceeds generated by this offering.

### Restrictions on Use of Proceeds

We will not use any proceeds from the sales of notes to pay administrative fees to Medical Capital Corporation for the services it provides as administrator or to pay servicing fees to MediTrak as the servicer of the receivables. The fees relating to these services are contained in the administrative services agreement and the master servicer agreement and are paid out of amounts collected from the accounts receivable and proceeds from other investments.

## PLAN OF DISTRIBUTION

### Offering of Notes

Medical Provider Funding Corporation VI is offering up to $400,000,000 in principal amount of notes on a continuous best efforts basis. The notes will be sold at their face value and in amounts of $50,000 or more in principal. You must purchase at least $50,000 in principal amount of notes. There is no minimum amount of notes that must be sold before we use the proceeds. Even if we sell less than all of the $400,000,000 in notes being offered, the notes that we sell will be issued, and the proceeds of those note sales will be invested as described in this Private Placement Memorandum. The proceeds from new sales of the notes will be paid directly to us promptly following each sale and will not be placed in an escrow account. For notes that are renewed by issuing a note offered under this Private Placement Memorandum, we will not receive any new proceeds.

### Marketing Arrangements

We expect to retain FINRA member broker-dealers and other appropriately licensed agents to sell the notes on a best efforts basis. No broker-dealer will have any obligation to take or purchase any notes. A broker-dealer is expected to assist us in the offering as follows: (1) in conducting informational meetings for subscribers and other qualified potential purchasers; (2) in keeping records of all

Confidential Treatment Requested by Medical Captial Holdings, Inc.        MCH0127022

subscriptions; and (3) in training and educating our employees regarding the mechanics and regulatory requirements of the offering process. These broker-dealers will receive sales commissions ranging from 4.50% to 6.0% of the aggregate principal amount of the notes they sell in the offering, depending on the class of notes sold.

Depending on market conditions, the notes may be offered for sale in the offering on a continuous best efforts basis by a selling group of selected broker-dealers agreed on by a broker-dealer and us. In addition, we may reimburse the broker-dealers for reasonable out-of-pocket expenses actually incurred, including expenses related to attorneys' fees and costs, not to exceed $500,000. We expect to agree to indemnify one or more broker-dealers against some liabilities, including liabilities under the Securities Act, and to contribute to payments they may be required to make in respect of those liabilities.

## BUSINESS

### Overview

Our primary business plan is to finance healthcare provider accounts receivable at prices that are based upon an assessment or valuation of the collectible value of those accounts receivable in the aggregate. We refer to this collectible value of the accounts receivable as the expected net receivable, or ENR. We finance the accounts receivable of a healthcare provider (a client) at a discount to the ENR amount of the receivable. We then attempt to collect 100% of the ENR. Under the terms of the purchase or loan agreement between us and the client, the client continues to collect the accounts receivable for our benefit, since the client billed the accounts receivable and the collection process is best served by the client's continued involvement. The client maintains the medical records associated with the financed accounts receivable. We rely on our affiliates to provide us the services required for the assessment, valuation, purchase, marketing, origination, underwriting, monitoring, administration and servicing of the financed accounts receivable.

We are increasing the number of financial products that we offer to the clients from which we purchase accounts receivable and to borrowers operating in the healthcare sector; provided, however, that we do not intend to make any loans or extend credit lines in any states that require a lending license or similar qualification without first obtaining such lending license or qualification. The financial products that we offer may include real estate first and junior lien mortgages and revolving credit lines. Usually, when we make an asset-backed loan with a healthcare client collateralized with assets other than accounts receivable, we and the borrower also enter into an accounts receivable financing contract.

### The Medical Capital Holdings Group

We are a wholly owned subsidiary of Medical Capital Holdings, Inc. In addition to our company, Medical Capital Holdings has other active operating subsidiaries engaged in healthcare related businesses. We often refer to these companies collectively as the Medical Capital Holdings group.

**Medical Capital Holdings, Inc.** Medical Capital Holdings is our parent entity and acts as a holding company for its five major operating subsidiaries. Medical Capital Holdings has been in business since 1996. In addition to the active operating subsidiaries described below, Medical Capital Holdings owns various special purpose corporations like Medical Provider Funding Corporation VI, each formed for the specific purpose of acquiring various groups or pools of assets. These special purpose corporations do not have active business operations other than acquiring, holding and collecting those assets.

**Medical Capital Corporation.** Medical Capital Corporation acts as the administrator for all of our receivable purchases and other lending transactions. Medical Capital Corporation essentially runs our business by administering our day to day operations, underwriting and originating our purchases of accounts receivable and performing marketing, sales and client support functions. Medical Capital Corporation primarily provides services to companies within the Medical Capital Holdings group. We compensate Medical Capital Corporation for underwriting and administering the accounts receivable that we purchase.

Medical Capital Corporation has provided services as an administrator since 1994 and is experienced in purchasing and monitoring healthcare receivables generated by all types of healthcare sellers. As of the date of this Private Placement Memorandum, Medical Capital Corporation had administered the purchase of over $5 billion in accounts receivable on behalf of companies in the Medical Capital Holdings group. Medical Capital Corporation generally charges companies in the Medical Capital Holdings group fees for its services that represent the approximate cost to Medical Capital Corporation of providing those services. We believe that the fees Medical Capital Corporation charges to companies within the Medical Capital Holdings group are similar to those that non-affiliated third parties would charge for providing the same services.

Medical Capital Corporation maintains an internet website at **www.medicalcapital.com**. Medical Capital Corporation uses this website as a marketing tool and solicits the purchase of healthcare receivables from potential sellers through the website. Because

REV 9-9-08                                         15

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**                    MCH0127023

Medical Capital Corporation underwrites the accounts receivable we purchase, some of our purchases and financing of accounts receivable may be made from sellers and borrowers that Medical Capital Corporation solicits through its website. Medical Capital Corporation also underwrites purchases of accounts receivable for other companies in the Medical Capital Holdings group, and to a limited extent, for companies outside the Medical Capital Holdings group. **Investors should not rely upon any representations made in Medical Capital Corporation's website, as the website is not part of this Private Placement Memorandum.**

**Medical Tracking Services, Inc.** MediTrak acts as the servicer for all of our accounts receivable transaction data. MediTrak monitors, tracks and posts all asset purchases and collections. We compensate MediTrak for performing these services for us. MediTrak primarily provides services to companies within the Medical Capital Holdings group.

MediTrak has been facilitating the manual and electronic tracking of healthcare receivables since 1997. MediTrak generally charges companies in the Medical Capital Holdings group fees for its services that represent the approximate cost to MediTrak for providing those services. We believe the fees MediTrak charges to companies within the Medical Capital Holdings group are equal to or lower than those non-affiliated third parties would charge for providing similar services. For services provided to companies outside the Medical Capital Holdings group, MediTrak generally charges higher rates. **MediTrak's website is www.meditrakservices.com. Investors should not rely upon any representations made in MediTrak's website, as the website is not part of this Private Placement Memorandum.**

**National Health Benefits Corporation.** NHBC provides medical healthcare claims processing, preferred provider organization (PPO) re-pricing and negotiated claims settlement services to insurance companies, third-party medical claims administrators and to companies that self-insure their medical claims. NHBC has been in business since 1987. We do not anticipate that NHBC will provide any services to us. NHBC's website is www.nhbc.com. **Investors should not rely upon any representations made in NHBC's website, as the website is not part of this Private Placement Memorandum.**

**Healthcare Financial Management and Acquisitions, Inc.** HCFMA collects and liquidates portfolios of accounts receivable for Medical Capital Corporation as well as outside, unrelated clients, such as financial asset-based lenders. Since there are unique characteristics and processes involved in the collection of aged accounts and liquidating portfolios of accounts receivable, HCFMA is establishing itself as a significant resource in the collection of healthcare accounts receivable. HCFMA has unrelated individual healthcare provider clients for whom it performs both billing and collection services in the healthcare sector sub-segment and in the market pertaining to New York's "no fault" personal injury protection. HCFMA's website is www.hcfma.com. **Investors should not rely upon any representations made in HCFMA's website, as the website is not part of this Private Placement Memorandum.**

**Financing Criteria**

The accounts receivable that we finance will be selected on the basis of underwriting standards established by Medical Capital Corporation. These standards are modified from time to time, based on changes in the market and economic environment, as well as the experience of Medical Capital Corporation in selecting receivables for financing by Medical Provider Funding Corporation VI and other affiliates. Medical Capital Corporation uses underwriting criteria which are similar to those used by lending institutions who lend against similar assets. It tests the prospective accounts receivable collateral through the use of at least two methods as described in the section titled "Receivables and Asset-Based Loan Underwriting Criteria." In addition, the relevant operating, historical and financial data of prospective clients (sellers or borrowers) are reviewed to assess the financial risk involved in financing that prospective client's accounts receivable and/or assets. This includes an on-site review of the prospective client's offices to confirm that the client has the capability of billing and collecting the accounts receivable and remain in business to fulfill the terms of the purchase or lending agreement. The following description explains, in a general way, the basis for selection of healthcare receivables for financing.

We will not purchase or finance any portion of a healthcare account receivable that is owed by an individual consumer or patient or a receivable that is classified as "self-pay". "Self-pay" refers to an uninsured patient or responsible consumer or that portion of an account receivable that is not reimbursed by a third-party insurer or payer,

**Background.** Financial groups and various smaller financing companies often provide financing collateralized by receivables. However, most of these institutions are not active in the healthcare sector. As a general matter, Medical Capital Corporation believes these lenders typically have been less willing to provide financing to healthcare clients because these lenders have not developed the healthcare industry expertise needed to underwrite the specialized receivables. These lenders also lack specialized systems necessary for tracking and monitoring healthcare receivables transactions, which are different from traditional accounts receivable finance transactions.

**We Target Healthcare Receivables Clients.** Medical Capital Corporation offers financing to physician practitioners, multiple physician groups, small to medium-sized hospitals, skilled nursing facilities, home health agencies, medical clinics and durable

Confidential Treatment Requested by Medical Captial Holdings, Inc.                MCH0127024

medical equipment providers, and other providers of goods and/or services in the healthcare sector by financing their receivables. Currently, its primary marketing strategy is to focus on the financing of accounts receivable from:

- hospitals;

- skilled nursing and assisted care facilities;

- physician groups consisting of one to six doctors;

- home healthcare facilities;

- durable medical equipment distributors;

- medical staffing companies;

- radiology and diagnostic medical facilities;

- medical testing facilities; and

- other healthcare businesses and related businesses which we determine through the underwriting process to have relatively low risk.

Medical Capital Corporation targets primarily those clients generating billings of $500,000 to $10,000,000 per month. They are healthcare providers who bill for healthcare goods and services using a retail billing rate for the services provided. They are then paid by the insurance companies based on medical fee schedules regionally established or referenced by the insurance industry or governmental agencies. These healthcare providers are mainly physician practitioners, multiple physician groups, small to medium-sized hospitals, skilled nursing facilities, home health agencies, medical clinics and durable medical equipment providers.

**Target Geographical Areas.** Medical Capital Corporation targets both metropolitan and rural markets for the purchase or financing of accounts receivable. Presently it has clients in major metropolitan areas like New York, Chicago, St. Louis and Southern California. It believes the middle to higher tier of metropolitan statistical areas contain the size and type of prospective clients that best suit its underwriting criteria. Additional markets include rural-based hospitals and larger clinics.

**Obtaining New Clients.** Medical Capital Corporation generally has four potential sources for developing and locating the client base from which we (and other affiliates) finance accounts receivable: (1) referrals from banks and other financial institutions, (2) referrals from independent financing brokers (we refer to them as "referral affiliates") and similar agents, (3) its network of companies that are in healthcare service businesses with which it has formal or informal cross referral arrangements, and (4) its marketing, origination and sales personnel. Medical Capital Corporation uses a network of referral affiliates who contact potential sellers or network with referral sources in their territory on a regular basis. Currently, Medical Capital Corporation has sales-referral networking sales representatives in Southern California, Chicago, Dallas and New York. The primary responsibility of the sales representatives is to develop and maintain relationships with their referral sources. These representatives are experienced in developing business within the commercial financing industry and have received specialized training from Medical Capital Corporation in the specific and distinctive issues surrounding the healthcare sector.

Banks and traditional financing companies are often approached by healthcare providers for their financing needs. Often, these traditional sources of financing do not understand the needs of these healthcare providers and the distinctive aspects of their business. In addition, traditional sources of financing typically do not understand the valuation of the assets that healthcare providers offer as a basis for financing. Medical Capital Corporation has the ability to value and appraise these healthcare assets, especially healthcare accounts receivable.

Medical Capital Corporation believes a rapidly growing community of independent brokers or referrers exists that arranges financing specific to the healthcare sector. These brokers refer sellers and borrowers to different lending institutions for a fee. These brokers assist in locating sellers and borrowers that typically cannot find traditional financing because of their size or the distinctive nature of the healthcare sector. These brokers and referrers often refer potential sellers and borrowers to Medical Capital Corporation. If we finance receivables from the referred seller, we pay a pre-arranged fee to the broker, referrer or referral affiliate. This fee is part of the origination fee charged to the seller or borrower at the close and initial funding of the transaction. In the case of multiple purchases of accounts receivable, there may be a pre-arranged fee paid by Medical Capital Corporation as part of these ongoing purchases. Any such fee is paid by Medical Capital Corporation as part of the services for which it is paid its administrative fee under the

REV 9-9-08                                    17

Confidential Treatment Requested by Medical Captial Holdings, Inc.                    MCH0127025

Administrative Services Agreement between us and Medical Capital Corporation.

The contacts of our brokers, referrers and referral affiliates have been developed over the past years through our affiliates' marketing and hiring efforts. In addition, many of our affiliates' officers and employees have previously worked in the healthcare sector in such areas as billing, collection, financing recovery and liquidation of accounts receivable and other assets. Medical Capital Corporation maintains membership affiliations with key industry groups, such as the Commercial Finance Association and the Western States Community Bankers association.

In addition to the above efforts and sources of obtaining new sellers and borrowers, Medical Capital Corporation maintains an Internet website at www.medicalcapital.com. Medical Capital Corporation uses this website as a marketing tool to reach potential sellers and borrowers in its target market. The website describes the business of Medical Capital Corporation, the receivables financing process and Medical Capital's program for financing, as well as offering flexible financing solutions for potential sellers and borrowers. The website also contains information and support for its network of referral affiliates, informing them of methods and techniques to help sell the services of Medical Capital Corporation to healthcare providers that may need financing. The website does not specifically refer to Medical Provider Funding Corporation VI and **you should not rely on any of the information in the website to influence your decision regarding the purchase of notes as described in this Private Placement Memorandum. Medical Capital Corporation's website is not part of this Private Placement Memorandum.**

### Receivables and Asset-Based Loan Underwriting Process

**General.**   The financing process used by Medical Capital Corporation has been in use and refined since 1994. Medical Capital Corporation also underwrites and has administered the purchases of healthcare receivables and portfolios of healthcare receivables for other companies and entities not affiliated with Medical Capital Holdings, Inc.

When we identify a healthcare client or other client for whom we may finance receivables, we enter into either a receivables purchase agreement or a receivables backed loan agreement with that client. These agreements give us the right of first refusal to finance all receivables from that client either weekly, bi-weekly, semi-monthly or monthly, generally for a period of one year. The terms of the agreement vary from client to client. Each finance interval (typically weekly, semi-monthly, or monthly) Medical Capital Corporation reviews all receivables we financed in the preceding week and decides which receivables it will finance on our behalf during the subsequent purchase interval. We refer to each financing of receivables in an interval as a "batch." Medical Capital Corporation has the sole discretion as to which receivables we will finance and the pricing of the financing of the batch of receivables.

**Underwriting Policies.**   All of our underwriting procedures are carried out on our behalf by Medical Capital Corporation through its underwriting and business development departments. Medical Capital Corporation maintains an underwriting department with experience in underwriting healthcare accounts receivable. The underwriting policies are consistent for both purchases of accounts receivable and loans backed by accounts receivable. For the purpose of this explanation of underwriting policies, any references to sellers of accounts receivable also apply to borrowers of accounts receivable or asset-backed loans. The underwriting policies of Medical Capital Corporation require a due diligence review of the prospective seller or borrower, its principals, its financial condition and strategic position, including a review of all available financial statements and other financial information, legal documentation and operational matters. Medical Capital Corporation's due diligence review also includes a detailed examination of the client's accounts receivable, accounts payable, billing and collection policies and practices, management information systems and real and personal property and other collateral. Records and data of the seller for the prior 24-month period are reviewed and evaluated for consistency, reliability and adequacy of performance. While past collection records of a client's receivables often are a good predictor of likely future results, past results may not reflect actual future results. Therefore, it is possible that the historical performance of receivables approved for financing under our administrator's program will be different from future collections on the receivables, which could adversely affect our profitability.
Medical Capital Corporation also normally requires:

- the client principal, each of the individual physicians and any medical personnel to be properly licensed to practice and have no unresolved legal or medical issues regarding their practice or an unusual amount of malpractice litigation, or litigation matters that were not disclosed by the healthcare provider;

- the provider to have been in business in its community for a minimum of 18 months;

- the client to demonstrate credit-worthiness as determined by assessments of credit reports, past receivables financing history, bank references, financial statements, accounting firm comments and UCC-1 searches;

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**          MCH0127026

- the client to grant us a first priority security interest in the client's accounts receivable, including all accounts receivable that the client may have in process and those accounts receivable that are not directly financed by us;

- the client to pledge all of its receivables, existing and future, as additional collateral, and to establish up to a 25% reserve accounting for the portion of the financing value of the receivables that will be withheld from the client; and

- one or more principals of the client to guaranty performance by the client of its covenants under the receivables purchase or loan agreement.

**Credit Risk Management.** The healthcare receivables that we acquire generally represent obligations of third parties to pay for healthcare services that have been rendered to patients by healthcare providers. Our healthcare receivables are paid by third-party payors, such as health maintenance organizations, managed care concerns and other insurers, large corporations that may be self-insured, other healthcare plans and government agencies. Because we finance these types of receivables, we rely on payments from these third-party payors for collections. We do not finance the portion of any healthcare receivable that is payable by individuals.

The possible insolvency or loss of funding of a particular third-party payor is a significant risk to our business. In order to minimize this risk, we impose restrictions on the amount of receivables that can be financed from any particular third-party payor, within each client and within the total loan portfolio. We review industry rating agency reports and industry journals and articles in order to gain any insight into possible financial problems of any third-party payors. Medical Capital Corporation independently confirms various matters with respect to the clients' business and the collectibility of its accounts receivable and any other collateral by conducting public record searches, and, where appropriate, by contacting third-party payors about the clients' receivables.

A credit report is obtained from an appropriate credit agency on each prospective client and its principals and any of its personnel with any ownership interest. Any negative credit comments must be explained and documented to our satisfaction or the satisfaction of Medical Capital Corporation. Special attention is given to any past receivable financing history. If the client finances any equipment, the applicable equipment leasing companies will be contacted for a credit history and reference. Prospective clients are required to provide favorable bank references. A UCC-1 financing statement search is performed to confirm that there are no present liens against the receivables of the prospective client. If any receivable liens do exist, the lien must be paid off before, or as part of, the initial purchasing or funding of any receivables.

**Purchase of Accounts Receivable.** Our accounts receivable purchase or loan agreement with a client requires that we have the first right of refusal on all of the client's accounts receivable on a regular-interval basis, for a minimum one year term. However, our total investment in accounts receivable from a client under either such agreement generally is made on a specified "commitment" amount as defined in the early stages of underwriting through a term sheet or letter of intent to finance accounts receivable. We do not make "one-time" purchases or loans against of accounts receivable.

For the first financing from a client, we review and offer to finance all of the accounts receivable of that client, depending on the above detailed analysis of the accounts receivable. This initial batch of receivables may be as much as 120 days aged from the date of original billing.   This initial batch of receivables is assessed claim-by-claim on a line item basis to ensure that the receivable remains collectible. We have more exposure on the initial batch of receivables since the billing has occurred prior to our engagement with the client and does not yet bear our lockbox remittance address.  The client is bound contractually to ensure that any payments for receivables financed are forwarded promptly to the client's assigned lockbox.  Contractual remedies regarding collections not forwarded to the client's assigned lockbox include but are not limited to cash reimbursement of the collections and reconciling withholding of advances on future financings of batches of receivables.

After the first financing, and for subsequent financings of batches of receivables we analyze all receivables from the preceding interval and decide which additional accounts receivable we will finance during the next interval. Under the terms of the financing agreement with the client, for each batch of receivables, we offer a financing price or value (for the entire batch of receivables submitted to us) equal to the aggregate purchase price or value of all accounts receivable (at ENR) that qualify under the terms of the financing agreement.  This means that although we may not advance amounts on a specific claim or claims, we in fact finance all claims, whether or not they qualify as eligible under our underwriting criteria as part of the aggregate purchase of the batch of receivables. Although we may own or have the right to receive payment from those claims that do not qualify under our underwriting criteria, they are not considered as collateral eligible for reporting purposes. Oftentimes we collect those ineligible receivables and apply those collections to the reserve accounting formula for the respective client.

Under the terms of the respective purchase or loan agreement with the client, we agree upon an allowable collection term (time to collect a batch of accounts receivable) for each accounts receivable portfolio.  The accounts receivable eligible for inclusion in the

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**          **MCH0127027**

collateral coverage ratio is based upon the batches of receivables due and owing as of the date of calculating that ratio. The number of days outstanding is counted from the date of purchase of each respective batch of receivables. Therefore, a client may provide a good or service on a specific day, bill the responsible insurer or obligor some days hence (typically less than 30 days) and the seller or borrower may submit the bills for financing during their next contracted purchase interval. At the time it is submitted to the obligor or payor, an individual account receivable (i.e. claim) could be 60 days, or older from the date the service or goods were provided. For this reason, and pursuant to our underwriting criteria and receivables pricing, we have the sole discretion as to which accounts receivable we will finance for a seller. We reserve the right to disqualify some categories, or some payors, of accounts receivable for financing at our discretion.

**Accounts Receivable Characteristics.**   On an ongoing basis, and in the ordinary course of business, we finance accounts receivable that are less than 90 days old. In some cases, however, we may finance accounts receivable that are more than 90 days old, depending on the analysis of the account receivable. The age of any account receivable is the number of days elapsed since its billing date to the obligor or payer. We finance accounts receivable with the goal that the average age of accounts receivable in our portfolio generally will not exceed 180 days. We have the sole discretion as to which accounts receivable we will finance for a client. We reserve the right to disqualify some categories, or some payors, of accounts receivable for financing at our discretion.

When financing accounts receivable, we only purchase or finance accounts receivable that are to be paid by:

- an insurance carrier with at least an "A" rating from a recognized rating agency like A.M. Best or Standard & Poor's;

- an HMO approved by Medical Capital Corporation;

- Medicare, Medicaid, CHAMPUS or other government agency approved by Medical Capital Corporation;

- County, Municipal, School District or other institutional facility approved by Medical Capital Corporation;

- a permissibly self-insured employer, as defined by a state authority; or

- any other entity which meets our financial standards.

Except for government agencies, the target maximum percentage of our portfolio of receivables that are payable by a single payor is 15%. We also ensure that at any given time, no more than 50% of our total outstanding investment portfolio of receivables, in the aggregate, is from Medicare and Medicaid payors. Because Medicare and Medicaid claims are submitted and subsequently paid electronically, the turnaround time for payment is about 30 days. It is for this reason we accept higher amounts of these receivables than from traditional commercial insurance carriers.

An "A" credit rating for an insurance carrier from A.M. Best means that the carrier has an excellent to superior ability to meet its obligations when due. A.M. Best publishes both a financial strength rating and a financial performance rating on more than 6,000 health, property and casualty insurance companies. A.M. Best's financial strength ratings range from A++ (Superior) to F (In Liquidation) and include 15 separate ratings (not including the S rating for "Suspended"). Our financings of receivables owed by insurance carriers are generally limited to those with an "A" or better rating because we believe insurance carriers with an "A" or better rating are more likely to pay a healthcare receivable on time. A.M. Best's "A" rating is its third highest rating.

We primarily finance accounts receivable that are payable by the types of payors described above. These are direct obligations owed by one business to another business for goods and services already provided or rendered. In respect of healthcare accounts receivable, we will only finance the insured portion of an account receivable generated by healthcare providers for goods and services rendered during the care of patients and that meet the financial requirements and underwriting standards established by Medical Capital Corporation. The insured portion of a healthcare receivable represents an obligation of third-party insurance companies, large corporations (as administered by third party administrators), state or federal government agencies, preferred provider organizations or health maintenance organizations. Medical Capital Corporation has been using and continually refining these underwriting standards since 1994.

The underwriting and business development departments of Medical Capital Corporation use credit criteria which are similar to those used by lending institutions who lend against similar assets. Medical Capital Corporation further tests the prospective accounts receivable through use of at least two methods for assessing the value of the accounts receivable. In addition, the relevant operating, historical and financial data of prospective sellers and borrowers are reviewed to assess the financial risk involved in financing that prospective client's accounts receivable or that prospective borrower's assets. This includes an on-site review of the seller's or

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**                    MCH0127028

borrower's offices to confirm that the seller or borrower has the capability of billing and collecting the accounts receivable and remain in business to fulfill the terms of the purchase or financing agreement. We will not finance any portion of accounts receivable that are owed by individuals or that are "self-pay." Self-pay relates to the portion of a healthcare receivable to be paid by an individual patient or other individual that is financially responsible for the patient.

**Pricing Receivables for Financing.** Once a client has met the criteria and agreed to the requirements, Medical Capital Corporation begins the process of selecting and pricing the receivables for financing. One of the most important aspects of the selection process, and the due diligence procedure performed on prospective client, involves an analysis of a client's receivables and collections to evaluate the receivables likely to be paid within a defined collection period. The analysis covers a period of not less than the prior 24 months. Using this data, Medical Capital Corporation develops ratios and other data which include the following information:

- the monthly total receivable balance;

- the amounts billed to and collected from the various payors;

- the amount of claims paid;

- the amount of claims not paid, and why;

- a review of claims files and related medical and billing records;

- the average payment turnaround time;

- the average response time of the prospective client to return payor requests for information;

- the classification of claims between insured and uninsured;

- the amount and number of worker's compensation and personal injury claims;

- the ratio of total monthly billed to total monthly collected receivables; and

- review of historical collections from each third-party payor of the receivables, including a listing of and aging of the receivables by each payor with a corresponding financial status rating of each.

From these data points, Medical Capital Corporation calculates an average receivable amount, receivable turn time, and the payment trend analysis on each payor. We also verify the existing outstanding receivables by randomly selecting individual billing files and contacting the applicable third-party payor to determine whether the claim has been submitted for payment and will be paid as anticipated. Prior to an account receivable being deemed eligible for financing by us, one of our required conditions is that there be an established payment history by the payor of the account receivable reimbursing an amount at least equal to the expected net receivable amount generally within 60 to 90 days of the date the claim is submitted. Finally, we interview the prospective seller's administrative, accounting and billing personnel to document and review the integrity of internal controls and follow-up billing and collections procedures.

The amount of our financing for a batch of healthcare and other receivables is based on a percentage of the face value of the receivable. To determine this amount, usually Medical Capital Corporation calculates, for the client, the ratio of actual collections to billings, in the aggregate, by using two methods:

(1) Determining an average of the ratio of billings to collections on a historical basis, for a minimum of two years, and

(2) Analyzing receipts and accompanying remittance advices, or "explanations of benefits" for a recent period, usually two months.

The resulting amount is then further reduced by considering other factors that influence the amount which is likely to be collected under the receivable, including the collection experience, office processes and specific area of expertise of the client. The resulting number is the estimate of the net collectible value of the receivable, which we refer to as the expected net receivable, or ENR. The ENR is a portion of the gross face amount of claims that are presented to us for financing, and is the amount that we actually expect the third party payor to pay on the batch of accounts receivable. The ENR is determined by Medical Capital Corporation's

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**                    MCH0127029

underwriting department through its underwriting process. The ENR is almost always less than the face amount of the accounts receivable and never more. For the accounts receivable we finance the ENR currently ranges between 25% and 90% of the face amount of the receivable. All of our calculations of purchase price, reserve and amount advanced to the client are based on the ENR. We do not use the face amount of the receivable for any calculations because we do not expect to be able to collect anything more than the ENR.

**Our Discount Fee.** We receive a fee, called the discount fee, on each purchased receivable. The discount fee is set in the receivables purchase agreement with the seller. We determine the discount fee through an analysis of the turnaround time during the ENR determination process, and take into account such factors as the days outstanding for a batch of accounts receivable, the average size of the claims (or individual accounts receivable), credit criteria for risk mitigation purposes, such as type of medical provider, creditworthiness of the principals of the seller entity, and years in business. The discount fee may also include the referral affiliate's fee. On average, the discount fee is approximately 6.0 to 8.0% of the ENR, though historically discount fees have ranged from as low as 3% to as high as 20%. Should we miscalculate the discount fee, we have the contractual right to adjust the discount fee for future purchases of accounts receivable batches from a seller. Medical Capital Corporation attempts to mitigate the risk of underestimating the appropriate discount fee through ongoing monitoring and administrative services as described in the section entitled "Administration and Servicing of Assets." If we were to miscalculate the ENR or the discount fee over a period of time, and not make the proper corresponding adjustments to our evaluation of new batches of accounts receivable, it could affect our ability to repay our noteholders.

**Reserve Accounting.** Only a portion of the amount financed, typically around 80%, but never exceeding 90%, of the ENR, is paid to the client immediately. The remainder of the ENR, net of our discount fee (or in the case of a loan, net of the advance, less any interest already paid), is deferred and allocated to a reserve accounting for that client. The reserve accounting reflects funds withheld from the client that are available to cover obligations that the seller has, in case of a breach of its representations, warranties and covenants under the receivables purchase or loan agreement. If the reserve accounting for a client exceeds 25% of the uncollected receivables for that client, we normally release to the client the excess above 25%. If, however, that client is in breach of its representations, warranties and covenants, or if we have reason to expect such a breach in the future, we may retain these amounts. At the end of the finance agreement term, the client may not be contractually entitled to remaining funds as accounted for in the reserve accounting if the client has breached any covenants or warranties as set forth in the receivables purchase or loan agreement.

**Batching of Accounts Receivables.** We finance accounts receivable from each client in batches. Each batch after the initial batch that we finance typically consists of between $25,000 and $2,000,000 in ENR. The client's reserve accounting arising from each batch is accounted for separately. To the extent that any accounts receivable are found not to satisfy the representations and warranties given by the client, the client is required to repurchase or provide substitute accounts receivable for those accounts receivable. If the client does not otherwise provide cash or substitute receivables for the nonconforming receivables, we apply funds from the reserve accounting to effect the repurchase or replacement. We may continue to attempt to collect payment on these receivables, as a convenience to the client, but any funds that we collect are for the benefit of the client, and applied to the reserve accounting.

We continue to collect payment on the accounts receivable in each batch for a period of time, normally between 120 and 180 days from the date of financing of the respective batch. We then reconcile the amounts collected, as well as any repurchases or replacements that have been required due to breaches of representations and warranties. We refer to this reconciliation as closing the batch. After closing the batch, we determine what portion of the deferred financing value remains in the reserve accounting. We either pay this amount to the client, or, if the client has other batches that have not yet closed, apply it to the reserve accounting with respect to those other batches. The effect of this process is that the deferred portion of the financing value of a client's accounts receivable is paid to the client only if there are sufficient reserves to cover 25% of the accounts receivable in all of that client's batches that have not yet closed.

**Acquisition of Loans and Other Investments**

We expect the healthcare sector to continue to provide long-term growth opportunities. We are increasing the number of financial products that we offer to the clients from which we purchase accounts receivable and to borrowers operating in the healthcare sector; provided, however, that we do not intend to make any loans or extend credit lines in any states that require a lending license or similar qualification without first obtaining such lending license or qualification. The financial products that we offer may include real estate first and junior lien mortgages and revolving credit lines. When we make a loan, we and the borrower generally enter into an accounts receivable purchasing contract. In cases such as these, the term of the loan is no longer than the term of the receivable finance contract. In addition, we may finance general business receivables payable by commercial enterprises that are determined through the underwriting process to be of relatively low risk. These loans or promissory notes are general obligations of the borrower further collateralized by one or more of the following: accounts receivable, inventory, purchase order, cash flow, intellectual property, patents and/or real estate. Our strategy for continuing to expand lending or leasing activities are:

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**                    MCH0127030

- Target sub-markets within the healthcare sector that have favorable characteristics for working capital financing, like fragmented sub-markets experiencing growth, consolidation or restructuring. Our initial focus is on the purchase of healthcare receivables in these sub-markets.

- Focus on sellers or borrowers with financing needs of between $500,000 and $10,000,000, which is a market that we believe has been under-served by commercial banks, diversified finance companies, traditional secured lenders and our other competitors. Most commercial banks, diversified finance companies and traditional secured lenders have typically focused on providing financing to companies with borrowing needs in excess of $5,000,000, however larger clients have engaged with Medical Capital Corporation in recent years. These clients are multiple site hospital operators. In order to mitigate risks associated with these multiple hospital systems, we fund, track and contract with the individual hospital facilities. We believe that our target market for transactions is much larger, in terms of the number of available financing opportunities, and is less competitive than the market servicing larger borrowing needs, thereby producing growth opportunities at attractive rates.

- Become the primary source for all financing needs of various entities involved in the healthcare sector sellers by introducing new financial products to leverage our and our affiliates' existing expertise in healthcare and other finance, and providing other services within our target markets. We expect to selectively introduce new products to existing and new sellers and borrowers, depending on their needs, general economic conditions, our resources and other relevant factors. In some cases, we anticipate that new products may be introduced as part of cooperative arrangements with other companies.

## Administration and Servicing of Assets

**Administration of Operations**. We have entered into an administrative services agreement with Medical Capital Corporation, one of our affiliates. Under the terms of the administrative services agreement, Medical Capital Corporation has agreed to serve as the exclusive provider of management services to us and as the administrator for the receivables and other financial assets that we acquire. As the administrator, Medical Capital Corporation is responsible for providing us the general and administrative services to facilitate the underwriting evaluation of receivables and other financial assets to be purchased or used as collateral for a loan. It provides the personnel and computer systems that are necessary to ensure the collateral is safeguarded and performs as anticipated. It also ensures the adequate processing and reporting of the assets in the portfolio. In addition, Medical Capital Corporation hires specialist appraisers, evaluators or monitors to help assess, appraise or evaluate a borrower's assets.

Medical Capital Corporation is responsible for providing management and underwriting services and making available to us its offices, personnel, facilities, equipment and services, as are determined to be reasonably necessary for the proper and efficient operation of our business. These services include:

- bookkeeping, payroll and accounting services, including administration of all promissory notes and interest payments;

- marketing and public relations;

- maintaining a network of account consultants to develop and maintain our relationships with receivable sellers; and

- opening, maintaining and directing bank accounts and lock box accounts for our benefit.

Under the administrative services agreement, we pay Medical Capital Corporation fees for providing the above services to us. The fees for the various services they provide are equal to the amount in the trust account that exceeds the amount needed for the collateral coverage ratio to equal 100%, after all required payments of trustee, servicer and lockbox fees and all principal and interest then due on the notes. The collateral coverage ratio is the ratio of (A) the ENR of all eligible accounts receivable included in the collateral plus the value of other assets included in the collateral (which, in the case of loans secured by real or personal property, is the lesser of the amount owing on the loan and the value of the property securing the loans) plus funds and investments in the lockbox accounts and the trust account (including funds loaned by Medical Capital Corporation, as administrator, on a nonobligatory basis, and deposited into a special account to pay the monthly trustee fee and periodic interest payments under the notes, to the extent amounts in the trust account are insufficient; Medical Capital Corporation has the right, but not the obligation, to make advances to us for these purposes) to (B) the aggregate outstanding principal amount of all notes. In addition to this fee, we also reimburse Medical Capital Corporation for compensation paid to its investor relations department for services rendered to us by that department. We also reimburse Medical Capital Corporation for out-of-pocket expenses paid on our behalf.

Confidential Treatment Requested by Medical Captial Holdings, Inc.          MCH0127031

**Lock Box and Collections.**  As required under the receivables financing agreements with each seller or borrower, all proceeds from the collection of the purchased receivables and principal and interest payments on loans, are required to be paid to a lock box, unique to that seller or borrower.  A lock box is a post office box established by the bank that processes the payments.  Payments are sent directly to these lock boxes.  Therefore, the third-party payor payments of receivables do not go to the seller or borrower, but rather are sent to the appropriate lock box.  When a client enters into a receivables financing agreement, a notice of change in mailing address is sent to all payors of the receivables that are being financed.  The notice instructs the payors to deliver all payments to the appropriate lock box.  Each lock box is established and functions solely to receive payments of receivables that were financed for one client.  When payments are received in the lock box, the lock box processing bank deposits the payment into a lock box account at that bank.  The lock box account is a bank account in the name of the seller and Medical Capital Corporation for government collections (Medicare, Medicaid, CHAMPUS, etc.), and in the name of Medical Capital Corporation alone for non-government collections.  The lock box accounts are swept daily by each bank maintaining a lock box account into a trust account that is under the control of the trustee.  The funds then remain in the trust account until disbursed to finance receivables, to pay certain fees and expenses, or until transferred to us for distribution in payment of interest and principal.

Accounts receivable due and owing from government programs are subject to laws and regulations not applicable to commercial payors.  Except in limited cases, Medicare and Medicaid laws and regulations provide that payments for services rendered under government programs can only be made to the healthcare provider that has rendered the services.  This is the reason that the lock box accounts for government collections are jointly in the name of the seller and Medical Capital Corporation.  If a governmental agency refuses to pay a healthcare receivable, we cannot force collection directly from the government agencies that are obligated to pay the healthcare receivables owed to us unless we first successfully obtain a court order.  This inability to force collection directly from the government agency without a court order could adversely affect our business.

**Tracking Receivables by Batch**.  After each batch of receivables is collected, Medical Capital Corporation reviews its collections history in comparison to the expected performance on the basis of which that batch was originally priced.  This analysis is applied to evaluate the ENR rates used for the relevant client in the future.  Should we make a loan to a borrower that is secured by assets that include accounts receivable, the borrower's accounts receivable will be tracked on a cash flow basis, to assure that the contractual collateral requirements are satisfied.  This cash flow-basis tracking is accomplished by having all collection proceeds flow into a lock box, in a manner similar to that used in the receivables purchase program.

Medical Capital Corporation causes reports to be generated reporting purchased receivables on a client-by-client basis.  These reports provide currently updated accounts receivable agings and other valuable portfolio information, including collections performance, cash receipts and adjustments for write-offs, if any.  Copies of these reports are sent to our executive offices and the respective clients.

**Servicing of Receivables and Non-Receivable Assets.**  We have a servicing agreement with our affiliated company, MediTrak, which is headquartered in Las Vegas, Nevada.  The servicing agreement provides that MediTrak will service the receivables and provide other support in connection with the processing and tracking of accounts receivable purchased or financed, posting of payments (receipts) of the accounts receivable, certain monitoring, enforcement of rights and payor notifications and related services.  MediTrak services all accounts receivable that we finance with our clients.  MediTrak also prepares analysis reports of receivables that are submitted for purchase or financing, but ultimately are disqualified for advances and not funded.

MediTrak maintains data on the accounts receivable we finance on a claim-by-claim basis, and processes and reports the data on a batch basis.  The payor's explanations of benefits, remittance advices and payment reports, which show how the payments on each receivable were calculated, its remittance advices and warrants from government agencies, and all other payments, are sent directly to the bank that is performing the lock box processing.  Copies of these documents are forwarded by the bank to MediTrak for posting. MediTrak is also provided with a report from the lock box processing bank of deposits into the lockbox accounts.

MediTrak inputs this information into its system and posts the proper credits to each client's account, on an account-by-account basis. It then transmits a report electronically to us giving details of all amounts received.  MediTrak then sends copies of all payment documents and other accompanying documents to the client.

For assets other than accounts receivable that are included in the Collateral, MediTrak will collect, post and process data in a generally similar manner, as appropriate for each asset type.

Under the servicing agreement, MediTrak is compensated for its services by receiving a fee for each claim posted on its tracking system.  The fee is equal to $3.00 per claim item in addition to a monthly minimum fee of $200.00 per seller, a one-time setup fee of $2,000 for each client and one-time data interface fee of up to $2,000 for each client.  We believe the fees MediTrak charges to companies within the Medical Capital Holdings group are equal to or lower than those non-affiliated third parties would charge for providing similar services.

Confidential Treatment Requested by Medical Captial Holdings, Inc.          MCH0127032

**Credit Loss Policy and Experience**

We establish, and regularly review to determine their adequacy, bad debt reserves for losses on accounts receivable, loans and other assets. To date, none of our affiliates has experienced any net losses on the pools of receivables they hold. We expect to maintain the bad debt reserve for losses on receivables at an amount estimated to be sufficient to absorb future losses, net of recoveries, inherent in the receivables. In evaluating the adequacy of the bad debt reserves, we consider factors like trends in healthcare and other relevant sub-markets, past-due accounts, historical charge-off and recovery rates, credit risk indicators, economic conditions, on-going credit evaluations, overall portfolio size, average seller balances, reserve account balances, real estate collateral valuations, if any, and underwriting policies. Many of these considerations involve the significant use of estimates and are subject to rapid changes which may be unforeseen and could result in immediate increased losses and material adjustments to the allowance or actual losses.

**Title to Accounts Receivable**

We believe that the accounts receivable purchase transactions we enter into are "true sales" and the purchased accounts receivable are owned by us. However, the purchase of an account receivable might be characterized as a secured financing, or a loan secured by the receivables. Therefore, we also take a first priority security interest in each account receivable purchased and file a UCC-1 financing statement under article 9 of the Uniform Commercial Code covering the purchased account receivable, as well as a separate UCC-1 financing statement covering all accounts receivable of the seller, pursuant to the terms of the accounts receivable purchase agreement by and between us and the seller. If it is determined that a true sale of the accounts receivable has not occurred, we may still be able to foreclose on the accounts receivable and the proceeds of the accounts receivable, as security for the amount paid for those accounts receivable.

When we make loans secured by accounts receivable or other assets that are personal property of a type subject to perfection through the filing of a financing statement, we file a UCC-1 financing statement covering all of the accounts receivable and all other assets of the borrower, pursuant to the terms of the financing agreement by and between us and the borrower. If the loan to the borrower is not repaid, we can foreclose on the assets and proceeds, taking title to accounts receivable and other assets and proceeds, sell or collect the accounts receivable and sell any other assets, and apply the resulting proceeds to repay the debt obligation of the borrower.

Although we pledge accounts receivable to the trustee under the Note Issuance and Security Agreement, we recognize that some accounts receivable may prove to be non-assignable. For example, the assignment of some Medicare and Medicaid accounts receivables may be prohibited by federal law. It is common in the medical accounts receivable financing industry to take other measures to secure the receipts from Medicare and Medicaid accounts receivables. We make every effort to ensure that the accounts receivable that we purchase are assignable. If an account receivable turns out to in fact be non-assignable, it is possible that neither the trustee nor we will have received title to the receivable, or even a security interest in it. This problem is addressed by taking additional collateral as security from the seller or its owners. Other steps may also be taken by our underwriting and business development departments to ensure that the notes are fully secured.

In a few cases, assignment of an account receivable of or any security interest in a nursing home has been found to require the recording of a mortgage. This is a practice we attempt to avoid and do not currently intend to follow, except when real property is actually being pledged as part of a receivables purchase or other financing transaction. In the event of a default by the payor or fraud on the part of the seller, on accounts receivable of this type, we could be at risk to the extent of the portion of the purchase price advanced with respect to the receivables.

**Competition**

We encounter significant competition in our healthcare finance business from numerous commercial banks, diversified finance companies, secured lenders and specialty healthcare finance companies. Many of these competitors have greater financial and other resources than we and may have significantly lower cost of funds because they have greater access to insured deposits or the capital markets. Moreover, some of these competitors have significant cash reserves and can better fund shortfalls in collections that might have a more pronounced impact on companies such as ours. They also have greater market share. In addition, accounts receivable clients often seek alternative sources of financing from a number of sources, including venture capital firms, small business investment companies, suppliers and individuals. As a result, we compete with a significant number of local and regional sources of financing and several large national competitors.

Competition can take many forms, including the pricing of the financing, transaction structuring, like the use of securitization vs. portfolio lending, timeliness and responsiveness in processing a seller's financing application and customer service. Some of our competitors may offer better pricing for receivables, be more timely and responsive in processing receivable purchases and have better customer service than we do. Some of these companies may also have greater experience and more efficient collection methods than we might develop. Some of our competitors target the same type of healthcare clients as we do and generally have operated in the

Confidential Treatment Requested by Medical Captial Holdings, Inc.                    MCH0127033

markets we service for a longer period of time. Although many of our competitors have focused their business on large hospitals and clinics and generally prefer to buy or finance receivables in multi-million dollar denominations, typically with a lower profit margin, these competitors could enter our target markets more aggressively in the future. If we are unable to successfully compete with these companies, our business could be adversely affected.

## Government Regulation

Our healthcare finance business is subject to federal and state regulation and supervision. Currently, there are no regulations that require us to obtain specific licenses or approvals, other than those applicable to businesses in general, to be able to finance receivables in any state. We continually research and monitor regulations and intend to apply for the appropriate licenses if regulations change and require us to be licensed to perform our business in any particular state in which we operate.

Governments at both the federal and state levels have continued in their efforts to reduce, or at least limit the growth of, spending for healthcare services. The Balanced Budget Act, or BBA, enacted in 1997 contains numerous Medicare and Medicaid cost-saving measures. These may affect the creation of healthcare receivables and their collectibility.

The healthcare sector is highly regulated at both the federal and state levels. As our primary business will consist of the financing of healthcare receivables, many healthcare regulations may be indirectly applicable to us as a holder in due course of such receivables. We also intend to make loans or extend credit lines to other businesses, most of which are expected to be in the healthcare business. To the extent that these borrowers are affected by healthcare regulations, such as Medicare-Medicaid fraud and abuse statutes and physician self-referral regulations, or efforts to recover payments made in error or inappropriately, the continuing viability of these borrowers could be impaired thereby adversely affecting their ability to repay their debt obligations.

Finally, our lending business may be subject to regulatory requirements. These include laws in some states that require that lenders be licensed by a governmental agency, and usury laws restricting the interest rate that can be charged on loans.

**State Lending License Requirements.** State laws differ as to the extent to which lenders to businesses are required to be licensed by a state regulatory agency. We may elect to conduct our lending business only in certain states, or with types of loans that are exempt, in order to limit the applicability of these requirements. We may, however, elect to become licensed in one or more states. The licensing requirements differ from state to state, but where they exist, they typically require the payment of licensing fees, periodic reporting, and submission to audit by state regulators. We do not intend to make any loans or extend credit lines in any states that require a lending license or similar qualification without first obtaining such lending license or qualification.

**Usury Laws.** State laws differ as to their imposition of a maximum interest rate that may be charged on loans. State laws also differ as to which kinds of lenders and borrowers are subject to these limits. Generally, the state whose usury laws apply is the state where the borrower is located. The consequence of a failure to comply with these limits, in most states, is that the lender forfeits the right to collect interest at all. We intend to comply with the usury limits where an exemption is not available.

**Health Insurance Portability and Accountability Act.** HIPAA requires that healthcare providers maintain records in ways, and implement procedures, designed to assure the privacy of patient records. HIPAA has precipitated widespread changes, including patient consent forms and access restrictions in data processing software. In order to carry out its business, Medical Capital Corporation enters into agreements with providers of medical services that, among other things, designate Medical Capital Corporation as a "business associate" of each of those providers. As a business associate, Medical Capital Corporation is entitled to have access to patient information, and takes on responsibility for preserving the privacy of that information, and using the information only for purposes related to the collection of the receivables.

## Changes in HMO and Insurance Company Payment and Reimbursement Practices

In addition to governmental initiatives, private reform efforts have been instituted throughout the healthcare sector, including payment audits and efforts to recover payments made in error or inappropriately, in a similar fashion to government payors. Possible changes in private healthcare delivery and payment systems that could adversely affect our business include employer initiatives like creating purchasing cooperatives and seller initiatives to integrate hospitals and physicians into comprehensive delivery systems. Also, management and billing services may be consolidated by integrated healthcare delivery systems. This consolidation may result in a decrease in the willingness of providers to sell healthcare receivables and reduce demand for related billing and collection services.

Capitation of healthcare expenditures is another development within the healthcare sector that could adversely affect our business. Capitation is the prepayment of a predetermined monthly fee to healthcare providers for some costs by third-party payors, typically HMOs and other managed healthcare concerns. The capitation fee is based on the aggregate number of patients under a healthcare providers' care. This fee does not vary, regardless of how much time the patient requires, the number of visits, or the nature of the

Confidential Treatment Requested by Medical Captial Holdings, Inc.          MCH0127034

illness. The healthcare provider then provides healthcare to these patients when and as needed, and assumes the risk of whether the capitation fee will cover its costs and provide a profit for all of the healthcare services it renders. Because some capitation eliminates patient billing, it can reduce the provider's healthcare receivables and risk of collection of fees that are the primary source of our business and cash flow. There is a risk that this practice will grow as HMOs expand.

### Employees

We employ no full-time employees. However, we make partial use of approximately 150 employees of our affiliates, for which we pay fees under the administrative services agreement.

### Properties

Our principal executive offices are located at 3770 Howard Hughes Parkway, Las Vegas, Nevada. We also maintain an office in Anaheim, California. Our office space is leased by our parent, Medical Capital Holdings, from a non-affiliated landlord. We believe that our existing facilities are adequate for our current needs and that suitable additional space will be available as needed.

### Legal Proceedings

We are not aware of any pending or threatened legal proceedings that, if adversely determined, would have a material affect on our company, assets or operations.

### Regulatory Matters

In 2001 the California Department of Corporations (the "Department") issued to Medical Capital Holdings and Carlmont Capital Special Purpose Corporation II (which was then an affiliate, and has since been terminated), an order to desist and refrain from the further offer and sale in California of securities unless and until qualification has been made under the California securities laws, or unless exempt. Without admitting or denying the Department's opinion, these companies did not request a hearing or otherwise contest the order. Medical Capital Holdings subsequently provided certain information to the Department and on May 15, 2008, the Department issued a letter advising us that the Department was closing its investigation.

Medical Capital Holdings and its special purpose subsidiaries believe that they are in compliance with all applicable securities laws and that this offering by Medical Provider Funding Corporation VI of notes hereunder is exempt from qualification under California securities laws.

Confidential Treatment Requested by Medical Captial Holdings, Inc.          MCH0127035

## MEDICAL PROVIDER FUNDING CORPORATION VI ORGANIZATION AND MANAGEMENT

Medical Provider Funding Corporation VI has been formed solely for the purpose of financing receivables and issuing notes as described in this Private Placement Memorandum.

### Description of Common Stock

Our common stock is not being sold by this Private Placement Memorandum. We currently have 25,000 shares of our common stock issued and outstanding, all of which are currently held by our parent, Medical Capital Holdings. Our common stock is not listed for trading on a securities exchange. There is no public market for our common stock. We have not paid any dividends on our common stock since we were formed.

### Directors and Executive Officers

The following is the name, age and position of Medical Provider Funding Corporation VI's current directors and executive officers:

| NAME | AGE | POSITION(S) |
|------|-----|-------------|
| Sidney M. Field | 63 | Chief Executive Officer and Director |
| Joseph J. Lampariello | 55 | President, Chief Operating Officer and Director |
| Alan J. Meister | 59 | Chief Financial Officer and Treasurer |
| Lawrence J. Edwards | 64 | Director |

### Compensation of Directors

The directors are not compensated for serving on our board of directors.

### Limitation of Liability and Indemnification of Directors and Executive Officers

Our articles of incorporation include a provision that eliminates the personal liability of our directors for monetary damages for breach of fiduciary duty as a director, except for liability:

- for any breach of the director's duty of loyalty to us or our stockholders;

- for acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law;

- under section 72.288 of the Nevada Revised Statutes, regarding unlawful dividends and stock purchases; or

- for any transaction from which the director derived an improper personal benefit.

These provisions are permitted under Nevada law.

Our bylaws provide that:

- we must indemnify our directors, officers, employees and agents to the fullest extent permitted by Nevada law, subject to very limited exceptions; and

- we must advance expenses, as incurred, to our directors and executive officers in connection with a legal proceeding to the fullest extent permitted by Nevada law, subject to very limited exceptions.

We have purchased directors and officers liability insurance through our parent, Medical Capital Holdings, Inc., in order to limit our exposure to liability for indemnification of directors and officers, including liabilities under the Securities Act.

The limitation of liability and indemnification provisions in our articles of incorporation and bylaws may discourage stockholders from bringing a lawsuit against directors for breach of their fiduciary duty. They may also have the effect of reducing the likelihood of

Confidential Treatment Requested by Medical Captial Holdings, Inc.                    MCH0127036

derivative litigation against directors and officers, even though such an action, if successful, might otherwise benefit us and our stockholders. Furthermore, a security-holder's investment may be adversely affected to the extent we pay the costs of settlement and damage awards against directors and officers under these indemnification provisions.

There is no pending litigation or proceeding involving any of our directors, officers or employees regarding which indemnification is sought, nor are we aware of any threatened litigation that may result in claims for indemnification.

## THE ADMINISTRATOR AND SERVICER

Medical Capital Corporation is a Nevada corporation that has been in existence since 1994. In addition to Medical Provider Funding Corporation VI, it has fifteen affiliates that are, or in the past have been, in the business of financing accounts receivable. Medical Capital Corporation has provided accounts receivable underwriting and administration for these entities.

### Management

The following describes the business experience during the past five years of the executive officers of Medical Capital Corporation:

SIDNEY M. FIELD is the Chief Executive Officer and Director of Medical Capital Corporation since 1994, and has served as the President, Chief Executive Officer and Director of Medical Capital Holdings and other of its subsidiaries since 1996. Prior to joining us, Mr. Field was the founder, past President and Chairman of FGS Insurance Brokers, one of the largest insurance brokers in the United States with annual sales of over $200,000,000. Mr. Field sold his interest in that firm in 1990. In 1971, he founded Field Group Services, which specialized in the placement and servicing of group medical insurance for medium size employers. Mr. Field has also been a principal in Delcom Inc., an advertising agency specializing in radio and television. Mr. Field earned his Bachelor of Arts degree at California State University at Long Beach with a major in Mathematics.

JOSEPH J. LAMPARIELLO has been the Chief Operating Officer of Medical Capital Holdings and its subsidiaries since 1996 and the President since 2004, as well as a Director since 1998, and is responsible for the day-to-day operations of Medical Capital Corporation, our administrator. This responsibility includes funding, underwriting, collections and all computer information services. Prior to joining us, Mr. Lampariello was the President of Medical Management & Acquisitions, Inc, based in Southern California, which specialized in recovery, dissolution and collections of medical claims of medical groups, physician practices and medical companies. Mr. Lampariello's extensive experience in medical practice management includes development of proprietary UNIX platform databases for medical billing and collections. Mr. Lampariello has served as a receiver for LA County Superior Court and as a specialist collector for the U.S. Bankruptcy Court. He holds a degree in Biomedical Engineering Technology from New York Institute of Technology.

ALAN J. MEISTER is the Chief Financial Officer of Medical Capital Corporation, having joined it in September of 1997. Prior to joining Medical Capital Corporation, Mr. Meister was the Vice President and Chief Financial Officer of American Express Educational Loans/UBL Financial Corporation, and served in that position since January of 1994. Prior to that, Mr. Meister was the Controller of FHP Healthcare, Inc., and served in that position since 1990. Mr. Meister holds a bachelors degree in Accounting from Northeastern University and an MBA from Suffolk University.

### Employment Agreements

Medical Capital Corporation has employment agreements with Mr. Sidney Field, its Chief Executive Officer and Director, Mr. Joseph J. Lampariello, its President, Director and Chief Operating Officer, and Mr. Alan Meister, its Chief Financial Officer. Each of these employment agreements is terminable by the employee for any reason by giving 30 days' advance notice to Medical Capital Corporation. Medical Capital Corporation may terminate each of these agreement with cause by giving five days' advance notice or without cause by giving 180 days' advance notice (in the case of Messrs. Field and Lampariello) or 90 days' advance notice (in the case of Mr. Meister) to the employee. These employment agreements also contain non-compete provisions that expire one year after the termination of employment with Medical Capital Corporation. Under California law, there are limits on the extent to which the non-compete provisions would be enforceable by Medical Capital Corporation if any of these employees were to terminate their employment.

Confidential Treatment Requested by Medical Captial Holdings, Inc.                    MCH0127037

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

We are a wholly owned subsidiary of Medical Capital Holdings. We rely on some of the other wholly owned subsidiaries of Medical Capital Holdings, like Medical Capital Corporation and MediTrak, to provide services to us. We pay fees to these affiliates for providing services to us, regardless of whether or not our business is profitable. Since we are under common control with these affiliates, the agreements and arrangements under which they provide us services were not made through independent arm's length negotiations. However, we believe the fees we pay for these services are no greater than those an independent third-party would charge for providing similar services.

Some members of our management team also work for and are compensated by our affiliates, and are in some cases shareholders of our common corporate parent, Medical Capital Holdings. Accordingly, their interests in the administrator and the servicer, or other of our affiliates, may conflict with their responsibilities to us. We have an agreement among our parent and our other affiliates where we are charged a fee for the portion of the salaries of these individuals and overhead attributable to our operations.

We believe that our affiliates have sufficient experience in regard to the kinds and nature of the services they provide us so that our needs for these services will be competently and adequately met. Further, we believe that the compensation the affiliates receive for rendering the services to us, whether from us or third parties, is reasonable and no more than the usual and customary amounts paid for those types of services by independent third parties. However, there can be no assurance that there are not now, or may in the future, be unrelated businesses that might be able to provide similar services to us in a more efficient, competent and less costly manner. Also, there can be no assurance that our affiliates will be able to continue to provide services to us. In the event that one of our affiliates is not able to perform its services, there can be no assurance that a suitable replacement can be located without incurring substantial expense or risking a deterioration in servicing the receivables.

Medical Capital Corporation is our administrator for the accounts receivable and other assets. The amount that the face value of an account receivable is discounted when the account receivable is financed will be determined by the administrator based on the underwriting criteria it has established. We could be adversely affected if the administrator requires the client's accounts receivable to be discounted at higher rates than those the client is accustomed to receiving. This could result in clients being unwilling to finance, or discouraged from financing all their accounts receivable with us. The administrator also underwrites accounts receivable that may be financed by our affiliates. The administrator attempts to allocate new clients fairly among its various affiliates, but the allocation may ultimately be unfair to us.

Medical Capital Corporation also has the right, but not the obligation, to loan funds to us to pay the monthly trustee fee and periodic interest payments under the notes to the extent amounts in the trust account are insufficient (see "Administration of Operations" above).

MediTrak is the servicer of our receivables. MediTrak is compensated for its services by receiving a fee for each claim posted on its tracking system. This fee is paid by the seller out of collections on the receivables. For some sellers with a minimal number of monthly claims being posted, a minimum monthly servicing fee will be charged. For a more detailed description of the functions of the administrator and the servicer, see the section entitled "Business" above.

**Transfer of Assets Between Affiliates.** Medical Capital Corporation may direct the sale of receivables, loans collateralized with accounts receivable, and other assets from one of our affiliates to us, or from us to one of our affiliates as a method of asset/liability management and to attempt to maintain diversification and certain ratios in our investment portfolio. The purchase price for these transactions is determined by Medical Capital Corporation. In the case of accounts receivable and other assets, sales among affiliates are generally priced at the sum of the total amount advanced on the outstanding receivables or assets as of the date the portfolio of assets is purchased or financed by such affiliate, less any collections already received on the accounts receivable, or in the case of a transfer of a debt obligation owed by a borrower, the principal amount outstanding under the related financing agreement. This price could be greater or less than the fair market value of the receivables and/or other assets at the time of the transaction. Such sales are for a client's entire portfolio of financed accounts and other assets, together with all contract rights under the respective financing agreements. When we purchase assets from our affiliates, we purchase all rights, title and interest in such assets that our affiliate owned, including reserve amounts.

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**　　　MCH0127038

## DESCRIPTION OF THE NOTES

**General**

The notes will be issued under a Note Issuance and Security Agreement, or note agreement, between us and The Bank of New York Mellon, as trustee. You may review a copy of the note agreement upon request. A copy of the note agreement is available for inspection at the office of the trustee. You may also make a request to review the note agreement by contacting Medical Capital Corporation.

The notes:

- are general obligations of our company and are not guaranteed by any other person or entity;

- are not savings accounts, certificates of deposit (CDs) or other deposits and are not insured by the FDIC or any other governmental agency;

- will be issued in the form of physical certificates without coupons;

- are secured by, and paid by us primarily from, the accounts receivable and the other collateral described in this Private Placement Memorandum, the composition of which may change over time;

- do not have the benefit of a sinking fund for the retirement of principal;

- are not convertible into capital stock or other securities of our company; and

- will cease to accrue interest after the applicable redemption date under the terms and subject to the conditions of the note agreement.

The notes will be denominated in U.S. dollars and we intend to sell them at 100% of their principal face amount. Notes will be sold subject to the stated minimum investment amount of $50,000. Notes will be sold for their principal face amount. Each class of notes will have the maturities and interest rates described under "Description of the Notes - Interest Rate and Maturity" below.

Additional series of notes may also be issued in the future under the note agreement or under a different note agreement or indenture.

We may change the stated interest rates, maturities and minimum investment amounts of any unissued notes at any time by supplementing this Private Placement Memorandum. Any change will have no effect on the terms of the notes sold prior to the date of the change. The notes issued under this Private Placement Memorandum and any future series of notes may be secured by the same collateral or separate pools of collateral.

The outstanding principal amount due at the maturity for each note, or upon redemption of the note by us, and all interest accrued and payable on the note, will be payable by us. We will make the payments through our paying and disbursement agent, Wells Fargo Bank, National Association, through checks, automated clearing house payments or wire transfers drawn on our account from funds received from the trustee.

Notes may be transferred or exchanged for other notes of the same series and class of a like aggregate principal amount subject to the limitations in the note agreement. We will not charge a fee for any registration, transfer or exchange of notes. However, we may require the holder to pay any tax, assessment or other governmental charge required in connection with any registration, transfer or exchange of notes. The registered holder of a note will be treated as its owner for all purposes.

**Interest Rate and Maturity**

The notes will bear interest at the rates as determined pursuant to the first page of this Private Placement Memorandum. Notes will also have different maturity dates, based on the date of purchase and the class of notes purchased. The maturity date will be on the day that is two, three or six years (depending on the class of note) from and after the effective date of the note as described under "Payments of Interest" below.

If the maturity date for a note is not a business day, payment of the amount due at maturity will be made on the next following business day. We do not require that the physical note be returned to us for verification prior to the repayment at maturity. However,

REV 9-9-08                                      31

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**                    **MCH0127039**

if a noteholder cannot locate its physical note, we may require that such noteholder execute a lost note indemnity agreement in a form satisfactory to us prior to repayment. Moreover, should the original noteholder (x) no longer be the holder of the note or (y) be unavailable, or a change in payee be necessary, such as in the case of a surviving estate, we may require a copy of the executed assignment agreement between the original noteholder and any transferee, or an order from a court or probate commission, as the case may be, in order that we know the principal is returned to the rightful party.

We may change the interest rate for any or all of the classes of notes to reflect market conditions at any time by supplementing this Private Placement Memorandum. If we change the interest rate on any class, the interest rate on notes issued before the date of the change will not be affected.

## Payments of Interest

Interest will accrue on the notes at the stated rate from and including the effective day of the note until maturity. The effective day of the note will be (a) if the note is paid for via wire transfer directly to the trustee, the business day on which the trustee receives the wire; (b) if the note is paid for by bank draft, the business day after the trustee receives the draft; and (c) if by personal check, five business days after the trustee receives the check. We will receive all subscription agreements, bank drafts and personal checks, and will deposit the drafts and checks with the trustee, together with information specifying the effective date; provided, however that no notes will be issued or dated prior to the Company's receipt and acceptance of a completed subscription agreement. Notes generally do not earn interest after the maturity date or date set for redemption. Each time we make a payment of interest, we pay the person in whose name the note was registered on the record date, which is the close of business on the last day of the calendar month preceding the month in which the payment date occurs. The trustee will transmit funds to pay the interest on the notes to our paying agent a few days before those payments are due, and our paying agent will make the payments of interest when due, to the person who is shown as the record holder on our books and records as of the applicable record date for payment. Interest will be calculated based on a year with twelve 30-day months.

The interest rate is adjusted twice a year, effective as of January 1 and July 1, based on the prime rate of interest, as reported in *The Wall Street Journal* on that date, plus a spread, subject to a minimum annual rate. The spread and the minimum annual rate differ for the different classes of notes and are stated on the first page of this Private Placement Memorandum. Interest on the notes will be paid monthly, quarterly, annually or on the maturity date, depending on the class of notes. Interest payments on classes other than B4, C4 and F4 will be on the tenth day of the month to the holder of record as of the last day of the month preceding the month in which the payment date occurs. Interest on these classes will be paid without any compounding. If the tenth day is not a business day, interest will be paid on the next following business day. Any accrued but unpaid interest outstanding on the maturity date of a note will be paid on the maturity date. Interest on classes B4, C4 and F4 will compound annually, and will be paid along with principal at the maturity date.

## Payments of Principal and Renewal

Each note matures as described above under "Description of the Notes - Interest Rate and Maturity," unless redeemed earlier, which we may do at our option. No principal payments are due before the maturity of the note unless we decide to redeem a note, or a portion of a note, before its stated maturity date. You have no right to demand that we redeem your note prior to its stated maturity date. The trustee will transmit funds for the payment of principal on the notes to our paying agent one business day before principal is due, and our paying agent will pay the principal when due, to the person who is shown as the record holder on our books and records as of the applicable record date for payment. The amount of such funds to be transmitted will be calculated by us and certified by us in writing to the trustee.

As a holder of a note, you may receive payment at maturity, or may renew the note for the same or a different term. If you do not notify us to the contrary, we will automatically renew your note, but not if to do so would extend the term beyond six years from the initial effective date. The renewal will be for the same term, or, if shorter, for a term that extends until a maturity date that is six years from your initial note effective date. That is, if your existing note is for two years, the automatic renewal will be for a second or third two-year term (as the case may be), and if your existing note is for three years, the automatic renewal will be for a second three-year term. If your existing note is for six years, however, the note will not automatically renew. The renewal period will never be to a date that is later than the sixth anniversary of your original investment. Your renewal note will have terms and conditions identical to your existing note (except that such renewal note shall bear interest at the interest rate and be subject to the terms set forth in other notes of the same class being issued by Medical Provider Funding Corporation VI at such time). In connection with your consideration whether to have the automatic renewal occur, we, upon request, will provide you with information with respect to any changes in interest rates or other material terms outlined in this Private Placement Memorandum.

If you wish to renew for a different term, or do not wish to renew at all, you must give written notice to Medical Provider Funding Corporation VI at least 90 days prior to the stated date of maturity for the note.

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**                    MCH0127040

We may, at our option, pay a maturing note in cash at maturity instead of renewing the note, regardless of whether any notice relating to the maturity of that note has been given. If you have not given notice of a request not to renew, and we decide to pay the maturing note in cash at maturity instead of automatically renewing the note, we will give notice to the note holder not less than 30 days before the maturity date of the note, in accordance with the note redemption procedures in the note agreement.

Principal payments may be funded from the proceeds of sales of new notes, including the sales of notes offered in this Private Placement Memorandum.

**The Trustee**

The Bank of New York Mellon is the trustee under the Note Issuance and Security Agreement. We may maintain deposit accounts with The Bank of New York Mellon. We may, from time to time, borrow money from The Bank of New York Mellon and conduct other banking transactions with it. As of the date of this Private Placement Memorandum, we had no loans outstanding from The Bank of New York Mellon. In the event of default, the note agreement permits the trustee to become a creditor of Medical Provider Funding Corporation VI and does not preclude the trustee from enforcing its rights as a creditor, including rights as a holder of collateralized indebtedness.

Generally, under the note agreement, the trustee is required, as directed by us in writing, to temporarily invest funds held in trust from time to time in:

- direct obligations of the United States government or obligations guaranteed by the United States government;

- interest-bearing time or demand deposits, certificates of deposit or other similar banking arrangements, or investment agreements, repurchase agreements or guaranteed investment contracts, with any bank, trust company, national banking association or other depository institution, including those of the trustee;

- commercial paper, including that of the trustee, which matures not more than 270 days after the date of purchase;

- bonds, debentures, notes or other evidences of indebtedness issued or guaranteed by Federal Farm Credit Banks, Federal Home Loan Mortgage Corporation, Governmental National Mortgage Association, Export-Import Bank of the United States, Federal National Mortgage Association, Student Loan Marketing Association, Farmers Home Administration, Federal Home Loan Banks or any agency of the United States established for the purposes of acquiring the obligations of any of these agencies;

- money market mutual funds investing solely in the above listed assets; and

- the AIM Short-Term Investments Trust Treasury Portfolio (Private Class) Money Market Fund.

The trustee will not act as paying agent or as note registrar nor have any obligation to monitor, supervise or verify our actions or omissions, or those of our affiliates. We have engaged a paying agent but not a note registrar, and will maintain the records of note ownership ourselves. Neither the trustee nor the paying agent is responsible to make any calculations of principal or interest, or to independently determine any collateral coverage ratios, or to otherwise make any inquiry or investigation or have any responsibility as to whether we are in default or have breached any obligation.

**Collateral**

Our obligation to pay principal and interest on the notes will be secured by our grant of a security interest to the trustee in:

- all rights to payment, accounts, health-care-insurance receivables, stock, debt instruments, tangible and intangible assets, deposit accounts, moneys, rights and properties related to the healthcare sector, including HMOs, PPOs, and third-party administrators that we have a security interest in or that may be purchased by us from time to time from funds disbursed from the trust account;

- amounts as from time to time may be held in the trust account created under the note agreement;

- our rights under any lock box and collection agreements for collections on the accounts and health-care-insurance receivables and the servicing and administration agreements related thereto;

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**          **MCH0127041**

- our rights under the various receivables purchase agreements; and

- any and all proceeds of the above.

These things together are referred to in this Private Placement Memorandum as the "collateral."

Subject to fees and expenses owed to the trustee, the notes will have a first priority claim against the collateral pledged to the trustee to the extent the collateral is acquired solely with proceeds of the notes. Therefore, if there is a default on other obligations of our company, collateral acquired solely with note proceeds can not be used to satisfy those obligations until the notes are paid in full. The note agreement does not require us to maintain any specified financial ratios, minimum net worth or minimum working capital.

### Sale of Collateral Pledged to Trust

Receivables and other collateral may be sold, or otherwise disposed of by the trustee, free from the lien of the note agreement. Prior to any sale we will identify to the trustee in writing the sale price and the person to which the collateral will be sold. We will also certify to the trustee in writing that:

- the disposition price is equal to or in excess of the amount disbursed from the trust account to acquire the collateral, less any principal amounts received by the trustee with respect to that collateral; or

- the disposition price is lower than the amount disbursed from the trust account to acquire the collateral, less any principal amounts received by the trustee with respect to that collateral, and

  (1)    we reasonably believe that the receipts expected to be received from the remaining collateral, after giving effect to the disposition, would be at least equal to the receipts required to timely pay the principal and interest on the notes;

  (2)    we will remain able to pay debt service on the notes and make payment on any other obligations to you on a timely basis, after giving effect to the sale, transfer or other disposition of the collateral, whereas we would not have been able to do so on a timely basis if we had not sold, transferred or disposed of the collateral at the discounted amount; or

  (3)    the sum of the amounts on deposit in the trust account, less moneys in any of these accounts which we, the servicer or administrator are then entitled to receive but which has not yet been removed from the account, plus the net collectable amount of the receivables and the fair market value of other collateral will be at least equal to 100% of the aggregate principal amount of the obligations owed to all holders of notes combined, plus accrued interest, after giving effect to the sale, transfer or other disposition.

Collateral may also be sold or transferred by the trustee if it receives a written direction from us certifying that the sale or transfer is necessary in order to avoid the occurrence of an event of default under the note agreement. Proceeds received upon any disposition of collateral may consist of cash, permitted investments under the note agreement and/or accounts receivable. The proceeds will be deposited by the trustee into the trust account described below.

### Flow of Funds

Under the note agreement, and subject to its terms and provisions, we will cause the trustee to establish and oversee the trust account. In addition to the trust account, lock box accounts will also be established for each provider at various banks. The amounts on deposit in all of these accounts will be pledged to the trustee and held in trust for your benefit. The following is a brief description of the function of each of these accounts.

### Trust Account

The primary purposes of the trust account are to collect the net proceeds from the sale of new notes and to pool funds to be used for various operational functions. The funds in the trust account will be used in the following order of priority, to:

- pay fees to the trustee and its reasonable costs and expenses;

REV 9-9-08                                      34

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**        **MCH0127042**

- pay us amounts to fund the payment of interest and principal on the notes when due;

- fund the financing of receivables and other assets;

- pay fees to the administrator and the servicer;

- pay distributions to Medical Provider Funding Corporation VI after all notes have been paid in full.

The trust account is not a sinking fund. The balance in the trust account is not required to be kept at a level sufficient to pay the principal on the notes at maturity. On or prior to each interest payment date, funds will be withdrawn from the trust account and transferred to us, based on our written certification, in an amount sufficient to pay the interest then due on the notes.

**Lock Box Accounts**

The primary purpose of the lock box accounts is to facilitate collection of the receivables and other assets. Payments on the receivables and other assets will be made to these lock box accounts at various lock box processing banks. Each bank maintaining a lock box account will periodically transfer the money in the lock box accounts to the trustee for deposit in the trust account.

The trustee will invest amounts on deposit in any of the above accounts, as we direct in writing, in investment securities and other permitted investments described in the note agreement. If we make no direction to the trustee, and to the extent practicable, the trustee will invest amounts held under the note agreement in the AIM money market fund described above.

**Redemption of Notes**

We may redeem any or all of the notes without penalty or premium, at our option, in whole or in part, at any time. If we redeem notes, we will make payment in cash to you of all unpaid principal and interest accrued to the date set for redemption, but excluding the date of redemption. We are required by the note agreement to deposit the amount to be paid in redemption of the notes with the trustee prior to the redemption date. If we decide to redeem notes, we will give notice of the redemption date by mail to the registered holders of the notes, or portions of notes, to be redeemed not less than 20 days nor more than 60 days before the redemption date. If notes are redeemed, they will be redeemed in denominations of $1,000. No sinking fund is provided for the notes.

We have the sole discretion whether to prepay any note, the amount to be prepaid and which notes, if any, to prepay. The notes are not required to be prepaid pro rata or according to any other formula.

**Mergers and Sales of Assets**

We may not consolidate with or merge into any other person or entity or convey, transfer or lease our properties and assets substantially as an entirety to another person or entity, unless:

- the resulting, surviving or transferee entity, if other than us, is organized and existing under the laws of the United States, any state of the U.S. or the District of Columbia;

- the successor entity assumes all of our obligations under the notes and the note agreement; and

- we and the successor entity will not, immediately upon completion of the proposed merger transaction, be in default under the note agreement.

Upon the assumption of our obligations by a successor as described above, subject to exceptions, we will be discharged from all obligations under the notes and the note agreement.

**Rights of Noteholders**

As a noteholder, you have limited rights to vote on actions involving our company. In general, you will have the right to vote on whether or not to approve some amendments to the note agreement. For a description of these rights, see the section below entitled "Modification of the Note Agreement and Supplemental Note Agreements." You will also have the right to direct some actions that the trustee takes in the event we default on the notes. For a description of these rights, see the sections below entitled "Defaults and Remedies." For a complete description of your rights as a noteholder, we encourage you to read a copy of the note agreement which is available for inspection at the office of Medical Provider Funding Corporation VI or the trustee.

REV 9-9-08

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**     **MCH0127043**

**Defaults and Remedies**

Events of default with respect to the notes include:

- the failure to pay interest or principal on any note for a period of 30 days after it becomes due and payable;

- a material breach of any covenant in the note agreement or a continuing material breach of the servicing agreement or the administration agreement for 30 days after notice of breach is given to us;

- a collateral coverage ratio that is below 100% as of the beginning of any month, and continues to be below 100% for a period of five consecutive days following our report to the trustee showing that this is the case;

- some events of bankruptcy, insolvency or reorganization with respect to Medical Provider Funding Corporation VI;

- material judgments against Medical Provider Funding Corporation VI; or

- a cessation of our business.

The trustee must give the registered holders notice of any default of which it has actual knowledge within 90 days after the occurrence of the default, unless it has been cured or waived. The trustee may withhold the notice if it determines in good faith that withholding the notice is in your best interests, unless the default is a failure to pay principal or interest on any note.

The trustee is not the registrar or paying agent and will not have direct access to information concerning the identities, holdings, addresses, and other contact information of the noteholders. To enable the trustee to give such notice, we will promptly forward to the trustee a current listing of the names, addresses, and holdings of investors in a format acceptable to the trustee. The trustee will be entitled to rely on the information provided, and shall be indemnified and held harmless by the collateral in the trust in the event that a noteholder is not notified due to inaccurate or incomplete information provided by us.

If an event of default occurs, either the trustee or the noteholders of more than 50% in principal amount of the outstanding notes as to which the event of default occurred may declare the principal of those notes to be immediately due and payable. The noteholders will have the right to direct the time, method and place of conducting any proceeding for some of the remedies available to the trustee, or of exercising some of the powers conferred on the trustee, except as otherwise provided in the note agreement. The trustee may require reasonable indemnity satisfactory to the trustee from noteholders before acting at their direction. You will not have any right to pursue any remedy with respect to the note agreement or the notes unless you satisfy the conditions contained in the note agreement.

Under some circumstances, the noteholders of more than 50% in aggregate principal amount due on the outstanding notes may rescind any acceleration with respect to the notes and its consequences or waive an event of default, except for a failure to pay principal and interest when due.

Within 120 days after the end of each fiscal year, we must furnish to the trustee a statement concerning our knowledge as to whether or not we are in default under the note agreement.

**Modification of the Note Agreement and Supplemental Note Agreements**

Modification and amendment of the note agreement or the notes may be made by us and the trustee with the consent of the noteholders of more than 50% of the principal amount due on the outstanding notes, or the notes of a particular series if only that series would be affected. However, no amendment may, without the consent of each noteholder affected, make changes that would:

- extend the maturity date of any note;

- reduce the principal amount due on, or redemption price of, any note or alter the manner or rate of accrual of interest on any note;

- reduce the aggregate principal amount on the notes required for consent to a supplemental note agreement or a change in the note agreement; or

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**    **MCH0127044**

- result in the creation of any lien on the collateral securing the notes other than a lien ratably securing all of the obligations under the note agreement with respect to the notes at any time outstanding except as otherwise provided in the note agreement.

The note agreement also provides for modification of its terms, in some cases, without the consent of the note holders.

Confidential Treatment Requested by Medical Captial Holdings, Inc.          MCH0127045

## MATERIAL FEDERAL INCOME TAX CONSIDERATIONS

The following is a general discussion of the material U.S. federal income tax considerations relating to the initial purchase, ownership and disposition of the notes by U.S. and non-U.S. holders. This discussion is a summary only and is not a complete analysis of all the potential tax considerations relating to the purchase, ownership and disposition of the notes. We have based this summary on the U.S. federal income tax laws in effect as of the date of this Private Placement Memorandum. However, these laws may change with possible retroactive effect. In addition, we have not obtained, nor do we intend to obtain, a ruling from the IRS or an opinion of counsel with respect to any tax consequences of purchasing, owning or disposing of notes. Thus, the IRS could challenge one or more of the tax consequences or matters described in this Private Placement Memorandum.

This discussion is limited to purchasers of notes who acquire the notes from us in this offering and hold the notes as capital assets for federal income tax purposes. This discussion does not address all possible tax consequences that may be applicable to you in light of your specific circumstances. For instance, this discussion does not address the alternative minimum tax provisions of the Internal Revenue Code of 1986, or the "Code," or special rules applicable to some categories of investors, like some financial institutions, insurance companies, tax-exempt organizations, dealers in securities, real estate investment trusts, regulated investment companies, or persons who hold notes as part of a hedge, conversion or constructive sale transaction, straddle or other risk reduction transaction, that may be subject to special rules. This discussion also does not address the tax consequences arising under the laws of any foreign, state or local jurisdiction or U.S. estate and gift tax law as applicable to U.S. holders.

If you are considering the purchase of a note, you should consult your own tax advisors as to the particular tax consequences to you of acquiring, holding or otherwise disposing of the notes, including the effect and applicability of state, local or foreign tax laws.

As used in this discussion, the term U.S. holder means a holder of a note that is:

- for United States federal income tax purposes, a citizen or resident of the United States;

- a corporation, partnership or other entity created or organized in or under the laws of the United States or of any political subdivision thereof or other entity characterized as a corporation or partnership for federal income tax purposes;

- an estate, the income of which is subject to United States federal income taxation regardless of its source; or

- a trust, the administration of which is subject to the primary supervision of a court within the United States and which has one or more United States persons with authority to control all substantial decisions, or if the trust was in existence on August 20, 1996, and has elected to continue to be treated as a United States trust.

For the purposes of this discussion, a non-U.S. holder means any holder other than a U.S. holder. Any note purchaser who is not a United States citizen will be required to furnish documentation, on IRS Form W-8BEN, that clearly states whether it is subject to United States withholding taxes, in accordance with applicable requirements of the Untied States taxing authority.

### Characterization of the Notes

The federal income tax consequences of owning notes are dependent upon the characterization of the notes as debt of Medical Provider Funding Corporation VI for federal income tax purposes, rather than as equity interests in Medical Provider Funding Corporation VI or a partnership among the holders of the notes and Medical Provider Funding Corporation VI. Medical Provider Funding Corporation VI believes that the notes have been structured in a manner that will allow the notes to be characterized as debt of Medical Provider Funding Corporation VI for federal income tax purposes. However, this is only Medical Provider Funding Corporation VI's belief, and no ruling from the IRS or an opinion of counsel has been sought in this regard. Thus, the IRS could successfully challenge this characterization.

In the event the notes are treated as equity interests in Medical Provider Funding Corporation VI, the notes would be deemed to be ownership interests in a taxable corporation for federal tax purposes. Similarly, if the notes were deemed to be equity interests in a partnership among the holders of notes and Medical Provider Funding Corporation VI, the holders likely would be deemed to own interests in a publicly traded partnership taxable as a corporation since the safe harbors to the application of the publicly traded partnership rules likely would not be available.

In either event, adverse tax consequences would result to holders. For example, payments of interest and principal on the notes would be treated as corporate distributions and dividends to the extent Medical Provider Funding Corporation VI has current or accumulated earnings and profits. The amount of any dividends would be taxable to holders of the notes as ordinary income to the extent of such earnings and profits. Distributions in excess of earnings and profits constitute a tax-free return of basis to the extent thereof, and then

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**                    MCH0127046

gain from a deemed sale or exchange of the instrument. Distributions and dividends are not deductible by corporations and publicly traded partnerships taxable as corporations. Thus, payments on the notes would not be deductible by Medical Provider Funding Corporation VI if the notes were deemed to be equity interests. In most cases, if the notes were deemed to be equity interests, Medical Provider Funding Corporation VI would have less available cash to make payment on the notes.

In addition to the above, treatment of the notes as equity interests could have other adverse effects on some holders. For example, income to non-U.S. holders could (1) be subject to federal income tax withholding, (2) constitute unrelated business taxable income to some tax-exempt entities, including pension funds and some retirement accounts (if the relationship were characterized as a partnership for tax purposes), and (3) cause the timing and amount of income that accrues to holders of notes to be different from that described below.

Because of these potential adverse effects, you are urged to consult your own tax advisors as to the tax consequences that may apply to your particular situation in the event the notes are re-characterized as equity interests and as to the likelihood the notes could be so re-characterized. The remainder of this discussion assumes that the notes are characterized as debt of Medical Provider Funding Corporation VI.

**Taxation of U.S. Holders**

**Stated Interest.** Under general federal income tax principles, you must include stated interest in income in accordance with your method of tax accounting. Accordingly, if you are using the accrual method of tax accounting, you must include stated interest in income as it accrues. If you are using the cash method of tax accounting, you must include stated interest in income as it is actually or constructively received. It is not anticipated that the notes will be issued with original issue discount, but if the IRS were to determine that the original issue discount rules applied, interest income would be computed and reported under special rules applicable in the case of original issue discount.

Payments of interest to taxable holders of notes will constitute portfolio and not passive activity income for the purposes of the passive loss limitations of the Code. Accordingly, income arising from payment on the notes will not be subject to reduction by losses from passive activities of a holder.

Income attributable to interest payments on the notes may be offset by investment expense deductions, subject to the limitation that individual investors may only deduct miscellaneous itemized deductions, including investment expenses, to the extent these deductions exceed 2% of the investor's adjusted gross income.

**Bond Premium and Market Discount.** If you acquire the notes from us, the issue price will be equal to the face amount of $1,000 per note. If you acquire the notes after their issuance, the price you pay may differ from $1,000, in which case the notes will be considered issued at a premium or discount. If the notes are acquired after their issuance for a price in excess of the face amount of the notes, the notes would be deemed to be acquired with bond premium. If the notes are acquired after their issuance for a price that is less than the face amount of the note will have market discount.

If the notes have bond premium, you may be able to elect to deduct the bond premium using a constant yield method over the remaining term of the notes as amortizable bond premium under Section 171 of the Code, provided that the notes are held as a capital asset. Except as provided in Treasury Department regulations, amortizable bond premium will be treated as an offset to interest income on the notes rather than as a separate deduction item. An election under Section 171 of the Code generally is binding once made and applies to all obligations owned or subsequently acquired by the taxpayer.

The market discount provisions of the Code generally provide that, subject to certain exceptions, if you acquire a debt instrument at a market discount and thereafter recognize gain on a disposition of the debt instrument, including a gift, the lesser of the gain or the portion of the market discount that accrued while the debt instrument was held by you will be treated as ordinary interest income at the time of the disposition. For this purpose, an acquisition at a market discount includes an acquisition, other than an acquisition at original issuance, resulting in a basis in the debt instrument below the debt instrument's stated redemption price at maturity. If you acquire a debt instrument at a market discount, and do not elect to include the market discount in income on a current basis, as discussed below, you may be required to defer a portion of any interest incurred or maintained to purchase or carry the debt instrument until you dispose of the debt instrument in a taxable transaction.

You may elect to have market discount accrue on a constant interest rate basis, as opposed to a straight-line basis. The current inclusion election, once made, applies to all market discount obligations acquired by you on or after the first day of the first taxable year to which the election applies and may not be revoked without the consent of the IRS. If you elect to include market discount in income in accordance with the preceding sentence, the above rules with respect to the recognition of ordinary income on a sale or select other dispositions of a note and the deferral of interest deduction on indebtedness related to the note will not apply.

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**                    **MCH0127047**

The notes provide that they may be redeemed, in whole or in part, before maturity. If some or all of the notes are redeemed, each holder of a note acquired at a market discount would be required to treat the principal payment as ordinary interest income to the extent of any accrued market discount on the notes.

**Disposition of Notes.** In general, you will recognize gain or loss upon the sale, exchange, redemption or other taxable disposition of a note measured by the difference between (1) the amount of cash and the fair market value of property received, excluding any portion of the payment that is attributable to accrued interest on the notes, and (2) your adjusted basis in the note as increased by any market discount previously included in income and decreased by any cash payments received, other than payments constituting qualified stated interest, and any amortizable bond premium deducted over the term of the note. Subject to the market discount rules discussed above, any of this gain or loss generally will be long-term capital gain or loss, provided that the note was a capital asset in the hands of the holder and was held for more than one year. Non-corporate taxpayers generally are subject to a maximum federal income tax rate of 15% on net long-term capital gains.

The terms of the notes may be modified upon the consent of a specified percentage of holders and, in some instances, without consent of the holders. In addition, the notes may be assumed upon the occurrence of specific transactions involving Medical Provider Funding Corporation VI. The modification or assumption of a note could, in some instances, give rise to a deemed exchange of a note for a new debt instrument for federal income tax purposes. If an exchange is deemed to occur by reason of a modification or assumption, you could realize gain or loss.

## Considerations for Tax-Exempt Holders of Notes

Holders of notes that are tax-exempt entities, including charitable corporations, pension, profit sharing or stock bonus plans, Keogh plans, individual retirement accounts and some other employee benefit plans are subject to federal income tax on unrelated business taxable income. For example, net income derived from the conduct of a trade or business regularly carried on by a tax-exempt entity or by a partnership in which it is a partner is treated as unrelated business taxable income.

A $1,000 special deduction is allowed in determining the amount of unrelated business taxable income subject to tax. Tax-exempt entities taxed on their unrelated business taxable income are also subject to the alternative minimum tax for items of tax preference which enter into the computation of unrelated business taxable income.

In general, interest income does not constitute unrelated business taxable income. Note however, that under the debt-financed property rules, if tax-exempt holders of notes finance the acquisition or holding of notes with debt, interest on the notes will be taxable as unrelated business taxable income. The notes will be treated as debt-financed property if the debt was incurred to acquire the notes or debt was incurred after the acquisition of the notes so long as the debt would not have been incurred but for the acquisition and, at the time of the acquisition, the incurrence of the debt was foreseeable.

## Non-U.S. Holders

The following discussion is a summary of the principal U.S. federal income consequences resulting from the ownership of the notes by non-U.S. holders. However, application of the U.S. federal income tax rules associated with non-U.S. holders is complex and factually sensitive. Thus, if you could be considered to be a non-U.S. holder, you are urged to consult your own tax advisors with respect to the application of the federal income tax rules for your particular situation.

**Payments of Interest to Non-U.S. Holders.** Subject to the discussion below under "Backup Withholding and Information Reporting," payments of interest received by a non-U.S. holder generally will not be subject to United States federal withholding tax, provided that (1) the non-U.S. holder does not actually or constructively own 10% or more of the total combined voting power of all classes of voting stock of Medical Provider Funding Corporation VI, (2) the non-U.S. holder is not a controlled foreign corporation that is related to Medical Provider Funding Corporation VI, actually or constructively, through stock ownership, (3) the beneficial owner of the note complies with the certification requirements, including delivery of a statement, signed by the holder under penalties of perjury, certifying that the holder is a foreign person and provides its name and address, or (4) the non-U.S. holder is entitled to the benefits of an income tax treaty under which the interest is exempt from United States withholding tax and the non-U.S. holder complies with the reporting requirements. This exemption does not apply to market discount. If a note is held through a securities clearing organization or other specified financial institutions (an "Intermediary"), the Intermediary may provide the relevant signed statement; in that case, however, unless the Intermediary is a "qualified" intermediary as defined under the Code, the signed statement provided by the Intermediary must be accompanied by a copy of a valid Form W-8BEN provided by the non-U.S. beneficial holder of the note.

Payments of interest not exempt from United States federal withholding tax as described above will be subject to a withholding tax at the rate of 30%, subject to reduction under an applicable income tax treaty. Payments of interest on a note to a non-U.S. holder

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**          MCH0127048

generally will not be subject to United States federal income tax, as opposed to withholding tax, unless the income is effectively connected with the conduct by the non-U.S. holder of a trade or business in the United States. You should consult your own tax advisor to determine the effects of the application of the United States federal withholding tax to your particular situation.

**Disposition of the Notes by Non-U.S. Holders.**  Subject to the discussion below under "Backup Withholding and Information Reporting," a non-U.S. holder generally will not be subject to United States federal income tax, and generally no tax will be withheld, with respect to gains realized on the disposition of a note, unless (1) the gain is effectively connected with a United States trade or business conducted by the non-U.S. holder or (2) the non-U.S. holder is an individual who is present in the United States for 183 or more days during the taxable year of the disposition and other requirements are satisfied.

**Non-U.S. Holders Subject to U.S. Income Taxation.**  If interest and other payments received by a non-U.S. holder with respect to the notes, including proceeds from the disposition of the notes, are effectively connected with the conduct by the non-U.S. holder of a trade or business within the United States, or the non-U.S. holder is otherwise subject to United States federal income taxation on a net basis with respect to the holder's ownership of the notes, or are individuals that have by operation of law become residents in the United States for federal income tax purposes, the non-U.S. holder generally will be subject to the rules described above applicable to U.S. holders of notes, subject to any modification provided under an applicable income tax treaty. These non-U.S. holders may also be subject to the "branch profits tax," if the holder is a corporation.

### Backup Withholding and Information Reporting

Non-corporate U.S. holders may be subject to backup withholding at a rate of 28% on payments of principal, premium and interest on, and the proceeds of the disposition of, the notes. In general, backup withholding will be imposed only if the U.S. holder (1) fails to furnish its taxpayer identification number ("TIN"), which, for an individual, would be his or her Social Security number, (2) furnishes an incorrect TIN, (3) is notified by the IRS that it has failed to report payments of interest or dividends, or (4) under some circumstances, fails to certify, under penalty of perjury, that it has furnished a correct TIN and has been notified by the IRS that it is subject to backup withholding tax for failure to report interest or dividend payments. In addition, the payments of principal and interest to U.S. holders generally will be subject to information reporting. You should consult your tax advisors regarding your qualification for exemption from backup withholding and the procedure for obtaining an exemption, if applicable.

Backup withholding generally will not apply to payments made to a non-U.S. holder of a note who provides the certification that it is a non-U.S. holder, and the payor does not have actual knowledge that a certificate is false, or otherwise establishes an exemption from backup withholding. Payments by a United States office of a broker of the proceeds of a disposition of the notes generally will be subject to backup withholding at a rate of 28% unless the non-U.S. holder certifies it is a non-U.S. holder under penalties of perjury or otherwise establishes an exemption. In addition, if a foreign office of a foreign custodian, foreign nominee or other foreign agent of the beneficial owner, or if a foreign office of a foreign "broker" pays the proceeds of the sale of a note to the seller, backup withholding and information reporting will not apply provided that the nominee, custodian, agent or broker is not a "United States related person," or a person which derives more than 50% of its gross income for some periods from the conduct of a trade or business in the United States or is a controlled foreign corporation. The payment by a foreign office of a broker that is a United States person or a United States related person of the proceeds of the sale of notes will not be subject to backup withholding, but will be subject to information reporting unless the broker has documentary evidence in its records that the beneficial owner is not a United States person for purposes of the backup withholding and information reporting requirements and other conditions are met, or the beneficial owner otherwise establishes an exemption.

The amount of any backup withholding imposed on a payment to a holder of a note will be allowed as a credit against the holder's United States federal income tax liability and may entitle the holder to a refund, provided that the required information is furnished to the IRS.

### STATE TAXES

We make no representations regarding the tax consequences of the purchase, ownership or disposition of the notes under the tax laws of any state. You should consult your own tax advisors regarding these state tax consequences.

Confidential Treatment Requested by Medical Captial Holdings, Inc.          MCH0127049

## ERISA CONSIDERATIONS

### General

The Employee Retirement Income Security Act, or "ERISA," and Section 4975 of the Code impose restrictions on employee benefit plans subject to ERISA or plans or arrangements subject to Section 4975 of the Code and on persons who are parties in interest or disqualified persons with respect to the plans. Some employee benefit plans, like governmental plans and church plans, if no election has been made under Section 410(d) of the Code, are not subject to the restrictions of Title I of ERISA, and assets of these plans may be invested in the notes without regard to the ERISA considerations described below, subject to other applicable federal and state law. However, any governmental or church plan like these which is qualified under Section 401(a) of the Code and exempt from taxation under Section 501(a) of the Code is subject to the "prohibited transaction rules" of ERISA and the Code. Any plan fiduciary which proposes to cause a plan to acquire any of the notes should consult with its counsel with respect to the potential consequences under ERISA and the Code of the plan's acquisition and ownership of the notes. Investments by plans are also subject to ERISA's and the Code's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that a plan's investments be made in accordance with the documents governing the plan.

### Prohibited Transactions

**General**. Section 406 of ERISA and Section 4975 of the Code prohibits certain "parties in interest" and "disqualified persons" with respect to a plan from engaging in select transactions involving a plan and its assets unless a statutory, regulatory or administrative exemption applies to the transaction. Section 4975 of the Code imposes excise taxes or, in some cases, a civil penalty may be assessed under Section 502(i) of ERISA, on parties in interest which engage in non-exempt "prohibited transactions." Section 502(i) of ERISA requires the Secretary of the United States Department of Labor ("Labor") to assess a civil penalty against a fiduciary who breaches any fiduciary responsibility under, or commits any other violation of, part 4 of Title I of ERISA, or any other person who knowingly participates in the breach or violation.

**Plan Asset Regulation.** Labor has issued regulations concerning the definition of what constitutes the assets of a plan for purposes of ERISA and the prohibited transaction provisions of the Code. The plan asset regulations describe the circumstances where the assets of an entity in which a plan invests will be considered to be "plan assets" so that any person who exercises control over the assets would be subject to ERISA's fiduciary standards. Generally, under the plan asset regulation, when a plan invests in another entity, the plan's assets do not include, solely by reason of the investment, any of the underlying assets of the entity. However, the plan asset regulation provides that, if a plan acquires an "equity interest" in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act of 1940, the assets of the entity will be treated as assets of the plan investor unless exceptions apply. Under the plan asset regulation, the term "equity interest" is defined as any interest in an entity other than an instrument that is treated as indebtedness under "applicable local law" and which has no "substantial equity features." Although the plan asset regulation is silent with respect to the questions of which law constitutes "applicable local law" for this purpose, Labor has stated that these determinations should be made under the state law governing interpretation of the instrument in question. In the preamble to the plan asset regulation, Labor declined to provide a precise definition of what features are equity features or the circumstances under which the features would be considered "substantial," noting that the question of whether a plan's interest has substantial equity features is an inherently factual one, but that in making that determination it would be appropriate to take into account whether the equity features are such that a plan's investment would be a practical vehicle for the indirect provision of investment management services. We believe that the notes will be classified as indebtedness without substantial equity features for ERISA purposes. One of the exceptions that might be available applies if not more than 25% of any class of our securities is held by benefit plan investors. Each investor who purchases a note will be required to represent and warrant, in the subscription agreement for the investment, whether the assets being invested constitute "plan assets" for purposes of ERISA.

If the notes were deemed to be equity interests for this purpose and no statutory, regulatory or administrative exception applies, we could be considered to hold plan assets by reason of a plan's investment in the notes. These plan assets would include an undivided interest in all of our assets. In this case, we may be considered a fiduciary with respect to the investing plans. We would be subject to the fiduciary responsibility provisions of Title I of ERISA, including the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code, and to Section 4975 of the Code with respect to transactions involving any of our assets. The ERISA fiduciary standards could affect the way we conduct our business, which would have consequences for all investors, not just those that are employee benefit plans.

Depending on the relevant facts and circumstances, prohibited transaction exemptions may apply to the purchase or holding of the notes - for example, Prohibited Transaction Class Exemption ("PTE") 96-23, which exempts some transactions effected on behalf of a plan or by an "in-house asset manager"; PTE 95-60, which exempts some transactions between insurance company general accounts and parties in interest; PTE 91-38, which exempts some transactions between bank collective investment funds and parties in interest; PTE 90-1, which exempts some transactions between insurance company pooled separate accounts and parties in interest; or PTE 84-

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**          **MCH0127050**

14, which exempts some transactions effected on behalf of a plan by a "qualified professional asset manager." However, there can be no assurance that any of these exemptions will apply with respect to any plan's investment in the notes, or that the exemption, if it did apply, would apply to all prohibited transactions that may occur in connection with the investment.

Any plan fiduciary considering whether to purchase any notes on behalf of a plan should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and the Code.  Before purchasing any notes, a fiduciary of a plan should make its own determination as to whether Medical Provider Funding Corporation VI, as borrower on the notes, is a "party in interest" under ERISA or a "disqualified person" under the Code with respect to the plan, the availability of the exemptive relief provided in the plan asset regulation and the availability of any other prohibited transaction exemptions. In addition, purchasers that are insurance companies should consult their own ERISA counsel with respect to their fiduciary responsibilities associated with their purchase and ownership of the notes, including any responsibility under the Supreme Court case, *John Hancock Mutual Life Insurance Co. v. Harris Trust and Savings Bank.*

[Remainder of page intentionally left blank]

Confidential Treatment Requested by Medical Captial Holdings, Inc.          MCH0127051

# FORM OF NOTE

THE SECURITY EVIDENCED HEREBY WAS ISSUED PURSUANT TO REGULATION D IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, (THE "1933 ACT"), AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF REGISTRATION UNDER THE 1933 ACT OR AN APPLICABLE EXEMPTION THEREFROM.  THE HOLDER OF THE SECURITY EVIDENCED HEREBY AGREES FOR THE BENEFIT OF THE COMPANY THAT THE SECURITIES MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 OR RULE 144A UNDER THE 1933 ACT, OR PURSUANT TO ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE 1933 ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT AND IN EACH CASE, IN ACCORDANCE WITH THE APPLICABLE SECURITIES LAWS OF ANY STATE, AND THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH ABOVE.

Note Number _____                   Clark County, Nevada

$ _____                   Effective Date _____, _____

Minimum Interest Rate:_____                   Due on _____, _____

Interest Rate Spread:_____

MEDICAL PROVIDER FUNDING CORPORATION VI

SERIES I SECURED NOTE, CLASS _____

(Adjustable Interest Rate, Payable _____)

MEDICAL PROVIDER FUNDING CORPORATION VI (the "Issuer"), for value received, hereby promises to pay to the order of _____ (the "Holder"), at such location as may be designated by Holder from time to time, the principal amount of _____ Dollars ($ _____ ), and to pay interest on the unpaid balance thereof from the date hereof, in lawful money of the United States, as follows:

From the effective date shown above, Holder shall be paid simple annual interest at the rate per annum that will be adjusted twice a year, effective as of January 1 and July 1.  For each such semi-annual period, the interest rate will be the sum of the prime rate of interest, as reported in *The Wall Street Journal* on that date, plus the Interest Rate Spread stated above, but not less than the Minimum Interest Rate stated above.

All interest paid hereunder shall be based on a three hundred sixty (360) day year, consisting of twelve (12) months, each consisting of thirty (30) days.  Interest shall be payable with the frequency (monthly, quarterly or annually, or at maturity only) as stated above, for the preceding _____, on or about the 10th day of the month following the end of such period during which any part of the principal amount hereof is outstanding and unpaid.

The principal amount hereof, and any interest not theretofore paid, shall be due and payable on the due date set forth above.  The Issuer may prepay this Note at any time without penalty.

20200523. 6

Confidential Treatment Requested by Medical Captial Holdings, Inc.                   MCH0127052

[For Notes with two- or three-year terms only.]  The Issuer, on the Maturity Date, shall exchange the Holder's Note for a new Note having terms and conditions identical to the Note exchanged (except that such replacement Note shall bear interest at the interest rate and be subject to the terms set forth in other notes of the same class being issued by the Issuer at such time).  The Maturity Date of a Note issued upon renewal of this or a subsequent Note will not occur on a date following the sixth anniversary of the date of issuance of the original Note.  In the event that the Holder hereof does not wish to renew this Note on the date hereof as set forth above, written notice must be given to the Issuer at least ninety (90) calendar days but no more than one hundred twenty (120) calendar days prior to the Maturity Date.  Notwithstanding the foregoing, the Issuer may determine, at its option, not to renew any Note and shall give written notice of such non-renewal to the Holder not less than twenty (20) days nor more than sixty (60) days prior to the Maturity Date.

These Notes are issued and to be issued pursuant to that certain Note Issuance and Security Agreement (the "Note Issuance Agreement") between the Issuer and The Bank of New York Mellon, as Trustee (the "Trustee"), which term shall include any successor Trustee.  Pursuant to the Note Issuance Agreement, Notes may be issued to Holder. The Notes are issued, and will be issued, to fund the purchase of accounts receivable by Issuer and/or to make loans secured by assets. The terms of the Notes include those stated in the Note Issuance Agreement and the Notes are subject to all such terms.

Under the Note Issuance Agreement, the Issuer assigns and pledges to the Trustee, to secure the payment of the principal and interest on the Notes, and the performance of all covenants made by the Issuer under the Note Issuance Agreement and grants to the Trustee a security interest in the Trust Estate. The Trust Estate includes (i) all purchased accounts receivable acquired by the Issuer pursuant to Purchase Agreements, (ii) all cash, securities and investments received or held by the Trustee under the Note Issuance Agreement, (iii) all investment earnings thereon, all other property at any time made subject to the Note Issuance Agreement pursuant to the provisions of the Note Issuance Agreement, and (v) all proceeds of the Trust Estate, except as otherwise provided in the Note Issuance Agreement.

Each payment made to Holder shall be credited first on interest then due, and the remainder, if any, on principal; and interest shall thereupon cease upon the principal so credited. Should default be made on payment of any installment when due, or of any obligation or covenant or warranty of the Issuer in the Note Issuance Agreement, the whole sum of principal and interest shall become immediately due and payable, at the option of the Holder of this Note. All principal and interest shall be payable in lawful money of the United States.

Any notice required or permitted under this Note shall be given in writing and shall be deemed effectively given upon personal delivery or sent by first class mail, postage prepaid, to the party to be notified at the address indicated herein, or at such other address as such party may designate by ten (10) days' advance written notice to the other parties.

Any term of this Note may be amended and the observance of any term of this Note may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Holder. Any amendment or waiver effected in accordance with this section shall be binding upon the Holder and each future Holder of this Note.

This Note shall be binding upon the heirs, assigns, successors in interest, agents and employees of the parties hereto.

The Issuer agrees to pay any and all attorneys' fees and costs incurred by Holder and/or the Trustee associated with the enforcement of the terms of this Note.

If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note and the balance of the Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

This Note shall be governed and construed and enforced in accordance with the laws of the State of Nevada.


MEDICAL PROVIDER FUNDING CORPORATION VI,  a Nevada corporation


By:_____

Confidential Treatment Requested by Medical Captial Holdings, Inc.          MCH0127053

Name:_____

Title:_____

20200523. 6

Confidential Treatment Requested by Medical Captial Holdings, Inc.     MCH0127054

# SUBSCRIPTION AGREEMENT

## Medical Provider Funding Corporation VI

### Series I

**Redeemable Secured Notes**
**Minimum Investment - $50,000**
**Two-, Three- and Six-Year Notes**

## 2100 South State College Boulevard
## Anaheim, CA 92806

**THIS SUBSCRIPTION AGREEMENT** (the "Agreement") is made by and between **Medical Provider Funding Corporation VI**, a Nevada corporation (the "Company"), and the undersigned prospective purchaser (sometimes hereinafter referred to as the "Subscriber" or the "Investor") who is subscribing hereby for certain of the **Medical Provider Funding Corporation VI**, Series I Notes (the "Notes"), pursuant to the Company's Confidential Private Placement Memorandum, dated August __, 2008 (the "Memorandum" which term includes all exhibits and supplements thereto and any amendments thereof) distributed to a limited number of accredited investors in connection with the offering of the Notes.

In consideration of the Company's agreement to sell Notes to the Subscriber upon the terms and conditions summarized in the Memorandum, the Subscriber hereby agrees and represents to the Company as follows:

## A.      SUBSCRIPTION

1.      The Notes will be offered and sold to you in a non-public placement to a limited number of purchasers in the United States who are "Accredited Investors" as that term is defined under Rule 501 of Regulation D ("Regulation D") promulgated under the Securities Act of 1933, as amended (the "1933 Act"). The Notes are offered pursuant to the Memorandum.

Upon original issuance thereof, and until such time as the same is no longer required under the applicable requirements of the 1933 Act, the Notes shall bear the following legend:

THE SECURITY EVIDENCED HEREBY WAS ISSUED PURSUANT TO REGULATION D IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, (THE "1933 ACT"), AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF REGISTRATION UNDER THE 1933 ACT OR AN APPLICABLE EXEMPTION THEREFROM.  THE HOLDER OF THE SECURITY EVIDENCED HEREBY AGREES FOR THE BENEFIT OF THE COMPANY THAT THE SECURITIES MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 OR RULE 144A UNDER THE 1933 ACT, OR PURSUANT TO ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE 1933 ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT AND IN EACH CASE, IN ACCORDANCE WITH THE APPLICABLE SECURITIES LAWS OF ANY STATE, AND THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH ABOVE.

2.      On the basis of the representation and warranties contained in this Agreement, and subject to its terms and conditions and further subject to acceptance of this Agreement by the Company, the Company agrees to issue and sell to the Investor, and the Investor agrees to purchase from the Company, the number of Notes set

S - 1

20200523.6

forth on the signature page hereof by payment to the Company of the amount set forth on the signature page hereof (the "Subscription Amount") either (i) in the form of a certified or bank check, payable in United States dollars to "Medical Provider Funding Corporation VI" or (ii) by wire transfer (wire instructions available upon request).

3.        The Subscriber understands that the Company will accept or reject all subscriptions no more than 30 calendar days following receipt of the completed Subscription Agreement and a transfer to the Company of funds in the full Subscription Amount. **No notes will be issued or dated prior to the Company's receipt and acceptance of a completed Subscription Agreement.** In the event that a subscription is rejected, the Subscription Amount (or, in the case of rejection of a portion of the undersigned's subscription, the part of the Subscription Amount relating to such rejected portion) shall be returned to the Subscriber by the Company, without interest being paid thereon.

4.        The Subscriber hereby acknowledges receipt of a copy of the Memorandum, including all exhibits thereto, and hereby adopts, accepts and agrees to be bound by each provision thereof upon the (i) execution and delivery to the company of the completed Subscription Agreement submitted by the Subscriber, and (ii) acceptance by the Company of the Subscriber's subscription for Notes.

**B.        REPRESENTATIONS AND WARRANTIES**

The Subscriber hereby represents and warrants to, and agrees with, the Company as follows:

1.        In the case of a Subscriber who is an individual, the Subscriber has reached the age of majority in the state or county in which he or she resides, has adequate means of providing for his or her current needs and personal contingencies and has no need for liquidity in this investment.

2.        The Subscriber, if acting in a representative capacity or as an agent, has full authority to make the representations and warranties specified herein and to consummate the transactions contemplated herein in such capacity.

3.        The Subscriber is acquiring the Notes for the Subscriber's own account, for investment purposes only, not for the account of any other person, and not with a view to distribution, assignment or resale to others or to fractionalization in whole or in part (excluding transfers which constitute bona fide gifts, provided the transferee agrees to be bound by terms of this Agreement). No other person has or will have a direct or indirect beneficial interest in the Notes. The Subscriber will not sell, hypothecate or otherwise transfer the Notes unless (i) the Notes to be transferred are registered under the 1933 Act and applicable state securities laws or (ii) in the opinion of counsel, concurred in by counsel to the Company, an exemption from the registration requirements of the 1933 Act and from the requirements of such state laws is available.

4.        The Subscriber has been furnished with and has carefully read the Memorandum, and is familiar with and understands the terms of the offering and the terms of the Notes. The Subscriber and his, her or its representatives have also either been supplied with or been given access by the Company to all information which the Subscriber has requested relating to an investment in the Notes, and all documents and information a reasonable investor would consider material in making an investment decision concerning the Notes, and has had the opportunity to ask questions and receive answers from knowledgeable individuals concerning the Company and the Notes, so that the Subscriber has all information Subscriber deems to be relevant or material to make a decision to purchase the Notes. In evaluating the suitability of an investment in the Company, the Subscriber has not relied upon any representations or other information (whether oral or written) from any other person, including without limitation, the Company, other than as set forth in the Memorandum, and is not relying on any other person to undertake to furnish or verify the information relating to this transaction. With respect to individual tax and other economic considerations involved in this investment, the Subscriber is not relying on the Company. The Subscriber has carefully considered and has, to the extent the Subscriber believes necessary, discussed with the Subscriber's professional, legal, tax, accounting and financial advisors the suitability of an investment in the Notes for the Subscriber's particular tax and financial situation and has determined that the Notes being subscribed for by the Subscriber are a suitable investment for the Subscriber.

S - 2

20200523.6

5.      The Subscriber has a pre-existing personal or business relationship with the Company or its officers or directors, or, by reason of the Subscriber's business or financial experience (or the business or financial experience of the subscriber's professional advisors who are not affiliated with and who are not compensated by the Company or any affiliate of the Company) has the capacity to protect his, her or its own interests in connection with this investment in the Notes, and either alone or with the Subscriber's professional advisors (as described above ) has such knowledge and experience in financial and business matters that the Subscriber is capable of evaluating the merits and risks of an investment in the Notes.

6.      THE SUBSCRIBER HEREBY REPRESENTS AND WARRANTS TO THE COMPANY THAT HE, SHE, OR IT SATISFIES ONE OF THE FOLLOWING REQUIREMENTS:  *(Initial the applicable statement)*

INITIALS

| | | |
|---|---|---|
| _____ | i | the Subscriber is an individual whose net worth, individually or jointly with spouse, currently exceeds $1,000,000; or |
| _____ | ii | the Subscriber is an individual whose individual income (exclusive of that of spouse) exceeded $200,000 in each of the immediately preceding 2 years, and who reasonably expects his or her personal income to exceed $200,000 in the current year; or |
| _____ | iii | the Subscriber is an individual whose joint income with that of his or her spouse exceeded $300,000 in each of the immediately preceding 2 years, and who reasonably expects such joint income to exceed $300,000 in the current year; or |
| _____ | iv | the Subscriber is a director, executive officer, or general partner of the Company or a director, executive officer or general partner of a general partner of the Company; or |
| _____ | v | the Subscriber is (a) a bank as defined in Section 3(a)(2) of the 1933 Act or a savings and loan association or other institution as defined in Section 3(a)(5)(A) of the 1933 Act, whether acting in its individual or fiduciary capacity, (b) a broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, (c) an insurance company as defined in Section 2(13) of the 1933 Act, (d) an investment company registered under the Investment Company Act of 1940, or a business development company as defined in Section 2(a)(48) of that act, (e) a Small Business Investment Company licensed by the United States Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958, (f) a plan established and maintained by a state or its political subdivision, or any agency or instrumentality of a state or its political subdivision, for the benefit of its employees, if such plan has total assets in excess of $5 million, or (g) an employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"), if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which plan fiduciary is a bank, savings and loan association, insurance company or a registered investment advisor, or if the employee benefit plan has total assets in excess of $5 million or, if a self-directed plan, with investment decisions made solely by persons who are accredited investors; or |
| _____ | vi | the Subscriber is a private business development company as defined in Section 202(a)(22) of the Investment Advisors Act of 1940; or |
| _____ | vii | the Subscriber is an organization described in Section 501(c)(3) of the Internal Revenue Code of 1986, a corporation, a Massachusetts or similar business trust or a partnership, not formed for the specific purpose of acquiring the Notes with total assets in excess of $5 million; or |
| _____ | viii | the Subscriber is a trust not formed for the specific purpose of acquiring the Notes, whose total assets exceed $5 million and whose purchase is directed by a person with such knowledge and experience in financial and business matters that he or she is capable of evaluating the merits and risks of this investment; or |
| _____ | ix | the Subscriber is an entity all of the equity owners of which meet the requirements of category (i), (ii), (iii), (iv), (v), (vi), (vii) or (v) above. |

S - 3

20200523.6

Confidential Treatment Requested by Medical Captial Holdings, Inc.          MCH0127057

7.    Indicate whether the assets being invested in the notes constitute "plan assets" within the meaning of ERISA and regulation 2510.3-101 promulgated thereunder *(Initial whichever one applies)*:

_____    Yes, the assets being invested in the notes <u>do</u> constitute "plan assets" within the meaning of ERISA and regulation 2510.3-101 promulgated thereunder.

_____    No, the assets being invested in the notes <u>do not</u> constitute "plan assets" within the meaning of ERISA and regulation 2510.3-101 promulgated thereunder.

8.    The Subscriber recognizes that investment in the Company involves substantial risks, including the risk of loss of the entire amount of such investment, and has taken full cognizance of and understands all the risk factors and tax consequences related to the Subscriber's purchase of the Notes. The Subscriber is willing to assume, and has substantial financial resources necessary to withstand, all the risks involved in the investment and the potential loss of investment in the Notes.

9.    If this Subscription Agreement is executed and delivered on behalf of a partnership, corporation or trust: (i) such partnership, corporation or trust has been duly authorized and is duly qualified (a) to execute and deliver this Subscription Agreement and all other instruments executed and delivered on behalf of such partnership, corporation or trust or by use of a power of attorney in connection with the purchase of its Notes, (b) to delegate authority pursuant to a power of attorney and (c) to purchase and hold such Notes; (ii) the signature of the party signing on behalf of such partnership, corporation or trust is binding upon such partnership, corporation or trust; and (iii) such partnership, corporation or trust has not been formed for the specific purpose of acquiring such Notes, unless each equity and beneficial owner of such entity is an Accredited Investor under Regulation D and has submitted information substantiating such qualification.

10.    The Subscriber hereby agrees to indemnify and hold harmless the Company, and each officer, director or control person of the Company and each officer and director of any such control person (each, an "<u>Indemnified Party</u>") who was or is a party or is threatened to be made a party to any threatened, pending or completed suit, action or proceeding, whether civil or criminal, administrative or investigative, to the fullest extent permitted by law, against any Losses incurred by reason of or arising from any actual or alleged misrepresentation or misstatement of facts or omission to represent or state facts made by the Subscriber to the Company including, without limitation, any such misrepresentation, misstatement or omission contained in this Subscription Agreement. For purposes of this paragraph, "<u>Losses</u>" shall include any and all losses, damages, liabilities and expenses for which an Indemnified Party has not otherwise been reimbursed (including attorneys' fees, judgments, fines and amounts paid in settlement or incurred in a securities or other action in which no judgment in favor of the Subscriber is rendered) actually and reasonably incurred by such person or entity in connection with such action, suit or legal proceeding.

## C.    UNDERSTANDINGS

The Subscriber understands, acknowledges and agrees with the Company as follows:

1.    This subscription may be rejected, in whole or in part, by the Company, or its Officers in their sole and absolute discretion. The Company may also allot to any prospective Subscriber fewer than the number of Notes subscribed for by such prospective Subscriber.

2.    This subscription is and shall be irrevocable by the Subscriber except to the extent otherwise provided by any applicable state law.

3.    THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE

S - 4

20200523.6

Confidential Treatment Requested by Medical Captial Holdings, Inc.        MCH0127058

AND MAY NOT BE TRANSFERRED OR RESOLD OR OTHERWISE DISPOSED OF EXCEPT AS PERMITTED UNDER THE 1933 ACT AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.  INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT UNTIL THE NOTES MATURE.

S - 5

20200523.6

**D.     MISCELLANEOUS**

1.     This Subscription Agreement is not binding on the Company until the Company has executed it.

2.     This Subscription Agreement and the representations and warranties contained herein shall be binding upon the heirs, executors, administrators, and other successors of the Subscriber and this Subscription Agreement shall inure to the benefit of and be enforceable by the Company. If there is more than one signatory hereto, the obligations, representations, warranties and agreements of the Subscriber are made jointly and severally.

3.     Neither this Subscription Agreement nor any provisions hereof shall be waived, modified, changed, discharged, terminated, revoked or canceled except by an instrument in writing signed by the party against whom any such change, discharge or termination is sought.

4.     Failure of the Company to exercise any right or remedy under this Subscription Agreement or any other agreement between the Company and the Subscriber, or delay by the Company in exercising such right or remedy, will not operate as a waiver thereof. No waiver by the Company will be effective unless and until it is in writing and signed by the Company.

5.     This Subscription Agreement shall be enforced, governed and construed in all respects in accordance with the laws of the State of California, as such laws are applied by California courts to agreements entered into and to be performed in California by and between residents of California. In the event that any provision of this Subscription Agreement is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any provision hereof which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision hereof.

6.     This Subscription Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by writing executed by all parties hereto.

S - 6

20200523.6

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**          **MCH0127060**

**E.    EXECUTION OF AGREEMENT BY POWER OF ATTORNEY**

IF THE SUBSCRIBER HAS SIGNED THIS SUBSCRIPTION AGREEMENT BY POWER OF ATTORNEY, THE SUBSCRIBER REPRESENTS THAT ATTACHED HERETO IS A TRUE AND COMPLETE COPY OF SUCH POWER OF ATTORNEY.

The undersigned Subscriber, desiring to purchase notes of Medical Provider Funding Corporation VI, Series I (the "Notes") pursuant to the Confidential Private Placement Memorandum dated August __, 2008 (the "Memorandum") of Medical Provider Funding Corporation VI, a Nevada Corporation (the "Company"), by executing this Signature Page, hereby agrees to be bound by all terms of this Subscription Agreement, and further, hereby executes, adopts, makes, confirms and agrees to all terms, conditions, representations and warranties of this Subscription Agreement.

Dated as of this _____ day of _____, ____.

Amount of Notes to Purchase:

| Two Years | B1 | _____ |
| | B2 | _____ |
| | B3 | _____ |
| | B4 | _____ |

| Three Years | C1 | _____ |
| | C2 | _____ |
| | C3 | _____ |
| | C4 | _____ |

_____
Name as it is to appear on Note.

| Six Years | F1 | _____ |
| | F2 | _____ |
| | F3 | _____ |
| | F4 | _____ |

_____
Signature (if signing on behalf of an entity, state capacity in which you are signing)

_____
Signature of Co-Subscriber (if any)

$_____ Amount paid-in
upon Subscription

_____
Print Name of Subscriber

_____
Print Name of Co-Subscriber (if any)

Federal Tax I.D. _____      Mailing Address of Subscriber:

SS# _____      _____

Phone # _____      _____

* If investor is not a United States citizen, furnish IRS Form W-8BEN with this Subscription Agreement

S - 7

20200523.6

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**    **MCH0127061**

## PLACEMENT AGENT CERTIFICATION

BASED ON THE INFORMATION OBTAINED FROM THE SUBSCRIBER CONCERNING HIS INVESTMENT OBJECTIVES, HIS OTHER INVESTMENTS AND HIS FINANCIAL SITUATION AND NEEDS, THE UNDERSIGNED PLACEMENT AGENT HAS REASONABLE GROUNDS TO BELIEVE THAT AN INVESTMENT IN THE NOTES OF THE COMPANY IS SUITABLE FOR THE SUBSCRIBER. PRIOR TO THE SUBSCRIBER'S EXECUTING THIS SUBSCRIPTION AGREEMENT, THE UNDERSIGNED PLACEMENT AGENT HAS INFORMED THE SUBSCRIBER OF ANY COMPENSATION THE UNDERSIGNED PLACEMENT AGENT SHALL RECEIVE ON ACCOUNT OF THE SALE OF THE NOTES HEREIN AND ALL PERTINENT FACTS RELATING TO AN INVESTMENT IN THE NOTES, INCLUDING THE RISK FACTORS DISCLOSED IN THE MEMORANDUM. THE UNDERSIGNED BELIEVES THAT THE REPRESENTATIONS AND WARRANTIES EXPRESSED ABOVE ARE TRUE AND CORRECT.


_____
      Placement Agent


By _____
      Agent's Authorized Signature


Name of Broker-Dealer: _____


Subscription accepted by the Company.


    Dated: _____


**MEDICAL PROVIDER FUNDING CORPORATION VI**


By_____
      Authorized Signature


S - 8

20200523.6

Confidential Treatment Requested by Medical Captial Holdings, Inc.    MCH0127062

# MEDICAL PROVIDER FUNDING CORPORATION VI

Confidential Private Placement Memorandum

**August __, 2008**

20200523.6

Confidential Treatment Requested by Medical Captial Holdings, Inc.                    MCH0127063

## TABLE OF CONTENTS

INVESTOR SUITABILITY STANDARDS (WHO MAY INVEST)............................................... 6

HOW TO SUBSCRIBE ........................................................................................................ 6

SUMMARY OF PRIVATE PLACEMENT MEMORANDUM.............................................. 7

SUMMARY OF THE TERMS OF THE OFFERING ......................................................... 8

RISK FACTORS.................................................................................................................... 9

FORWARD-LOOKING STATEMENTS ............................................................................. 14

USE OF PROCEEDS ........................................................................................................... 15

PLAN OF DISTRIBUTION................................................................................................. 15

Acquisition of Loans and Other Investments.................................................... 23

Administration and Servicing of Assets ............................................................ 24

Credit Loss Policy and Experience .................................................................... 26

Title to Accounts Receivable ............................................................................. 26

Competition......................................................................................................... 26

Government Regulation ...................................................................................... 27

Changes in HMO and Insurance Company Payment and Reimbursement Practices ............................. 27

Employees........................................................................................................... 28

Properties ............................................................................................................ 28

Legal Proceedings .............................................................................................. 28

Regulatory Matters ............................................................................................. 28

MEDICAL PROVIDER FUNDING CORPORATION VI ORGANIZATION AND MANAGEMENT ............................................................................................................... 29

AGE ......................................................................................................... 29

THE ADMINISTRATOR AND SERVICER .................................................................... 30

CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS ................................. 31

DESCRIPTION OF THE NOTES ....................................................................................... 32

General ................................................................................................................ 32

Interest Rate and Maturity ................................................................................. 32

Payments of Interest........................................................................................... 33

Payments of Principal and Renewal .................................................................. 33

The Trustee ......................................................................................................... 34

Collateral............................................................................................................. 34

Sale of Collateral Pledged to Trust ................................................................... 35

20200523.6

Confidential Treatment Requested by Medical Captial Holdings, Inc.                MCH0127064

Flow of Funds ......................................................................................................... 35

Trust Account .......................................................................................................... 35

Lock Box Accounts ................................................................................................. 36

Redemption of Notes ............................................................................................... 36

Mergers and Sales of Assets ................................................................................... 36

Rights of Noteholders ............................................................................................. 36

Defaults and Remedies ............................................................................................ 37

Modification of the Note Agreement and Supplemental Note Agreements ........... 37

**MATERIAL FEDERAL INCOME TAX CONSIDERATIONS** ..................................... 39

**STATE TAXES** ...................................................................................................................... 42

**ERISA CONSIDERATIONS** .............................................................................................. 43

**FORM OF NOTE** ................................................................................................................... 45

**SUBSCRIPTION AGREEMENT** ..................................................................................... S-1

20200523.6

**Confidential Treatment Requested by Medical Captial Holdings, Inc.**     **MCH0127065**

**EXHIBIT 3**

**Medical Capital**
Financing the Future of Healthcare

July 14, 2009

Dear Broker-Dealer:

Pursuant to our past conversations in late May and early June regarding sales of notes on behalf of Medical Provider Funding Corporation VI ("MPFC VI"), this it to confirm that **we are not accepting any new note subscriptions, until further notice.  Since early June there have been instances of several sales which have caused us to write this confirmatory notice.  Please discontinue sales activity pertaining to MPFC VI until further notice from us.**

We will let you know the status and any developments with respect to MPFC VI periodically as appropriate.  Thank you for your continued support of Medical Capital.   We look forward to continuing our relationship in the future.

Sincerely,

Joseph J. Lampariello
President