JOHN B. BULGOZDY, Cal. Bar No. 219897
Email: bulgozdyj@sec.gov
NICHOLAS S. CHUNG, Cal. Bar No. 192784
Email: chungni@sec.gov
MORGAN B. WARD DORAN, Cal. Bar No. 246107
Email: warddoranm@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Rosalind R. Tyson, Regional Director
Andrew G. Petillon, Associate Regional Director
John M. McCoy III, Regional Trial Counsel
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036-3648
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SOUTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>MEDICAL CAPITAL HOLDINGS, INC.; MEDICAL CAPITAL CORPORATION; MEDICAL PROVIDER FUNDING CORPORATION VI; SIDNEY M. FIELD; and JOSEPH J. LAMPARIELLO,<br><br>Defendants. | Case No. 09-CV-818 DOC (RNBx)<br><br>**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND RELATED RELIEF** |

I.     **INTRODUCTION**

Plaintiff Securities and Exchange Commission ("Commission") respectfully submits this reply in support of its *Ex Parte* Application for Temporary Restraining Order and Orders: (1) Freezing Assets, (2) Appointing a Temporary Receiver, (3) Prohibiting Destruction of Documents, (4) Granting Expedited Discovery, and (5) Requiring Accountings; and Order to Show Cause re Preliminary Injunction and Appointment of a Permanent Receiver ("TRO Application"). Defendants have now made two filings opposing the Commission's TRO Application: (1) Defendants' Emergency *Ex Parte* Application Requesting Additional Time to Respond, filed July 20, 2009 ("Def. Opp. I"), and (2) Defendants' Opposition to the TRO Application, filed July 22, 2009 ("Def. Opp. II").

In their oppositions, Defendants do not contest that MCC extracted $25 million in administrative fees from MP VI, or that at least $18.5 million of those fees were paid from MP VI investor funds, contrary to the express representations in the PPM. Instead, Defendants have offered two different rationalizations for taking excessive fees, neither of which excuses Defendants' misrepresentation to investors that administrative fees would not be paid from offering proceeds. On this basis alone, the Court should grant the Commission's TRO Application.

Defendants further admit that they misrepresented to investors that prior affiliated entities of MP VI had not defaulted. Defendants attempt to justify their misrepresentation to investors by now claiming that the defaults were in "non-core, non-receivable assets," (Def. Opp. II at 6:26-28), and assert that "MPFC VI has only invested in receivable assets." (*Id.* at 7:1.) However, the distinctions now advanced were not presented to investors in the PPM. MP VI's PPM actually stated that it could invest in the same kind of "non-core, non-receivable assets" that were in default in prior affiliated offerings. Defendants' *post hac* explanation concerning defaults lacks any merit.

///

1

Finally, Defendants make several unpersuasive arguments to support their continued control over investor funds. Defendants have made fraudulent statements to investors and misappropriated investor funds and admit that they used funds from later investors to purchase assets from earlier offerings, in order to make payments to earlier investors. (Def. Opp. II at 7:26-8:6.) The public interest and protection of the investing public supports the Commission's request for appointment of a receiver over Defendants MCHI, MCC, and MP VI.

## II.  LEGAL ARGUMENT

### A.  Defendants Improperly Used Investor Funds to Pay Themselves Administrative Fees

Defendants do not controvert the Commission's evidence that they paid themselves over $25 million in administrative fees, and that at least $18.5 million of those fees were paid from investor funds, contrary to the representation in the MP VI PPM. Instead, Defendants have offered two different explanations in an attempt to explain their improper use of investor funds. Defendants' justifications lack merit and should be rejected.

The Commission alleged, and Defendants admit, that the MP VI PPM expressly states that administrative fees would not be paid from the proceeds of the sale of notes, but rather only from amounts collected from accounts receivable and other investments. (Chung TRO Dec. ¶ 5, Ex. 5 at p. 159; Def. Opp. II at 5:19-22.) Defendants do not dispute that MP VI collected only $6.5 million on receivables through June 19, 2009. Defendants also do not dispute that MCHI and MCC caused MP VI to pay approximately $25 million in administrative fees to MCC from September 2008 through June 2009. There is no dispute that Defendants used over $18.5 million of MP VI investor funds to pay themselves administrative fees.

Unable to dispute their misrepresentation to investors and their misappropriation of investor funds, Defendants have offered different explanations for their conduct. Defendants first argued that $25 million in administrative fees

1  was not excessive because they were entitled to pay broker-dealer commissions
2  and other start-up fees for the funds, which were "sometimes" included under
3  administrative fees.  (Def. Opp. I at 3:12-15; Lampariello Dec. ¶ 5.)  In response,
4  the Commission showed that Defendants disclosed in the MP VI PPM that such
5  start-up fees and commissions were expressly limited: "Offering expense are
6  estimated to be approximately $500,000 and sales commissions will not exceed
7  6.0% of the principal amount of the notes sold."  (Commission's Emergency *Ex*
8  *Parte* Application for Reinstatement of Temporary Restraining Order, etc. ("SEC
9  App. II") at 3:17-26 (citing Chung TRO Dec. Ex. 5 at p. 159).)  A simple
10 arithmetic calculation established that, at most, Defendants were entitled to only
11 $5.1 million in commissions and start-up costs on sales of $76.9 million in notes,
12 which is far less than the total $25 million in fees Defendants paid themselves.
13 (*Id.*)  Assuming *arguendo* that these amounts were properly paid from investor
14 funds, Defendants still improperly took at least $13.5 million of investor funds to
15 pay administrative fees.
16     Defendants now argue that the MP VI Administrative Services Agreement
17 ("MP VI ASA") allows MCC to calculate the amount of its administrative fees,
18 and that these fees are "specifically approved by the financial institution trustees."
19 (Def. Opp. II at 5:25-6:7; 10:23-27.)  However, the MP VI ASA was not
20 distributed to investors and does not contradict the clear restriction on use of
21 proceeds stated in the MP VI PPM.  Moreover, the MP VI ASA defines the
22 "administrative fee which *may* be paid to MCC."  (Supp. Lampariello Dec. at ¶ 17,
23 page 5:22-25 (emphasis added).)  Simply because Defendants could calculate a fee
24 amount does not mean that they may use investor funds to make such payments,
25 contrary to express representations to investors.  Nothing in the MP VI ASA
26 contradicts the express restriction on use of proceeds in the MP VI PPM, which
27 was provided to investors.
28     Defendants' argument, that the trustee "specifically approved" payment of

3

1  administrative fees from investor funds, also lacks merit.  The Note Issuance and
2  Security Agreement ("NISA") provides that, absent any event of default, the
3  trustee "shall" pay any requested administrative fees that are accompanied by the
4  appropriate certification from MCC.  (Chung TRO Dec. Ex. 18 at pp. 32-33
5  [Section 5.08(a)(ii)(F) ("To the extent funds are available in the Trust Account, the
6  Trustee shall withdraw from the Trust Account and pay, remit, or transfer as and
7  when instructed by the Debtor in writing . . . .")].)  If the funds are in the account
8  and there is no default, the trustee simply confirms that Defendants have submitted
9  the proper request and makes the payment.

**B.     Defendants Admit That They Failed to Disclose Prior Defaults**

Defendants admit that the disclosure in the MP VI PPM concerning prior defaults by affiliates of MP VI was false.  (Lamapriello Dec. ¶ 6; Def. Opp. II at 7:2-3; Supp. Lampariello Dec. ¶ 26.)  The MP VI PPM expressly represented that Defendants' affiliates "have *never* defaulted in the payment of their obligations" to investors.  (Chung TRO Dec. Ex. 5 at p. 151 (emphasis added).)  This misrepresentation was clearly material, as it involved the performance of prior, identical investment vehicles managed by Defendants, and related directly to the quality of Defendants' management, experience, and business model.

The Court should reject Defendants' attempt to explain away their misrepresentation by arguing a distinction between "non-core, non-receivable assets" and some other class of assets.  Defendants' PPM made no such distinction for investors.  In fact, Defendants' PPM states that MP VI may acquire exactly the types of assets that were in default:  "We currently intend to use the proceeds received from the sale of the notes to purchase accounts receivable, make loans collateralized by account receivable, [and] make loans or extend credit lines secured by assets . . . ."  (Chung TRO Dec. Ex. 5, at p. 159.)  Defendants' misrepresentation about prior performance of affiliated entities managed by MCC and MCHI was material.  *See, e.g., SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir.

4

1980)("[T]he materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge.") (citations omitted).

### C. Plaintiff Has Made a *Prima Facie* Showing That Defendants Are Engaging in Securities Fraud and Emergency Relief is Appropriate

In its original application, the Commission made a *prima facie* showing that Defendants were violating the federal securities laws. Defendants do not dispute that they made misrepresentations to investors in the MP VI PPM, but argue that their "lack of clarity" should not be considered "a *prima facie* material misstatement." (Opposition at 12:7-8.) However, the antifraud provisions are designed to protect investors from conduct such as Defendants' "lack of clarity" in failing to disclose that affiliates of MP VI had defaulted on payments to investors, and misrepresenting that the affiliates had "never" defaulted. Similarly, Defendants' statement in the MP VI PPM restricting the use of investor proceeds was explicit and clear, and did not lack clarity in the promise made to investors. Defendants violated the antifraud provisions when they made that promise to investors, and then misappropriated millions of dollars of investor funds to pay themselves fees. There can be little dispute that Defendants' misrepresentations were material and the Commission has established a *prima facie* case that Defendants violated the antifraud provisions.

Defendants argue that, despite having engaged in securities fraud or otherwise been less than clear in their representations to investors, they are in the best position to protect investors and their assets. Defendants make this assertion despite the fact that MP II, MP III, MP IV, and MP V are all in default in payments of interest and/or principal to investors, which shows that Defendants have not managed investor funds prudently to this point. Indeed, the trustee for MP III and MP V reports that MCC employees failed to provide accurate information during an investigation into MCC's business methods and processes, including that MCC's

employees were instructed to delete emails containing certain reports. (Supp. Chung Dec. Ex. 4.) Defendants' failure to cooperate with the trustee of defaulted offerings provides additional evidence that supports the requested emergency relief, including the appointment of a receiver over MCHI, MCC, and MP VI.

Defendants have effectively commingled funds between and among MP VI and other SPVs, so that placing a receiver over MCC, which manages all the SPVs, is the only effective way to protect investors in MP VI. Defendants do not dispute that they used over $41 million of cash from MP VI to purchase assets from affiliated SPVs, which they then valued at over $52 million.[1] (Boudreau TRO Dec. ¶ 9.) Through MCC and MCHI, Defendants transferred funds from MP VI to affiliated entities that were or are in default to investors. Indeed, Defendants admit that they have used funds from later investors to pay off investors in earlier SPVs, in classic Ponzi-like fashion. (Def. Opp. II at 7:26-8:22.) Accordingly, Defendants' arguments that the Court should somehow segregate the prior offerings from a receivership should be rejected.

The Court should appoint Thomas Seaman as receiver over MCHI, MCC, and MP VI. Contrary to Defendants' allegations, neither Mr. Seaman nor his counsel engaged in any improper conduct or disclosure. Indeed, as temporary receiver, Mr. Seaman was an arm of the Court and his obligation was to the Court, not Defendants. It is important for the Court to know that, in the few short hours that he was temporary receiver, Mr. Seaman discovered that Defendants had invested millions of dollars in a movie that had not been distributed, in a yacht, and had not been able to make payroll.[2] These are important facts that can help inform the Court's decision,

---

[1] The value of MP VI's assets is used to determine the CCR and the amount of administrative fees. If Defendants overvalued the assets purchased from affiliated companies, this would flow through their CCR calculation.

[2] Defendants suggest that they are preparing a rescission offer for MP VI investors; however, it is unclear where they will get the funds to make such payments in view of their inability to meet payroll.

6

and the interests of justice as well as the public interest in the protection of investors, clearly outweighs any confidentiality issues asserted by Defendants.  Moreover, the Commission understands that Mr. Seaman's counsel is filing a declaration today that contradicts Defendants' account of any agreement between Defendants' lawyer and counsel for Mr. Seaman.

## IV.   CONCLUSION

In view of the Commission's showing that Defendants have violated the antifraud provisions of the federal securities laws, the Court should grant the Commission's request for emergency relief in all respects, including issuance of a temporary restraining order or preliminary injunction, appointment of a receiver over MCHI, MCC, and MP VI, an asset freeze, and all other relief requested by the Commission in its TRO Application.

Dated:  July 28, 2009                    Respectfully submitted,

/s/ John B. Bulgozdy
John B. Bulgozdy
Nicholas S. Chung
Morgan B. Ward Doran
Attorneys for Plaintiff
Securities and Exchange Commission

## PROOF OF SERVICE

I am over the age of 18 years and not a party to this action.  My business address is:

[X]   U.S. SECURITIES AND EXCHANGE COMMISSION, 5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036-3648

Telephone No. (323) 965-3998; Facsimile No. (323) 965-3908.

On July 28, 2009, I caused to be served the document entitled **PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND RELATED RELIEF** on all the parties to this action addressed as stated on the attached service list:

[ ]   **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

   [ ]   **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

   [ ]   **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

[ ]   **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

[ ]   **FEDERAL EXPRESS:**  By placing in sealed envelope(s) designated by Federal Express with delivery fees paid or provided for, which I deposited in a facility regularly maintained by Federal Express or delivered to a Federal Express courier, at Los Angeles, California.

[X]   **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

[ ]   **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

[X]   **(Federal)** I declare under penalty of perjury that I am a member of the bar of this Court and that the foregoing is true and correct.

Date: July 28, 2009                    /s/ John B. Bulgozdy
                                       John B. Bulgozdy

<u>**SEC v. MEDICAL CAPITAL HOLDINGS, INC., et al.**</u>
**United States District Court – Central District of California
Case No. SACV 09-818 DOC (RNBx)
LA-3474**

<u>SERVICE LIST</u>

John F. Libby, Esq.
Manatt Phelps & Phillips, LLP
11355 W. Olympic Boulevard
Los Angeles, CA 90064
Email: jlibby@manatt.com
*Attorneys for Defendant Medical Capital Holdings, Inc., Medical Capital Corporation, Medical Provider Funding Corporation VI; Sidney M. Field, and Joseph J. Lampariello*