# EXHIBIT C

NOTE ISSUANCE AND SECURITY AGREEMENT

by and between

MEDICAL PROVIDER FUNDING CORPORATION V

and

WELLS FARGO BANK, NATIONAL ASSOCIATION,

as Trustee

SERIES I

Dated as of  October 8, 2007

NOTE ISSUANCE AND SECURITY AGREEMENT

This NOTE ISSUANCE AND SECURITY AGREEMENT, dated as of the 8th day of October, 2007 (the "Note Agreement"), is made by and between MEDICAL PROVIDER FUNDING CORPORATION V, a Nevada corporation (hereinafter referred to as the "Debtor") and WELLS FARGO BANK, NATIONAL ASSOCIATION (the "Trustee"), a national banking association duly organized, existing and authorized to accept and execute trusts of the character herein set out under and by virtue of the laws of the United States, with its principal office located in Minneapolis, Minnesota, as trustee for the benefit of the Noteholders.

For good and valuable consideration, the adequacy and sufficiency of which is hereby acknowledged, each party agrees, for the benefit of the other and for the equal and ratable benefit of the Noteholders, as follows:

## ARTICLE I

## DEFINITIONS

When used herein, the following terms shall have the meanings set forth below:

"ADMINISTRATION AGREEMENT" means the Administrative Services Agreement entered into as of October 8, 2007 between the Administrator and the Debtor concerning the administrative services to be performed by the Administrator with regard to the Receivables, as supplemented and amended.

"ADMINISTRATIVE FEE" means the monthly fee, payable, to Administrator for the performance of its services under the Administration Agreement, in an amount equal to the balance remaining in the Trust Account after payment of the Trustee fees as well as accrued interest and principal due to Noteholders in such month, in each instance to the extent such payment would not breach Section 3.05(h) if such payment were instead a distribution of funds to the Debtor, as certified by the Administrator to the Trustee.

"ADMINISTRATOR" means Medical Capital Corporation, Inc., a Nevada corporation, or any other successor selected by the Debtor and identified in writing to the Trustee, in its capacity as such under the Administration Agreement.

"AGGREGATE NOTE BALANCE" means, as of any date of determination, the total unpaid principal and accrued and unpaid interest evidenced by all of the Outstanding Notes.

"A.M. BEST" shall mean A.M. Best Company an insurance industry rating company existing under the laws of the State of New Jersey, and its successors and assigns.

"APPLICABLE NOTES" means (a) the Notes (Series I) in the case of an Event of Default and (b) the Notes of each other series, in the case of an Event of Default with respect to such series as provided in any supplemental note agreement relating to the Notes of such series.

"APPROVED PAYOR" means (a) any private medical insurance company which at the time of purchase of any Receivable payable by such private medical insurance company, the private medical insurance company has been assigned a long-term debt rating, or a rated claims paying ability of "A" or better by S&P, "A1" or better by Moody's, "A" or better by A.M. Best or Fitch, or the Administrator in its determination, otherwise believes is financially suitable; (b) any Federal or State government sponsored health care program; (c) any for-profit or not-for-profit commercial organization (as determined by the Administrator in its discretion); (d) large self insured corporations (as determined by the Administrator in its discretion); and (e) health maintenance organizations, in each case as identified in a certificate signed by the Administrator and delivered to the Trustee.

"BATCH" means a group of Receivables that were acquired on the same date from a single Health Care Provider.

"BROKER/DEALER" means any Person as may be designated by the Debtor from time to time.

"BUSINESS DAY" means each day of the year on which federally-chartered banking institutions are not required or authorized to close in New York, New York, and in the city in which the corporate trust office of the Trustee is located.

"COLLATERAL" shall have the meaning set forth in Section 3.01(c).

"COLLATERAL COVERAGE DEFAULT" means a determination by the Debtor, certified to the Trustee, that the Net Collateral Coverage Ratio does not meet or exceed the Collateral Coverage Requirement.

"COLLATERAL COVERAGE REQUIREMENT" means a Net Collateral Coverage Ratio of not less than one hundred percent (100%).

"CORPORATE TRUST OFFICE" means the Minneapolis, Minnesota office of the Trustee, or such other office as may be set forth from time to time in Section 9.03.

"DATE OF ISSUE" means, with respect to a Note, (a) if the Note is paid for via wire transfer directly to the Trustee, the Business Day on which the Trustee receives the wire with respect to that Note, (b) if the Note is paid for by bank draft, the Business Day after the draft with respect to that Note is deposited in the Subscription Account, and (c) if the Note is paid for by personal check, five (5) Business Days after the check with respect to that Note is deposited in the Subscription Account or, if later exchanged pursuant to Section 2.01(f), the date the previously outstanding Note or portion thereof is exchanged.

"DEBTOR" means Medical Provider Funding Corporation V, a Nevada corporation, or its successors in interest.

"DUNN & BRADSTREET" means a credit reporting agency associated with "Moody's" existing under the laws of the State of New Jersey.

"ELIGIBLE RECEIVABLE" means, as of the date that it is pledged to the Trustee pursuant to this Note Agreement, any Receivable that:

(a)    an Approved Payor is directly obligated to pay, which obligation is valid, binding, and enforceable against the Approved Payor in accordance with its terms except that (i) such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws (whether statutory, regulatory or decisional) now or hereafter in effect relating to creditors' rights generally, (ii) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to certain equitable defenses and to the discretion of the court before which any proceeding therefor may be brought, whether a proceeding at law or in equity, and (iii) such enforcement may, with respect to Governmental Payor Receivables, be subject to the effect of all applicable laws and regulations;

(b)    is not subject to any dispute, offset, counterclaim or defense;

(c)    is denominated and payable in U.S. dollars in the United States and that is acquired by the Debtor pursuant to a Purchase Document;

(d)    constitutes an "account" or a "general intangible" as defined in the Uniform Commercial Code as in effect in the jurisdiction in which the Debtor is required to perfect a security interest therein;

(e)    with regard to which each of the representations and warranties set forth in Section 4.01 is true and correct;

(f)    the Approved Payor of which (other than a Receivable payable by Medicare or Medicaid) has received written notice of the sale of the Receivable to Debtor;

(g)    with regard to which the claim for payment has been submitted to the Approved Payor not more than one hundred eighty (180) days prior to the purchase thereof by the Debtor (if the Receivable is part of the first Batch purchased from a Receivable Seller);

(h)    will be subject to a first priority perfected lien held by the Trustee pursuant to this Note Agreement upon its purchase with funds from the Trust Account and the filing of any applicable financing statement pursuant to the UCC;

(i)    the claim for payment has been acknowledged by the Approved Payor (other than a Receivable payable by Medicare or Medicaid); and such Approved Payor has received written notice that payments with respect thereto are to be sent solely to a Lock Box Account; and

(j)    is set forth in a certificate delivered to the Trustee by the Debtor in the form attached as Exhibit A-1 hereto.

"EVENT OF DEFAULT" (i) with respect to the Notes (Series I), shall have the meaning set forth in Section 6.01 (a) through (k) and (ii) with respect to each other series of Notes shall have the meaning set forth in the supplemental note agreement creating such series.

"EXPECTED NET RECEIVABLE AMOUNT" means, with respect to a Receivable, the net amount that is expected to be collected on a Receivable by the related Receivable Seller from a third party payor, which shall be calculated by Servicer at the time of purchase based on the claim information gathered from the such Receivable Seller in accordance with the applicable Purchase Documents and the Servicer's customary methods.

"FITCH" shall mean Fitch, Inc., a corporation organized and existing under the laws of the State of Delaware, and its successors and assigns.

"GOVERNMENTAL PAYOR" means an Approved Payor in connection with any Receivable arising under or in relation to a program known as "Medicare," "Medicaid," "Civilian Health and Medical Program of the Uniform Services" or any successor, substitute or new program of similar nature and/or purpose: (i) any state, city, county or local government (including, without limitation, their Departments of Health and Social Services, however denominated, and any successors to such departments and any health and/or social services department or district of any of their political subdivisions), (ii) the United States Government (including, without limitation, its Department of Health and Human Services and any successor to such department and any administration, division or administered insurance trust fund thereof), and (iii) any intermediary making payments on behalf of or as contracted for by the United States Government.

"GOVERNMENTAL PAYOR RECEIVABLE" means all Receivables owing to a Receivable Seller by a Governmental Payor.

"INTEREST PAYMENT DATE" means, with respect to an Outstanding Note, except as set forth in the last sentence of this definition, the tenth day of each calendar month (in the case of Class B1, C1 and F1 Notes), the tenth day of every third calendar month (in the case of Class B2, C2 and F2 Notes), or the tenth day of every twelfth calendar month (in the case of Class B3, C3 and F3 Notes), in each case] commencing on the tenth day of the month following the preceding monthly, quarterly or annual interest accrual period, as applicable, and continuing on each succeeding tenth day of a month following the next succeeding interest accrual period until the Note has been repaid in full, or if the tenth day of a month is not a Business Day, then the next following Business Day. Notwithstanding the foregoing, if the Date of Issue with respect to a Note is a date following the fifteenth day of any month, interest payments will instead commence on the tenth day of the (i) second calendar month following issuance (with respect to Notes paying interest on a monthly basis), (ii) fourth calendar month following issuance (with respect to Notes paying interest on a quarterly basis) and (iii) thirteenth month following issuance (with respect to Notes paying interest on an annual basis), following which subsequent payment shall be as set forth in the preceding sentence. Moreover, notwithstanding the foregoing, the Interest Payment Date with respect to any Class B4, C4 and F4 Notes or any other Notes, which by their terms do not pay interest currently, shall be such Note's Maturity Date.

"LOCK BOX ACCOUNT" means an account established by the Debtor, or the Servicer on behalf of the Debtor, or in connection with Governmental Payor Receivables, the Receivable Seller, with a bank chartered by the United States or any state therein for the purpose of collecting the proceeds of Receivables for the benefit of the Trustee as set forth in the applicable

Purchase Agreement and as to which a copy of the written executed agreement pursuant to which the account has been established has been provided to the Trustee.

"MATURITY DATE" with respect to a Note shall have the meaning set forth in Section 2.01(d).

"MOODY'S" means Moody's Investors Services, Inc., and its successors.

"NET COLLATERAL COVERAGE RATIO" means, as calculated by the Administrator, the ratio of the sum of the Expected Net Receivable Amounts of all Eligible Receivables pledged to the Trustee hereunder plus all collections and funds in respect to all Receivables as may be held by the Trustee or Servicer in the Trust Account, all moneys, cash, credits, and accounts, payment intangibles, general intangibles, supporting obligations, and contract rights in connection with said Receivables, plus the Value of all real and personal property that the Debtor has purchased or the lesser of (x) the Value of such real and personal property in which the Debtor has taken a valid security interest as collateral for a loan and (y) the outstanding loan amount owed by the obligor on such loan, in each case that constitutes Non-Receivable Assets pledged to the Trustee hereunder, divided by the aggregate principal amount of the Notes outstanding plus (i) accrued interest on the Notes, (ii) the amount of the unpaid monthly Trustee fee, (iii) the amount of the accrued Servicing fee, and (iv) the monthly unpaid Lock Box Account fees, as determined as of the last day of the month preceding the determination of the Net Collateral Coverage Ratio.

"NON-GOVERNMENTAL PAYOR RECEIVABLES" shall mean all Receivables owing to a Receivables Seller that do not constitute Governmental Payor Receivables.

"NON-RECEIVABLE ASSET" shall mean any of the following that may be purchased by the Debtor from time to time from funds disbursed from the Trust Account: stock, debt instruments and other tangible and intangible assets, moneys, rights, and properties related to the healthcare industry (including, without limitation, HMO's, PPO's, and third party administrators).

"NOTE" is any one of the different classes or series of promissory notes issued by the Debtor in certificated form without coupons pursuant to the terms of this Note Agreement.

"NOTE (SERIES I)" is any one of the different classes of promissory notes issued by the Debtor pursuant to Section 2.01(d).

"NOTE AGREEMENT" means this Note Issuance and Security Agreement dated as of October 8, 2007, between the Trustee and Debtor, as amended, supplemented or otherwise modified from time to time.

"NOTE REGISTER" has the meaning set forth in Section 2.02(a).

"NOTEHOLDER" means the Person in whose name a Note is registered on the Note Register.

"OBLIGATIONS" has the meaning set forth in Section 3.02.

"OUTSTANDING" shall mean, on the date of determination (i) with respect to a Note, a Note which has been issued pursuant to this Note Agreement which on such date remains unpaid as to principal or interest, unless provision has been made for such payment pursuant to Section 2.04, excluding Notes which have been replaced pursuant to this Note Agreement and (ii) with respect to any other Obligation, the unpaid amount of the Obligation.

"PERMITTED INVESTMENTS" means any of the following:

(a)    direct obligations of the United States of America;

(b)    obligations, the payment of the principal of and interest on which is unconditionally guaranteed by the United States;

(c)    interest-bearing time or demand deposits, certificates of deposit or other similar banking arrangements, investment agreements, repurchase agreements, or guaranteed investment contracts, with a maturity of twelve (12) months or less with any bank, trust company, national banking association or other depository institution, including those of the Trustee and any of its affiliates (and, with respect to, investment agreements or guaranteed investment contracts, any corporation), provided that, at the time of deposit or purchase such depository institution has commercial paper which is rated "A-1" by S&P, "P-1" by Moody's or "F-1" by Fitch;

(d)    interest-bearing time or demand deposits, certificates of deposit or other similar banking arrangements, investment agreements, repurchase agreements, or guaranteed investment contracts, with a maturity of twenty-four (24) months or less, but more than twelve (12) months, with any bank, trust company, national banking association or other depository institution, including those of the Trustee and any of its affiliates (and, with respect to , investment agreements or guaranteed investment contracts, any corporation), provided that, at the time of deposit or purchase such depository institution has senior debt rated "A" or higher by S&P, "P-1" or higher by Moody's or "A" or higher by Fitch, and, if commercial paper is outstanding, commercial paper which is rated "A-1" by S&P, "P-1" by Moody's or "F-1" by Fitch;

(e)    interest-bearing time or demand deposits, certificates of deposit or other similar banking arrangements, investment agreements, repurchase agreements, or guaranteed investment contracts, with a maturity of more than twenty-four (24) months with any bank, trust company, national banking association or other depository institution, including those of the Trustee and any of its affiliates (and, with respect to , investment agreements or guaranteed investment contracts, any corporation), provided that, at the time of deposit or purchase such depository institution has senior debt rated "AA" or higher by S&P, "Aa2" or higher by Moody's or "AA" or higher by Fitch and, if commercial paper is outstanding, commercial paper which is rated "A-1" by S&P, "Aa2" by Moody's or "F-1" by Fitch;

(f)    commercial paper, including that of the Trustee and any of its affiliates, which is rated no less than "A-1" by S&P, "P-1" by Moody's or "F-1" by Fitch, and which matures not more than two hundred seventy (270) days after the date of purchase;

(g)    bonds, debentures, notes or other evidences of indebtedness issued or guaranteed by any of the following agencies: Federal Farm Credit Banks, Federal Home Loan Mortgage Corporation; Governmental National Mortgage Association; Export-Import Bank of the United

States; Federal National Mortgage Association; Student Loan Marketing Association; Farmers Home Administration; Federal Home Loan Banks; or any agency or instrumentality of the United States of America which shall be established for the purposes of acquiring the obligations of any of the foregoing or otherwise providing financing therefor;

(h)     a money market mutual fund investing solely in the above-listed assets; or

(i)     the AIM Short-Term Investments Trust Treasury Portfolio (Private Class) Money Market Fund, which is rated "AAA" by S&P, Moody's and Fitch and invests in U.S. Treasury bills, notes and direct obligations of the U.S. Treasury and in repurchase agreements fully collateralized by such obligations.

Permitted Investments may be purchased by the Trustee directly or through an affiliate of the Trustee.

"PERSON" or "PERSONS" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"PURCHASE AGREEMENT" means each fully executed agreement between a Receivable Seller and the Debtor (or the Administrator) in effect as of the date of determination pursuant to which Receivables are acquired from such Receivable Seller.

"PURCHASE DOCUMENTS" means (i) with respect to each Receivable Seller, (a) with regard to the initial purchase of Receivables from such Receivable Seller, the Purchase Agreement executed by the Debtor (or the Administrator) and such Receivable Seller, including Exhibit A thereto listing the Receivables to be purchased, along with copies of all security documentation executed in connection therewith, including all: UCC Financing Statements, personal guarantees, bills of sale and powers of attorney and (b) with regard to each subsequent purchase of Receivables from such Receivable Seller, a supplement to the Purchase Agreement listing the additional Receivables to be purchased from such Receivable Seller, along with all additional security documentation executed in connection therewith, including any amendments to previously delivered security documentation; and (ii) with respect to Non-Receivable Assets, such documents as the Debtor identified on the schedule to the certificate in the form of Exhibit A-2 or A-3, as applicable, delivered to the Trustee as provided in Section 3.01, which (a) in the case of any loan shall include the promissory note evidencing the loan, endorsed by the Debtor in blank or in favor of the Trustee, and (b) in the case of a loan secured by real property, shall also include a copy of the mortgage or deed of trust in favor of the Debtor, in the form submitted for recordation in the applicable jurisdiction, and an assignment of mortgage or assignment of deed of trust signed by the Debtor in blank or in favor of the Trustee, in form appropriate for recordation in the jurisdiction where the real property is located.

"QUALIFIED INSTITUTIONAL BUYER" shall mean a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act.

"RECEIVABLE" means any right to payment or reimbursement from an Approved Payor or Receivable Seller whether constituting an account, chattel paper, instrument or a general intangible, arising from or in connection with the provision of general business,

healthcare, or healthcare related services by a Receivable Seller or durable medical equipment to a Receivable Seller that was (a) acquired or funded by the Debtor from amounts on deposit in the Trust Account or otherwise accounted for in the Trust Account or otherwise constituting a part of the Collateral or (b) substituted or exchanged for Receivables pursuant to Article IV, but does not include Receivables released from the lien of this Note Agreement. The term "Receivable" shall include Governmental Payor Receivables and Non-Governmental Payor Receivables, as appropriate.

"RECEIVABLE SELLER" means any provider of healthcare services or goods and any other for-profit or not-for-profit commercial organization and whose financial condition meets the criteria set forth by the Debtor. The criteria set by the Debtor shall be based on ratings of the Receivable Seller published by Dunn & Bradstreet and other rating agencies, as well as the underwriting criteria for such Sellers established by the Debtor from time to time.

"RECORD DATE" means, with respect to a Note, the close of business on the last day of the month immediately preceding the month in which a payment of interest or principal, or both, is due and payable on a Note, or, with respect to the first Interest Payment Date, the Date of Issue.

"REDEMPTION PRICE" means the unpaid principal balance, plus all accrued and unpaid interest thereon to (but excluding) the date set for redemption, of an Outstanding Note (or part thereof) selected for redemption, all as pursuant to Section 2.04. If a Note is issued with original issue discount, the amount payable upon full or partial redemption will be the applicable portion of the amortized face amount on the redemption date. The amortized face amount of such an original issue discount Note will be equal to the issue price plus that portion of the difference between the issue price and the original principal amount of the Note that would have accrued at the yield to the maturity of the Note, prorated to (but excluding) the redemption date. The amortized face amount of an original issue discount Note will never be greater than its original principal amount.

"REVENUE" or "REVENUES" means all recoveries of principal, dividends, interest, payments, proceeds, charges and other income or amounts received by the Trustee or the Debtor from or on account of any of the Collateral (excluding amounts described in Sections 5.08(a)(ii)(B)).

"RULE 144A" means Rule 144A under the Securities Act.

"S&P" means Standard & Poor's Ratings Group, a Division of The McGraw-Hill Companies, Inc., and its successors and assigns.

"SECURITIES ACT" means the Securities Act of 1933, as amended.

"SERVICER" means Medical Tracking Services, Inc. a Nevada corporation, whose rights and obligations are more fully set forth in the Servicing Agreement.

"SERVICING AGREEMENT" means the Servicing Agreement dated as of October 8, 2007 by and between the Debtor and the Servicer, as the same may be amended, supplemented or otherwise modified from time to time.

"SUBSCRIPTION ACCOUNT" means one or more demand deposit accounts, in the name of the Trustee as trustee for the trust established hereunder, which account shall be established and maintained at a branch office of the state or federal chartered bank designated by the Debtor for the deposit of note proceeds that are received in the form of drafts and checks.

"TRANSACTION DOCUMENTS" means the Notes, this Note Agreement, the Servicing Agreement, the Administration Agreement, the agreements pursuant to which the Lock Box Accounts have been established and are administered, the Purchase Documents and any other documents executed in connection therewith.

"TRANSFER" means any disposition or attempt to dispose of a Note or any or all of a Noteholder's interest in a Note by any means, including by way of example and not by limitation, any gift, hypothecation, assignment, alienation or pledge of the Note or any interest therein.

"TRUST ACCOUNT" means the account established and maintained pursuant to Section 5.08(a), including any subaccounts created by the Trustee therein pursuant to this Note Agreement.

"TRUSTEE" means Wells Fargo Bank, National Association, a national banking association, or its successors in interest.

"UCC" means, with respect to each separate item of Collateral, the Uniform Commercial Code of the State the law of which governs the creation and perfection of the Trustee's security interest in the item of Collateral or the Debtor's security interest in the item of Collateral, as the case may be.

"VALUE," when used with reference to a Non-Receivable Asset, means the value of such asset determined pursuant to the most recently completed appraisal or other appropriate valuation conducted by the Debtor or an independent third party selected by the Debtor.

## ARTICLE II

### NOTES

**2.01    THE NOTES.**

(a)    ISSUABLE IN SERIES; GENERAL TITLE. The Notes may be issued in series as from time to time shall be authorized by the Debtor. With respect to the Notes of any particular series, the Debtor may incorporate in or add to the general title of such Notes any words, letters or figures designed to distinguish that series. Each series shall be designated sequentially with Roman numerals beginning with Series I and each class shall contain a sequential alphabetic designation beginning with Class B.

(b)    TERMS OF PARTICULAR SERIES. The Notes of each series (other than the Notes (Series I) as to which specific provision is made in Section 2.01(d) and (e)) shall be payable at such place or places, shall mature on such date or dates, shall bear interest at such rate or rates payable in such installments and on such dates and at such place or places and to

Noteholders registered as such, and may be redeemable at such price or prices and upon such terms, all as shall be provided for in the supplemental note agreement creating that series. The Debtor may at the time of the creation of any series of Notes or at any time thereafter make, and the Notes of such series may contain, provision for:

 (i) the redemption of all, or of all or any part, of the Notes of such series prior to maturity;

 (ii) a sinking, amortizations improvement or other analogous fund;

 (iii) limiting the aggregate principal amount of the Notes of such series;

 (iv) the exchange or conversion of the Notes of that series, at the option of the Noteholders thereof, for or into new Notes of a different series and/or shares of stock of the Debtor and/or other securities;

 (v) exchanging Notes of that series, at the option of the Noteholders thereof, for other Notes of the same series of the same aggregate principal amount of a different authorized kind and/or authorized denomination or denominations; and/or

 (vi) extension of the maturity date for the Notes at the option of the Noteholder.

 (c) FORM AND DENOMINATIONS. The form of the Notes of each series (except the Notes (Series I)) may be established by the supplemental note agreement creating such series. The Notes (Series I) shall be issued only as certificated notes unless a supplemental Note Agreement is entered into by the Debtor and the Trustee providing otherwise. The Notes of each series shall be distinguished from the Notes of other series in such manner as may be prescribed in the supplemental note agreement creating such series. The Notes of each series shall be issued in such denominations as shall be provided in the supplemental note agreement creating such series or as the Debtor may determine, except that the Notes (Series I) shall be issued in the denominations provided for in Section 2.01(d) below.

 (d) NOTES (SERIES I). There shall be an initial series of Notes entitled Redeemable Secured Notes (Series I). The Notes (Series I) shall be issued as various classes of Notes substantially in the forms set forth in Exhibit C hereto. The Notes (Series I) shall be issued in minimum denominations of $1,000 with a minimum investment of $50,000 per Noteholder. Each Note (Series I) shall be payable and have such other terms and provisions as provided in Exhibit A and in this Note Agreement. The Notes (Series I) shall be issued in the maturities and class denominations as follows, and shall set forth the applicable interest rate:

| CLASS | STATED MATURITY FROM DATE OF ISSUANCE | FREQUENCY OF INTEREST PAYMENTS |
|---|---|---|
| Class B1 | Two years | Monthly |
| Class B2 | Two years | Quarterly |
| Class B3 | Two years | Annually |
| Class B4 | Two years | At Maturity |
| Class C1 | Three years | Monthly |
| Class C2 | Three years | Quarterly |
| Class C3 | Three years | Annually |
| Class C4 | Three years | At Maturity |
| Class F1 | Six years | Monthly |
| Class F2 | Six years | Quarterly |
| Class F3 | Six years | Annually |
| Class F4 | Six years | At Maturity |

(e)    GENERAL TERMS. Notes may bear different Maturity Dates based on the Date of Issue and their class or series designation, but in no event may a Note have a term of less than two (2) years. The annual interest rate for each class of notes shall be adjusted on each January 1 and July 1 during the term of the Note, to a rate that is equal to the prime rate, as reported in *The Wall Street Journal*, plus the spread established at the time of issuance for the applicable Note, subject to the stated minimum annual interest rate stated in the Note. The spreads over prime and minimum annual interest rates may vary as among the series and classes of Notes, as determined by the Debtor in its sole discretion. Notes in the same class of a series may be issued with different spreads and minimum interest rates as determined by the Debtor in its sole discretion, but in no event may Notes in the same class of a series with the same Date of Issue have different spreads or minimum rates of interest, other than Notes that are exchanged pursuant to Section 2.01(f) of this Note Agreement. Following execution and delivery of this Note Agreement, the Debtor shall register the name and address of the Noteholder, and the terms of the related Note, in the Note Register only after the Debtor has accepted the related subscription agreement and has received and forwarded to the Trustee the Note issuance proceeds equal to the aggregate issue price of the Note. The Notes bear interest at their respective stated fixed rates of interest per annum. The interest on a Note will begin to accrue on its Date of Issue. The interest accrued on a Note in a calendar month (or portion thereof in the case of the first Interest Payment Date for a Note) will be paid on the next following Interest Payment Date in accordance with Section 5.08(e) prior to the Maturity Date of the Note to the Noteholders as of each related Record Date; *provided, however,* that any interest accrued on a Note which by its terms does not pay interest on a current basis shall be paid on such Note's Maturity Date. Except with respect to a Note exchanged at maturity for a new Note pursuant to Section 2.01(f) of this Note Agreement, any accrued but unpaid amounts of interest outstanding shall be paid on each Note's Maturity Date. Interest on each Note will be calculated on the basis of a three hundred-sixty (360) day year consisting of twelve (12) thirty (30)-day months. If, in accordance with this Note Agreement, the Trustee holds in the Trust Account on a date set for redemption or the stated maturity of one or more Notes, money or securities, if permitted

hereunder, sufficient to pay in full the Notes to be redeemed on that date, as certified by the Debtor in writing, then on and after the date specified by the Debtor as further set forth in sub-section (f) below, such Notes shall cease to be outstanding and interest, if any, on such Notes shall cease to accrue; provided, if such Notes are to be redeemed, notice of such redemption has been duly given pursuant to this Note Agreement or provision therefor has been made in a form satisfactory to the Trustee. The Debtor, or if requested by the Debtor, the Trustee shall mail such notice to Noteholders, as identified on a certified copy of Debtor's Note Register and such other necessary information as the Trustee shall reasonably require in order to mail such notice, upon which the Trustee may conclusively rely.

(f)     PAYMENTS AT MATURITY; AUTOMATIC RENEWAL. Except as set forth below or as may be set forth in a supplemental note agreement with respect to a series, principal on a Note is due and payable in full on any of (a) a redemption date at the Redemption Price or (b) its original stated Maturity Date. Notwithstanding the foregoing, unless, not later than the fifth Business Day prior to the Maturity Date of the Note, the Debtor has given written direction to the Trustee to forward funds to the Debtor sufficient to make a payment under the Note, the Debtor, on the Maturity Date, shall exchange the Noteholder's Note for a new Note having terms and conditions identical to the Note exchanged (except that such replacement Note shall bear interest at the interest rate and be subject to the terms set forth in other notes of the same class being issued by the Debtor at such time) without further action on the part of the Noteholder; *provided, however*, that Notes shall only be exchanged pursuant to this sub-section (f) if the Debtor furnishes a then current private placement memorandum or supplemental private placement memorandum as may be required by the rules and regulations of the U.S. Securities and Exchange Commission, as then in effect, and a state blue sky qualification, or valid exemption therefrom, is in effect with respect to the state in which the applicable Noteholder resides. If such current prospectus is not available or such blue sky qualification or exemption is not effective on the Maturity Date, the maturing Note shall be paid on the Maturity Date. Notwithstanding anything to the contrary herein, in no event shall the Maturity Date of a Note issued upon the renewal of another Note occur on a date following the sixth anniversary of the date of issuance of the original Note. If a Noteholder does not wish to renew a maturing Note as provided above, written notice must be given to the Debtor at least ninety (90) calendar days but no more than one hundred twenty (120) calendar days prior to the Maturity Date. Notwithstanding the foregoing, the Debtor may determine, at its option, not to renew any Note and shall give written notice to such effect to such Noteholder not less than twenty (20) days nor more than sixty (60) days before the Maturity Date in accordance with Section 2.04.

(g)     DEPOSIT OF NOTE PROCEEDS. With respect to the gross proceeds from initial sale of beneficial interests in a Note, the Debtor agrees to remit or cause to be remitted all bank drafts and personal checks by depositing the same to the Subscription Account, and if received by Debtor any funds remitted by wire transfer, representing the gross proceeds from the initial sale of each beneficial interest of a Note to the Trustee for deposit into the Trust Account not later than the Business Day following the date such proceeds are received by the Debtor. In connection with any such transfer to the Trustee, the Debtor shall provide to the Trustee a written statement setting forth with respect to each class of Note for which gross proceeds are being transferred to the Trustee and stating that these amounts are to be deposited into the Subscription Account or sent by wire transfer to the Trustee, as the case may be, for accounting purposes. No later than one Business Day after receipt, the Debtor shall cause the bank designated to maintain

the Subscription Account to transfer such funds from the Subscription Account to the Trust Account.

## 2.02    REGISTRATION, TRANSFER AND EXCHANGE OF NOTES.

(a)    The Debtor shall cause to be kept at its office in Anaheim, California a Note Register (the "Note Register") in which, subject to such reasonable regulations as it may establish, the Debtor shall provide for the recordation of Notes and of transfers, pledges and exchanges of Notes as herein provided. Each Note shall be held, transferred, and exchanged in accordance with its customary procedures.

Subject to the restrictions and limitations set forth below, upon surrender for recordation of transfer or pledge of any Note at the office of the Debtor, the Debtor shall execute and deliver, in the name of the designated transferee(s) or pledgee(s), one or more new Notes in authorized denominations evidencing the same aggregate principal amount.

The Debtor shall provide to the Trustee, on a quarterly basis, or within two (2) Business Days after receipt of a written request from the Trustee therefor, a certified copy of the Note Register, in such form as may be reasonably requested by the Trustee. Additionally, any time the Trustee receives a notice, direction, instruction, consent or other communication from any Person representing to be a Noteholder, the Trustee may request and shall be provided with a certified copy of the Note Register and any other information the Trustee deems necessary to confirm such Person's status as a Noteholder. Upon request to the Trustee by the Debtor to give any notice or any communication to a Noteholder, the Debtor shall cause all necessary information to be provided to the Trustee in certified form to enable the Trustee to perform such duties. The Trustee may conclusively rely on such certified copy of the Note Register and other information in connection with its performance of such duties.

(b)    No Transfer of a Note shall be made unless such Transfer is exempt from the registration requirements of the Securities Act and any applicable state or foreign securities laws. No Transfer of a Note shall be permitted, (i) unless (1) such Transfer is to (x) an "accredited investor" (as such term in defined at the applicable time in Regulation D promulgated under the Securities Act) or (y) a "qualified institutional buyer" (as defined in Rule 144A) in reliance on Rule 144A of the Securities Act by a Person not an affiliate of the Debtor or the Trustee or (2) the Debtor has received a written opinion of counsel acceptable to and in form and substance satisfactory to the Debtor in its sole and absolute discretion, to the effect that such Transfer may be made pursuant to an exemption, describing the applicable exemption and the basis therefor, from the Securities Act and any applicable state or foreign securities laws, which opinion of counsel shall not be an expense of the trust created hereunder or of the Debtor and (ii) the Debtor shall have received an investment representation letter in form and substance satisfactory to it, in the exercise of its absolute discretion, from the proposed transferee addressed to the Debtor. Preparation of any such investment representation letter shall not be an expense of the trust created hereunder or of the Debtor. The original Noteholder, and the transferee of a transferred Note by accepting such Note, does hereby agree to indemnify the Trustee and the Debtor against any liability that may result if such Transfer is not exempt from such federal, state and foreign laws.

(c)    All Notes canceled by the Debtor in connection with a Transfer or exchange of Notes shall not be entitled to payment of principal and shall have no further legal rights or effect.

## 2.03    PERSONS DEEMED OWNERS.

Prior to submission to the Debtor of a Note for registration of its transfer on the Note Register, the Debtor, any agent of the Debtor and the Trustee (when necessary) may treat the Person in whose name any Note is registered in the Note Register as the owner of such Note for the purpose of receiving payments and for all other purposes whatsoever, and none of the Debtor, nor any agent of the Debtor, nor the Trustee, shall be affected by notice to the contrary. Brokerage firms for which a Noteholder acts as agent and holders of beneficial interests in a Note represented by the Noteholder or the brokerage firm shall have no rights under this Note Agreement with respect to such Notes.

## 2.04    REDEMPTION.

(a)    Except as may be set forth in a supplemental note agreement with respect to a series, the Debtor, at its option, at any time may redeem one or more of the Outstanding Notes in whole or in part. If the Debtor elects to redeem all or part of any Note, it shall notify the Trustee in writing of the redemption date and the principal amount of Notes to be redeemed at least twenty-five (25) days but not more than sixty-five (65) days before the redemption date unless a shorter notice shall be satisfactory to the Trustee.

(b)    If less than all the Notes are to be redeemed, the Debtor shall make the selection at least twenty-five (25) days, but not more than sixty-five (65) days, before the redemption date from Outstanding Notes not previously called for redemption. The Debtor may select for redemption Notes or portions of the principal amount of Notes that have denominations of $50,000 or larger.

(c)    At least twenty (20) days but not more than sixty (60) days before a redemption date, the Debtor or, if requested by the Debtor pursuant to Section 2.01(e), the Trustee, shall mail a notice of redemption by first-class mail, postage prepaid, to each Noteholder of Notes (or portion thereof) to be redeemed as specified in the Debtor's request to the Trustee. The notice shall identify the Notes to be redeemed and shall state:

(i)    the redemption date;

(ii)    the Redemption Price;

(iii)    the name and address of the Debtor;

(iv)    if fewer than all the Outstanding Notes are to be redeemed, the certificate number and principal amounts of the particular Notes to be redeemed; and

(v)    that interest, if any, on Notes (or portions thereof) called for redemption will cease to accrue on and after the redemption date.

Notice shall be mailed by the Trustee to the Noteholders selected and specified by the Debtor at

the applicable addresses set forth in the certified copy of the Note Register provided to the Trustee by the Debtor in accordance with Sections 2.01(e) and 2.02(a).

(d)     The notice, if mailed in the manner herein provided, shall be conclusively presumed to have been duly given, whether or not the Noteholder receives such notice.  In any case, failure to give such notice by mail or any defect in the notice to the Noteholder of any Note designated for redemption as a whole or in part shall not affect the validity of the proceedings for the redemption of any other Note.  If requested pursuant to Section 2.04(c), the Trustee shall give such notice of redemption, at the Debtor's request, in the Debtor's name.  All redemption notices shall be at the Debtor's expense.

(e)     Once notice of redemption is given pursuant to this Section 2.04, the Notes or portion of the Notes called for redemption become due and payable on the redemption date and at the Redemption Price.  Upon the redemption date, such Notes shall be paid at the Redemption Price stated in the notice.

(f)     On the redemption date, the Debtor shall pay to the respective Noteholders, upon tender of their respective Notes to it, the Redemption Price of all Notes or portion of the Notes to be redeemed on that date other than Notes or portions of Notes called for redemption which prior thereto have been surrendered to the Debtor for cancellation, and on or after the redemption date (unless the Debtor shall default in the payment of the Notes at the Redemption Price), interest, if any, on the Notes or portion of Notes called for redemption shall cease to accrue and, except as provided in Section 7.03 below, to be entitled to any benefit or security under this Note Agreement, and the Noteholders thereof shall have no right in respect of such Notes (or portion thereof) except the right to receive the Redemption Price thereof.

(g)     Upon partial redemption of a Note, the Debtor shall make the appropriate entries on the Note Register to evidence such partial redemption and a new authorized denomination equal in principal amount to the unredeemed portion of the Note.

(h)     Pursuant to this Note Agreement, any amounts which are available to redeem Notes may instead be used by the Debtor to purchase Outstanding Notes at the same times and subject to the same conditions (except as to price) as apply to the redemption of Notes.  Any Notes purchased shall be retired by the Debtor and shall no longer be deemed Outstanding hereunder.

## 2.05   MUTILATED, DESTROYED, LOST AND STOLEN NOTES.

(a)     If (a) any mutilated Note is surrendered to the Debtor, or (b) the Debtor receives evidence to its satisfaction of the destruction, loss or theft of any Note, and there is delivered to the Debtor, such Note or indemnity, as may be required by it to save it harmless, then, in the absence of notice to the Debtor that such Note has been acquired by a bona fide purchaser or protected purchaser, the Debtor shall execute and deliver, in exchange for any such mutilated Note or in lieu of any such destroyed, lost or stolen Note, a replacement Note of like tenor and principal amount, bearing a number not contemporaneously outstanding.

(b)     In case any such mutilated, destroyed, lost or stolen Note has become or is about to become due and payable, the Debtor in its discretion may, instead of issuing a replacement Note, pay such Note.

(c)     Upon the issuance of any replacement Note under this Section, the Debtor may require the payment of a sum sufficient to pay all documentary, stamp or similar issue or transfer taxes or other governmental charges that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Debtor and the Trustee) connected therewith.

(d)     Every replacement Note issued pursuant to this Section in lieu of any mutilated, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Debtor, whether or not the destroyed, lost or stolen Note shall be at any time enforceable by anyone, and shall be entitled to all benefits of this Agreement equally and proportionately with any and all other Notes duly issued hereunder.

(e)     The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

## ARTICLE III

## SECURITY

### 3.01   GRANT OF SECURITY.

(a)     The Debtor, to secure the obligations described in Section 3.02 below, hereby does grant, convey, pledge, transfer, assign and deliver to the Trustee for the equal and proportionate benefit and security of all present and future registered Noteholders a first and prior security interest in, all of the Debtor's right, title and interest in and to the following, whether now or hereafter existing and/or arising or acquired:

(i)     All Receivables, whether eligible or ineligible, that are identified on a certificate in the forms of Exhibit A-1 hereto delivered to the Trustee and Servicer in connection with (A) the disbursement of funds from the Trust Account by the Trustee at the direction of Debtor to purchase the Receivables identified on such certificate or (B) the replacement of Receivables that are not Eligible Receivables pursuant to Section 4.02;

(ii)     All collections in respect of such Receivables and all funds as may be held by the Trustee in the Trust Account or by the Servicer from time to time, and funds on deposit and all investments made with such funds, all claims thereunder or in connection therewith, and interest, dividends, moneys, instruments, securities, securities accounts, securities entitlements, deposit accounts, and other property from time to time received, receivable or otherwise distributed in respect of any or all of the foregoing;

(iii)     All moneys, cash, cash proceeds, credits, contract rights, accounts (including all health-care-insurance receivables), general intangibles, and other obligations of any kind now or hereafter existing and/or arising out of or in connection

20189323.2                                    16

with the Receivables and all rights now or hereafter existing in and to all agreements and contracts securing or otherwise relating to any such Receivables;

(iv)    The rights of the Debtor (but not its obligations) in, to and under the Purchase Documents including, without limitation, the rights of the Debtor (A) to enforce the Purchase Documents and the agreements pursuant to which the Lock Box Accounts are established and maintained against the respective Receivable Sellers and the obligations thereunder and (B) to cause the Receivable Sellers to repurchase Receivables purchased under the respective Purchase Document as to which there has occurred a breach of representation, warranty or covenant in accordance with the provisions of the Purchase Documents;

(v)    All of the Debtor's rights, (but not its obligations) in, to and under the Servicing Agreement and the Administration Agreement, including any rights (if any) of Debtor in and to Servicer's software programs and billing systems, if any;

(vi)    The Trust Account and the Subscription Account;

(vii)    All products and proceeds of any and all of the foregoing and, to the extent not otherwise included, all payments under insurance (whether or not the Debtor is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing; and

(viii)    Any and all other property, rights and interests of every kind or description that from time to time hereafter is granted, conveyed, pledged, transferred, assigned or delivered to the Trustee as additional security hereunder.

(b)    The Debtor, to secure the obligations described in Section 3.02 below, hereby does grant, convey, pledge, transfer, assign and deliver to the Trustee for the equal and proportionate benefit and security of all present and future registered Noteholders a first and prior security interest in, all of the Debtor's right, title and interest in and to the following, whether now or hereafter existing and/or arising or acquired:

(i)    All of the Non-Receivable Assets, which shall be identified in the documents specified in a certificate in the form of Exhibit A-2 hereto (specifying the type of Non-Receivable Assets being purchased pursuant to this Section 3.01(b)) provided to the Trustee by the Debtor, which certificate shall certify the Value of each of the Non-Receivable Assets set forth on the certificate and the basis for the valuation thereof and the priority of the lien granted hereunder to the Trustee;

(ii)    All collections and distributions in respect of the Non-Receivable Assets and all funds as may be held or controlled by the Trustee in the Trust Account or by the Servicer from time to time from collections and distributions in respect of the Non-Receivable Assets, together with all certificates and instruments, if any, from time to time evidencing such collections and distributions, and such collections and distributions on deposit and all investments made with such collections and distributions, all claims in connection therewith, and interest, dividends, moneys, instruments, securities and other

property from time to time received, receivable or otherwise distributed in respect of any or all of the foregoing;

(iii)     All moneys, cash, credits, contract rights, and other obligations of any kind now or hereafter existing and/or arising out of or in connection with the Non-Receivable Assets and all rights now or hereafter existing in and to all agreements and contracts securing or otherwise relating to any such Non-Receivable Assets; and

(iv)     All products and proceeds of any and all of the assets, moneys, rights, and properties described in Section 3.01(b)(i) above and, to the extent not otherwise included, all payments under insurance (whether or not the Debtor is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing.

(c)     All of the moneys, rights, and properties described in Sections 3.01(a) and 3.01(b) are referred to as the "Collateral" unless released from the lien of this Note Agreement pursuant to the terms hereof.

## 3.02     PLEDGE TO SECURE OBLIGATIONS.

This Note Agreement secures the Notes and enforcement of the payment of the Notes in accordance with their terms, and all other sums payable hereunder or on the Notes (whether now or hereafter existing, whether for principal, interest, fees, expenses or otherwise, whether matured or unmatured, absolute or contingent), and for the performance of and compliance with the obligations, covenants, and conditions of this Note Agreement, as if all the Notes at any time Outstanding had been executed and delivered simultaneously with the execution and delivery of this Note Agreement (collectively, the "Obligations"); provided however, that pursuant to the terms of a supplemental note agreement under which a series of Notes is issued, the Non-Receivable Assets and the Receivables acquired from the proceeds of such series of Notes and the related Collateral can be pledged to secure only that series of Notes and the other related Obligations and not any other series of Notes or its related Obligations, in which case Collateral pledged to secure other series of Notes and their related Obligations shall not secure the series of Notes issued pursuant to such supplemental note agreement or other related Obligations.

## 3.03     COLLATERAL TRANSFERS AND OTHER LIENS.

Subject to Section 3.04 below, the Debtor shall not:

(a)     Assign (by operation of law or otherwise) or otherwise dispose of any of the Collateral or any interest therein; or

(b)     Create or suffer to exist any lien, security interest or other charge or encumbrance upon or with respect to any of the Collateral to secure debt of any Person, except (i) for the security interest created by this Note Agreement and (ii) with respect to the Non-Receivable Assets, any security interest set forth on the schedule describing the Non-Receivable Assets provided pursuant to Section 3.01(b) to the Trustee upon disbursement of funds from the Trust Account in connection with the acquisition of the Non-Receivable Assets.

**3.04    SALE OF COLLATERAL.**

(a)    Collateral may be sold, transferred or otherwise disposed of by the Debtor free from the lien of this Note Agreement and any applicable supplemental note agreement at any time, provided that the Trustee has received from the Debtor a written statement of the gross proceeds to be derived from the sale and the Person to which the Collateral is to be sold or transferred and certifying to the Trustee substantially in the form of Exhibit B:

(i)    the disposition price is equal to or in excess of the amount disbursed from the Trust Account to acquire the Collateral (less any principal amounts received by the Trustee with respect to such Collateral); or

(ii)    the disposition price is lower than the amount disbursed from the Trust Account to acquire the Collateral (less any principal amounts received by the Trustee with respect to such Collateral), and (A) the Revenues expected to be received from the remaining Collateral (after giving effect to such disposition) would be at least equal to the Revenues required to timely pay the principal and interest on the Outstanding Notes, or (B) the Debtor shall remain able to pay debt service on the Notes and make payment on any other Obligations on a timely basis (after giving effect to such sale, transfer or other disposition) whereas it would not have been able to do so on a timely basis if it had not sold, transferred or disposed of the Collateral at such discounted amount, or (C) the sum of the amounts on deposit in the Trust Account (less moneys in the Trust Account which the Trustee, Debtor, Servicer, or Administrator are then entitled to receive but which have not yet been removed from the Account) plus the Expected Net Receivable Amount of the Receivables and the Value of the Non-Receivable Assets will be at least equal to one hundred percent (100%) of the aggregate principal amount of the then Outstanding Obligations plus accrued interest after giving effect to such sale, transfer or other disposition. As a clarification, all unpaid fees and expenses due to the Trustee shall also be deducted from the amount on deposit in the Trust Account when calculating the sum in clause (C) above.

(b)    The Trustee, following receipt of the foregoing and such other certificates as may be required by this Note Agreement or any applicable supplemental note agreement, shall release such Collateral from the lien of this Note Agreement upon the receipt of the gross proceeds set forth on a certification substantially in the form of Exhibit B and deliver all documents evidencing the Debtor's ownership of the collateral as directed in writing by the Debtor at the expense of the Debtor.

(c)    Gross proceeds to be received upon any disposition of Collateral may consist of cash, Permitted Investments, and/or Eligible Receivables. The Trustee shall deposit all of such gross proceeds into the Trust Account.

(d)    In the case of Collateral constituting a loan secured by real property, the Trustee shall (i) release the related promissory note to the Debtor or its designee (acknowledging receipt as bailee and custodian for the benefit of the Trustee), upon the written request of Debtor, for the purpose of facilitating foreclosure upon or other enforcement of the security interest in the real property, (ii) execute a reconveyance of the mortgage or deed of trust, and endorse the related

promissory note (if the same was previously endorsed to the Trustee, rather than in blank), as directed by the Debtor, if the loan is repaid in full by the related borrower, or (iii) execute an assignment of mortgage or deed of trust, and endorse the related promissory note (if the same was previously endorsed to the Trustee, rather than in blank) as directed by the Debtor, if the Debtor sells the loan. The Debtor shall cause the net proceeds of foreclosure, loan repayment or sale to be delivered directly to the Trustee or Lock Box Account, to held as part of the Collateral. The Trustee shall have no liability for the consequences of releasing and endorsing documents, and of assigning liens, in compliance with instructions of the Debtor as provided in this Section 3.04(d).

## 3.05   RESPONSIBILITIES OF DEBTOR.

(a)     If any Non-Receivable Assets (or the Debtor's ownership interest therein) shall be evidenced by a promissory note, other instrument or chattel paper, the Debtor shall promptly deliver possession thereof to the Trustee duly endorsed and accompanied by a certificate in the form of Exhibit A-2, together with the duly executed instruments of transfer or assignment as identified in such certificate. The Debtor shall promptly deliver possession to the Trustee of such other documents relating to the Collateral, possession of which are necessary to perfect the security interest of the Trustee in the Collateral under this Note Agreement, all as described in the certificate in the form of Exhibit A-2. The Trustee shall be entitled to rely conclusively upon the statements in the certificate as to the identity of documents that are necessary and appropriate to serve as the instruments of transfer or assignment and those necessary to perfect the security interest in the Collateral.

(b)     With respect to the acquisition of Non-Receivable Assets, as a condition precedent to the disbursement of funds pursuant to Section 5.08(a)(ii)(E), the Debtor shall deliver at Debtor's expense an opinion of counsel to the effect that immediately following the acquisition of the Non-Receivable Assets, the Trustee will have a perfected security interest therein, which security interest is subject to the provisions of this Note Agreement.

(c)     The Debtor shall keep its chief place of business and chief executive office and the office where it keeps its records concerning the Collateral at the Debtor's notice address set forth in Section 9.03 or, upon thirty (30) days prior written notice to the Trustee, at such other locations specified in a written notice to the Trustee. The Debtor will hold and preserve its records concerning such Collateral, and will permit representatives of the Trustee and the Noteholders upon reasonable prior notice during normal business hours to inspect and make abstracts from such records relating to the Collateral as well as any contract, other agreements, documents, instruments or chattel paper that relate to the Collateral.

(d)     The Debtor agrees to take or cause to be taken such actions and execute such documents (including, without limitation, the filing in the applicable public recording office of all necessary UCC1 financing statements or chattel mortgage agreements, which may be made through blanket filings covering Collateral and after-acquired Collateral pledged to the Trustee under this Note Agreement) naming the Debtor as debtor and the Trustee as secured party and any amendments to UCC1 financing statements as are necessary to perfect and protect the Trustee's interests in the Collateral on behalf of the Noteholders and the proceeds thereof and all other items described in Section 3.01. Except during the continuance of an Event of Default, the

Trustee shall have no responsibility to monitor or otherwise assure the filing of financing statements or chattel mortgage agreements, or continuation statements with respect thereto.

(e)     With respect to Receivables pledged to the Trustee from time to time, the Debtor shall be responsible at the Debtor's expense to file all required continuation statements for the UCC1 financing statements then on file listing MEDICAL PROVIDER FUNDING CORPORATION V as the secured party/purchaser and the Receivable Seller or other seller of the Receivable to MEDICAL PROVIDER FUNDING CORPORATION V as the debtor/seller.

(f)     The Debtor authorizes the filing by the Trustee of any and all UCC1 financing statements against the Debtor with respect to the Collateral or amendments, continuation statements, or termination statements for any related UCC1 financing statement filed against the Debtor as may be necessary to perfect the security interest of the Trustee in the Collateral under the applicable UCC.  In the event that the Debtor fails to file UCC1 financing statements or continuation statements as required pursuant to Sections 3.05(d) or (e), the Trustee is hereby authorized to file, and may cause (but shall not be obligated to cause) to be filed, such statements pursuant to Section 3.05(d) (and may file such statements pursuant to Section 3.05(e)) promptly after actual knowledge of such failure is obtained by any officer within the Corporate Trust Department of the Trustee.

(g)     The Debtor will provide to the Trustee a schedule in an electronic form readable by the Trustee listing all of the (i) Collateral then pledged to the Trustee and each of the related UCC1 financing statements showing the Trustee as secured party, the location where each was filed, filing number assigned by the applicable public recording agency, date of filing, and the Debtor's name appearing as debtor thereon and (ii) the UCC1 financing statement filed with respect to each of the Receivables then pledged to the Trustee showing the Debtor as secured party, the location where it was filed, filing number assigned by the applicable public recording agency, date of filing, and the debtor's name appearing thereon.  The schedule shall be provided to the Trustee within fifteen (15) days after the end of each calendar quarter.  The Trustee shall hold such schedule in its files and shall have no obligation to review, examine, inspect, or otherwise determine the accuracy of the information set forth therein, nor any obligation to monitor the composition of the Collateral or to determine the percentages of Receivables and Non-Receivable Assets comprising the Collateral.  The Debtor shall also provide to the Trustee along with the quarterly schedule, a certification that, pursuant to Section 4(a) of Exhibit A-1, original copies of the Purchase Documents between the Debtor and the sellers of Eligible Receivables referenced on said schedule are on file with the Debtor on behalf of the Trustee.

(h)     The Debtor shall provide, or cause the Administrator to provide, on the 15th day of each month, a written certification to the Trustee, in such form as the Trustee and Debtor shall agree upon, which sets forth the calculation of the Net Collateral Coverage Ratio and whether or not the Collateral Coverage Requirement is satisfied as of the last day of the month prior to the date of such certificate.  In addition, whenever the Administrator shall request disbursement of the Administrative Fee by the Trustee, the Debtor shall provide, or cause the Administrator to provide, a certification to the Trustee with its request, to the effect that the Collateral Coverage Requirement is satisfied (after giving effect to the requested disbursement) on the basis of the Net Collateral Coverage Ratio calculated and provided by the Debtor to the Trustee as of the last day of the month preceding the month in which such request is made.

(i)       The Debtor shall cause all real property included in or securing any portion of the Collateral to be appraised at least once every year by an independent appraiser. The Debtor shall re-evaluate the Value of personal property included in or securing any portion of the Collateral at least annually, which valuation process shall include an on-site audit of such personal property. The Debtor shall cause each acquired portfolio of Receivables that is a static pool (as opposed to a revolving arrangement with a Seller) and that is included in the Collateral to be re-evaluated by the Administrator's employee responsible for collections and liquidations, in light of performance since the date of acquisition. The Debtor shall annually, not later than January 31 of each year, certify to the Trustee that these valuations have been completed, during the preceding calendar year, in accordance with this Note Agreement and specifying the outstanding loan amount owed with respect to such Non-Receivable Asset and the current Value based on such valuations as of their respective dates during the preceding calendar year. Calculations of the Net Collateral Coverage Ratio, and certifications given pursuant to Section 3.05(h) shall be based on the most recently completed valuations of the types described in this Section 3.05(i).

(j)       The Debtor shall give notice to the Trustee promptly upon becoming aware that an Event of Default has occurred.

## 3.06    CONTINUING SECURITY INTEREST.

This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until payment in full of all Notes, (b) be binding upon the Debtor, its successors and assigns, and (c) inure to the benefit of the Trustee, the Noteholders, and any participant and their respective successors, transferees, and assigns.

## 3.07    FURTHER ASSURANCES.

(a)       The Debtor agrees from time to time, at Debtor's expense, to promptly execute and deliver all further instruments and documents (including, without limitation, legal opinions in form and substance reasonably acceptable to the Trustee), and take all further action, that may be necessary or desirable, or that the Trustee may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby or to enable the Trustee to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Debtor shall from time to time at Trustee's request provide promptly to it a current, accurate and complete list of all Receivable Sellers (and their respective addresses) from whom Debtor has acquired any Receivables. Insofar as any property and/or documents which may be Collateral hereunder, the Debtor will sign and deliver to the Trustee on demand such forms of financing statements as may be required by the Trustee, will pay any related filing fees, and will file, or cause to be filed, such financing statements in the applicable jurisdictions. The Trustee's rights as specified herein or therein shall be in furtherance of and/or in addition to, but not in limitation of, the Trustee's rights under any applicable law.

(b)       The Debtor hereby authorizes the Trustee in connection with the lapse or imminent lapse of any previously filed financing statement of which an officer within the Corporate Trust Department of the Trustee acquires actual knowledge to file one or more financing or continuation statements, and amendments thereto relative to all or part of the then Collateral (including, without limitation, the financing or continuation statements referred to in

Section 3.05(e)) without the signature or authorization of the Debtor where permitted by law. The Debtor agrees to reimburse the Trustee for the expense of any such filings, including its legal fees and expenses incurred in connection herewith. The Trustee shall have no obligation or liability to monitor the status or priority of any filings.

(c)    The Debtor will furnish to the Trustee and the Noteholders, from time to time, statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Trustee or the Noteholders may reasonably request, all in reasonable detail.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

**4.01    REPRESENTATIONS AND WARRANTIES.**

The Debtor represents and warrants, as of the date of purchase of the Collateral and continuing thereafter, as follows:

(a)    The Debtor owns the Collateral, other than Governmental Payor Receivables to the extent their assignment is prohibited or limited by applicable laws and regulations, free and clear of any lien, security interest, charge or encumbrance, except (i) for the security interest created by this Note Agreement and any financing statement filed in favor of the Trustee in connection herewith, and (ii) with respect to Non-Receivable Assets, any security interest set forth on Schedule A to the certificate then being delivered, in the form of Exhibit A-2, describing such Non-Receivable Assets provided with the documents delivered pursuant to Section 3.01(b) to the Trustee upon disbursement of funds from the Trust Account in connection with the acquisition of such Non-Receivable Assets. No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording office, except (i) such as may have been filed in favor of the Trustee relating to this Note Agreement and (ii) with respect to Non-Receivable Assets, such as may have been filed in connection with any security interest set forth on Schedule A to the certificate in the form of Exhibit A-2 describing such Non-Receivable Assets provided pursuant to Section 3.01(b) to the Trustee upon disbursement of funds from the Trust Account in connection with the acquisition of such Non-Receivable Assets.

(b)    This Note Agreement creates a valid security interest in favor of the Trustee in the Collateral, other than Governmental Payor Receivables to the extent the creation of security interests therein is prohibited or limited by applicable laws and regulations, securing the payment of the Obligations, and all filings have been made that are necessary in any jurisdiction to perfect in favor of the Trustee for the benefit of the Noteholders (i) a first priority security interest in the Receivables and (ii) with respect to Non-Receivable Assets a first or junior priority security interest as set forth on Schedule A to the certificate in the form of Exhibit A-2 describing the Non-Receivable Assets provided with the document delivered pursuant to Section 3.01(b) to the Trustee upon disbursement of funds from the Trust Account in connection with the acquisition of the Non-Receivable Assets.

(c)    Except (x) as contemplated by this Note Agreement and (y) with respect to Governmental Payor Receivables, no authorization, approval or other actions by, and no notice to or filing with, any governmental authority or regulatory body is required by either (i) for the grant by the Debtor of the security interest granted hereunder or for the execution, delivery or performance of this Note Agreement by the Debtor or (ii) for the perfection of or the exercise by the Trustee of its rights and remedies hereunder.

(d)    All of the Receivables are "accounts" or "general intangibles" with the meaning of Article 9 of the UCC.

## 4.02    REPLACEMENT OF DEFECTIVE COLLATERAL.

(a)    Upon discovery by the Debtor, or upon actual knowledge of the Trustee, of a breach of any of the such representations and warranties in Section 4.01 which materially and adversely affects the value of the Collateral or the interest of the Noteholders, or which materially and adversely affects the interests of the Noteholders in the related item of Collateral as determined by the Administrator in the reasonable exercise of its discretion, the party discovering such breach shall give prompt written notice to the other. The Debtor shall within ninety (90) days of the earlier of its discovery or its receipt of notice of any breach of a representation or warranty, promptly cure such breach in all material respects or (i) if the defective item of Collateral is a Receivable, replace the defective item of Collateral with Eligible Receivables as to which the Debtor is entitled to receive in the aggregate at least as much from the related Approved Payor as under the defective Receivable or (ii) if the defective item of Collateral is a Non-Receivable Asset, replace it with Collateral of substantially equivalent fair market value as determined by the Administrator as set forth in a Certificate in the form of Exhibit A-3, or (iii) prepay principal on Outstanding Notes pursuant to Section 2.04 in an amount at least equal to the funds disbursed from the Trust Account to purchase the defective item of Collateral.

(b)    It is understood and agreed that the obligations of the Debtor set forth in this Section 4.02 to cure or substitute a defective item of Collateral or prepay Notes constitute the sole remedies of the Trustee and the Noteholders hereunder respecting a breach of the representations and warranties contained in Section 4.01. Any cause of action against the Debtor relating to or arising out of a material defect in a document relating to Collateral or arising out of a breach of any representations and warranties made in Section 4.01 shall accrue as to any item of Collateral upon (i) discovery of such defect or breach by any party and notice thereof to the Debtor, (ii) failure by the Debtor to cure such defect or breach or replace such defective collateral or prepay Notes as provided in this Section 4.02, and (iii) demand upon the Debtor by the Trustee or a majority of the Noteholders of the aggregate principal amount of then Outstanding Notes to take the actions described in Section 4.02(b)(ii).

(c)    The Trustee shall have no duty to conduct any affirmative investigation as to the occurrence of any condition requiring the prepayment of Notes or replacement of any defective item of Collateral pursuant to this Section or the eligibility of any item of Collateral for purposes of this Note Agreement.

(d)    In connection with a prepayment of Notes or replacement of a defective item of Collateral pursuant to this Section 4.02, the Debtor shall amend and deliver to the Trustee the applicable schedule of Collateral provided to the Trustee and an executed Certificate of Replacement Collateral substantially in the form of Exhibit A-3 hereto to reflect (i) the removal of the applicable item of defective Collateral from the terms of this Note Agreement and (ii) if applicable, the replacement of the defective item of Collateral.  Upon the Debtor's compliance with the terms of this Section 4.02, the lien of this Note Agreement and any applicable supplemental note agreement shall be released with respect to the item of defective Collateral and the Trustee shall promptly return to the Debtor all documents evidencing the item of defective Collateral.

**4.03    COVENANT TO REPLACE SERVICER.**

In the case of an entry or a decree or order for relief by any court or agency or supervisory authority having jurisdiction in respect of the Servicer in any voluntary or involuntary case under any present or future federal or state bankruptcy, insolvency or similar law, the appointment of a receiver, liquidator, assignee, trustee, custodian, conservator or other similar official in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or an order of the winding up or liquidation of the affairs of the Servicer having been entered against the Servicer and the continuance of any such decree or order unstayed and in effect for a period of sixty (60) consecutive days, the Debtor will take steps to promptly appoint a successor Servicer and take all reasonable steps to cause the Servicer to transfer the servicing to the successor Servicer in accordance with Sections 9.02 and 9.03 of the Servicing Agreement.

## ARTICLE V

### TRUSTEE; COMMUNICATIONS AND REPORTS; ACCOUNTS

**5.01    CERTAIN DUTIES OF TRUSTEE.**

In addition to the other duties set forth in this Note Agreement, the Trustee as trustee for the Noteholders shall:

(a)    RELEASE.  The Trustee shall upon written request from the Debtor in the form of Exhibit B hereto and subject to the provisions of this Note Agreement, take all actions reasonably necessary to effect the release of any Collateral from the lien of this Note Agreement or any supplemental note agreement to the extent the terms hereof permit the sale, disposition or transfer of such Collateral.  Upon the receipt of a Request for Release attached in substantially the form of Exhibit D hereto, the Trustee shall, within three (3) Business Days, release and deliver to, or at the direction of, the Debtor any files in its possession, at the expense of the Debtor.

(b)    POWER OF ATTORNEY.  The Debtor does hereby irrevocably appoint the Trustee both as trustee for the Noteholders and as the Debtor's Attorney-in-Fact with full authority in the place and stead of the Debtor and in the name of Debtor, the Trustee or otherwise, from time to time in the Trustee's discretion, effective upon the occurrence of an

Event of Default, to take any action and to execute any instrument which the Trustee may deem necessary or advisable to enforce, collect and dispose of the Collateral and to enforce the Transaction Documents, including the authority to:

(i)     ask, demand, collect, sue for, recover, compound, receive and give acquaintance and receipts for money due and to become due under or in respect to any of the Collateral;

(ii)    receive, endorse, collect any drafts or other instruments, documents and chattel paper, in connection herewith or otherwise;

(iii)   file any claims or take any action or institute any proceedings which the Trustee may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the right to the Trustee for the benefit of the Noteholders with respect to any of the Collateral;

(iv)    if and when so directed in writing by a majority of the Noteholders, appoint a successor Servicer selected by a majority of the Noteholders and upon terms and conditions acceptable to a majority of the Noteholders, including contracting on behalf of the Trust to pay the servicing costs, fees and expenses of the successor Servicer, and direct the predecessor Servicer to transfer the records, files and servicing information to the successor Servicer; and

(v)     notify the Servicer, any Receivable Seller and any Approved Payor of Debtor's collateral assignment and/or grant of a security interest in the Receivables to the Trustee for the benefit of the Noteholders; cause such Persons to remit payments directly to the successor Servicer; and direct the successor Servicer to transfer all amounts so received to the Trustee for deposit in the Trust Account in accordance with this Agreement.

The Debtor hereby acknowledges, consents and agrees that the power of attorney granted pursuant to this Section 5.01(b) is irrevocable and coupled with an interest; it being understood that the Trustee shall be under no obligation to exercise any such powers.

(c)     ON-HAND AND EXCEPTION REPORTS; VERIFICATION.   The Trustee agrees to deliver to the Debtor on the [first] day of each calendar [week/month], as of the end of the prior [week/month], a report setting forth all files being held by the Trustee and all exceptions related thereto. The Trustee shall be responsible for verifying that it has received an opinion of counsel pursuant to Section 3.05(b), but shall not be obligated for the contents thereof. The Trustee shall also verify that any documents that it receives pursuant to Section 3.05(a) are fully executed, but shall not be obligated for the contents thereof.

## 5.02    CORPORATE TRUSTEE REQUIRED; ELIGIBILITY; CONFLICTING INTERESTS.

There shall at all times be a Trustee hereunder which shall be eligible to act as Trustee and shall have a combined capital and surplus of at least $50,000,000. If such corporation publishes reports of condition at least annually, pursuant to law or the requirements of federal,

state, territorial or District of Columbia supervising or examining authority, then for the purposes of this Section 5.02, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 5.02, it shall correct such ineligibility or resign immediately in the manner and with the effect hereinafter specified in Section 5.03. Neither the Debtor nor any Person directly or indirectly controlling or controlled by, or under common control with, the Debtor shall serve as Trustee.

### 5.03   REPLACEMENT OF TRUSTEE.

(a)    The Trustee may resign by so notifying the Debtor; *provided, however*, no such resignation shall be effective until a qualified successor Trustee has accepted its appointment pursuant to this Section 5.03 or is otherwise appointed pursuant to Section 5.03(c).    The Noteholders of a majority in aggregate Outstanding principal amount of the Notes may remove the Trustee by so notifying the Trustee and may appoint a successor Trustee. The Debtor shall remove the Trustee if:

(i)    the Trustee fails to comply with, or ceases to be eligible under, Section 5.02 hereof;

(ii)    the Trustee is adjudged bankrupt or insolvent;

(iii)    a receiver or public officer takes charge or control of the Trustee or its property or affairs; or

(iv)    the Trustee otherwise in the Debtor's reasonable judgment becomes incapable of acting.

(b)    If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Debtor shall promptly appoint, by resolution of its Board of Directors, a successor Trustee. Every successor Trustee appointed hereunder shall execute, acknowledge and deliver to the Debtor and to the retiring Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts and duties of the retiring Trustee; but, on the request of the Debtor or the successor Trustee, such retiring Trustee shall, upon payment of its charges (including all unpaid amounts due and owing), execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder. Upon request of any such successor Trustee, the Debtor shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts. No successor Trustee shall accept its appointment unless at the time of such acceptance such successor Trustee shall be eligible under this Note Agreement.

(c)    If no successor Trustee has been appointed by the date specified or within a period of ninety (90) days from the receipt of the notice by the Debtor, whichever period is the shorter, (i) the Trustee may appoint a temporary successor Trustee having the qualifications

provided in Section 5.02 hereof or (ii) the retiring Trustee, the Debtor or the Noteholders of a majority in aggregate Outstanding principal amount of the Notes may request a court of competent jurisdiction to appoint a Trustee having the qualifications provided in Section 5.02 hereof. In the event a temporary successor Trustee is appointed pursuant to (i) above, the Board may remove such temporary successor Trustee and appoint a successor thereto.

**5.04    TRUSTEE'S OWNERSHIP OF NOTES.**

The Trustee hereunder, or any successor Trustee, in its individual or other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Debtor, with the same rights it would have if it were not the Trustee. The Trustee may act as depository for, and permit any of its officers or directors to act as a member of, or act in any other capacity in respect to, any committee formed to protect the rights of the Noteholders or to effect or aid in any reorganization growing out of the enforcement of the Notes or of this Note Agreement, whether or not any such committee shall represent the Noteholders of more than sixty percent (60%) of the collective aggregate principal amount of the Outstanding Notes.

**5.05    STATEMENT AS TO COMPLIANCE.**

The Debtor will deliver to the Trustee, within one hundred twenty (120) days after the end of each fiscal year, a written certificate, signed in the name of the Debtor by its Chairman of the Board, a Vice Chairman, its President or a Vice President and one other such officer of the Debtor, and delivered to the Trustee in which one of the two officers signing such certificate is either the principal executive officer, principal financial officer or principal accounting officer of the Debtor, stating whether or not to the knowledge of the signers thereof the Debtor is in compliance with all conditions and covenants under this Note Agreement and, in the event of any noncompliance, specifying such noncompliance and the nature and status thereof of which the signers may have knowledge.

The Debtor will cause the Servicer to deliver to the Trustee and the Debtor, on or before February 15 of each year, beginning with February 15, 2008, a certificate stating that (i) a review of the activities of the Servicer during the preceding calendar year and of its performance under the Servicing Agreement has been made under the supervision of the officer signing such certificate, and (ii) to the best of such officer's knowledge, based on such review, the Servicer has fulfilled all its obligations under the Servicing Agreement throughout such year or there has been a default in the fulfillment of any such obligation and specifying each such default known to such officer and the nature and status thereof.

**5.06    PERFORMANCE BY THE TRUSTEE.**

(a)    The Trustee hereby accepts the trusts imposed upon it by this Note Agreement, and agrees to perform said trusts, but only upon and subject to the following terms and conditions.

(i)    Except during the continuance of an Event of Default of which an officer in the Corporate Trust Department of Trustee has actual knowledge, the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Note Agreement and the Transaction Documents to which it is a party, and no implied

covenants or obligations shall be read into this Note Agreement against the Trustee. The Trustee shall not be obligated to perform any of the obligations or duties of the Debtor thereunder or to take any action to collect or enforce any of the Receivables, Non-Receivable Assets, or any Transaction Document or other claim for payment assigned hereunder, except as the Trustee may elect to undertake on behalf of the Noteholders upon full and adequate indemnification acceptable to the Trustee for any and all costs and liabilities that may result from such collection or enforcement.

(ii)    In the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Note Agreement (it being understood that the Trustee shall have no obligation to investigate or confirm the accuracy of any mathematical calculations or other facts stated therein); but in the case of any such certificates or opinions which by any provisions hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform as to form with the requirements of this Note Agreement and whether or not they contain the statements required under this Note Agreement.

(iii)   In case an Event of Default has occurred and is continuing, the Trustee, in exercising the rights and powers vested in it by this Note Agreement, shall use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of his or her own affairs.

(b)    If the Debtor fails to perform any agreement contained herein, the Trustee may itself perform, or cause performance of, such agreement, and the expenses of the Trustee incurred in connection therewith shall be payable by the Debtor under Section 5.08.

(c)    The Trustee shall pay to the Debtor the amount requested by the Debtor for payment of the interest on the Notes(s) when due and payable, and the principal and any accrued interest on any of (a) a redemption date at the Redemption Price or (b) at its original stated Maturity Date, from the cash available in the Trust Account. The Trustee has no duty or obligation to pay the Notes from its own funds, assets or corporate capital or to make inquiry regarding, or investigate the use of, amounts disbursed from the Trust Account.

(d)    Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, if it is reasonably determined by the Trustee that it may incur costs, damages or liability for which it has no adequate source of payment or indemnity, the Trustee shall have no duty as to the Notes or any Collateral or as to the taking of any necessary steps to preserve or exercise rights against any Persons or any other right pertaining to any Collateral.

(e)    The Trustee shall not be liable or responsible in any manner whatsoever (i) for any action of the Debtor, the depository bank of any funds of the Debtor or the Servicer while the Servicer is acting as bailee or agent of the Trustee with respect to the Receivables or for actions taken in compliance with any instruction or direction given to the Trustee or (ii) for the

application of funds or moneys by the Servicer until such time as funds are received by the Trustee.

(f)     The Trustee shall have no liability for actions taken at the direction of the Debtor, except for negligence or willful misconduct in the performance of its express duties hereunder. The Trustee shall have no obligation to administer, service or collect, or to maintain or monitor the administration, servicing or collection of, the Collateral.

(g)     The Trustee shall be protected and shall incur no liability to the Debtor or any Noteholder in relying upon the accuracy, acting in reliance upon the contents, and assuming the genuineness of any notice, demand, certificate, signature, instrument or other document reasonably believed by the Trustee to be genuine and to have been duly executed by the appropriate signatory, and, except to the extent the Trustee has actual knowledge to the contrary, the Trustee shall not be required to make any independent investigation with respect thereto.

(h)     Before the Trustee acts or refrains from acting, it may require an Officer's Certificate. The Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on the Officer's Certificate.

(i)     The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys or a custodian or nominee, and the Trustee shall not be responsible for any misconduct or negligence on the part of, or for the supervision of the Debtor, the Servicer or the Administrator, or any agent, attorney, custodian or nominee appointed with due care by it hereunder.

(j)     The Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; provided, however, that the Trustee's conduct does not constitute willful misconduct, negligence or bad faith.

(k)     The Trustee may consult with counsel of its selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(l)     The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Note Agreement at the request or direction of any of the Noteholders pursuant to this Note Agreement, unless such Noteholders shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

(m)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by the Holders of Outstanding Notes evidencing not less than twenty-five percent (25%) of the principal amount of each class thereof; provided, however, that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not reasonably assured to the Trustee by the security afforded to it by the terms of this Note Agreement, the Trustee may

require reasonable indemnity against such cost, expense or liability as a condition to so proceeding; the reasonable expense of every such examination shall be paid by the Person making such request, or, if paid by the Trustee, shall be reimbursed by the Person making such request upon demand.

## 5.07  INDEMNITY AND EXPENSES.

(a)  The Debtor agrees to indemnify each of the Trustee and the Noteholders from and against any and all claims, damages, expenses, losses and liabilities growing out of or resulting from this Note Agreement or any other security held by the Trustee with respect to the Notes, except claims, losses or liabilities determined to have been caused by such indemnified party's own negligence or willful misconduct.

(b)  The Debtor will pay upon demand to the Trustee the amount of any and all reasonable fees and expenses, including the reasonable fees and disbursements of its counsel and of any experts and agents, which the Trustee may incur, acting in good faith, in connection with (i) the custody, collection from, or other realization upon, any of the Collateral upon the occurrence of an Event of Default, (ii) the exercise of or enforcement of any of the rights of the Trustee hereunder, including without limitation costs incurred in effecting a substitution of Servicer pursuant to Section 5.01, or (iii) the failure by the Debtor to perform or observe any of the material provisions hereof.

(c)  The Debtor's payment obligations pursuant to this Section 5.07 shall survive the discharge of this Note Agreement. When the Trustee incurs expenses after the occurrence of an Event of Default specified in Section 6.01(g) or (h), the expenses are intended to constitute expenses of administration under Title 11, United States Code, or any similar Federal or state law for the relief of debtors.

## 5.08  ACCOUNTS; PAYMENTS ON NOTES.

The Trustee as trustee for the Noteholders shall establish, maintain and administer the Trust Account and the Subscription Account as follows:

(a)  TRUST ACCOUNT AND SUBSCRIPTION ACCOUNT.

(i)  DEPOSITS: The Trustee shall deposit into the Trust Account:

(A)  Pursuant to Section 2.01(g), the proceeds from the issuance of Notes (including transfers from the Subscription Account as provided therein);

(B)  The gross proceeds received pursuant to Section 3.04;

(C)  All amounts wired to the Trustee pursuant to Section 5.08(b), amounts remitted by the Debtor pursuant to Section 5.08(c), all proceeds derived from the Collateral and all other amounts to be deposited therein upon receipt of a direction in writing from the Debtor;

(ii)   WITHDRAWALS. To the extent funds are available in the Subscription Account, the Debtor shall cause the bank designated to maintain the Subscription Account to transfer such funds to the Trust Account. To the extent funds are available in the Trust Account, the Trustee shall withdraw from the Trust Account and pay, remit, or transfer as and when instructed by the Debtor in writing (except as to amounts under clause (A)   below, which the Trustee may withdraw and pay without regard to instructions from the Debtor) or otherwise as directed by an order of a court of competent jurisdiction the following amounts in the following order of priority (any funds not so transferred or paid are to remain in the Trust Account until subsequently applied pursuant to this Section 5.08(a)(ii)):

(A)   To pay to the Trustee, the amount of its fee due and payable for performing services under this Note Agreement and any supplemental note agreements and expenses incurred in connection therewith relating to the Notes (Series I);

(B)   Any amounts specifically identified by the Debtor or the Servicer in writing (I) deposited in the Trust Account by the Debtor, or transferred to the Trustee from a Lock Box Account, in error, or (II) deposited in the Trust Account with respect to property that does not constitute Collateral, Permitted Investments, proceeds from the issuance of the Notes or proceeds thereof;

(C)   First, on or prior to each respective Interest Payment Date, to a disbursement account designated by the Debtor in an amount sufficient to make payments to Noteholders, the interest then due and payable on their respective Notes and second, subject to Section 2.01(f), to the Noteholders on the respective Maturity Dates of their Notes or other date set for redemption of Outstanding Notes all principal then due and payable pursuant to the terms of such Notes, this Note Agreement, and any applicable supplemental note agreement;

(D)   Following each deposit pursuant to Section 5.08(a)(i)(A) or each exchange of a Note pursuant to Section 2.01(f), to pay, as directed by the Debtor in writing, to the applicable Broker/Dealer or other selling agent any related sales expenses and commissions or to the Debtor to reimburse the Debtor for its payment of such sales expenses and commissions;

(E)   As directed in writing by the Debtor from time to time, amounts for the purchase of Eligible Receivables, Non-Receivable Assets, or both, provided that the Trustee has received a duly authorized and executed certification substantially in the form of Exhibit A-1 or Exhibit A-2, as applicable, to this Note Agreement;

(F)   To pay the Administrative Fee if permitted by Section 3.05(h);

(G)   To pay to the Debtor, the amount of the reserve account balance of a Receivable Seller that the Debtor certifies to the Trustee in writing that the Debtor is required to return pursuant to the related Purchase Documents;

(H)     To invest the remaining amounts promptly in Permitted Investments as provided in Section 5.08(d); and

(I)     To pay amounts to the Debtor pursuant to Section 5.08(g).

(b)     FUNDS FROM LOCK BOX ACCOUNTS.   The Debtor shall cause each custodian or trustee of a Lock Box Account to sweep the funds in each Lock Box Account and wire such funds to the Trustee for deposit in the Trust Account on each Business Day on which such custodian or trustee and the Trustee is open for business.  To the extent necessary to comply with applicable laws and regulations, the Debtor may instead enter into an account control agreement with respect to Lock Box Accounts into which Governmental Payor Receivables are paid and pursuant to which such funds on deposit therein are wire transferred to the Trustee on each Business Day on which the Trustee is open for business.

(c)     DEBTOR TO REMIT FUNDS.

All subscription proceeds and all Revenues received by the Debtor, if any, in respect of the Collateral shall be immediately remitted to the Trustee for deposit into the Trust Account, which Revenues shall at all times be segregated from other funds of the Debtor.

(d)     INVESTMENT OF FUNDS HELD BY TRUSTEE.

(i)     The Trustee shall invest money held for the credit of the Trust Account or subaccount held by the Trustee hereunder as directed in writing (or oral direction confirmed in writing) by the Debtor, to the fullest extent practicable and reasonable, in Permitted Investments.    Such direction by the Debtor shall not conflict with the obligation of the Trustee to make timely payments pursuant to Section 5.08(e).  In the absence of any such direction and to the extent practicable, the Trustee shall invest amounts held hereunder in those Permitted Investments described in clause (h) of the definition of the Permitted Investments.  All income and earning on such investments shall be held in the Trust Account to which the Permitted Investment is related and withdrawn pursuant to the applicable provisions of Section 5.08.  The Trustee and the Debtor hereby agree that unless an Event of Default shall have occurred hereunder, the Debtor shall be entitled to, and shall, provide written direction or oral direction confirmed in writing to the Trustee with respect to any discretionary acts required or permitted of the Trustee under any Permitted Investment and the Trustee shall not take such discretionary acts without such written direction.

(ii)     The Permitted Investments held by the Trustee shall be deemed at all times to be part of the related Trust Account or subaccounts or combination thereof, and the Trustee shall inform the Debtor of the details of all such investments.  Upon direction in writing from the Debtor, the Trustee shall use reasonable efforts to sell at the best price obtainable, or present for redemption, any Permitted Investment whenever it shall be necessary to provide money to meet any payment from the applicable Trust Account. The Trustee shall advise the Debtor in writing, on or before the tenth (10th) Business Day of each month (or such later date as reasonably consented to by the Debtor) of all investments held for the credit of the Trust Account in its custody under the provisions of

this Note Agreement as of the end of the preceding month and the market value thereof in accordance with the Trustee's customary bank statements.

(iii)     The Trustee shall not be responsible or liable for any losses on investments made by it hereunder or for keeping the Trust Account fully invested at all times, its only responsibility being to comply with the investment instructions of the Debtor.

(e)    PAYMENT    OF    INTEREST    AND    PRINCIPAL.    Pursuant    to Section 5.08(a)(ii)(C), the Trustee shall pay to the Debtor an amount equal to the aggregate interest and principal due on the Notes on the related Interest Payment Date or such specified redemption date from the funds on deposit in the Trust Account. Such payments shall be made at least one (1) Business Day before the relevant Interest Payment Date or such specified redemption date. The Debtor shall make payments to the registered Noteholder on the applicable Record Date. Each payment of interest and principal on any Note shall be paid by check (or, in the discretion of the Debtor, if so requested by the Noteholder by automatic clearinghouse transfer) to each Noteholder's address located inside the United States as provided to the Debtor in writing.

(f)    PAYMENTS TO NOTEHOLDERS. Each payment with respect to a Note shall be paid to the Noteholder.

(g)    EXCESS FUNDS.    After repayment of all Notes, and of all trustee fees, Administrative Fees and other fees and expenses, if applicable, as directed in writing by the Debtor, the Trustee shall distribute any remaining moneys on deposit in the Trust Account to the Debtor free of the lien of this Note Agreement.

(h)    RIGHTS TO PAYMENTS.  The rights of the Noteholders to receive payments in respect of their Notes, and all rights and interests of the Noteholders in and to such payments, shall be as set forth in this Note Agreement. Neither the Noteholders of any class of Notes nor any party hereto shall in any way be responsible or liable to the Noteholders of any other class of Notes in respect of amounts properly previously distributed on the Notes.

(i)    Any amounts which the Debtor requests the Trustee to wire pursuant to this Note Agreement shall be wired by the Trustee as directed by the Debtor on the day the executed certification or other request in form and substance as required by this Note Agreement is received by the Trustee if such certification or request is received before 11:00 a.m. Mountain Time, and if not so received, on the next following Business Day.

## 5.09    ADMINISTRATION AGREEMENT; SERVICING AGREEMENT.

The Trustee is not a party to, and has no responsibility for the duties and obligations of any party to, the Administration Agreement or the Servicing Agreement.

## ARTICLE VI

### DEFAULT

**6.01    EVENTS OF DEFAULT.**

With respect to the Notes, each of the following events and occurrences shall constitute an "Event of Default" under this Note Agreement:

(a)    Debtor shall default in the payment or prepayment when due of any principal or interest on any Note (Series I), or Debtor shall fail to make any payment or deposit when required hereunder, and such default or failure shall continue unremedied for fifteen (15) days;

(b)    Subject to Section 4.02, any representation or warranty made by Debtor in any Transaction Document securing the Notes (Series I) shall have been incorrect in any material respect when made or confirmed, or any certificate or determination of Debtor furnished hereunder or in connection with the Notes (Series I) was false or misleading as of the date made in any material respect and which, within thirty (30) days of notice by the Trustee, the Debtor fails to cure such inaccuracy;

(c)    Debtor materially breaches any other covenant or provision of this Note Agreement with respect to the Notes (Series I) and such breach continues unremedied for a period of thirty (30) days after receipt of notice from a Noteholder or the Trustee, and in the case of a notice from a Noteholder, the Debtor shall provide a copy of such notice to the Trustee pursuant to Section 6.08;

(d)    Debtor materially breaches any of the terms, conditions or its obligations in the Servicing Agreement or the Administration Agreement with respect to the Notes (Series I) and such breach continues unremedied for a period of thirty (30) days after notice from the Servicer or the Administrator, as applicable;

(e)    Any judgment against the Debtor or any attachment, levy or execution against any material portion of its respective properties for which an amount in excess of twenty-five percent (25%) of the Debtor's total assets shall remain unpaid, or shall not be discharged of record, or bonded, for a period of ninety (90) days or more after its entry, issue or levy, as the case may be;

(f)    The Debtor shall be unable, or generally fail to pay, or admit in writing its inability or unwillingness to pay its debts as they mature or become due;

(g)    The Debtor shall make any assignment for the benefit of creditors, or a trustee, receiver or liquidator shall be appointed for the Debtor or for any of their property, or the commencement of any case or proceedings by the Debtor under any bankruptcy, reorganization, arrangement of debt, insolvency, readjustment of debt, receivership, liquidation or dissolution law or statute or the commencement of any such case or proceedings without the consent of the Debtor and such proceeding shall continue undischarged for a period of ninety (90) days;

(h)    Debtor ceases to do business for any reason whatsoever or institutes any proceeding for its dissolution or termination;

(i)     A moratorium shall be agreed to or declared in respect of any indebtedness of Debtor, or any governmental authority or agency shall have seized, compulsorily purchased or appropriated all or a substantial part of the assets of Debtor;

(j)     It becomes unlawful for Debtor to perform any material obligation hereunder or under other documents executed in connection herewith; or

(k)     The occurrence of a Collateral Coverage Default and the continuation of such default unremedied for a period exceeding five (5) days following the Debtor's delivery of a report to the Trustee, pursuant to Section 3.05(h), which shows that there is a Collateral Coverage Default.

## 6.02   NOTEHOLDER'S DIRECTION UPON DEFAULT.

The Trustee shall not be deemed to have notice of an Event of Default unless the Trustee has actual knowledge or has received written notice thereof to the same extent as required in Section 6.05. Upon acquiring actual knowledge or receiving written notice thereof, the Trustee shall give notice, except to the extent otherwise set forth in Section 6.05, to the Noteholders and, if an Event of Default shall occur and be continuing, (a) the Trustee may, in its sole discretion and (b) subject to Section 6.02(c), the Trustee shall upon written request of Noteholders of Outstanding Applicable Notes evidencing more than fifty percent (50%) of the principal due on the Outstanding Applicable Notes, by notice to Debtor declare all Applicable Notes together with accrued interest and any other sum payable hereunder, to be immediately due and payable (and the same shall thereupon become due and payable without presentment, demand, protest or notice of any kind, other than are hereby expressly required by this Section 6.02, all of which are hereby expressly waived by Debtor). Upon such acceleration, in addition to the other remedies set forth in Section 6.03:

(a)     The Trustee may liquidate all funds in the Trust Account related to the Applicable Notes (and all related funds that may thereafter be deposited in such Trust Account) and the Permitted Investments related to the Applicable Notes. Upon such liquidation, the proceeds realized from any such liquidation shall be applied by the Trustee on the next Interest Payment Date on which the Applicable Notes are Outstanding in the following order of priority:

(i)     First, to the payment of all of Trustee's fees, costs and expenses incurred by it or incurred by acting on behalf of the Noteholders of the Applicable Notes in enforcing its rights and remedies hereunder (including, without limitation, its attorneys' fees and expenses);

(ii)     Second, to the payment of any unpaid fee that is payable, based solely on the records of the Debtor, as reported by the Debtor to the Trustee, to (A) the bank acting as the custodian for the Lock Box Account with respect to the Applicable Notes and (B) the Servicer and Administrator for services performed under the Servicing Agreement and the Administration Agreement with respect to the Collateral for the Applicable Notes following its pledge to the Trustee hereunder;

(iii)     Third, to the payment of all of the costs and expenses of the Noteholders of the Applicable Notes incurred in enforcing their rights and remedies hereunder

(including, without limitation, their attorneys' fees and expenses) or under the other related Transaction Documents based on appropriate certificates of the Noteholders attaching a court order and other evidence of such amounts;

       (iv)    Fourth, to the payment to the Noteholders of the Applicable Notes, based solely on the records of the Debtor, as reported by the Debtor to the Trustee, pro rata, the amount then owing or unpaid under the Note for interest and then principal; and

       (v)    Fifth, to the extent available, to the payment to Debtor, its successors or assigns any remaining proceeds of such liquidation.

       (b)    The Trustee shall apply all payments received thereafter with respect to the Receivables or other Collateral securing the Applicable Notes in the order of priority set forth in Paragraph 6.02(a) above.

       (c)    Upon the Noteholders providing to the Trustee indemnity satisfactory to it for costs, expenses and liability, the Trustee shall take any and all actions permitted by law to realize upon their security interest in the Collateral securing the Applicable Notes and otherwise exercise remedies and undertake all actions as may be desirable or necessary to recover all amounts due and owing Noteholders of the Applicable Notes;

       (d)    The Trustee may, and upon the written instruction of Noteholders of Outstanding Applicable Notes evidencing more than fifty percent (50%) of the principal due on the Outstanding Applicable Notes shall, exercise all of the Debtor's rights, but not its obligations, under the terms of the Servicing Agreement, the Purchase Agreement and the other Transaction Documents with respect to the Applicable Notes; and

       (e)    The Trustee may, and upon the written instruction of Noteholders of Outstanding Applicable Notes evidencing more than fifty percent (50%) of the principal due on the Outstanding Applicable Notes shall, waive the Event of Default, except failure to pay principal and interest when due, provided that no waiver of any Event of Default shall constitute a waiver of any other or any succeeding Event of Default or of the continuance of the Event of Default so waived except in accordance with the terms of the waiver.

## 6.03   REMEDIES.

       (a)    Pursuant to the Debtor's collateral assignment of all of its interest in the Collateral to the Trustee, and pursuant to the Servicing Agreement, Debtor agrees that the Trustee may, upon occurrence of an Event of Default, cause the Servicer or a successor Servicer to collect, at the Debtor's expense, all amounts due or to become due under the Collateral securing the Applicable Notes.  In connection with such collections, the Debtor agrees that the Trustee may take or direct such action as the Trustee may deem necessary or advisable to enforce collection or liquidation of such Collateral.

       (b)    If an Event of Default occurs and is continuing, the Trustee may recover judgment in its own name and as trustee of an express trust against the Debtor for the whole amount owing with respect to the Applicable Notes and the amounts provided for in Section 5.08.

(c)    Upon the occurrence of any Event of Default, Trustee may, and shall upon the direction of the Noteholders as provided in Section 6.02 above, exercise any of the rights provided for in this Note Agreement (including Section 6.02), or at law or equity, including, without limitation, all the rights and remedies of a secured party under the UCC. The Trustee shall be obligated to act only upon receipt of full indemnification satisfactory to it from Noteholders of the Applicable Notes for any and all costs and liabilities that may result from exercise of such remedies prior to undertaking any thereof, and appropriate certifications evidencing that such Persons constitute Noteholders.

(d)    At any time after a declaration of acceleration has been made pursuant to Section 6.02 and before a judgment or decree for payment of the money due has been obtained by the Trustee as provided herein, the Noteholders of Outstanding Applicable Notes evidencing more than fifty percent (50%) of the principal due on the Outstanding Applicable Notes, by written notice to the Debtor and the Trustee, may rescind and annul such declaration and its consequences if:

        (i)    the Debtor has paid or deposited with the Trustee a sum sufficient to pay:

            (A)    all overdue installments of interest on such Applicable Notes,

            (B)    the principal of and premium, if any, on such Applicable Notes which have become due otherwise than by such declaration of acceleration and interest thereon at the respective rates borne by such Applicable Notes,

            (C)    to the extent that payment of such interest is lawful, interest upon overdue installments of interest at the respective rates borne by such Applicable Notes, and

            (D)    all sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, in each case, with respect to such Applicable Notes; and all Events of Default, other than the nonpayment of the principal of such Applicable Notes which have become due solely by such acceleration, have been cured or waived as provided in this Note Agreement. No such rescission shall affect any subsequent Events of Default or impair any right consequent thereon.

## 6.04    TRUSTEE MAY FILE PROOFS OF CLAIM.

(a)    In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Debtor or any other obligor upon the Notes or the property of the Debtor or of such other obligor or their creditors, the Trustee (irrespective of whether the principal of the Notes of any class or series shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand on the Debtor for the payment of overdue principal, premium, if any, or interest) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(i) to file and prove a claim for the whole amount, or such lesser amount as may be provided for in the Applicable Notes, of principal and interest, if any, owing and unpaid in respect of the Applicable Notes and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee and its agents and counsel) and of the Noteholders allowed in such judicial proceeding; and

(ii) to collect and receive any money or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator (or other similar official) in any such judicial proceeding is hereby authorized by each Noteholder to make such payments to the Trustee, and if the Trustee shall consent to the making of such payments directly to the Noteholder, to pay to the Trustee any amount due to it for the reasonable compensation, expenses, disbursements and advances of the Trustee and any predecessor Trustee, their agents and counsel, and any other amounts due the Trustee or any predecessor Trustee.

(b) Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Noteholder any plan of reorganization, arrangement, adjustment or composition affecting the Applicable Notes or the rights of any Noteholder thereof, or to authorize the Trustee to vote in respect of the claim of any Noteholder of an Applicable Note in any such proceeding.

(c) In any proceedings brought by the Trustee (and also any proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party), the Trustee shall be held to represent all the Noteholders of the Applicable Notes, and it shall not be necessary to make any Noteholder of the Applicable Notes parties to any such proceedings.

## 6.05    NOTICE OF DEFAULTS.

Within ninety (90) days after the occurrence of any Event of Default hereunder with respect to the Applicable Notes, the Trustee shall transmit to the Noteholders notice of such Event of Default hereunder known to the Trustee, unless such Event of Default shall have been cured or waived. Such Event of Default shall be treated as known to the Trustee only when actual knowledge of such Event of Default is obtained by any officer within the Corporate Trust Department of the Trustee responsible for the administration of this Agreement and the trust created hereby to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject. Except in the case of an Event of Default consisting of a default in the payment of the principal of or interest with respect to any Applicable Note, the Trustee shall be protected in withholding such notice if and so long as an authorized officer of the Trustee in good faith determines that the withholding of such notice is in the interest of the Noteholders. The Trustee shall not give notice of an Event of Default consisting of a default in the payment of the principal of or interest with respect to any Applicable Note until at least sixty (60) days have passed since its occurrence, but such notice shall be given not later than ninety (90) days after such occurrence.

**6.06    TRUSTEE MAY ENFORCE CLAIMS WITHOUT POSSESSION OF NOTES.**

All rights of action and claims under this Note Agreement or the Applicable Notes may be prosecuted and enforced by the Trustee without the possession of any of the Applicable Notes or the production thereof in any proceeding relating thereto, and any such proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any unpaid fees, expenses, costs and other amounts due as set forth in Section 6.02, be for the ratable benefit of the Noteholders in respect of which such judgment has been recovered.

**6.07    LIMITATION ON SUITS.**

(a)    No Holder of any Applicable Note shall have any right to institute any proceeding, judicial or otherwise, with respect to this Note Agreement, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(i)    such Noteholder has previously given written notice to the Trustee of a continuing Event of Default with respect to Applicable Notes of the same series, and certifying that such Person is a Noteholder;

(ii)    the Noteholders of Outstanding Applicable Notes evidencing not less than twenty-five percent (25%) of the principal due on the Outstanding Applicable Notes shall have made written request to the Trustee to institute proceedings in respect of such Event of Default in its own name as Trustee hereunder;

(iii)    such Noteholder or Noteholders have offered to the Trustee indemnity satisfactory to it against the costs, expenses and liabilities to be incurred in compliance with such request;

(iv)    the Trustee for sixty (60) days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(v)    no direction inconsistent with such written request has been given to the Trustee during such sixty (60)-day period by the Noteholders of Outstanding Applicable Notes evidencing more than fifty percent (50%) of the principal due on the Outstanding Applicable Notes;

(vi)    No individual Noteholder, nor any group or committee of Noteholders, shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Note Agreement or any Note to affect, disturb or prejudice the rights of any other Noteholders, or to obtain or to seek to obtain priority or preference over any other Noteholders or to enforce any right under this Note Agreement or any Note, except in the manner herein provided and for the equal and ratable benefit of all the Noteholders.

**6.08    NOTICES PROVIDED TO THE TRUSTEE**

In the case of any notice under this Article VI to be provided to the Debtor by the Servicer, Administrator or a Noteholder, upon receipt of such notice the Debtor shall promptly provide to the Trustee a copy of such notice.

## ARTICLE VII

## TERMINATION OF NOTE AGREEMENT

**7.01    DEPOSIT OF PAYMENT.**

When the Debtor has delivered to the Trustee a statement that it does not intend to authorize any further series or classes of Notes under this Note Agreement and all Outstanding Notes have become due and payable and the Debtor deposits with the Trustee funds, as permitted by the terms of this Note Agreement including all supplemental note agreements, sufficient to pay at their stated maturity the principal and accrued and unpaid interest of all Outstanding Notes, and the Debtor deposits with the Trustee or pays, or adequate provision has been made for, all other sums payable under this Note Agreement and all supplemental note agreements, then this Note Agreement and all supplemental note agreements and the trusts created thereby shall, subject to Section 5.08 above, cease to be of force and further effect and shall terminate. The Trustee shall join in the execution of a document prepared by the Debtor and reasonably acceptable to the Trustee acknowledging satisfaction and discharge of this Note Agreement and all supplemental note agreements on request of the Debtor.

**7.02    APPLICATION OF FUNDS.**

The Trustee shall hold in trust for the benefit of the Noteholders all amounts deposited pursuant to Section 7.01 (and all investments of such amounts).  The Trustee shall apply such deposited amounts in accordance with Section 5.08(a) of this Note Agreement.

**7.03    REINSTATEMENT.**

If the Trustee is unable to apply any amounts deposited in accordance with Section 8.01 by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Debtor's obligations under this Note Agreement shall be revived and reinstated as though no deposit had occurred pursuant to this Article VII, until such time as the Trustee is permitted to apply all such amounts in accordance with Section 7.02; *provided, however*, that if the Debtor makes any payment of principal of or interest on any Note following the reinstatement of its obligations, the Debtor shall be subrogated to the rights of the Noteholders to receive such payment from the amounts held by the Trustee after payment in full to the Noteholders.

**7.04    UNCLAIMED FUNDS.**

The Debtor shall be entitled to retain any unclaimed money, provided that Noteholders entitled to the money shall continue to have a right to payment by the Debtor for payment as general creditors unless an applicable abandoned property law designates another Person.

### ARTICLE VIII

### AMENDMENTS AND SUPPLEMENTAL NOTE AGREEMENTS

**8.01    GENERAL.**

Subject to Sections 8.02 and 8.03 below, this Note Agreement may be amended only by an instrument in writing signed by the Trustee and the Debtor which may waive any provision of this Note Agreement. Upon the execution of any amendment or supplemental note agreement under this Article VIII, this Note Agreement shall be modified in accordance therewith, and such amendment or supplemental note agreement shall form a part of this Note Agreement for all purposes; and every Note theretofore or thereafter issued hereunder shall be bound thereby.

**8.02    AMENDMENT WITHOUT CONSENT OF NOTEHOLDERS.**

The Debtor and the Trustee may, without the consent of or notice to any of the Noteholders, enter into or amend any note agreement(s) supplemental to this Note Agreement for any one or more of the following purposes:

(a)    to cure any ambiguity or formal defect or omission in this Note Agreement;

(b)    to grant to or confer upon the Trustee for the benefit of the Noteholders any additional benefits, rights, remedies, powers or authorities that may lawfully be granted to or conferred upon the Noteholders or the Trustee;

(c)    to subject to this Note Agreement additional revenues, properties or collateral;

(d)    to evidence the appointment of a separate or co-Trustee or transfer agent or the succession of a new Trustee hereunder;

(e)    to provide for the issuance or redemption of Notes pursuant to this Note Agreement, including the creation of the Trust Account and subaccounts with respect to such Notes;

(f)    to amend this Note Agreement to allow for any Notes to be supported by a letter of credit or insurance policy or a liquidity agreement;

(g)    to make any other change which is not to the material prejudice of the Noteholders, as evidenced by an Officer's Certificate delivered to the Trustee;

(h)    to provide for the assumption of the Debtor's obligations to the Noteholders of the Notes in case of a merger or consolidation or sale of all or substantially all of the Debtor's assets;

(i)     to provide for the creation, terms and provisions of any series of Notes (other than Notes (Series I)) as provided in Article III;

*provided, however*, that nothing in this Article VIII shall permit, or be construed as permitting, any modification of the trusts, powers, rights, duties, remedies, immunities and privileges of the Trustee without the prior written approval of the Trustee, which approval shall be evidenced by execution of a supplemental note agreement.

## 8.03   AMENDMENT WITH CONSENT OF NOTEHOLDERS.

Exclusive of amendments and supplemental note agreements covered by Section 8.02 and subject to the terms and provisions contained in this Section 8.03, the Noteholders of Outstanding Notes evidencing more than fifty percent (50%) of the principal due on the Outstanding Notes shall have the right, from time to time, to consent to and approve the execution by the Debtor and the Trustee of such other Note Agreement supplemental hereto as shall be deemed necessary and desirable by the Trustee for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained in this Note Agreement or in any supplemental note agreement; *provided, however*, if such modified, altered, amended, added or rescinded provision applies only to a particular series of Notes, or the rights of the Noteholders of only a particular series would be modified, the consent of the Noteholders of Outstanding Notes evidencing more than fifty percent (50%) of the principal due on the Outstanding Notes of only such series shall be required, and, provided further, that nothing in this Article VIII shall permit, or be construed as permitting:

(a)     without the consent of all Noteholders affected thereby,

(i)     an extension of the maturity date of the principal of or a change in the interest rate on any Note other than in accordance with the terms of this Note Agreement;

(ii)    a reduction in the principal amount due on any Note or alteration of the manner or rate of accrual of interest thereon;

(iii)   a privilege or priority of any Note over any other Note;

(iv)    a reduction in the aggregate principal amount of the Notes required for consent to a supplemental note agreement or modification, alteration, amendment, addition to or rescission of this Note Agreement;

(v)     the creation of any lien on the Collateral securing the Notes except as otherwise provided herein; or

(vi)    any modification of the trusts, powers, rights, obligations, duties, remedies, immunities and privileges of the Trustee without the prior written approval of the Trustee.

It shall not be necessary for the consent of the Noteholders under this Article VIII to approve the particular form of any proposed amendment or supplemental note agreement, but it shall be sufficient if such consent approves the substance thereof.

**8.04    EXECUTION OF AMENDMENTS**

In executing, or permitting the additional trusts created by, any amendment permitted by this Article VIII or the modifications thereby of the trusts created by this Note Agreement, the Trustee shall be entitled to receive, and shall be fully protected in relying upon, an opinion of counsel stating that the execution of such amendment is authorized or permitted by this Note Agreement. The Trustee may, but shall not be obligated to, enter into any such amendment that affects the Trustee's own rights, duties, liabilities or immunities under this Note Agreement or otherwise.

**8.05    NOTICE TO NOTEHOLDERS.**

After an amendment or supplemental note agreement under this Article VIII becomes effective, the Trustee, at the Debtor's expense, shall mail to each Noteholder, at the address set forth in the certified copy of the Note Register provided by the Debtor to the Trustee, a notice briefly describing the amendment or supplemental note agreement; provided that no notice shall be required to Noteholders of a Class with respect to a supplemental note agreement the sole function of which is to create an additional Class the collateral for which is entirely separate from the collateral for the existing Class.

**8.06    RIGHTS OF NOTEHOLDERS NOT IMPAIRED.**

Notwithstanding any other provision of this Note Agreement, but subject to Article VI, Section 6.02(e), and Section 9.02, the right of any Noteholder to receive payment of the principal amount, Redemption Price or interest, if any, in respect of the Notes held by such Noteholder, on or after the respective due dates expressed in the Notes or any date of redemption, or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected adversely without the consent of each such Noteholder.

**8.07    REQUIRED CERTIFICATIONS; RELIANCE**

Notwithstanding any provision of this Agreement, if any Person purporting to be a Noteholder wishes to exercise its rights or remedies hereunder or seeks to give the Trustee any notice, direction, instruction, consent or other communication, such Person shall be entitled to do so upon delivery to the Trustee of a statement certifying that such Person is a Noteholder and including information as to the series and class, principal balance, interest rate, date of issuance and maturity of the Notes.  Before the Trustee shall be obligated to take any action pursuant to any notice, direction, instruction, consent or other communication, the Debtor shall deliver to the Trustee a certified copy of the Note Register and the information pertaining to the Notes described above in order to enable the Trustee to confirm the identity and status of the Person as a Noteholder.  The Trustee shall be entitled conclusively to rely upon any such certified copies and information described herein in confirming the identity and status of a Noteholder or in taking any action based on any such notice, direction, instruction, consent or other communication.

## ARTICLE IX

## MISCELLANEOUS

### 9.01   GOVERNING LAW.

This Agreement shall be governed by and construed in accordance with the internal law of the State of California without regard to applicable conflicts of law principles.

### 9.02   WAIVER.

The Debtor hereby waives notice of acceptance of this Note Agreement and also presentment, demand, protest and notice of dishonor of any and all of its Obligations herein or in the Notes, or other Transaction Documents, and promptness in commencing suit against any party hereto or liable thereon, and in giving any notice to or of making any claim or demand hereunder upon the Debtor.  No failure on the part of Trustee to exercise, and no delay in exercising, any right hereunder or with respect to the obligations shall operate as a waiver thereof; nor shall any single or partial exercise of any rights hereunder or with respect to the Obligations preclude any other right.  No waiver of any Event of Default shall constitute a waiver of any other or any succeeding Event of Default or of the continuance of the Event of Default so waived except in accordance with the terms of the waiver.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law or equity.

### 9.03   NOTICES.

(a)    Any notice hereunder shall be in writing and shall be personally delivered or transmitted by facsimile, postage prepaid registered mail, return receipt requested, or overnight delivery service addressed to the party receiving such notice at the following address: If to Debtor:

Medical Provider Funding Corporation V
2100 South State College Blvd.
Anaheim, CA 92806

Telephone:  (714) 935-3100
Facsimile:  (714) 935-3114

If to Trustee:

Wells Fargo Bank, National Association
MAC N9311-161
Sixth Street and Marquette Avenue
Minneapolis, MN  55479
Attention: Corporate Trust Services – Asset-Backed Administration

Telephone: (612) 667-8058
Facsimile:  (612) 667-3464

All notices and other communications shall be deemed to have been duly given on the date of delivery if delivered personally, on the date five (5) days after if transmitted by mail, in the case of a telecopy, telex, telegram, or cable, at the time sent, provided that any notice to be given to the Trustee shall be effective only when received. Any party may change its address for proposes hereof by written notice to the other.

(b)    The Debtor or the Trustee by notice to the other may designate additional or different addresses for subsequent notices or communications. Failure to mail a notice or communication to a Noteholder or any defect in it shall not affect its sufficiency with respect to other Noteholders. Except as otherwise provided, if a notice or communication is mailed in the manner provided above, it is duly given, whether or not received by the addressee. If the Debtor mails a notice or communication to the Noteholders, it shall mail a copy to the Trustee.

## 9.04    TRUSTEE TO ACT ON INSTRUCTIONS

The Trustee shall rely on the written instructions of the Debtor signed by its President, Chief Executive Officer, Chief Operating Officer, Chief Accounting Officer or a Vice President or any of their designees, directing the Trustee to take certain actions or to refrain from taking certain actions. In addition, the Trustee may, at its option, request a certificate stating that in the opinion of the signers, all conditions precedent, if any, provided for in this Note Agreement relating to the proposed action have been complied with. The Trustee also may, at its option, request an opinion of counsel reasonably acceptable to the Trustee, stating that, in the opinion of such counsel, all conditions precedent, if any are provided for in this Agreement, to such action have been complied with.

## 9.05    CERTIFICATE AND OPINION AS TO CONDITIONS PRECEDENT.

Upon any request or application by the Debtor to the Trustee to take any action under this Note Agreement, the Debtor shall furnish to the Trustee:

(a)    a written certificate signed in the name of the Debtor by its President, Chief Executive Officer, Chief Operating Officer, or a Vice President, and delivered to the Trustee stating that, in the opinion of the signers, all conditions precedent, if any, provided for in this Note Agreement relating to the proposed action have been complied with; and

(b)    an opinion of counsel reasonably acceptable to the Trustee stating that, in the opinion of such counsel, all such conditions precedent have been complied with; provided that in the case of any such request or application as to which the furnishing of such documents is specifically required by any provision of this Note Agreement relating to such particular application or request, no additional certificate or opinion need be furnished.

## 9.06    SEVERABILITY.

Any provision of this Note Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Note Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

**9.07   NONLIABILITY OF DIRECTORS; NO GENERAL OBLIGATION.**

It is hereby expressly made a condition of this Note Agreement that any agreements, covenants, or representations herein contained or contained in the Notes or supplemental note agreements do not and shall never constitute or give rise to a personal or pecuniary liability or charge against the incorporators, officers, employees, agents, or directors of the Debtor. Nothing contained in this Section, however, shall relieve the Debtor from the observance and performance of the several covenants and agreements on its part herein contained.

**9.08   SCOPE OF DEBTOR'S LIABILITY.**

Anything herein to the contrary notwithstanding:

(a)   The Debtor shall remain liable under the Notes, Servicing Agreement and the other Transaction Documents and all other agreements included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Note Agreement has not been executed; and

(b)   The exercise by the Trustee of any of the rights hereunder shall not release the Debtor from any of its duties or obligations under the Note, the Receivables, or other Transaction Documents and all other agreements included in the Collateral.

**9.09   ASSIGNMENT.**

Except as set forth in Section 5.03, the Trustee may assign or transfer this Note Agreement or transfer therewith the whole or any part of the security hereunder only with the prior written consent of the Noteholders holding Notes evidencing more than fifty percent (50%) of the principal due on the Outstanding Notes. The Debtor shall not be entitled to transfer its rights and obligations hereunder without the prior written consent of the Trustee and the Noteholder holding Notes evidencing more than fifty percent (50%) of the principal due on the Outstanding Notes.

**9.10   WHEN THE DEBTOR MAY MERGE OR TRANSFER ASSETS.**

(a)   The Debtor shall not consolidate with or merge with or into any other Person (other than in a merger or consolidation in which the Debtor is the surviving Person), unless:

(i)   the Person (if other than the Debtor) formed by such consolidation or into which the Debtor is merged or the Person which acquires by conveyance, transfer or lease the properties and assets of the Debtor substantially as an entirety shall be a corporation, limited liability company, partnership or trust organized and validly existing under the laws of the United States or any State thereof or the District of Columbia, and shall expressly assume by a supplemental note agreement, executed and delivered to the Trustee in form reasonably satisfactory to the Trustee, the due and punctual payment of the Obligations and Redemption Price, if any, on the Notes, according to their tenor, and the due and punctual performance of all of the covenants and obligations of the Debtor under the Notes and this Note Agreement, and shall have provided for conversion rights in accordance with this Note Agreement; and

(ii)    immediately after giving effect to such transaction, no Event of Default or any event, condition or occurrence that after notice or lapse of time or both, would constitute an Event of Default shall have occurred and be continuing

(b)    The successor Person formed by such consolidation or into which the Debtor is merged shall succeed to, and be substituted for, and may exercise every right and power of, the Debtor under this Note Agreement with the same effect as if such successor had been named as the Debtor herein; and thereafter, except in the case of a lease, the Debtor shall be discharged from all obligations and covenants under this Note Agreement and the Notes.

**9.11    SECTION REFERENCES.**

All references to Articles, Sections, Subsections, or Clauses in this note Agreement are a reference to an Article, Section, Subsection or Clause of this Note Agreement unless otherwise stated.

**9.12    WAIVER OF JURY TRIAL.**

EACH OF THE DEBTOR AND THE TRUSTEE HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTES OR THE TRANSACTION CONTEMPLATED HEREBY.

**9.13    FORCE MAJEURE.**

In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

* * * *

IN WITNESS WHEREOF, the parties hereto have caused this Note Agreement to be duly executed by their authorized representatives as of the date first written above.

**DEBTOR:**          **MEDICAL PROVIDER FUNDING CORPORATION V**

By: 

Name: Joseph J. Lampariello
Title:  President & Chief Operating Officer

**TRUSTEE:**          **WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee**

By: 
Name:          Benjamin J. Krueger
Title:               Vice President

## EXHIBIT A-1

## RECEIVABLE ACQUISITION CERTIFICATE

This Receivable Acquisition Certificate is submitted pursuant to the provisions of Section 5.08(a)(ii)(E) of the Note Issuance and Security Agreement, dated as of October 8, 2007, (the "Note Agreement"), between Medical Provider Funding Corporation V, a Nevada corporation (the "Debtor") and Wells Fargo Bank, National Association (the "Trustee"). All capitalized terms used in this Certificate and not otherwise defined herein shall have the same meanings given to such terms in the Note Agreement. In your capacity as Trustee, you are hereby authorized and requested to disburse to the Debtor the sum of $_____ for the acquisition of Eligible Receivables. With respect to the Eligible Receivables so to be acquired, the Debtor hereby certifies as follows:

1.    The receivables to be acquired are Eligible Receivables, and the wiring instructions and related information are specified in Schedule A attached hereto (the "Acquired Eligible Receivables") and the information therein is true and correct.

2.    Each Acquired Eligible Receivable is an Eligible Receivable authorized so to be acquired by the Note Agreement.

3.    The Debtor is not, on the date hereof, in default under the Note Agreement or in the performance of any of its covenants and agreements made in the Purchase Documents relating to the Acquired Eligible Receivables, and, to the best knowledge of the Debtor, the Seller is not in default in the performance of any of its covenants and agreements made in the Purchase Documents applicable to the Acquired Eligible Receivables, and the Note Agreement and the covenants and agreements made in the Purchase Documents are enforceable in accordance with their terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general and except as such enforceability may be limited by general principles of equity (whether considered in a proceeding at law or in equity).

4.    All of the conditions specified in the Purchase Agreement applicable to the Acquired Eligible Receivables and the Note Agreement for the acquisition of the Acquired Eligible Receivables and the disbursement hereby authorized and requested have been satisfied.

5.    If an Eligible Receivable currently pledged to the Trustee is being sold in exchange for an Acquired Eligible Receivable, the final expected maturity date of such Acquired Eligible Receivable shall be substantially similar to that of the Eligible Receivable being sold and such sale and exchange will not adversely affect the ability of the Trustee to make timely principal and interest payments under the Note Agreement on the Notes.

6.    The proposed use of moneys in the Trust Account as directed by the Debtor to acquire the Acquired Eligible Receivables is in compliance with the provisions of the Note Agreement.

7.    The Administrator has conducted such UCC searches as it has deemed prudent with respect to such Acquired Eligible Receivables, and such searches indicate that such

A-1-1

Acquired Eligible Receivables are free and clear of all liens and security interests. The Debtor or the Administrator on your behalf is retaining such UCC searches.

8.    The Debtor will use the funds disbursed pursuant to this Certificate solely in connection with the acquisition and pledge of the Acquired Eligible Receivables pursuant to the Note Agreement.

The undersigned is authorized to sign and deliver this Certificate on behalf of the Debtor.

WITNESS my hand this _____ day of _____.

**MEDICAL PROVIDER FUNDING CORPORATION V**

By: _____

Name:_____

Title: _____

A-1-2

## SCHEDULE A TO EXHIBIT A-1

## ACQUIRED ELIGIBLE RECEIVABLES

**LIST OF ACQUIRED ELIGIBLE RECEIVABLES**

**[INSERT
INFORMATION]**

## WIRING INSTRUCTIONS

We hereby authorize and request you to wire funds per the following instructions to Medical Provider Funding Corporation V for the purpose of acquiring the Acquired Eligible Receivables:

| Face Amount of Receivables | Expected Net Receivable Amount | Advance Amount | Amount to be Wired at Closing |
|---|---|---|---|
| $ | $ | $ | $ |

Wire Instructions:

Account #

**ABA #**

| Withhold | anticipated | shortfall | $_____ |
|---|---|---|---|

**EXHIBIT A-2**

**NON-RECEIVABLE ASSET ACQUISITION CERTIFICATE**

This Non-Receivable Asset Acquisition Certificate is submitted pursuant to the provisions of Section 5.08(a)(ii)(E) of the Note Issuance and Security Agreement, dated as of October 8, 2007, (the "Note Agreement"), between Medical Provider Funding Corporation V, a Nevada corporation (the "Debtor") and Wells Fargo Bank, National Association, as Trustee (the "Trustee"). All capitalized terms used in this Certificate and not otherwise defined herein shall have the same meanings given to such terms in the Note Agreement. In your capacity as Trustee, you are hereby authorized and requested to disburse to the Debtor the sum of $_____ for the acquisition of Non-Receivable Assets. With respect to the Non-Receivable Assets so to be acquired, the Debtor hereby certifies as follows:

1.      The Non-Receivable Assets to be acquired are eligible as Collateral, and the wiring instructions and related information are specified in Schedule A attached hereto (the "Acquired Assets") and the information therein is true and correct.

2.      Each Acquired Asset is an Asset authorized so to be acquired by the Note Agreement.

3.      You have been previously, or are herewith, provided with the following items:

    (a)     a copy of the agreement between the Debtor and the seller of the Acquired Assets pursuant to which the Acquired Assets are being purchased;

    (b)     instruments duly assigning the Acquired Assets to the Trustee pursuant to the Note Agreement;

    (c)     an opinion from counsel to the effect that the Trustee will have a perfected security interest in the Acquired Assets upon their acquisition by the Debtor;

    (d)     copies of all applicable Bills of Sale or Assignments relating to the Acquired Assets;

    (e)     to the extent the Acquired Assets are stock in a corporation, the applicable stock certificates endorsed in blank and accompanying stock powers; and

    (f)     a checklist identifying which documents provided to Trustee hereunder satisfy the obligations under Sections 3(a)-(e) hereof, as applicable.

4.      The Debtor is not, on the date hereof, in default under the Note Agreement or in the performance of any of its covenants and agreements made in the purchase agreement relating to the Acquired Assets, and, to the best knowledge of the Debtor, the seller of the Acquired Assets is not in default in the performance of any of its covenants and agreements made in the purchase agreement applicable to the Acquired Assets, and the Note Agreement and the covenants and agreements made in the purchase agreement are enforceable in accordance with

their terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general and except as such enforceability may be limited by general principles of equity (whether considered in a proceeding at law or in equity).

5.    All of the conditions specified in the purchase agreement applicable to the Acquired Assets and the disbursement hereby authorized and requested have been satisfied.

6.    The proposed use of moneys in the Trust Account as directed by the Debtor to acquire the Acquired Assets is in compliance with the provisions of the Note Agreement.

7.    The Debtor has conducted such UCC searches [and searches of records of other applicable governmental authorities covering ownership or lien matters] as it has deemed prudent with respect to such Acquired Assets, and such searches indicate that such Acquired Assets are free and clear of all liens and security interests, except those listed on Schedule A hereto. The Debtor on your behalf is retaining such UCC and other searches.

8.    The Debtor will use the funds disbursed pursuant to this Certificate solely in connection with the acquisition and pledge of the Acquired Assets pursuant to the Note Agreement.

The undersigned is authorized to sign and deliver this Certificate on behalf of the Debtor.

WITNESS my hand this _____ day of _____.

MEDICAL PROVIDER FUNDING CORPORATION V

By: _____

Name: _____

Title: _____

**SCHEDULE A TO EXHIBIT A-2**

**ACQUIRED ASSETS**

**[INSERT INFORMATION on documents delivered, including items consistent with Section 3.01(b)(i) and 3.05, and specify the type of Non-Receivable Asset.]**

**WIRING INSTRUCTIONS**

        We hereby authorize and request you to wire funds per the following instructions to Medical Provider Funding Corporation V for the purpose of acquiring the Acquired Assets:

| Gross Purchase Price | Fees and Expenses | Amount to be Wired at Closing |
|---|---|---|
| $ | $ | $ |

Wire Instructions:


        Account #

        **ABA #**

A-2-3

## EXHIBIT A-3

## COLLATERAL REPLACEMENT CERTIFICATE

This Collateral Replacement Certificate is submitted pursuant to the provisions of Section 4.02 of the Note Issuance and Security Agreement, dated as of October 8, 2007, (the "Note Agreement"), between Medical Provider Funding Corporation V, a Nevada corporation (the "Debtor"), and Wells Fargo Bank, National Association, as Trustee (the "Trustee"). All capitalized terms used in this Certificate and not otherwise defined herein shall have the same meanings given to such terms in the Note Agreement. With respect to the replacement Collateral, the Debtor hereby certifies as follows:

1.      The replacement Collateral constitutes [Eligible Receivables or Non-Receivable Assets eligible as Collateral], and information specified in Schedule A attached hereto (the "Replacement Collateral") and the information therein is true and correct.

2.      If applicable, the requirements of Section 3.04 of the Note Agreement will be met upon the acquisition of the Replacement Collateral.

3.      Each item of Replacement Collateral is an Eligible Receivable or Non-Receivable Asset authorized so to be acquired by the Note Agreement.

4.      You have been previously, or are herewith, provided with the following items:

   (a)      a copy of the [Purchase Documents] [or other document pursuant to which the Replacement Collateral is acquired by the Debtor] between the Debtor and the seller of the Replacement Collateral (the "Seller") with respect to the Replacement Collateral (original copy maintained on file with the Debtor on behalf of the Trustee);

   (b)      instruments duly assigning the Replacement Collateral to the Trustee pursuant to the Note Agreement; and

   (c)      [if the Replacement Collateral is not a Receivable] an opinion from counsel in form and substance reasonably acceptable to the Trustee to the effect that that the Trustee will have a perfected security interest in the Replacement Collateral upon their acquisition by the Debtor.

5.      The Debtor is not, on the date hereof, in default under the Note Agreement or in the performance of any of its covenants and agreements made in the [Purchase Documents] [or other document pursuant to which the Replacement Collateral is acquired by the Debtor] relating to the Replacement Collateral, and, to the best knowledge of the Debtor, the Seller is not in default in the performance of any of its covenants and agreements made in the [Purchase Documents] [or other document pursuant to which the Replacement Collateral is acquired by the Debtor] applicable to the Replacement Collateral, and the Note Agreement and the covenants and agreements made in the [Purchase Documents] [or other document pursuant to which the Replacement Collateral is acquired by the Debtor] are enforceable in accordance with their terms, except as enforceability may be limited by applicable bankruptcy, insolvency,

20189323.2

reorganization, moratorium or other similar laws now or hereafter effect affecting the enforcement of creditors' rights general and except as such enforceability may be limited by general principles of equity (whether considered in a proceeding at law or in equity).

       6.     All of the conditions specified in the [Purchase Documents] [or other document pursuant to which the Replacement Collateral is acquired by the Debtor] applicable to the Replacement Collateral and the Note Agreement for the acquisition of the Replacement Collateral requested have been satisfied.

       7.     If an Eligible Receivable currently pledged to the Trustee is being sold in exchange for Replacement Collateral constituting an Eligible Receivable, the final expected maturity date of such Replacement Collateral shall be substantially similar to that of the Eligible Receivable being sold and such sale and exchange will not adversely affect the ability of the Trustee to make timely principal and interest payments under the Note Agreement on the Notes.

[IF REPLACEMENT COLLATERAL IS RECEIVABLES, ADD THE FOLLOWING:]

       8.     The Administrator has conducted such UCC searches as it has deemed prudent with respect to such Replacement Collateral, and such searches indicate that such Replacement Collateral is free and clear of all liens and security interests. The Debtor or the Administrator on your behalf is retaining such UCC searches.

[IF REPLACEMENT COLLATERAL IS NOT RECEIVABLES, ADD THE FOLLOWING:]

       8. The Debtor has conducted such UCC searches [and searches of records of other applicable governmental authorities covering ownership or lien matters] as it has deemed prudent with respect to such Replacement Collateral, and such searches indicate that such Replacement Collateral is free and clear of all liens and security interests, except those listed on Schedule A hereto. The Debtor on your behalf is retaining such UCC and other searches.

The undersigned is authorized to sign and deliver this Certificate on behalf of the Debtor.

WITNESS my hand this _____ day of _____.

**MEDICAL PROVIDER FUNDING CORPORATION V**

By: _____

Name: _____

Title: _____

A-3-2

## SCHEDULE A TO EXHIBIT A-3

## ACQUIRED ELIGIBLE RECEIVABLES

**LIST OF REPLACEMENT COLLATERAL**

**[INSERT INFORMATION]**

A-3-3

**EXHIBIT B**

**SALE OF COLLATERAL AND RELEASE OF LIEN CERTIFICATE**

This Sale of Collateral and Release of Lien Certificate is submitted pursuant to the provisions of Section 3.04 of the Note Issuance and Security Agreement, dated as of October 8, 2007 (the "Note Agreement"), between Medical Provider Funding Corporation V, a Nevada corporation (the "Debtor") and Wells Fargo Bank, National Association, as Trustee (the "Trustee"). All capitalized terms used in this Certificate and not otherwise defined herein shall have the same meanings given to such terms in the Note Agreement.

Pursuant to Section 3.04, the Debtor intends to sell the Collateral set forth on the attached Schedule I (the "Sale Collateral") to [NAME] (the "Purchaser"). In your capacity as Trustee, you are hereby authorized and directed to take all actions reasonably requested by the Debtor to release the lien to which the Sale Collateral is subject under the Note Agreement and to transfer the Sale Collateral to the Purchaser. The gross proceeds from the sale will be $_____, consisting of _____. The gross proceeds from the sale shall be deposited directly with the Trustee and the Trustee shall deposit such proceeds into the Trust Account. With respect to the sale of the Sale Collateral, the Debtor hereby certifies to the Trustee as follows [INCLUDE ONE OF THE FOLLOWING]:

[the disposition price is equal to or in excess of the amount disbursed from the Trust Account to acquire the Sale Collateral (less any principal amounts received by the Trustee with respect to such Sale Collateral).]; or

[the disposition price is lower than the amount disbursed from the Trust Account to acquire the Sale Collateral (less any principal amounts received by the Trustee with respect to such Sale Collateral), and (A) the Revenues expected to be received from the remaining Collateral (after giving effect to such disposition) would be at least equal to the Revenues required to timely pay the principal and interest on the Outstanding Notes, or (B) the Debtor shall remain able to pay debt service on the Notes and make payment on any other Obligations on a timely basis (after giving effect to such sale, transfer or other disposition) whereas it would not have been able to do so on a timely basis if it had not sold, transferred or disposed of the Sale Collateral at such discounted amount, or (C) the sum of the amounts on deposit in the Trust Account (less moneys in the Trust Account which the Debtor, Servicer, or Administrator is then entitled to receive but which has not yet been removed from the Trust Account) plus the Expected Net Receivable Amount of the Receivables and the fair market value of other Collateral will be at least equal to one hundred percent (100%) of the aggregate principal amount of the then Outstanding Obligations plus accrued interest after giving effect to such sale, transfer or other disposition of the Sale Collateral.]

The undersigned is authorized to sign and deliver this Certificate on behalf of the Debtor.

WITNESS my hand this _____ day of _____.


**MEDICAL PROVIDER FUNDING CORPORATION V**

By: _____

Name: _____

Title: _____

## EXHIBIT C

## FORM OF NOTE

THE SECURITY EVIDENCED HEREBY WAS ISSUED PURSUANT TO REGULATION D IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER SECTION 5 OF THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, (THE "1933 ACT"), AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF REGISTRATION UNDER THE 1933 ACT OR AN APPLICABLE EXEMPTION THEREFROM. THE HOLDER OF THE SECURITY EVIDENCED HEREBY AGREES FOR THE BENEFIT OF THE COMPANY THAT THE SECURITIES MAY BE RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144 OR RULE 144A UNDER THE 1933 ACT, OR PURSUANT TO ANOTHER EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE 1933 ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 1933 ACT AND IN EACH CASE, IN ACCORDANCE WITH THE APPLICABLE SECURITIES LAWS OF ANY STATE, AND THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THE SECURITY EVIDENCED HEREBY OF THE RESALE RESTRICTIONS SET FORTH ABOVE.

Note Number _____                                    Las Vegas, Nevada
$ _____            Effective Date _____, _____
                                                  Due on _____, _____

MEDICAL PROVIDER FUNDING CORPORATION V
SERIES I SECURED NOTE, CLASS ____
(___% Interest, Payable _____)

MEDICAL PROVIDER FUNDING CORPORATION V (the "Issuer"), for value received, hereby promises to pay to the order of _____ (the "Holder"), at such location as may be designated by Holder from time to time, the principal amount of _____ Dollars ($ _____ ), and to pay interest on the unpaid balance thereof from the date hereof, in lawful money of the United States, as follows:

From the effective date shown above, Holder shall be paid simple annual interest at the rate of _____ percent (___%) per annum.

All interest paid hereunder shall be based on a Three Hundred Sixty (360) day year, consisting of twelve (12) months, each consisting of thirty (30) days. Interest shall be payable with the frequency (monthly, quarterly or annually, or at maturity only) as stated above, for the preceding _____, on or about the 10th day of the month following the end of such period during which any part of the principal amount hereof is outstanding and unpaid.

The principal amount hereof, and any interest not theretofore paid, shall be due and payable on the due date set forth above.

[For Notes with one-year terms only.] The Issuer may prepay this Note at any time without penalty. In the event that the Holder hereof, prior to the due date hereof as set forth above, does not demand repayment hereof at maturity, this Note shall automatically renew, in the discretion of the Issuer, for one additional term of one year, at the interest rate set forth above.

These Notes are issued and to be issued pursuant to that certain Note Issuance and Security Agreement (the "Note Issuance Agreement") between the Issuer and Wells Fargo Bank, National Association, as Trustee (the "Trustee,"

which term shall include any successor Trustee). Pursuant to the Note Issuance Agreement, Notes may be issued to Holder. The Notes are issued, and will be issued, to fund the purchase of healthcare accounts receivable by Issuer. The terms of the Notes include those stated in the Note Issuance Agreement and the Notes are subject to all such terms.

Under the Note Issuance Agreement, the Issuer assigns and pledges to the Trustee, to secure the payment of the principal and interest on the Notes, and the performance of all covenants made by the Issuer under the Note Issuance Agreement and grants to the Trustee a security interest in the Trust Estate. The Trust Estate includes (i) all purchased healthcare receivables acquired by the Issuer pursuant to Purchase Agreements, (ii) all cash, securities and investments received or held by the Trustee under the Note Issuance Agreement, (iii) all investment earnings thereon, all other property at any time made subject to the Note Issuance Agreement pursuant to the provisions of the Note Issuance Agreement, and (v) all proceeds of the Trust Estate, except as otherwise provided in the Note Issuance Agreement.

Each payment made to Holder shall be credited first on interest then due, and the remainder, if any, on principal; and interest shall thereupon cease upon the principal so credited. Should default be made on payment of any installment when due, or of any obligation or covenant or warranty of the Issuer in the Note Issuance Agreement, the whole sum of principal and interest shall become immediately due and payable, at the option of the Holder of this Note. All principal and interest shall be payable in lawful money of the United States.

Any notice required or permitted under this Note shall be given in writing and shall be deemed effectively given upon personal delivery or sent by first class mail, postage prepaid, to the party to be notified at the address indicated herein, or at such other address as such party may designate by ten (10) days' advance written notice to the other parties.

Any term of this Note may be amended and the observance of any term of this Note may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Holder. Any amendment or waiver effected in accordance with this section shall be binding upon the Holder, each future Holder of all such securities.

This Note shall be binding upon the heirs, assigns, successors in interest, agents and employees of the parties hereto.

The Issuer agrees to pay any and all attorneys' fees and costs incurred by Holder, and/or the Trustee associated with the enforcement of the terms of this Promissory Note.

If one or more provisions of this Note are held to be unenforceable under applicable law, such provision shall be excluded from this Note and the balance of the Note shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

This Note shall be governed and construed and enforced in accordance with the laws of the State of Nevada.

MEDICAL PROVIDER FUNDING CORPORATION V, a Nevada corporation

By:_____

Name:_____

Title:_____

## EXHIBIT D

## REQUEST FOR RELEASE OF RECEIVABLE

To:  Wells Fargo Bank, N.A.                                                Date:_____
     ABS Custody Vault
     1055 10th Avenue SE
     MAC N9401-011
     Minneapolis, MN 55414
     Attention:  ABS Custody-Release Team
     ABS.Custody.Vault@WellsFargo.com
     Fax (612) 667-1080

         In connection with the administration of the pool of Receivables ("Receivables") held by
you as custodian ("Custodian") relating to **Pool name (w/deal document date)** the undersigned, as
Servicer (or other) of the Receivables, requests the release of the Receivables described below for the
reason indicated.  The undersigned shall return the documents to the Custodian when the undersigned's
need therefor no longer exists, except where the Receivable is paid in full or otherwise disposed of (as
indicated below).

**Reason for Document Request:** (check one)

     **Reason**
     ___  Maturity
     ___  Sale
     ___  Servicing
     ___  Other (please specify) _____

(All documents are to be returned unless specified)

**Account** Number_____  **Account** Name_____

(See attached Excel spreadsheet if multiple **accounts** are requested. Please include the reason for release.)

**Address where files are to be shipped**:

_____
_____
_____
_____                    _____
                                                     **Authorized Signature of EPF Financial, LLC**

**Shipping Number**:_____
**Carrier:**_____
                                                     _____
                                                     **Authorized Signature of Lender**
                                                     (or other required party)

*See governing documents for necessary signatures needed to authorize collateral releases.

## TABLE OF CONTENTS

**PAGE**

**ARTICLE I**       DEFINITIONS.................................................................................... 1

**ARTICLE II**      NOTES........................................................................................... 9

    2.01            THE NOTES................................................................................ 9
    2.02            REGISTRATION, TRANSFER AND EXCHANGE OF
                    NOTES......................................................................................... 13
    2.03            PERSONS DEEMED OWNERS ................................................. 14
    2.04            REDEMPTION............................................................................ 14
    2.05            MUTILATED, DESTROYED, LOST AND STOLEN
                    NOTES......................................................................................... 15

**ARTICLE III**     SECURITY ..................................................................................... 16

    3.01            GRANT OF SECURITY ............................................................ 16
    3.02            PLEDGE TO SECURE OBLIGATIONS.................................... 18
    3.03            COLLATERAL TRANSFERS AND OTHER LIENS .............. 18
    3.04            SALE OF COLLATERAL .......................................................... 19
    3.05            RESPONSIBILITIES OF DEBTOR ......................................... 20
    3.06            CONTINUING SECURITY INTEREST .................................. 22
    3.07            FURTHER ASSURANCES ....................................................... 22

**ARTICLE IV**      REPRESENTATIONS AND WARRANTIES ............................................. 23

    4.01            REPRESENTATIONS AND WARRANTIES ........................... 23
    4.02            REPLACEMENT OF DEFECTIVE COLLATERAL ............... 24
    4.03            COVENANT TO REPLACE SERVICER ................................. 25

**ARTICLE V**       TRUSTEE; COMMUNICATIONS AND REPORTS; ACCOUNTS........... 25

    5.01            CERTAIN DUTIES OF TRUSTEE ........................................... 25
    5.02            CORPORATE TRUSTEE REQUIRED; ELIGIBILITY;
                    CONFLICTING INTERESTS................................................... 26
    5.03            REPLACEMENT OF TRUSTEE............................................... 27
    5.04            TRUSTEE'S OWNERSHIP OF NOTES ................................... 28
    5.05            STATEMENT AS TO COMPLIANCE ...................................... 28
    5.06            PERFORMANCE BY THE TRUSTEE ..................................... 28
    5.07            INDEMNITY AND EXPENSES ............................................... 31
    5.08            ACCOUNTS; PAYMENTS ON NOTES.................................... 31
    5.09            ADMINISTRATION AGREEMENT; SERVICING
                    AGREEMENT .............................................................................. 34

**ARTICLE VI**      DEFAULT ...................................................................................... 35

    6.01            EVENTS OF DEFAULT.............................................................. 35
    6.02            NOTEHOLDER'S DIRECTION UPON DEFAULT ................. 36
    6.03            REMEDIES.................................................................................. 37
    6.04            TRUSTEE MAY FILE PROOFS OF CLAIM ........................... 38
    6.05            NOTICE OF DEFAULTS ........................................................... 39

# TABLE OF CONTENTS
(continued)

**PAGE**

6.06        TRUSTEE MAY ENFORCE CLAIMS WITHOUT
            POSSESSION OF NOTES ................................................. 40
6.07        LIMITATION ON SUITS .................................................. 40
6.08        NOTICES PROVIDED TO THE TRUSTEE.............................. 41

**ARTICLE VII**   TERMINATION OF NOTE AGREEMENT ............................... 41

7.01        DEPOSIT OF PAYMENT................................................. 41
7.02        APPLICATION OF FUNDS ............................................. 41
7.03        REINSTATEMENT ...................................................... 41
7.04        UNCLAIMED FUNDS .................................................. 42

**ARTICLE VIII**  AMENDMENTS AND SUPPLEMENTAL NOTE AGREEMENTS .......... 42

8.01        GENERAL............................................................... 42
8.02        AMENDMENT WITHOUT CONSENT OF
            NOTEHOLDERS ....................................................... 42
8.03        AMENDMENT WITH CONSENT OF NOTEHOLDERS ........ 43
8.04        EXECUTION OF AMENDMENTS ............................... 44
8.05        NOTICE TO NOTEHOLDERS ................................. 44
8.06        RIGHTS OF NOTEHOLDERS NOT IMPAIRED .................... 44
8.07        REQUIRED CERTIFICATIONS; RELIANCE........................ 44

**ARTICLE IX**    MISCELLANEOUS ...................................................... 45

9.01        GOVERNING LAW.................................................... 45
9.02        WAIVER ................................................................ 45
9.03        NOTICES............................................................... 45
9.04        TRUSTEE TO ACT ON INSTRUCTIONS ................................. 46
9.05        CERTIFICATE AND OPINION AS TO CONDITIONS
            PRECEDENT .......................................................... 46
9.06        SEVERABILITY........................................................ 46
9.07        NONLIABILITY OF DIRECTORS; NO GENERAL
            OBLIGATION.......................................................... 47
9.08        SCOPE OF DEBTOR'S LIABILITY.......................................... 47
9.09        ASSIGNMENT.......................................................... 47
9.10        WHEN THE DEBTOR MAY MERGE OR TRANSFER
            ASSETS ................................................................ 47
9.11        SECTION REFERENCES ....................................... 48
9.12        WAIVER OF JURY TRIAL........................................ 48
9.13        FORCE MAJEURE ................................................. 48

Exhibit A-1    Form of Eligible Receivable Acquisition Certificate

Exhibit A-2    Form of Non-Receivable Asset Acquisition Certificate

## TABLE OF CONTENTS
(continued)

**PAGE**

Exhibit A-3    Form of Collateral Replacement Certificate

Exhibit B    Form of Sale of Collateral and Release of Lien Certificate

Exhibit C    Form of Note (Series I)

Exhibit D    Request for Release of Receivable