# EXHIBIT G

Doc #: _CD_
ACS Key: _MPFCV_
Date: _10/8/07_

# MEDICAL PROVIDER FUNDING CORPORATION V
## MASTER SERVICE AGREEMENT

**THIS MASTER SERVICE AGREEMENT,** including the Exhibits and Appendices attached hereto (this "Agreement"), is effective as of October 8, 2007, and is entered into among **MEDICAL PROVIDER FUNDING CORPORATION V** (the "Company"), **MEDICAL CAPITAL CORPORATION** ("MCC") and **MEDICAL TRACKING SERVICES, INC.** (the "Servicer").

## STATEMENT OF PURPOSE

The Company is in the business of (i) purchasing Receivables (as hereafter defined) from health care providers, (ii) making loans secured by Receivables and other assets of the Company Debtors (as hereafter defined), and (iii) acquiring businesses and interests in businesses.

The Company expects to engage MCC in the Administrative Services Agreement (as hereafter defined) to perform certain services relating to the servicing and administration of Receivables purchased by the Company.

The Company desires to engage the Servicer to provide certain services related to the processing, servicing and tracking of Receivables, including but not limited to those Receivables purchased by the Company and securing its obligations under the Note Issuance and Security Agreement (as hereafter defined), and those Receivables and other assets pledged as collateral by Company Debtors.

## ARTICLE I

## AGREEMENT

In consideration of the mutual covenants set forth below and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE II

## SERVICING AND ADMINISTRATION OF RECEIVABLES

This Agreement outlines the overall responsibilities and relationships between the Company and the Servicer regarding the servicing functions and services to be provided by the Servicer to the Company.

**Section 2.01. Servicing and Administration of Receivables.** The Company hereby appoints Medical Tracking Services, Inc. as the Servicer. The Servicer shall perform the services required pursuant to the terms of this Agreement, including all of the services described in this Agreement, including but not limited to those services described in Exhibit B hereto. In performing its duties hereunder, the Servicer shall have full power and authority to do or cause to be done any and all things in connection with such servicing and administration which either may deem necessary or desirable in accordance with the terms of this Agreement.

**Section 2.02. Delegation of Duties.** The Servicer may delegate some of its duties hereunder relating to the servicing of the Receivables to a subservicer; provided, that the Servicer shall remain responsible for the performance of all such duties delegated in accordance with this Agreement. The Servicer shall cause any such subservicer which the Servicer retains to timely notify the Servicer of such matters as will allow the Servicer to perform the duties contemplated hereby. If the Servicer shall appoint a subservicer and the Servicer thereafter shall be terminated or resign, the appointment of the subservicer shall automatically terminate upon the Servicer's termination or resignation unless reappointed by the successor Servicer. Compensation payable to any subcontractor under this Agreement shall be payable by the subcontractor, unless expressly agreed to be paid by the Company. Any additional services to be provided by MCC or other subservicers shall be set forth in a Component Agreement as may be entered into from time to time.

**Section 2.03. Collections on Receivables.** In the Administrative Service Agreement, the Administrator, on behalf of the Company, undertakes to cause each custodian or trustee of a Lock Box Account to sweep the funds in each Lock Box Account and transfer such funds to the Company or the Trustee on each Business Day on which such custodian or trustee and the Company is open for business for deposit in the Trust Account. To the extent that any collections on the Receivables are received by the Servicer, the Servicer shall immediately forward such collections to the Administrator for deposit in the Trust Account.

## ARTICLE III

## DEFINITIONS

**Section 3.01. General.** Except as otherwise specified or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Agreement, and the definitions of such terms are equally applicable to all genders of such terms. Capitalized terms used but not defined herein have the respective meanings ascribed to such terms in the Note Issuance and Security Agreement.

*"Administrative Service Agreement"* means the Administrative Services Agreement dated as of _____, 2007 by and between the Administrator and the Company.

*"Administrator"* means MCC.

*"Agreement"* means this Master Service Agreement effective as of _____, 2007, between the Company, MCC and the Servicer, as amended, supplemented or otherwise modified from time to time.

*"Approved Payor"* means (a) any private medical insurance company or other private company, which at the time of purchase of any Receivable payable by such private company, the private company has been assigned a long-term debt rating, or a rated claims paying ability of "A" or better by S&P, "A1" or better by Moody's, "A" or better by A.M. Best or Fitch, or the Administrator in its determination, otherwise believes is financially suitable; (b) any Federal or State government sponsored health care program; (c) any for-profit or not-for-profit commercial organization (as determined by the Administrator in its discretion); (d) large self insured corporations (as determined by the Administrator in its discretion); and (e) health maintenance

organizations, in each case as identified in a certificate signed by the Administrator and delivered to the Trustee.

"*Batch*" means a group of Receivables purchased by the Company from a single Provider on a particular date.

"*Business Day*" means each Monday, Tuesday, Wednesday, Thursday and Friday which is a day on which banking institutions in the city of Anaheim, California, or the city where the corporate trust office or the corporate trust operations office for the Trustee are located and are authorized or obligated by law or executive order to close.

"*Cash Percentage*" means a designated percentage established for a Provider in the Purchase Agreement or other agreement by and between the Company and its Provider(s) which percentage shall be identified by the Company to the Servicer for each such Provider(s).

"*Collateral*" has the meaning set forth in the Note Issuance and Security Agreement.

"*Collateral Receivables*" means all Receivables that have been pledged as collateral by Company Debtors in connection with loans by the Company, and submitted by the Company to the Servicer for servicing. "Collateral Receivables" have not been purchased by the Company.

"*Company Debtor*" means all Persons with debt obligations to the Company who have pledged Receivables or other assets as collateral in connection with such debt obligations.

"*Compensable Receivables*" means all Receivables purchased by the Company and submitted by the Company to the Servicer for servicing, including all Receivables that are Eligible Receivables. However, with respect to a skilled nursing facility or a nursing home, room and board charges for each patient during any calendar month shall be deemed to be a single Compensable Receivable notwithstanding purchases by the Company of such Healthcare Receivables on a weekly basis during a calendar month.

"*Component Agreements*" means any subcontractor agreements that may be entered into from time to time between the Servicer and the subcontractor.

"*Effective Date*" means the date of execution and delivery of this Agreement.

"*Event of Default by Company*" has the meaning specified in Section 7.02.

"*Event of Default by Servicer*" has the meaning specified in Section 7.01.

"*Federal and/or State Provider Identification Number*" means the Federal Employer Identification Number as issued to the Provider by the Internal Revenue Service and/or the Provider's corresponding Medicare or Medicaid identification number and/or the Provider's state issued vendor or payee identification number.

"*Government Entity*" means the United States of America, any state, and any agency or instrumentality of the United States of America or any state which is obligated to make any payment with respect to Medicare, CHAMPUS, Medicaid, a State Health Title Program and any other type of Receivable representing amounts owing under any program established by federal

or state law, including CHAMPUS as set forth in Title 10, U.S.C. Section 1071 et. seq., and the program set forth in Title 3, I.S.C Section 1713.

"*Healthcare Provider*" means a hospital, medical practitioner, nursing home, professional service corporation, clinic, medical group or any other Provider of healthcare goods or services, each of which is acceptable to the Servicer as identified by a Federal and/or State Provider Identification Number, or a separate geographic location and which has entered into a Purchase Agreement.

"*Healthcare Receivables*" means, with respect to each Healthcare Provider, the patient accounts existing or hereafter created on the records of such Healthcare Provider, any and all rights to receive payments due on such accounts from any Healthcare Insurer or Healthcare Obligor under or in respect of such account and all proceeds in any way derived, whether directly or indirectly, from any of the foregoing.

"*Healthcare Insurer*" or "*Healthcare Obligor*" means any payor or obligor which in the ordinary course of its business or activities agrees to pay for healthcare goods and services received by individuals, including a commercial insurance company, a nonprofit insurance company (such as Blue Cross/Blue Shield entity), an employer or union which self-insures for employee or member health insurance and a health maintenance organization approved by the Company other than a Governmental Entity which is responsible for payment of all or any portion of a Healthcare Receivable. A Healthcare Insurer includes any insurance company issuing health, personal injury, workmen's compensation or other types of insurance, but does not include any individual guarantors.

"*Lock Box Account*" means a lockbox account established pursuant to the Administrative Services Agreement or otherwise on behalf of the Company, for the collection of Receivables purchased by the Company.

"*Medicare and Medicaid Receivables*" means a Healthcare Receivable representing a claim against a Governmental Entity pursuant to the Medicare program (as set forth in Title 42 U.S.C. Section 1395 et. seq.) or the Medicaid Program (as set forth in Title 42 U.S.C. Section 1396 et. seq.).

"*Note Issuance and Security Agreement*" means the Note Issuance and Security Agreement dated as of October 8, 2007 by and between the Company and Wells Fargo Bank, National Association, as may be amended, supplemented or modified from time to time.

"*Officer*" means, with respect to any Person, the Chairman of the Board, President, or a Vice President, the Treasurer, an Assistant Treasurer, the Secretary or an Assistant Secretary of such Person.

"*Officer's Certificate*" means a certificate that has been signed on behalf of the Company or the Servicer, as applicable, by an individual who is identified in that certificate as an Officer of the Company or the Servicer, as applicable.

"*Participation Interest*" with respect to a Receivable, means a percentage which will be identified by the Company to the Servicer with respect to such Receivable purchased by the Company or its designee which percentage will be used pursuant to the Purchase Agreement to

determine the amount collected with respect to such Receivables in excess of the Sharing Breakpoint to be paid to the Provider.

"*Person*" means any individual, corporation, partnership, joint venture, association, joint stock company, trust, limited liability company, unincorporated organization or government or any agency or political subdivision thereof.

"*Provider*" means any Person who is due Receivables in connection with providing goods and services and entered into a Purchase Agreement for such Receivables.  Provider includes, but is not limited to, a Healthcare Provider.

"*Purchase Agreement*" means the agreement among the Company and/or the Administrator and a Provider pursuant to which the Provider agrees to sell to the Company its Receivables substantially in the form set forth in Exhibit A hereto.

"*Purchased Account File*" means, with respect to each Receivable purchased by the Company, the related billing and invoicing forms, patient consent to payment and all other medical documents and authorizations necessary to obtain payment from any Account Payor.

"*Receivable*" means any right to payment or reimbursement from an Approved Payor or Receivable Seller whether constituting an account, chattel paper, instrument or a general intangible, arising from or in connection with the provision of services by a Receivable Seller or durable equipment to a Receivable Seller that was (a) acquired or funded by the Company from amounts on deposit in the Trust Account or otherwise accounted for in the Trust Account or otherwise constituting a part of the Collateral or (b) substituted or exchanged for Receivables pursuant to Article IV of the Note Issuance and Security Agreement, but does not include Receivables released from the lien of that agreement.  The term "Receivable" shall include Governmental Payor Receivables and Non-Governmental Payor Receivables, as appropriate.

"*Receivable Seller*" means any provider of healthcare and non-healthcare services or goods and any other for-profit or not-for-profit commercial organization and whose financial condition meets the criteria set forth by the Company.  The criteria set by the Company shall be based on ratings of the Receivable Seller published by Dunn & Bradstreet and other rating agencies, as well as the underwriting criteria for such sellers established by the Company from time to time.

"*Sharing Breakpoint*" with respect to a Receivable, means an amount equal to the Expected Net Receivable for such Receivable, multiplied by a fraction (the numerator of which is the Cash Percentage and the denominator of which is the Participation Interest); provided, however, that after a Provider has ceased selling Receivables to the Company or the Company has ceased purchasing Receivables from a Provider, the Company shall combine all Receivables for which there has been no final settlement, and treat such Receivables as a single Receivable, at which time the Sharing Breakpoint will become the total Expected Net Receivable of all previously unpaid Receivables of such Provider, multiplied by a fraction (the numerator of which is the Cash Percentage and the denominator of which is the weighted average of the Participation Interest for all of such combined Receivables of such Provider).  The Company shall give the Servicer written notice indicating when the above provision is to be used in the preparation of reports by the Servicer.

"*State Health Title Program*" means any Medicare or other state-administered or state-funded program that provides health care services.

## ARTICLE IV

### SERVICES PROVIDED BY SERVICER RELATED TO: PURCHASE OF HEALTHCARE AND OTHER TYPES OF BUSINESS ACCOUNTS RECEIVABLE AND SERVICING, TRACKING AND REPORTING ON OTHER FORMS OF COLLATERAL

**Section 4.01. Obtaining Receivable Data Records**. The Company or its designee will instruct each Provider or Company Debtor, as the case may be, to furnish the Servicer with all information and data relating to each Compensable Receivable or Collateral Receivable which is necessary for the Servicer to perform its duties as described in the relevant Exhibits attached to this Agreement. In the event the information or data provided by the Provider or Company Debtor to the Servicer requires clarification, the Servicer will communicate directly with such party to obtain such clarification.

**Section 4.02. Reporting on Receivables**. In addition to the information set forth and described in the relevant Exhibit for each Component Agreement to the extent required (a) for the preparation of the required reports (to the extent that such information is different from prior information submitted to the Servicer); (b) for the Servicer to identify the Provider or Company Debtor and their Receivables and to set it up on the Servicer's systems; and (c) for the Servicer to identify the parameters that the Company utilizes for entering into transactions with such Provider or Company Debtor, Company will assure the required information is timely supplied to the Servicer by the Company, Provider or Company Debtor.

**Section 4.03. Possession of Receivable Documents**. Unless otherwise specified herein, for two years from the resolution of the claim represented by the respective Compensable Receivable for which the Servicer has provided servicing or billing services, the Servicer shall maintain, for the benefit of the Company in accordance with the Note Issuance and Security Agreement, physical possession of good and legible copies (which copies may consist of or electronic media) of the Purchased Account File with respect to each Compensable Receivable purchased by the Company, together with such other instruments or documents that modify or supplement the Purchased Account File and all other instruments and documents generated by or coming into the possession of the Servicer that are required to document or service such Receivable; including, but not limited to, insurance claim files, ledger showing payment records, the premium receipts, correspondence and current and historical computerized data files, whether developed or originated by the Servicer or others who have delivered such items to the Servicer. No earlier than the end of 24 months from the date on which the respective Compensable Receivable was purchased by the Company, the Servicer will notify the Company of the proposed destruction of the foregoing documents and electronic media and, if requested by the Company within 10 days of the Company's receipt of such notification, transfer physical possession of the foregoing documents and electronic media to the Company or the applicable Provider. Any such transfer shall be at the Company's cost. If the Company does not request such transfer within such 10-day periods, the Servicer may destroy such documents and electronic media. Prior to destruction, each Purchased Account File shall remain the property of the Company regardless of whether the Servicer or the Company has physical possession.

**Section 4.04. Data Processing of Information Supplied Pursuant to Section 4.01 and Section 4.02.** The Servicer shall enter into the applicable tracking system, either by electronic data interchange or manually the accounts receivable data necessary to adequately and properly service, monitor and report on the Receivables delivered to the Servicer pursuant to Section 4.01 above. The Servicer will make every effort to maintain data in a manner that complies with all federal and state requirements regarding maintaining the confidentiality of the contents of the receivables files.

**Section 4.05. Implementation of Procedures at Company Debtor's Location.** The Company, or its assigns, assisted by the Servicer, shall use reasonable efforts and resources to cause the Company Debtors to implement appropriate procedures and processes in their offices for the purpose of maintaining adequate records of the Receivables or other collateral pledged to the Company. The Company will also make reasonable demands to cause the Company Debtors to exercise due care and custodianship of the Collateral Receivables or other collateral so as to ensure it is adequately insured and that adequate safekeeping measures are taken to preserve its value.

**Section 4.06. Servicer's Fees.** The Servicer shall be compensated by the Company from the proceeds of the Collateral for providing a variety of services in the method outlined below:

(a) The Servicer is to be paid a fee of $2,000 (two thousand) per new Provider or Company Debtor for establishing a new claims management account in its claims management computer system.

(b) The Servicer is to be paid a fee of $2,000 (two) per new Provider or Company Debtor for establishing a new electronic data interface between the new Provider's billing system and the tracking system of the Servicer.

(c) The Servicer is to be paid a fee of $3.00 per claim posted on its tracking system. This posting process includes the entering on the tracking system of the billing charges and also entering on the tracking system the payments received from the various payors. This charge is the same if the entries are facilitated manually, or by electronic data interface posting. This charge also applies if the Provider provides the Servicer with billing claims that duplicate the claims that have been previously provided to the Servicer.

(d) The Servicer is to be paid $0.15 per page copied of various documents, reports or information.

(e) The Servicer is to be paid a fee of a minimum charge of $200 per month for tracking and reporting on each individual Provider. This minimum fee is to cover the Servicer's administrative, equipment and other overhead costs.

(f) For Collateral other than Receivables that the Company has submitted for servicing hereunder, the Servicer shall be compensated at a fee to be agreed upon by the Company and the Servicer prior to any work by the Servicer with respect to such Collateral.

## ARTICLE V

## COVENANTS

**Section 5.01.  Corporate Existence: Servicer.**  The Servicer shall keep in full force and effect its existence and good standing as a corporation under the laws of the State of Nevada and will obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to enable the Servicer to perform its duties under this Agreement.

**Section 5.02.  Servicer's Agreement Not to Terminate.**

(a)      Except as provided in Section 5.02(b), in the Event of Default by Company and failure to cure that default within 30 days of receipt of written notification from the Servicer, the Servicer shall not resign from the duties and obligations hereby imposed on it except upon the consent of the Company.

(b)      The Servicer shall give written notice to the Company within 30 days of an occurrence and continuance of an event for which notice was given to the Company and the proper cure period expired, and which constitutes an Event of Default of Company.  It is agreed by the parties that the period of time for the Servicer to discontinue performance of services shall be 30 days, which shall begin to run at such time as notice is given to the Company.

**Section 5.03.  Covenants of Company: Corporate Existence.**  The Company shall keep in full force and effect its existence and good standing as a corporation under the laws of the State of Nevada and will obtain and preserve its qualification to do business as a foreign entity in each jurisdiction in which such qualification is or shall be necessary to enable the Company to perform its duties under this Agreement.

**Section 5.04.  No Default Certification.**  Within 30 days after each 12 month interval beginning with the date of this Agreement, the Servicer will deliver to the Company an Officer's Certificate of the Servicer certifying that (a) no default or Event of Default exists under this Agreement, or if such a default or Event of Default exists, the Officer's Certificate shall identify same and specify actions being taken to cure same; and (b) all representations and warranties made by the Servicer in Section 6.01 of this Agreement remain true and correct as of the date of such Officer's Certificate or if such representation and warranties do not remain true and correct, the Officer's Certificate shall identify those which do not remain true and correct, and shall specify actions being taken to cure same.

# ARTICLE VI

# REPRESENTATIONS AND WARRANTIES

**Section 6.01. Representations and Warranties of Servicer.**   The Servicer hereby represents, warrants and covenants to the Company that, as of the date hereof:

(a)     The Servicer is a corporation duly organized, and validly existing and in good standing under the laws of the State of Nevada with corporate power and authority to conduct its business as currently conducted and as contemplated by this Agreement:

(i)     All necessary corporate action has been taken by the Company to authorize and empower the Servicer and its officers or representatives, acting on the Servicer's behalf, to ensure the Servicer has full power and authority to execute, deliver and perform this Agreement.

(ii)     The execution and delivery of this Agreement by the Servicer and its performance and compliance with the terms of this Agreement will not violate the Servicer's organization and regulatory documents or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, or result in the breach of, any material contract, indenture, loan, credit agreement or any other agreement or instrument to which the Servicer is a party or which may be applicable to the Servicer or any of its assets.

(iii)     The Servicer is not in violation of, and the execution and delivery of this Agreement by the Servicer and its performance and compliance with the terms of this Agreement will not constitute a violation with respect to, any order or decree of any court or any order, regulation or demand of any federal, state, municipal or governmental agency, which violation might have consequences that would materially and adversely affect the condition (financial or other) or options of the Servicer or its properties or might have consequences that would affect the performance or its properties or might have consequences that would affect the performance of its duties hereunder; provided, however, that the Servicer is not representing or warranting whether its performance and compliance with the terms of this Agreement will constitute a violation under the Medicare or Medicaid laws or other federal or state laws referenced in Section 6.02(g) below.

(iv)     To the knowledge of the Servicer, no proceeding of any kind, including, but not limited to, litigation, arbitration or administrative, is pending or threatened against or contemplated by the Servicer which would have any material adverse effect on the execution, delivery, performance or enforceability of this Agreement.

(v)     No information, certificate of an officer, statement furnished in writing or report delivered to the Company by the Servicer regarding this Agreement or the duties or obligations contemplated by the Agreement has, to the knowledge of the Servicer, contained any untrue statement of a material fact or

omitted a material fact necessary to make the information, certificate, statement or report not misleading.

(b)    It is understood and agreed that the representations and warranties set forth in this Section 6.01 shall inure to the benefit of the Company.

**Section 6.02. Representations and Warranties of the Company.** The Company hereby represents, warrants and covenants to the Servicer that, as of the date hereof and as of the date of each delivery of a Purchased Account File to the Servicer:

(a)    The Company is a corporation duly organized, and validly existing and in good standing under the laws of the State of Nevada with power and authority to conduct its business as currently conducted and is contemplated by this Agreement.

(b)    All necessary partnership, regulatory or other similar action has been taken to authorize and empower the Company and the officer or representatives acting on the Company's behalf, and the Company has full power and authority to execute, deliver and perform this Agreement.

(c)    The execution and delivery of this Agreement by the Company and its performance and compliance with the terms of this Agreement will not violate the Company's organization and regulatory documents or constitute a default (or an event which, with notice of lapse of time, or both, would constitute a default) under, or result in the breach of, any material contract, indenture, loan credit agreement or any other agreement or instrument to which the Company is a party or which may be applicable to the Company or any of its assets.

(d)    This Agreement constitutes a valid, legal and binding obligation of the Company, enforceable against it in accordance with the terms thereof, subject to applicable bankruptcy, insolvency, reorganization, moratorium and other laws affecting the enforcement of creditor's rights generally and to general principles or equity, regardless of whether such enforcement is considered in a proceeding in equity or at law.

(e)    The Company is not in violation of and the execution and delivery of this Agreement by the Company and its performance and compliance with the terms of this Agreement will not constitute a violation with respect to, any law, order or decree of any court or any order, regulation or demand of any federal, state, municipal or governmental agency, which violation might have consequences that would materially and adversely affect the condition (financial or other) or operations of the Company or its properties or might have consequences that would affect the performance of its duties hereunder.

(f)    To the knowledge of the Company, no proceeding of any kind, including, but not limited to, litigation, arbitration, judicial or administrative, is pending or threatened against or contemplated by the Company which would under any circumstance have any material adverse effect on the execution, delivery, performance or enforceability of this Agreement.

(g)    The Company's purchase of Healthcare Receivables representing claims under the Medicare and Medicaid programs and any other programs established by

Governmental Entities, as contemplated by the respective Purchase Agreements, will not violate any provisions of the Medicare Act (42 U.S.C. Sections 1395-1396) or the Medicaid Program of the Social Security Act (42 U.S.C. Sections 1396-1396p) or any other provisions of federal or state law which provide for payment for healthcare services to be made to the Providers of such services.

(h)     No information, certificate of an officer, statement furnished in writing or report delivered to the Servicer by the Company, to the knowledge of the Company, contains any untrue statement of a material fact or omits a material fact necessary to make the information, certificate, statement or report not misleading.

It is understood and agreed that the representations and warranties set forth in this Section 6.02 shall inure to the benefit of the Servicer.

## ARTICLE VII

## DEFAULT

**Section 7.01. Events of Default—Servicer.**  Any act or occurrence described in this Section 7.01 shall constitute an Event of Default by the Servicer under this Agreement.

(a)     Any failure on the part of the Servicer duly to observe or perform in any material respect any of the other covenants or agreements on the part of the Servicer to be performed under this Agreement, which failure continues unremedied for a period of (i) five Business Days with respect to the delivery of reports required by a Component Agreement; and (ii) with respect to all other covenants or agreements, 30 calendar days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by or on behalf of the Company.

(b)     The entry of a decree or order for relief by any court or agency or supervisory authority having jurisdiction in respect of the Servicer in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law, or appointing a receiver, liquidator, assignee, trustee, custodian, conservator or other similar official in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, ordering the winding up or liquidation of the affairs of the Servicer shall have been entered against the Servicer and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days.

(c)     The Servicer shall consent to the appointment of a conservator or receiver or liquidator in any bankruptcy, insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the Servicer or relating to all or substantially all of its property.

(d)     The Servicer shall (i) admit in writing its inability to pay its debts generally as they become due; (ii) commence a voluntary case under the federal bankruptcy laws, as now or hereafter in effect, or any present or future federal or state bankruptcy, insolvency or similar law; (iii) consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other

similar official of the Servicer or of a substantial part of its property; (iv) make an assignment for the benefit of its creditors; (v) fail generally to pay its debts as such debts become due; or (vi) take corporate action in furtherance of any of the foregoing.

(e)    Any material representation, warranty or statement of the Servicer made herein or in any certificate, report of other writing delivered pursuant hereto shall prove to be incorrect in any material respect as of the time when the same shall have been made and, within 30 calendar days after written notice thereof shall have been given to the Servicer by or on behalf of the Company, the circumstance or condition in respect of which such representation, warranty or statement was incorrect shall not have been eliminated or otherwise cured and the adverse effects thereof shall not have been cured.

**Section 7.02.  Events of Default—Company.**  Any act or occurrence described in this Section 7.02 shall constitute an Event of Default by Company under this Agreement.

(a)    Any failure by the Company to timely make any payment to the Servicer (solely out of collections on the Receivables) required to be made by the Company pursuant to Section 4.06 of this Agreement other than a failure that does not continue for more than two Business Days after the earlier of (i) discovery of such failure by an Officer of the Company or (ii) delivery of written notice of such failure to the Company by or on behalf of the Servicer shall constitute an Event of Default by Company under this Agreement.  If any fees or expenses in Section 4.06 of this Agreement are not paid within 30 days of billing, the Company agrees to pay a late charge on the past due amount equal to the lower of 1½% of such amount per month, or the maximum rate allowed by law.

(b)    Failure of the Company to provide information or to use its influence and authority to cause information required for the Servicer's processing to be furnished by the Company or Provider within the time frame stipulated in the Component Agreement.

(c)    The entry of a decree or order for relief by any court or agency or supervisory authority having jurisdiction in respect of the Company in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law, or appointing a receiver, liquidator, assignee, trustee, custodian, conservator or other similar official in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, ordering the winding up or liquidation of the affairs of the Servicer shall have been entered against the Company and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days

(d)    The Company shall consent to the appointment of a conservator, receiver or liquidator in any bankruptcy, insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the Company or relating to all or substantially all of its property.

(e)    The Company shall (i) admit in writing its inability to pay its debts generally as they become due; (ii) commence a voluntary case under the federal bankruptcy laws, as now or hereafter in effect, or any present or future federal or state bankruptcy, insolvency or similar law; (iii) consent to the appointment of or taking

possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Company or of a substantial part of its property; (iv) make an assignment for the benefit of its creditors; (v) fail generally to pay its debts as such debts become due; or (vi) take corporate action in furtherance of any of the foregoing.

**Section 7.03. Remedies for Event of Default by Company.** If an Event of Default by Company shall have occurred and be continuing under this Agreement for a period of 30 days from the time of notice in writing, the Servicer shall be entitled to terminate this Agreement pursuant to notifications outlined in Section 5.02, subject to Section 5.02(a), and cease all servicing with respect to Purchased Accounts in its possession, in which event it shall return the Purchased Accounts to the Company and shall be entitled to retain all fees previously paid by the Company to the Servicer pursuant to Section 4.06.

**Section 7.04. Remedies for Event of Default by Servicer.** If an Event of Default by the Servicer shall have occurred and be continuing under this Agreement for a period of 30 days from the time of notice in writing, the Company shall be entitled to (a) appoint a successor Servicer; (b) enter the premises of the Servicer for any or all of the following purposes: (i) assuming control of management of the servicing duties; (ii) replacing data-entry and posting staff; (iii) redirection of mail to the Provider; or (iv) removal of all database containing equipment, computers and servers; and (c) a right of offset of fees for any uncorrected servicing related errors in an amount equal to the costs incurred correcting such errors.

## ARTICLE VIII

## INDEMNITY AND EXCULPATION

### Section 8.01. Indemnification of Company and Servicer.

(a) *Indemnification by Servicer.* The Servicer shall indemnify, defend and hold harmless the Company, including the Collateral under the Note Issuance and Security Agreement, from and against any and all losses, costs, expenses, damages and liabilities, including, without limitation, reasonable attorney's fees and court costs, directly attributable to any claim by any third party that the Servicer committed any act involving negligence, willful misconduct, or breach of this Agreement; provided that as to third-party claims a court of competent jurisdiction has determined that the Servicer's actions involved negligence, willful misconduct or breach of this Agreement (a "Servicer Adjudication"), and; provided, further, that the Servicer is given prompt written notice of such third-party claim after the Company becomes aware of the same, reasonable assistance from the Company and sole authority to defend or settle such claim subject to Section 8.02. The Servicer shall have no obligation under this Section if such claim arises from the Servicer's or a subcontractor's compliance with or reliance upon the Company's, Trustee's or the Lock Box Account bank's data specification or instructions, policies or procedures or if such third-party claim is the direct result of the negligence of Trustee or the Lock Box Account bank.

(b) *Indemnification by Company.* The Company shall indemnify, defend and hold harmless the Servicer from and against any and all losses, costs, expenses, damages and liabilities including, without limitation, reasonable attorney's fees and court costs,

directly attributable to any claim by any third-party that the Company committed any act involving negligence, willful misconduct, or breach of this Agreement; provided that a court of competent jurisdiction has determined that the Company's actions involved negligence, willful misconduct or breach of this Agreement (a "Company Adjudication") and, provided further, that the Company is given prompt written notice of such third-party claim after the Servicer becomes aware of the same, reasonable assistance from the Servicer and sole authority to defend or settle such claim subject to Section 8.03. The Company shall have no obligation under this Section if such claim arises from the Company's or a subcontractor's compliance with or reliance upon the Servicer's, Trustee's or the Lock Box Account bank's data, specification or instructions, policies or procedures.

**Section 8.02. Procedure for Third Party Claim Indemnification.** In the event any third party asserts any claim: (a) against the Company with respect to any matter to which the indemnification of Section 8.01(a) may eventually be applicable; or (b) against the Servicer with respect to any matters as to which the indemnification of Section 8.01(b) may eventually be applicable, then the Person seeking indemnification (the "Indemnified Party") shall give notice to the other Person (the "Indemnifying Party") of such claim and the Indemnifying Party shall have the right at its election to take over the defense or settlement of such claim at its own expense by giving notice of such election in writing to the Indemnified Party. If the Indemnifying Party does not give notice and does not proceed to diligently defend such third-party claim within 30 days after notice from the Indemnified Party, the Indemnifying Party shall have no further right to defend such third-party claim or participate in the negotiation of any settlement but shall reimburse the Indemnified Party for all losses, costs, expenses, damages and liabilities, including without limitation, reasonable attorney's fees and court costs related to the defense or settlement of such third-party claim. The Indemnifying Party shall be entitled to participate in and, upon notice to the Indemnified Party, assist in the defense of any such action or claim in reasonable cooperation with, and with the reasonable cooperation of, the Indemnified Party. The Indemnified Party will have the right to employ its own counsel in any such action in addition to the counsel to the Indemnifying Party, but the fees and expenses of such counsel will be at the expense of such Indemnified Party, unless (i) the employment of counsel by the Indemnified Party at its expense has been authorized in writing by the Indemnifying Party; (ii) the Indemnifying Party has not in fact employed counsel to assume the defense of such action within a reasonable time after receiving notice of the commencement of the action; or (iii) the named parties to any such action or proceeding (including any impleaded parties) include both the Indemnifying Party and one or more Indemnified Parties, and the Indemnified Parties shall have been advised by counsel that there may be one or more legal defenses available to them which are different from or in addition to those available to the Indemnifying Party (it being understood, however, that the Indemnifying Party shall not, in connection with any one such action or proceeding or separate but substantially similar or related actions or proceedings in the same jurisdiction arising out of the same general allegations or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys at any time for the Indemnified Party). The fees and expenses of counsel, except for the Indemnified Party's separate counsel retained under circumstances that are not set forth in (i), (ii) and (iii) above, will be at the expense of the Indemnifying Party, and all such fees and expenses will be reimbursed promptly as they are incurred. No settlement of any such claim or action, including an admission of liability or the imposition of duties of performance or payment of fines or other monetary amounts upon the Indemnified Party or the Indemnifying Party shall be entered into without the

prior written consent of the Indemnified Party or, if the Indemnifying Party is not controlling the proceedings, the Indemnifying Party. Any failure by an Indemnified Party to comply with the provisions of this Section shall relieve the Indemnifying Party of liability only if such failure is prejudicial to the position of the Indemnifying Party and then only to the extent of such prejudice.

Section 8.03. Other Provisions Limiting Liability. In no event shall the Servicer or the Company be liable to each other or to any third party for any lost profits, lost business opportunities or any other consequential or incidental damages arising out of or related to this Agreement or the services provided hereunder. This limitation of liability shall apply even if the Servicer or the Company has been advised of the possibility of such damages. The Servicer shall not be liable for any action taken or omitted by the Company. The Servicer may rely in good faith and shall be protected in acting upon (a) any document or information of any kind respecting any matter arising hereunder believed by the Servicer to be genuine and correct and to have been signed or sent by the proper person and (b) any instructions, consents, notices, or waivers given by the Company. Notwithstanding Section 8.01(a) or 8.01(b), the indemnity obligation owed to an Indemnified Party shall be reduced to the extent of an Indemnified Party's comparative negligence as determined by a Servicer Adjudication or Company Adjudication as the case may be.

## ARTICLE IX

## TERM AND TERMINATION OF AGREEMENT

Section 9.01. Term and Termination of Agreement.

(a) The initial term of this Agreement shall commence upon the Effective Date and expire simultaneously with the termination of the Note Issuance and Security Agreement, unless terminated earlier pursuant to the terms hereof.

(b) This Agreement shall not be terminated solely as a result of the occurrence of an Event of Default under the Note Issuance and Security Agreement (unless such Event of Default is also an Event of Default by the Servicer under the terms of this Agreement).

(c) All rights accrued and obligations incurred by any party prior to termination of this Agreement shall continue to exist notwithstanding such termination.

Section 9.02. Transfer of Servicing. In the event servicing performed hereunder is terminated by the Company, the Servicer shall (a) pay over to any Person entitled thereto all other moneys with respect to the Receivables held by the Servicer less any amounts then due to the Servicer under this Agreement; (b) subject to Section 7.02, release the servicing and deliver all the Purchased Account Files then in the possession of the Servicer to the Company or any other person or entity as designated by the Company and (c) perform all steps required of the Servicer of Receivables to transfer such servicing under applicable law, provided that all costs and expenses of such transfer shall be paid by the Company.

**Section 9.03.  Delivery of Receivables Tape**.  Without limitation to the foregoing, and to facilitate the transfer of servicing to the successor Servicer, the Servicer shall, at the Company's sole expense (except as provided in the provisions above), promptly deliver to the Company, from time to time, upon request of the Company and provided that at the time of such request all amounts owing the Servicer pursuant to this Agreement have been paid, a computer-generated magnetic test tape in a form acceptable to the Company and with programming adjustments containing any information regarding the Receivables which the Company reasonably requests in good faith.  The Servicer and the Company shall cooperate with one another to facilitate an orderly transfer of servicing.

**Section 9.04.  Amounts To Be Held in Trust**.  Following the transfer of servicing by the Servicer, all amounts relating to the Receivables collected by the Servicer shall be received in trust for the benefit of the Company and immediately forwarded for deposit in the Trust Account. The Company shall provide the Trustee with the necessary information to identify the source of all amounts relating to Receivables.

## ARTICLE X

## MISCELLANEOUS PROVISIONS

**Section 10.01.  Amendment**.    Except as provided herein under Section 10.07, this Agreement may only be amended by the written agreement of the parties hereto.  The Servicer may amend the terms and conditions of Component Agreements if necessary to conform to the requirements of applicable law or the policies or requirements of payors by giving the Company prior written notice thereof.

**Section 10.02.  Waivers**.  The failure of either party at any time to require performance by the other of any provision of this Agreement shall in no way affect that party's right to enforce such provision, nor shall the waiver by either party of any breach of any provision of this Agreement be taken or held to be a waiver of any further breach of the same provision or any other provision.

**Section 10.03.  Notices**.    All notices, requests, consents and other communications hereunder shall be in writing and shall be sufficiently given and shall be deemed given when delivered personally or mailed by first-class mail, postage prepaid, or sent by telegram, telex or telecopy, or other similar facsimile communication, or when given by telephone, confirmed in writing, sent by any of the above methods on the same day, addressed as follows or to any other address designated in writing by the applicable Party:

|  |  |
|---|---|
| To Servicer: | Medical Tracking Services, Inc.<br>3770 Howard Hughes Parkway, Suite 301<br>Las Vegas, Nevada 89109<br>Attention:  Joseph J. Lampariello, Chief Executive Officer<br>Telephone:  (800) 818-1102<br>Facsimile:  (702) 735-3739 |
| To Company: | Medical Provider Funding Corporation V<br>2100 South State College Blvd. |

Anaheim, CA 92806
Attention: Sidney M. Field , Chief Executive Officer
Telephone: (714) 935-3100
Facsimile: (714) 935-3114

To MCC:        Medical Capital Corporation
2100 South State College Blvd.
Anaheim, CA 92806
Attention: Sidney M. Field, Chief Executive Officer
Telephone: (714) 935-3100
Facsimile: (714) 935-3114

**Section 10.04. Severability of Provision.** If one or more of provisions of this Agreement shall be for any reason whatever held invalid, such provisions shall be deemed severable from the remaining covenants, agreements and provisions of this Agreement and shall in no way affect the validity or enforceability of such remaining provisions or the rights of any parties hereto. To the extent permitted by law, the parties hereto waive any provision of law, which renders any provision of this Agreement prohibited or unenforceable in any respect.

**Section 10.05. Rights Cumulative.** Except as specifically set forth herein, all rights and remedies from time to time conferred upon or reserved to the Company or the Servicer are cumulative, and none is intended to be exclusive of another. No delay or omission in insisting upon the strict observance of performance of any provision of this Agreement, or in exercising any right or remedy shall be construed as a waiver or relinquishment of such provision, nor shall it impair such right or remedy. Except as specifically set forth herein, every right and remedy may be exercised from time to time as often as deemed expedient.

**Section 10.06. Inspection and Audit Rights.** The Servicer agrees that, upon prior written notice and to the extent permitted under laws relating to the privacy rights of patients, will permit the Company or independent certified public accountants selected by the Company, during the Servicer's normal business hours, to examine the Purchased Account Files, all the books of account, records, reports and other papers in the possession of the Servicer relating to the Receivables purchased by the Company and to make copies and extracts therefrom such as to cause such books to be audited for the purpose of (i) confirming that nothing has come to their attention that causes them to believe that the servicing has not been conducted in substantial compliance with the terms and conditions set forth in Exhibit B and (ii) reconciling on a test basis the information contained in the weekly reports delivered by the Servicer with information contained in the accounts, records and computer systems of the Servicer .

**Section 10.07. Merger or Consolidation of, or Assumption of, the Obligation of Servicer.** Nothing in this Agreement shall prevent (a) any consolidation or merger of the Servicer with or into any other corporation, or any consolidation or merger of any other corporation with or into the Servicer; or (b) any assignment by the Servicer of its rights and obligations hereunder to any affiliate or to any corporation which is the surviving corporation of any such consolidation or merger or which acquires all or substantially all of its assets. The Servicer covenants and agrees that the consolidation, merger or assignment shall be upon the conditions that the due and timely performance and observance of all the terms, covenants and conditions of this Agreement to be kept or performed by the Servicer shall, by an agreement

20167070.1                              17

supplemental hereto, be assumed by the affiliate which is the assignee hereunder or by the successor corporation (if other than the Servicer) formed by or resulting from any such consolidation or merger, or which shall have received the transfer of all or substantially all of the property and assets of the Servicer and to which the assignee hereunder or successor corporation shall succeed to such rights and obligations, just as fully and effectually as if such successor corporation had been the original Servicer. Upon the effectiveness of such consolidation merger or assignment, the assigning Servicer shall cease to be obligated hereunder.

Section 10.08. **Mutual Covenants Not to Compete**. The Company is not in the business of computerized servicing, tracking, billing, invoicing, or collecting medical receivables for third parties, nor does the Company have any intention of doing so. Rather, the Company is in the business of financing the acquisition or factoring of Receivables. Also, the Servicer is not in the business of acquiring or factoring receivables, and has no intention of doing so. Rather, the Servicer is in the business of utilizing computer technology to service, track, bill, invoice, and collect receivables. The intention of this Agreement is to create a strategic alliance of the parties for the benefit of both parties, without fear or threat of competition from each other's business activities. To the extent permitted by applicable law, the parties agree not to compete with each other during the terms, or extended terms, of this Agreement, as applied to the United States of America. In the event this Agreement is terminated, this covenant not to compete shall continue in full force and effect for a period of 18 months after the date of termination.

Section 10.09. **Binding Effect**. All provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto.

Section 10.10. **Captions**. The article, paragraph and other headings contained in this Agreement are for reference purposes only and shall not limit or otherwise affect the meaning hereof.

Section 10.11. **Legal Holidays**. In the case where the date on which any action required to be taken, documents required to be delivered or payment required to be made is not a Business Day, such action, delivery or payment need not be made on such date, but may be made on the next succeeding Business Day.

Section 10.12. **Counterparts**. This Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

Section 10.13. **Governing Law**. This Agreement shall be deemed entered into with and shall be governed by and interpreted in accordance with the laws of the State of Nevada. The rights and liabilities of the parties hereto shall be determined in accordance with the laws of the State of Nevada except to the extent that it is mandatory that the laws of some other jurisdiction apply.

Section 10.14. **Mutual Covenants Regarding Marketing Efforts**. The parties covenant that upon entering into this Agreement each will use its best efforts to establish and implement a joint marketing effort whereby the Servicer and the Company will each facilitate access to officers and other management and decision making personnel of the other's clientele in order that each may make known its respective servicing and financing capabilities.

IN WITNESS WHEREOF, the Company, MCC and the Servicer have caused this Agreement to be duly executed by their respective officers thereunto duly authorized as of the day and year first above written.

MEDICAL PROVIDER FUNDING
CORPORATION V

By: _____
Name: Sidney M. Field
Title:  Chief Executive Officer

MEDICAL CAPITAL CORPORATION

By: _____
Name: Sidney M. Field
Title:  Chief Executive Officer

MEDICAL TRACKING SERVICES, INC.

By: _____
Name: Joseph J. Lampariello
Title:  President, Chief Executive Officer

**EXHIBIT A**

**PURCHASE AGREEMENT**

## EXHIBIT B

## DUTIES OF THE SERVICER

**Database Maintenance:**

1. The Receivables database is to be maintained by the Servicer.
2. The Servicer grants user and copy license to the Company for all proprietary software used for the processing and maintenance of the Receivables.
3. Receive copies of all lockbox payments from the Provider/Company's corresponding Lock Box Account banks.
4. Copy and forward to Provider all Lock Box Account receipts.
5. Post all payments and corresponding balance write-offs against individual Receivables on a line-item basis.
6. Post all balance write-offs against Receivables on a line-item basis.
7. Reconcile all postings to cash deposits on a daily basis.
8. Interact with the Company's staff for all posting questions and errors.
9. Submit all reports and report corrections within the same business day (or four hours into the subsequent business day)

**Relationship with Company's Providers:**

1. Intake of all Receivables in any of the following formats:
   a. HCFA-1500 (and related versions)
   b. UB-82/92 (and related versions)
   c. Invoice (common format)
   d. National Standard Format for Healthcare Claims
   e. Spreadsheet or comma separated values
2. The Servicer shall accept Receivables in various forms including:
   a. Electronic mail
   b. File acceptance
   c. File printer form
   d. Facsimile
   e. Paper
3. The Servicer must be able to re-assemble the Receivables into a form acceptable to Company.
4. The Servicer shall be able to identify and flag duplicate Receivables based upon criteria set forth between the Servicer and the Company.

**Reports:**

The Servicer will utilize the terms, definitions and descriptions pursuant to the Purchase Agreement and in accordance to the Company's requests which may be adjusted from time to time.  The reports are to be furnished to the Company as described:

B-1

**PROVIDER SUMMARY REPORT- AS REQUESTED BY COMPANY**

The Provider summary report is a management report that may be ordered by relationship, provider or corporation. This report provides the relationship's, provider's or corporation's activity for a given time period. The report includes outstanding, net owed, reserve, collections, disbursements and fees. The report is time dependent therefore, it cannot be ordered for back dated reports.

**COLLECTION REPORT-MONTHLY OR AS REQUESTED BY COMPANY**

The collection report is a summary report that can be printed daily to report and be used to verify posted transactions. The report is ordered by provider or by corporation. The collection report provides a detailed list of transactions/payments that have a post date within the period requested. This report provides a detailed line for each payment that includes post date, claim number, Batch number of the claim, payor, check number, Estimated Net Receivable amount and the transaction/payment amount. The collection report should be kept with the settlement reports. The daily collection report used to verify posted payments should be kept with the payment control folder.

**PURCHASE REPORT/CLAIM APPRAISAL REPORT PART OF EACH PURCHASE TRANSACTION ON A PRE-DETERMINED FREQUENCY AS SET FORTH BY EACH PROVIDER DESCRIPTION**

The purchase report is a final report that can be requested by each individual provider after all edits are completed. The report can only be requested after the merge process. This report provides data on claims that were imported, appraised and considered for purchase during the settlement period. The report groups claims into the categories of purchased, rejected or pending. Claims that are rejected or pending will be identified with and error code for reference. The purchases report should be filed with the settlement reports in the claims control file. The appraisal process calculates and assigns an Estimated Net Receivable amount to a claim. The Estimated Net Receivable is calculated based on the reimbursement rates established on the account.

**PURCHASE-PENDING-REJECTION REPORT PART OF EACH PURCHASE TRANSACTION ON A PRE-DETERMINED FREQUENCY AS SET FORTH BY EACH PROVIDER DESCRIPTION**

The purchase-pending-rejection report shows what claims were purchased and rejected.

**SETTLEMENT STATEMENT PART OF EACH PURCHASE TRANSACTION ON A PRE-DETERMINED FREQUENCY AS SET FORTH BY EACH PROVIDER DESCRIPTION**

The settlement statement is a summary report that is issued by provider and by corporation on the date of purchase. The settlement statement includes a summary of the advanced amount for the Batch during the current period. The statement contains a summary of the activity that occurred during the settlement period collectively arriving at the net due provider for settlement. The period's summarized activity includes collections, previous reserve disbursements and open and the balance. The advance for the current Batch should be verified to the purchase report. The



amount due the provider for the period should be verified to the reserve account report. The settlement statement should be kept with the purchase reports filed in the claims control file.

## AGED REPORT BY PAYOR – WEEKLY

The aged report by payor provides a summary for a Provider aging the claims by payor.

## BATCH REPORT WITH AGING-WEEKLY

The Batch report with aging contains a summary for a Provider aging the claims by Batches.

## OUTSTANDING CLAIMS REPORT-MONTHLY

The outstanding claims report is a summary of all outstanding claims by Batches. This reports is the outstanding accounts receivable balance. There is an identifiable outstanding gross receivable and outstanding net receivable.

20167070.1