# EXHIBIT H

# FORBEARANCE AGREEMENT

This Agreement is entered into as of April 10, 2009, by and among Medical Provider Financial Corporation III, a Nevada corporation (the "**Debtor**"), Medical Capital Corporation, Inc., a Nevada corporation ("**MCC**"), Medical Tracking Services, Inc., a Nevada corporation ("**MTS**"), and Wells Fargo Bank, National Association, a national banking association, as trustee under the Note Agreements described below (in such capacity, the "**Trustee**").

The Debtor and the Trustee have entered into the Note Agreements, as defined below, setting forth the terms on which the Trustee acts on behalf of the holders of certain notes issued by the Debtor.

The Debtor is in default under such notes and has asked the Trustee to forbear from exercising its rights with respect thereto. Subject to the rights of the holders of such notes to direct that the Trustee terminate the forbearance period set forth herein, the Trustee is willing to do so on the terms and subject to the conditions set forth below.

ACCORDINGLY, in consideration of the mutual covenants contained in this Agreement and in the other documents described herein, the parties hereby agree as follows:

**1.   Definitions.**

As used herein:

>"**Administrative Fees**" means Administrative Fees, as defined in either Note Agreement.
>
>"**Business Day**" has the meaning specified in the Series I Note Agreement.
>
>"**Default**" means any event or condition that, with the giving of notice, the passage of time or both, would constitute an Event of Default.
>
>"**Event of Default**" means an Event of Default as defined in either Note Agreement.
>
>"**Existing Series I Collateral**" means the Collateral, as defined in the Series I Note Agreement.
>
>"**Existing Series II Collateral**" means the Collateral, as defined in the Series II Note Agreement.
>
>"**Expense Reserve Account**" means, with respect to either Note Agreement, a deposit account maintained by Wells Fargo in the Trustee's own name, into which funds are deposited and disbursed as specified in Section 4.
>
>"**Known Payment Default**" means any Event of Default arising under Section 6.01(a) of either Note Agreement on account of the Debtor's failure to make any payment of principal or interest due under the Notes on or before the date hereof.
>
>"**MCH**" means Medical Capital Holdings, Inc.
>
>"**Notes**" means each Note (Series I), as defined in the Series I Note Agreement, and each Note (Series II), as defined in the Series II Note Agreement, collectively.
>
>"**Note Agreements**" means the Series I Note Agreement and the Series II Note Agreement, collectively.
>
>"**Noteholders**" means the Noteholders, as defined in the Series I Note Agreement, and the Noteholders, as defined in the Series II Note Agreement, collectively.

"**Series I Note Agreement**" means the Note Issuance and Security Agreement dated June 27, 2005 between the Debtor and the Trustee.

"**Series I Obligations**" means the Obligations, as defined in the Series I Note Agreement.

"**Series II Note Agreement**" means the Series I Note Agreement, as modified with respect to the Notes (Series II) (as defined therein) by the First Supplemental Note Issuance and Security Agreement dated April 10, 2007 between the Debtor and the Trustee.

"**Series II Obligations**" means the Obligations, as defined in the Series II Note Agreement.

"**UCC**" means the Uniform Commercial Code as adopted in the State of Minnesota.

"**Wells Fargo**" means Wells Fargo Bank, National Association, without regard to its capacity as trustee under the Note Agreements or otherwise.

2. **Forbearance.**

Subject to satisfaction of the conditions set forth in Section 12, the Trustee will forbear from exercising any of its rights or remedies under the Note Agreements as a result of the Known Payment Defaults until the earliest to occur of the following (the earliest to occur of such dates being the "**Forbearance Termination Date**"):

(a) the date on which any Event of Default occurs, other than the Known Payment Defaults and any Events of Default arising from the failure to pay, when due, the entire principal and interest on any Notes (Series II) (as defined in the Series II Note Agreement) that mature or are accelerated after the date hereof;

(b) the date on which the Trustee determines that any Event of Default, other than the Known Payment Defaults, was outstanding on the date hereof;

(c) the issuance of, or service upon or receipt by the Trustee of, any garnishment, attachment, levy or similar process with respect to the Debtor, any property of the Debtor in the possession of the Trustee, or any indebtedness of the Trustee to the Debtor (including but not limited to any deposit account);

(d) the date, if any, on which the Debtor fails to comply in any respect with any provision of this Agreement;

(e) the date on which the Trustee determines that any representation or warranty made by the Debtor in this Agreement or either Note Agreement was incorrect or misleading in any material respect when made;

(f) the date, if any, on which the Trustee has received direction from Noteholders holding at least 50% of the principal due on the Notes (Series I) (as defined in the Series I Note Agreement) or the Notes (Series II) (as defined in the Series II Note Agreement), directing the Trustee to terminate the forbearance granted hereunder;

(g) the date, if any, on which each of the conditions set forth in Section 6.07(a)(i)-(v) of either Note Agreement shall have occurred that would authorize any Noteholder to exercise its rights or remedies against the Debtor; or

(h) June 30, 2009.

-2-

fb.us.3752871.05

The period commencing on the date hereof and ending on the day preceding the Forbearance Termination Date is herein called the **"Forbearance Period."** Termination of the forbearance granted hereunder shall not terminate any other provision of this Agreement. The foregoing agreement to forbear is for the limited purpose set forth herein, shall be limited to the precise meaning of the words as written herein, and shall not be deemed to constitute or imply any waiver or modification of any term or condition of either Note Agreement or any related document. The Debtor, MCC and MTS acknowledge that the Trustee has no obligation to extend the Forbearance Period, or to grant any other forbearance. Nothing contained in this Agreement shall prevent the Trustee from accelerating the Notes (Series II) pursuant to the terms of the Series II Note Agreement or shall affect any rights that any Noteholders have pursuant to any Notes or the Note Agreements.

3. **Interest Payment Funding.**

If, at the opening of business on the Business Day immediately preceding any Interest Payment Date, as defined in either Note Agreement, the funds in the Trust Account (as defined in that Note Agreement) are insufficient to make all unpaid interest payments due on or before such Interest Payment Date under the Notes issued under that Note Agreement, MCC shall on that Business Day deposit immediately available funds in such Trust Account in the amount of such insufficiency. Such deposit shall be deemed a capital contribution to the Debtor or, at MCC's option, a non-interest-bearing loan to the Debtor. For purposes of this Section 3, the 5th day after the date of this Agreement and the 10th day of each calendar month thereafter (or the next Business Day if such day is not a Business Day) shall be deemed an Interest Payment Date with respect to any Note the principal of which is past due (whether because the Maturity Date for such Note has occurred, the Note has been accelerated pursuant to the terms of the Note Agreement, the Debtor has elected to redeem the Note or otherwise), regardless of whether interest was due prior to maturity on a monthly, quarterly or other basis.

4. **Expense Reserve Account.**

Concurrent with the execution and delivery hereof, MCC shall remit $150,000 to the Trustee for deposit in the Expense Reserve Account with respect to the Series I Note Agreement and $150,000 to the Trustee for deposit in the Expense Reserve Account with respect to the Series II Note Agreement. Each Expense Reserve Account shall bear interest as agreed upon between MCC and the Trustee, and all such interest shall be credited to the applicable Expense Reserve Account and disbursed with other funds therein as provided under this Section 4. Upon the incurrence or payment by the Trustee of any fees or expenses with respect to either Note Agreement or this Agreement (including but not limited to trustee annual administration fees, miscellaneous fees and extraordinary services fees, as set forth in the Revised Schedule of Fees dated March 29, 2007 prepared by the Trustee and acknowledged March 30, 2007 by MCC, as administrator for the Debtor, as such Schedule may from time to time be amended, modified or restated), the Trustee may withdraw the amount of such fees and expenses from the Expense Reserve Account with respect to the applicable Note Agreement to pay or reimburse itself for such fees and expenses (but the right to withdraw such amount shall not limit the Trustee's rights to withdraw any particular amount from the Trust Account (as defined in the applicable Note Agreement) in lieu of withdrawing such amount from the applicable Expense Reserve Account). Not more than 5 Business Days following notice of any such withdrawal, MCC shall remit to the Trustee, for deposit in the applicable Expense Reserve Account, an amount equal to the amount so withdrawn. In addition, MCC shall from time to time, not more than 5 Business Days following notice from the Trustee, deposit in the Expense Reserve Accounts such additional amounts as the Trustee reasonably believes necessary to cover anticipated fees and expenses with respect to the applicable Note Agreements or this Agreement. MCC hereby grants the Trustee a security interest in the Expense Reserve Accounts and all amounts maintained therein to secure all obligations of MCC and the Debtor under this Agreement or under either Note Agreement. MCC will execute such additional security agreements, control agreements and other documents as the Trustee may reasonably request to establish that the Trustee holds a valid, perfected,

first-priority security interest therein. Prior to payment of the Obligations (as defined in either Note Agreement) in full, the Trustee shall have the sole right (in accordance with this Agreement) to withdraw or otherwise cause the disbursement of funds from the Expense Reserve Account with respect to that Note Agreement, and MCC shall have no right to recover any amount deposited in such Expense Reserve Account.

5. **Additional Collateral.**

(a) *Grant of Security Interest.* Subject to paragraph (b) below, the Debtor hereby grants to the Trustee, for the benefit of the Noteholders, a security interest in all of the Debtor's right, title and interest in and to any accounts, chattel paper, commercial tort claims, consumer goods, deposit accounts, documents, equipment, farm products, general intangibles, instruments, inventory, investment property, letter-of-credit rights, letters of credit, money, and oil, gas and other minerals before extraction, in each case whether now owned or hereafter acquired (all of the foregoing being collectively called the **"Collateral"**). For purposes of this grant, the terms, **"accounts," "chattel paper," "commercial tort claims," "consumer goods," "deposit accounts," "documents," "equipment," "farm products," "general intangibles," "instruments," "inventory," "investment property," "letter-of-credit rights," "letters of credit"** and **"money"** have the meanings given them in the UCC (and specifically in Article 9 of the UCC, in the case of the definition of "instrument").

(b) *Priority in Existing Collateral.* Notwithstanding any other provision of this Section 5, (i) any security interest held by the Trustee in the Existing Series I Collateral solely by reason of this Section 5 shall, to the extent that it secures the Series II Obligations, be fully subordinate to any security interest held by the Trustee therein to secure the Series I Obligations, and (ii) any security interest held by the Trustee in the Existing Series II Collateral solely by reason of this Section 5 shall, to the extent that it secures the Series I Obligations, be fully subordinate to any security interest held by the Trustee therein to secure the Series II Obligations.

(c) *Maintenance of Priority and Collateral.* The Debtor will keep all Collateral free and clear of all liens, security interests and encumbrances other than the security interests granted under the Note Agreements and this Agreement. The Debtor will not sell or otherwise dispose of the Collateral or any interest therein (including by foreclosure of any lien or security interest securing any Collateral, or by a transfer in lieu of such foreclosure) without the prior written consent of the Trustee. Without the Trustee's prior written consent, the Debtor shall not consent to or permit any modification, amendment, forbearance, release, cancellation or subordination of any obligation constituting Collateral.

(d) *Additional Documents; Evidences of Collateral.* The Debtor will execute, deliver or endorse any and all assignments, security agreements, control agreements and other agreements and writings that the Trustee may at any time reasonably request in order to secure, protect, perfect or enforce the security interest granted hereunder and the Trustee's rights under this Agreement. Without limiting the generality of the foregoing, the Debtor will (i) promptly (upon receipt) deliver to the Trustee all certificates or instruments representing or constituting Collateral, if any, and (ii) duly endorse, in blank, each and every certificate or instrument constituting Collateral, if any, by signing on said certificate or instrument or by signing a separate document of assignment or transfer, as required by the Trustee. Prior to any of the foregoing deliveries, the Debtor shall hold all such certificates or instruments, if any, in trust for the benefit of the Trustee.

(e) *Expenses.* The Debtor will pay when due or reimburse the Trustee on demand for all costs of collection of any of the Series I Obligations or Series II Obligations and all other out-of-pocket expenses (including in each case all reasonable attorneys' fees) incurred by the Trustee in connection with the creation, perfection, satisfaction, protection, defense or enforcement of the

security interest granted hereunder, including expenses incurred in any litigation or bankruptcy or insolvency proceedings.

(f) *Debtor Status; Financing Statements.* The Debtor will not change its name, jurisdiction of organization or chief executive office without prior written notice to the Trustee. The Trustee may (and the Debtor hereby authorizes the Trustee to) execute and file such financing statements and other documents as the Trustee may at any time deem appropriate to perfect the security interest granted hereunder. Without limiting the generality of the foregoing, the Debtor authorizes the Trustee to file financing statements designating the collateral as "all personal property" or "all assets" of the Debtor, and authorizes, ratifies and approves any financing statement filed by the Trustee on or prior to the date of this Agreement. The Debtor will not amend or terminate any financing statement naming the Trustee as secured party except upon written prior authorization of the Trustee.

(g) *Trustee's Right to Take Action.* If the Debtor at any time fails to perform or observe any agreement contained in this Section 5, the Trustee may (but need not) perform or observe such agreement on behalf and in the name, place and stead of the Debtor (or, at the Trustee's option, in the Trustee's own name) and may (but need not) take any and all other actions which the Trustee may reasonably deem necessary to cure or correct such failure; and, except to the extent that the effect of such payment would be to render any loan or forbearance of money usurious or otherwise illegal under any applicable law, the Debtor shall thereupon pay the Trustee on demand the amount of all moneys expended and all costs and expenses (including reasonable attorneys' fees) incurred by the Trustee in connection with or as a result of the Trustee's performing or observing such agreements or taking such actions, together with interest thereon from the date expended or incurred by the Trustee at the highest rate then applicable to any of the Series I Obligations or the Series II Obligations. To facilitate the performance or observance by the Trustee of such agreements of the Debtor, the Debtor hereby irrevocably appoints (which appointment is coupled with an interest) the Trustee, or its delegate, as the attorney-in-fact of the Debtor with the right (but not the duty) from time to time to create, prepare, complete, execute, deliver, endorse or file, in the name and on behalf of the Debtor, any and all instruments, documents, applications for insurance and other agreements and writings required to be obtained, executed, delivered or endorsed by the Debtor under this Section 5.

(h) *Commercial Tort Claims.* The Debtor holds no commercial tort claims as of the date hereof. Promptly upon obtaining knowledge thereof, the Debtor will deliver to the Trustee notice of any commercial tort claim that the Debtor may acquire, including a summary of the facts giving rise to such commercial tort claim, an estimate of the Debtor's damages, copies of any complaint or demand letter submitted by the Debtor, and such other information as the Trustee may request. Upon request by the Trustee, the Debtor will grant the Trustee a security interest in all commercial tort claims that it may have against any person.

(i). *Remedies upon Event of Default.* Upon the occurrence of an Event of Default and at any time thereafter, the Trustee may exercise and enforce any or all rights and remedies available to the Trustee by law or agreement, including but not limited to the right to take possession of any Collateral, proceeding without judicial process or by judicial process (without a prior hearing or notice thereof, which the Debtor hereby expressly waives), and the right to sell, lease or otherwise dispose of any or all of the Collateral, and in connection therewith, the Trustee may require the Debtor to make the Collateral available to the Trustee at a place to be designated by the Trustee which is reasonably convenient to all applicable parties.

(j) *Requests for Accounting.* All requests under Section 9-210 of the UCC (i) shall be made in a writing signed by an authorized person, (ii) shall be personally delivered, sent by registered or certified mail, return receipt requested, or by overnight courier of national reputation (iii) shall be

deemed to be sent when received by the Trustee and (iv) shall otherwise comply with the requirements of Section 9-210 of the UCC. The Debtor requests that the Trustee respond to all such requests which on their face appear to come from an authorized individual and release the Trustee from any liability for so responding. The Debtor shall pay Trustee the maximum amount allowed by law for responding to such requests.

(k) *Real Property.* Concurrent with the execution hereof, the Debtor shall deliver to the Trustee a schedule of all interests in real property held by the Debtor (other than mortgages or deeds of trust previously assigned to the Trustee). The Debtor shall thereafter notify the Trustee promptly upon becoming aware that it is likely to acquire any interest in any real property (whether by foreclosure, deed in lieu of foreclosure or otherwise), and in any event not later than the acquisition of such interest. Each such schedule or notice shall identify the location of the real property, the circumstances under which it was acquired, the nature of the Debtor's interest, and such other information as the Trustee may reasonably request. Upon request of the Trustee at any time, the Debtor shall deliver (or cause to be delivered) to the Trustee, with respect to each such real estate interest, (i) such mortgages or deeds of trust as the Trustee may reasonably require to ensure that the Trustee holds a lien on such real estate interest, (ii) such title insurance policies as the Trustee may reasonably require to confirm and insure that the interest of the Trustee is subject to no prior liens, other than liens approved by the Trustee in writing, and (iii) such surveys, environmental audits, appraisals and other documents with respect to the applicable real property as the Trustee may reasonably require to establish the value of its interest therein.

**6. Subordination of Obligations to MCC and MTS.**

(a) *Definitions.* As used in this Section 6:

"**Junior Obligations**" means each and every debt, liability and obligation of every type and description that the Debtor may now or at any time hereafter owe to MCC or MTS, whether such debt, liability or obligation now exists or is hereafter created or incurred, and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or joint, several or joint and several, including but not limited to any obligation to pay Administrative Fees and any obligation to repay any amount deemed to be a loan under Section 3.

"**Restricted Payment**" means any payment by the Debtor on account of the Junior Obligations, and any other payment by the Debtor to MCC or MTS, whether or not the Debtor is obligated to make such payment, including but not limited to any payment of Administrative Fees.

"**Senior Obligations**" means the Obligations, as defined in the Series I Note Agreement, and the Obligations, as defined in the Series II Note Agreement, together with all obligations owed by the Debtor to the Trustee pursuant to this Agreement.

(b) *Subordination.* The payment of all of the Junior Obligations is hereby expressly subordinated to the extent and in the manner hereinafter set forth to the payment in full of the Senior Obligations. So long as any of the Senior Obligations remain outstanding, without the prior written consent of the Trustee, the Debtor shall not make, and neither MCC nor MTS shall demand, receive or accept, any Restricted Payment, except that, during the Forbearance Period, (i) the Debtor may make, and MCC may accept, payments (but not prepayments) of principal with respect to any loan deemed to have been made under Section 3 for the payment of interest on the Notes issued under the Series I Note Agreement, so long as such payment is made solely from collections of interest actually received from obligors on Receivables (as defined in the Series I Note Agreement) and Non-Receivable Assets (as defined in the Series I Note Agreement) constituting

Existing Series I Collateral, the payment of which interest was due prior to the date of such loan, and (ii) the Debtor may make, and MCC may accept, payments (but not prepayments) of principal with respect to any loan deemed to have been made under Section 3 for the payment of interest on the Notes issued under the Series II Note Agreement, so long as such payment is made solely from collections of interest actually received from obligors on Receivables (as defined in the Series II Note Agreement) and Non-Receivable Assets (Series II) (as defined in the Series II Note Agreement) constituting Existing Series II Collateral, the payment of which interest was due prior to the date of such loan. If MCC or MTS receives any Restricted Payment that it is not entitled to receive under the provisions of this Section 6, MCC or MTS (as the case may be) will hold the amount so received in trust for the Trustee and will forthwith turn over such Restricted Payment to the Trustee in the form received (except for the endorsement of MCC and/or MTS where necessary) for application to then-existing Senior Obligations (whether or not due). If MCC or MTS fails to make any endorsement required under this Agreement, the Trustee, or any of its officers or employees or agents on behalf of the Trustee, is hereby irrevocably appointed as the attorney-in-fact for MCC and MTS to make such endorsement in the name of MCC and/or MTS.

(c) *Action by MCC; Bankruptcy.* Neither MCC nor MTS will accelerate all or any part of the Junior Obligations, commence any action or proceeding against the Debtor to recover all or any part of the Junior Obligations, or join with any creditor in bringing any proceeding against the Debtor under any bankruptcy, reorganization, readjustment of debt, arrangement of debt, receivership, liquidation or insolvency law or statute of the federal or any state government, unless and until the Senior Obligations have been paid in full. In the event of any receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization or arrangement with creditors, whether or not pursuant to bankruptcy law, the sale of all or substantially all of the assets of the Debtor, dissolution, liquidation or any other marshaling of the assets or liabilities of the Debtor, MCC and MTS will file all claims, proofs of claim or other instruments of similar character necessary to enforce the obligations of the Debtor in respect of the Junior Obligations and will hold in trust for the Trustee and promptly pay over to the Trustee in the form received (except for the endorsement of MCC and/or MTS where necessary) for application to the then-existing Senior Obligations, any and all moneys, dividends or other assets received in any such proceedings on account of the Junior Obligations, unless and until the Senior Obligations have been paid in full. If MCC or MTS fails to take any such action, the Trustee, as attorney-in-fact for MCC and MTS, may take such action on behalf of MCC and MTS. MCC and MTS each hereby irrevocably appoint the Trustee, or any of its officers or employees on behalf of the Trustee, as the attorney-in-fact for MCC and MTS to demand, sue for, collect and receive any and all such moneys, dividends or other assets and give acquittance therefor and to file any claim, proof of claim or other instrument of similar character, and to take such other action in the Trustee's own name or in the name of MCC and/or MTS as the Trustee may deem necessary or advisable for the enforcement of the agreements contained herein; and MCC and MTS will execute and deliver to the Trustee such other and further powers-of-attorney or instruments as the Trustee may request in order to accomplish the foregoing.

(d) *Continuing Effect.* The subordination set forth in this Section 6 shall be continuing and irrevocable, and the Trustee may, without notice to or consent by MCC or MTS, to the extent the Trustee is authorized to do so under the Note Agreements, modify any term of the Senior Obligations in reliance upon this Agreement. Without limiting the generality of the foregoing, the Trustee may, to the extent it is authorized to do so under the Note Agreements, at any time and from time to time, without the consent of or notice to MCC or MTS and without incurring responsibility to MCC or MTS or impairing or releasing any rights of the Trustee or of the obligations of MCC and MTS hereunder:

-7-

    (i)    change the interest rate or change the amount of payment or extend the time for payment or renew or otherwise alter the terms of any Senior Obligations or any instrument evidencing the same in any manner;

    (ii)    sell, exchange, release or otherwise deal with any property at any time securing payment of the Senior Obligations or any part thereof;

    (iii)    release anyone liable in any manner for the payment or collection of the Senior Obligations or any part thereof;

    (iv)    exercise or refrain from exercising any right against the Debtor or any other person; and

    (v)    apply any sums received by the Trustee, by whomsoever paid and however realized, to the Senior Obligations in such manner as the Trustee shall deem appropriate.

(a)    *Other Affiliate Obligations.* The Debtor (i) represents that, as of the date hereof, the Debtor has no obligations to any Affiliate other than the Junior Obligations owed to MCC and MTS, and (ii) agrees that it will not incur any obligation to any Affiliate other than obligations constituting Junior Obligations owed to MCC and MTS. As used in this paragraph, **"Affiliate"** means any Person (as defined in the Series I Note Agreement) controlled by, controlling or under common control with the Debtor; and **"control"** of a Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

**7.    Disbursements for Principal and Interest Payments.**

Unless otherwise agreed to by the Trustee, so long as any Default or Event of Default has occurred and is continuing, the Debtor shall not request or use any disbursement from the Trust Account, as defined in either Note Agreement, for any purpose other than the payment of principal and interest on the Notes, as defined in that Note Agreement, or of obligations owed to the Trustee. Concurrent with any request for a withdrawal of funds from either Trust Account, the Debtor shall deliver to the Trustee a schedule setting forth the identity of each Noteholder to be paid from the proceeds of such disbursement, the amount of the payment to be made to such Noteholder, and the percentage of the outstanding interest and principal owing to such Noteholder that will be paid thereby. Except to the extent otherwise required by the applicable Note Agreement, the Debtor shall apply each withdrawal from either Trust Account for the payment of principal or interest on the Notes (i) first, to the payment of accrued but unpaid interest on the Notes issued under that Note Agreement that is due or past due as of the date of payment, ratably in the proportion that the accrued but unpaid due or past-due interest on each Note bears to the aggregate due or past-due interest on Notes under that Note Agreement; and (ii) second, to the payment of principal of the Notes issued under that Note Agreement that is due or past due as of the date of payment, ratably in the proportion that the principal of each Note bears to the aggregate due or past-due principal of all Notes under that Note Agreement.

**8.    Additional Reporting.**

The Debtor shall deliver to the Trustee:

(a)    Not more than 5 but not less than 3 Business Days before each Interest Payment Date, a schedule of all outstanding Notes as of the last day of the calendar month immediately preceding such Interest Payment Date, including for each Note the Noteholder thereof (including name, address and other contact information), the issuance date, maturity date and principal balance thereof, the interest rate applicable thereto, the amount, date and allocation (among principal and interest) of the most recent payment thereunder, the amount, date and allocation of the next payment due thereunder, and the amount, date and allocation of any past due payments thereon.

(b) On or before the date hereof and on or before the 10th calendar day of each calendar month, a collateral report setting forth, for all Receivables (as defined in either Note Agreement), Non-Receivable Assets (as defined in the Series I Note Agreement) and Non-Receivable Assets (Series II) (as defined in the Series II Note Agreement), the aggregate amount of principal and interest owing to the Debtor with respect thereto, the amount and date of all payments thereunder during the preceding calendar month, and the amount, due date and days delinquent with respect to each payment that is past due thereunder.

(c) As soon as available, and in any event not more than 105 days after the end of each fiscal year of MCH, a copy of the annual financial statements of MCH, which financial statements shall include the consolidated balance sheet of MCH as of the end of such fiscal year and the related consolidated statements of income, owners' equity and cash flows for the fiscal year then ended, as well as the related consolidating statements for MCC and Debtor, all in reasonable detail, prepared in accordance with generally accepted accounting principles and reviewed by independent certified public accountants of recognized national standing selected by MCH, together with a certificate in form and substance satisfactory to the Trustee, executed by the chief financial officer of MCH, stating that such financial statements have been prepared in accordance with GAAP.

(d) As soon as available, and in any event not more than 45 days after the end of each fiscal quarter of MCH, the consolidated and consolidating balance sheet of MCH as at the end of such quarter and related consolidated and consolidating statements of earnings and cash flows of MCH for such quarter and for the year to date, in reasonable detail and stating in comparative form the figures for the corresponding date and period in the previous year, all prepared in accordance with generally accepted accounting principles, subject to year-end audit adjustments, together with a certificate in form and substance satisfactory to the Trustee, executed by the chief financial officer of MCH, stating that such financial statements have been prepared in accordance with GAAP, subject to year-end adjustments.

(e) Promptly upon receipt, copies of all appraisals, collateral reports or similar documents received by the Debtor with respect to any Collateral (including but not limited to any property acquired by the Debtor through foreclosure or transfer in lieu of foreclosure) and all financial statements or similar reports received by the Debtor with respect to any obligor with respect to any Collateral.

(f) From time to time, such other information as the Trustee may from time to time request regarding the Notes, the Debtor or the Collateral.

### 9. Inspection Rights.

The Debtor shall, at any time and from time to time upon request of and reasonable notice by the Trustee, give any representatives of the Trustee (including independent professionals engaged by the Trustee) access to, and permit such representatives to examine, copy or make extracts from, any and all books and records of the Debtor and other documents in the Debtor's possession or control, and to review the Collateral and collection activities with respect thereto.

### 10. Acknowledgment.

The Debtor hereby acknowledges and agrees (i) each Note Agreement and Note is the Debtor's valid obligation, enforceable in accordance with its terms, (ii) all Obligations (as defined in each Note Agreement) are fully due and owing by the Debtor without restriction, defense, offset, deduction or counterclaim of any kind or character whatsoever, and (iii) because the Debtor failed to pay the Notes in full as they matured, Events of Default have occurred under both Note Agreements, and the Trustee is accordingly entitled to exercise the rights and remedies available to it under the Note Agreements and by law on account of an Event of Default.

### 11. Payment of Costs.

The Debtor reaffirms its obligation under the Note Agreements, and specifically agrees, to pay or reimburse the Trustee on demand for all costs and expenses incurred by the Trustee in connection with the Note Agreements, including but not limited to all fees and disbursements of legal counsel to the Trustee, and specifically including all costs and expenses of the Trustee, including attorneys' fees, incurred in connection with the drafting and preparation of this Agreement and any related documents.

### 12. Conditions Precedent.

The agreements of the Trustee set forth in Section 2 are subject to the conditions precedent that, on or before the date hereof (or such later date as the Trustee may approve in writing), the Debtor shall have delivered to the Trustee each of the following, each in form and substance satisfactory to the Trustee:

(a) This Agreement, duly executed by the Debtor.

(b) The initial remittance required with respect to the Expense Reserve Account in accordance with Section 4.

(c) All items required to be delivered on or before the date hereof pursuant to Section 8.

### 13. Release.

The Debtor, MCC and MTS do each hereby waive, release, relinquish and forever discharge the Trustee and the Noteholders, and their past and present directors, officers, agents, employees, parents, subsidiaries, affiliates, insurers, attorneys, representatives and assigns, and each and all thereof (collectively, the "**Released Parties**"), of and from any and all manner of action or causes of action, suits, claims, demands, judgments, damages, levies, and the execution of whatsoever kind, nature and/or description arising on or before the date hereof, including, without limitation, any claims, losses, costs or damages, including compensatory and punitive damages, in each case whether known or unknown, liquidated or unliquidated, fixed or contingent, direct or indirect, which the Debtor, MCC or MTS ever had or now has or may claim to have against any of the Released Parties, with respect to any matter whatsoever, including, without limitation, the administration of the Note Agreements and the negotiations relating to this Agreement.

### 14. WAIVER OF JURY TRIAL.

**THE DEBTOR, MCC, MTS AND THE TRUSTEE EACH IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE NOTE AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. THE DEBTOR, MCC, MTS AND THE TRUSTEE EACH REPRESENT TO EACH OTHER THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY GIVEN.**

### 15. Miscellaneous.

This Agreement sets forth the entire agreement of the parties with respect to the subject matter hereof. It cannot be waived, modified or amended except by a writing signed by the party against which enforcement is sought. This Agreement shall be governed by the internal law of Minnesota. This Agreement shall be binding upon and shall accrue to the benefit of the parties and their successors and assigns. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts of this Agreement, taken together, shall constitute but one and the same instrument.

-11-

**16.   Advice of Counsel.**

Each of the Debtor, MCC and MTS acknowledges and agrees that it has received the advice of independent counsel selected by it before entering into this Agreement, and has not relied upon the Trustee or any of its officers, directors, employees, agents or attorneys concerning any aspect of the transactions contemplated by this Agreement.

*Signature pages follow*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above-written.

**MEDICAL PROVIDER FINANCIAL CORPORATION III**

By _____
Name: Joseph J. Lampariello
Title: President

**MEDICAL CAPITAL CORPORATION, INC.**

By _____
Name: Sid M. Field
Title: Chief Executive Officer

**MEDICAL TRACKING SERVICES, INC.**

By _____
Name: Joseph J. Lampariello
Title: President

*Signature page to Medical Provider Financial Corporation III Forbearance Agreement*

WELLS FARGO BANK, NATIONAL
ASSOCIATION, as Trustee

By _*Elizabeth A. Walker*_ (signature)
Name: Elizabeth A. Walker
Title: Vice President

*Signature page to Medical Provider Financial Corporation III Forbearance Agreement*