1  DAVID R. ZARO (BAR NO. 124334)
   MICHAEL R. FARRELL (BAR NO. 173831)
2  ALLEN MATKINS LECK GAMBLE
       MALLORY & NATSIS LLP
3  515 South Figueroa Street, Ninth Floor
   Los Angeles, California 90071-3309
4  Phone: (213) 622-5555
   Fax: (213) 620-8816
5  E-Mail: dzaro@allenmatkins.com
            mfarrell@allenmatkins.com
6
   EDWARD G. FATES (BAR NO. 227809)
7  ALLEN MATKINS LECK GAMBLE
       MALLORY & NATSIS LLP
8  501 West Broadway, 15th Floor
   San Diego, California 92101-3541
9  Phone: (619) 233-1155
   Fax: (619) 233-1158
10 E-Mail: tfates@allenmatkins.com

11 Attorneys for Defendant
   THOMAS SEAMAN
12

13              UNITED STATES DISTRICT COURT

14            SOUTHERN DISTRICT OF CALIFORNIA

15                   SOUTHERN DIVISION

16 SECURITIES AND EXCHANGE          Case No. SACC09-818 DOC (RNBx)
   COMMISSION,
17                                  10 DAY REPORT AND ACCOUNTING
              Plaintiff,            OF RECEIVER THOMAS A. SEAMAN
18
         v.                         Complaint Filed: July 16, 2009
19
   MEDICAL CAPITAL HOLDINGS,
20 INC.; MEDICAL CAPITAL
   CORPORATION; MEDICAL
21 PROVIDER FUNDING
   CORPORATION VI; SIDNEY M.
22 FIELD; AND JOSEPH J.
   LAMPARIELLO,
23
              Defendants.
24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ................................................................ 1

II.    PROCEDURAL BACKGROUND ....................................... 2

III.   SUMMARY OF RECEIVER'S ACTIVITIES TO DATE........................... 3

       A.    The Vacated TRO ................................................. 3

       B.    The Existing TRO................................................. 4

IV.    FACTUAL BACKGROUND ............................................. 5

       A.    Operations Overview/Corporate Structure.................. 6

       B.    Current Financial Condition of the MPs ..................... 9

             1.    MP I............................................................ 10

             2.    MP II .......................................................... 10

             3.    MP III ......................................................... 11

             4.    MP IV ......................................................... 11

             5.    MP V .......................................................... 12

             6.    MP VI ......................................................... 12

       C.    Investment/Operating Entities ................................ 13

             1.    Medical Capital Corporation............................ 13

             2.    Medical Tracking Services, Inc ........................ 13

             3.    National Health Benefits Corporation................. 14

             4.    Healthcare Financial Management & Acquisitions, Inc........................................................... 15

             5.    The Perfect Game, LLC .................................. 16

             6.    Vivavision, Inc ............................................. 17

             7.    Single Touch Interactive, Inc .......................... 18

             8.    Georgia Medical Provider Financial Corporation......... 18

             9.    Gulf Pines Hospital, Inc ................................. 19

             10.   Corporate Impressions, LLC............................ 19

             11.   15101 Red Hill Holdings, LLC......................... 19

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

INTERIM REPORT OF RECEIVER

|  |  |  | **Page** |
|---|---|---|---|
|  | 12. | Castle Hill Investors | 20 |
| V. | AREAS OF CONCERN | | 20 |
| | A. | Diversion/Withholding of Accounts Receivable Payments by Providers | 20 |
| | B. | Transfer of Accounts Receivable Between SPC's | 22 |
| | C. | Other Intercompany Transfers | 25 |
| | D. | Trace Life Science | 26 |
| | | 1. Use of Loan Accounts | 26 |
| | | 2. Environmental/Asset Value Issues | 26 |
| | E. | Overstatement of Collateral Values | 26 |
| | | 1. Non-AR Collateral | 27 |
| | | 2. Potential Non-Arms Length Loan Transactions | 27 |
| | F. | Mischaracterization of Assets as Medical Receivables | 28 |
| | G. | Potential Violation of the Security Agreements | 28 |
| | H. | Failure to Preserve Collateral Value | 28 |
| | I. | Administration of the Receivership | 29 |
| VI. | PENDING LITIGATION INVOLVING RECEIVERSHIP ENTITIES | | 29 |
| | A. | Actions Brought by the Receivership Entities | 30 |
| | | 1. New Life Sciences | 30 |
| | | 2. Concept 1 Academies | 30 |
| | | 3. Trace Life Sciences | 30 |
| | | 4. Dermacia | 30 |
| | B. | Actions Brought Against Receivership Entities | 30 |
| | | 1. Coalition America | 30 |
| | | 2. Progressive Insurance | 31 |
| | | 3. State Farm Insurance | 31 |
| | | 4. Loan Oak Fund | 31 |

1

**Page**

VII.    RECOMMENDATIONS............................................................................. 32

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

INTERIM REPORT OF RECEIVER

(iii)

I. **INTRODUCTION**

Thomas A. Seaman, Court-appointed receiver ("Receiver") of Medical Capital Holdings, Inc. ("MCH"), Medical Capital Corporation ("MCC"), Medical Provider Funding Corporation VI ("MP VI"), and their subsidiaries and affiliates (collectively, the "Receivership Entities"), submits this 10 Day Report (the "Report") pursuant to Paragraph VII(E) of the Temporary Restraining Order and Orders: (1) Freezing Assets; (2) Appointing a Temporary Receiver; (3) Prohibiting the Destruction of Documents; and (4) Requiring Accountings; and Order to Show Cause Re: Preliminary Injunction and Appointment of a Permanent Receiver entered on August 3, 2009 ("TRO").  This Report provides the Court and all interested parties with the status of the Receiver's activities and preliminary findings to date. The Receiver and his counsel have met with many people and reviewed countless documents and records over the 10-day period. **The volume of material and information acquired, the shortness of time, the complexity of the matters analyzed and the need for additional information, verification and analysis requires that this Report be considered preliminary; the Receiver may need to materially modify its contents after further review and analysis.** The Court will note that the amount of hard accounting data in the Report is limited.  Based on his preliminary investigation, the Receiver determined that much of the company's financial documentation was unreliable, forcing the Receiver to review source documents such as cash reports and bank documents to find accurate information. Given these limitations, the large volume of transactions, the numerous intercompany transactions, the misapplication of collections between MPs, and the short time period for preparation of this Report, the Receiver was unable to generate complete financial statements.  The Receiver anticipates that the preparation of a more complete accounting will require significant additional time.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA                                                -1-

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

## II.   **PROCEDURAL BACKGROUND**

On July 16, 2009, the Securities and Exchange Commission ("Commission") commenced an enforcement action against MCH, MCC, MP VI, Sidney M. Field and Joseph J. Lampariello ("Defendants"), alleging various violations of securities laws. On the same day, the Commission filed an Ex Parte Application for Temporary Restraining Order and Orders: (1) Freezing Assets; (2) Appointing a Temporary Receiver; (3) Prohibiting the Destruction of Documents; (4) Granting Expedited Discovery, and (5) Requiring Accountings; and Order to Show Cause Re: Preliminary Injunction and Appointment of a Permanent Receiver.

On July 20, 2009 (the "Original Appointment Date"), the Court entered a Temporary Restraining Order and Orders: (1) Freezing Assets; (2) Appointing a Temporary Receiver; (3) Prohibiting the Destruction of Documents; and (4) Requiring Accountings; and Order to Show Cause Re: Preliminary Injunction and Appointment of a Permanent Receiver (the "Original Order"), appointing Thomas A. Seaman as temporary receiver for the Receivership Entities. On July 21, 2009, at the request of the Defendants, the Court vacated the Original Order and ordered the submission of additional briefing and evidence by the parties to the action.

On August 3, 2009 (the "Appointment Date"), the Court entered the TRO, again appointing Thomas A. Seaman as temporary receiver for the Receivership Entities. Pursuant to Paragraph VII of the TRO, the Receiver is required to undertake certain tasks, including:

> C.     to conduct such investigation and discovery as may be necessary to locate and account for all of the assets . . . ,
>
> D.     to take such action as is necessary and appropriate to preserve and take control of and to prevent the dissipation, concealment or disposition of any assets . . . ,
>
> E.     to make an accounting, . . . of the assets and financial condition . . . ;
>
> G.     to employ attorneys and others to investigate and, where appropriate, to institute, pursue and prosecute all claims and causes of action of whatever kind and nature . . . .

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

## III.   SUMMARY OF RECEIVER'S ACTIVITIES TO DATE

Pursuant to the authority granted to him under Paragraph VII(G) of the TRO, the Receiver has engaged Allen Matkins Leck Gamble Mallory & Natsis LLP ("Allen Matkins") as his general counsel, and LECG, LLC as forensic computer and data preservation specialists.  The Receiver's forensic accounting work is being performed by the Receiver and his staff at Thomas Seaman Company.  Allen Matkins, LECG and the staff at Thomas Seaman Company have assisted the Receiver in various capacities in all aspects of his preliminary investigation.

### A.   The Vacated TRO

On July 20, 2009, upon receiving notice that the Court had entered the Original Order, the Receiver went to the MCC offices in Tustin and secured the premises by having the locks changed.  The Original Order was entered in the afternoon on July 20th.  When the Receiver arrived at the MCC premises, most employees had gone home for the day.  The Receiver gave a copy of the Original Order to all employees who were present, inspected the building, and met with Mr. Lampariello and Mr. Fazio.

In the meantime, the Court entered a minute order granting the Defendants' request for additional time to respond to the Commission's Ex Parte Application. The Receiver's counsel promptly called the Court for clarification regarding the two orders and left a voicemail message.

The following morning, the Receiver, his counsel and his forensic computer specialists from LECG arrived at the MCC premises at approximately 7:00 a.m. The Receiver provided a copy of the Original Order to all employees as they arrived.  The employees were advised that MCC and its affiliated companies had temporarily been put under the sole management and control of the Receiver. Employees were asked to remain in a large conference room and to not return to their desks unless accompanied by the Receiver or his assistants.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

-3-

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

1    LECG immediately began work to preserve the electronic data located on the

2  company servers and hard drives. With the assistance of counsel, the Receiver

3  conducted interviews of MCC's employees. Shortly before 11:00 a.m., the Receiver

4  received notice that the Original Order had been vacated by the Court. He

5  immediately called a meeting of all MCC employees and advised them that his

6  appointment had been vacated and that they could return to work as they normally

7  would. The Receiver promptly turned over the keys to Mr. Fazio and left the

8  building. The subsequent interaction outside the building between the Receiver's

9  counsel and Mr. Fazio is described in the Declaration of David R. Zaro filed on July

10  28, 2009.

11    B.    The Existing TRO

12    On August 3, 2009, upon receiving notice that the TRO had been entered, the

13  Receiver travelled to the MCC premises in Tustin, secured the premises and called a

14  meeting of all MCC employees. The Receiver advised the employees that unless

15  they were called by him or his representatives and asked to come back in to work,

16  their employment with MCC was terminated effective immediately. The employees

17  informed the Receiver that no one had been paid the July 31 payroll and certain

18  employees' July 15 payroll had also not been paid. In addition, the Receiver is

19  informed that the health insurance premium had not been paid and was therefore

20  cancelled as of July 31, 2009.

21    LECG immediately resumed their electronic data preservation work which

22  consists of making an unalterable forensically sound image of all digital

23  information. The Receiver asked a few employees to return to the MCC offices and

24  assist the Receiver and his staff in locating key documents and financial data, and in

25  notifying interested parties of the TRO. From that point forward, the Receiver and

26  his counsel have taken the following initial steps to investigate and secure the assets

27  of the Receivership Entities, enforce and implement the TRO, preserve the value of

28  the Receivership Entities, and prepare this initial report to the Court:

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

-4-

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

1      1) Provide notice of the TRO, including the Receiver's appointment and the

2   stay of all creditor actions against the Receivership Entities, to as many as interested

3   parties as possible, including employees (of MCC and affiliated companies), outside

4   counsel and accountants, banks and other financial institutions, the trustees for the

5   MP funds, noteholders, healthcare provider clients, insurance companies with

6   accounts payable to the Receivership Entities, parties in pending litigation or

7   transactions with the Receivership Entities, broker-dealers and brokers that sold MP

8   notes, companies in which the Receivership Entities have equity investments and/or

9   to whom the Receivership Entities have made loans, lenders with security interests

10  in receivership assets and other creditors.

11     2) Interview former MCC employees and counsel (Mr. Fazio and various

12  outside counsel) regarding the operations and assets of the Receivership Entities,

13  pending litigation and transactions, and the flow of funds into and out of the

14  companies.

15     3) Locate and review company documents pertaining to key non-receivable

16  assets, pending litigation and various transactions.

17     4) Advise insurance companies and healthcare providers regarding the

18  possible diversion by healthcare providers of medical receivable payments owed to

19  the MP funds in breach of relevant receivable purchase agreements and in violation

20  of the TRO.

21     5) Establish a website at www.medicalcapitalreceivership.com with

22  information about the case and the receivership for interested parties, including the

23  Commission's complaint, the TRO and the Court's August 3, 2009 minute order.

24  **IV.    FACTUAL BACKGROUND**

25     The following reflects the Receiver's report on the corporate structure,

26  enterprise and operations of the Receivership Entities based on interviews,

27  document review and observations.  As with other aspects of this Report, the

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA                                                      -5-

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

1  information in this section is preliminary and subject to modification by the

2  Receiver as his investigation continues.

3      A.    <u>Operations Overview/Corporate Structure</u>

4      The Receivership Entities were in the business of purchasing healthcare

5  accounts receivable at a discount from healthcare providers, making other loans and

6  investments, and managing the collection of such receivables/loans/investments.

7  The Receivership Entities' activities were managed through its chief operating

8  company, MCC, a wholly owned subsidiary of MCH.

9      The funds used to make investments were raised through the sale of

10  promissory notes to investors from Special Purpose Corporations ("SPC's").

11  Defendant MP VI is one such SPC.[1] The notes are sold as private placements, and

12  potential investors receive a Private Placement Memorandum ("PPM") describing

13  the terms of the notes, the nature of, and limitations on, the loans and investments

14  that will be made with the proceeds, and the policies and procedures for the payment

15  of fees to the trustees of the MP's (who hold the funds from noteholders until they

16  are used to make investments, and who release funds to the MP's for the purpose of

17  making payments of interest and principal to noteholders)[2] to MCC, and to MTS

18  (defined *infra)*. MCC was the Administrator for each MP pursuant to an

19  Administrative Services Agreement. MTS was the Servicer for each MP pursuant to

20  a Master Service Agreement. As Administrator and Servicer, MCC and MTS

21

22  [1]  MP VI is the last in a series of SPC's comprised of Medical Provider Financial
23  Corporation I ("MP I"), Medical Provider Financial Corporation II ("MP II"),
Medical Provider Financial Corporation III ("MP III", which is divided into
24  Series 1 ("MP III.1") and Series 2 ("MP III.2")), Medical Provider Financial
Corporation IV ("MP IV", which is divided into Series 1 ("MP IV.1") and Series
25  2 ("MP IV.2")), and Medical Provider Financial Corporation V ("MP V")
Collectively, the MP entities are referred to herein as the "MP's" or the "MP
26  Series". Prior to the MP series, MCH had created similar SPC's through which it
conducted similar note offerings and receivable factoring operations. These
27  earlier SPC's include a series under the name Carlmont Capital. Each of the
SPC's are wholly owned subsidiaries of MCH.
28  [2]  In the case of MP I, II, IV and VI, the trustee is Bank of New York Mellon
("BNYM"). In the case of MP III and V, the trustee is Wells Fargo Bank
("WFB").

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

-6-

1  essentially performed all functions of the MP's, including (a) negotiating, executing

2  and issuing promissory notes, (b) identifying and evaluating potential receivable

3  purchase transactions, loans and other investments, (c) producing reports and

4  statements to the trustees required for the release of monies for the funding of

5  receivable purchases, loans and other investments, (d) handling healthcare provider

6  and noteholder relations, (e) processing receivable payments and other loan and

7  investment payments through lockbox accounts to the trustee, and (f) providing

8  periodic reports to the trustee. Indeed, the MP's had no employees or offices of their

9  own, and therefore relied entirely on MCC, and to a lesser degree MTS, to perform

10  all functions.

11      As envisioned, the operation of each MP was governed by, among other

12  contracts, a Note Issuance and Security Agreement (the "Security Agreement")

13  between the MP and the trustee. Pursuant to the Security Agreements and

14  Administrative Services Agreements, MCC could request payment of an

15  Administrative Fee which was based on a written certification by the MP (prepared

16  by MCC as Administrator) to the trustee of the pertinent MP fund. The certification

17  was to include the calculation of the Net Collateral Coverage Ratio, which was

18  apparently derived by adding together the value of all cash, eligible receivables and

19  collateral, then dividing that number by the amounts payable under the Security

20  Agreement and Notes issued thereunder (principal due at maturity and interest then

21  due to noteholders, trustee/lockbox/servicing costs). It is important to note that in

22  valuing collateral, accounts receivable are only "eligible" to be included if they were

23  purchased by the MP within 180 days of the date the claim was submitted to the

24  payor. Additionally, loans made by the MPs must be valued using the *lesser* of the

25  principal and interest due from the borrower or the value of the property securing

26  them. If the Net Collateral Coverage Ratio was greater than 100% (i.e. the stated

27  value of the assets exceeded the current liabilities), MCC appears to have taken the

28  position that it could request an Administrative Fee in an amount up to the entire

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

-7-

1   balance in the account above and beyond that necessary to maintain the 100% ratio

2   (although it is not clear that this was done).

3       According to its agreements and disclosures, the MP (through MCC as

4   administrator) was to have all real and personal property securing loans and

5   investments appraised at least once a year by an independent appraiser. The MP

6   was to then certify each year that the required valuations had been completed. Each

7   certification of the Net Collateral Coverage Ratio was to be based on the most recent

8   valuations. Thus, MCC was only entitled to an Administrative Fee if, based on

9   recent independent valuations, the Net Collateral Coverage Ratio was at least 100%.

10      MCC was very successful in attracting investors, apparently raising over

11  $1.7 billion from investors in the MP series. In more recent years, however, MCC

12  appears to have strayed from its core competency of purchasing and collecting

13  medical receivables, and began using investor funds to make direct loans to

14  healthcare providers. As time went on, MCC used a significant percentage of

15  investor funds to make investments unrelated to the healthcare industry, including

16  real estate, advertising, mobile phone technology, and even a feature film.

17      MCC has collected Administrative Fees in the amount of $324.899 million

18  from the MP's. A summary of Administrative Fees by MP follows ($000):

19              MPFC I                      91,030

20              MPFC II                     55,659

21              MPFC III                    48,650

22              MPFC IV                     56,565

23              MPFC V                      48,030

24              MPFC VI                     24,615

25              Total                      324,899

26  Attached hereto as Exhibit "1" is a breakdown of the Administrative Fees by year.

27      Beginning in August 2008 and continuing through the present, MP II through

28  VI defaulted on their obligations to make payments of interest and/or principal to

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP
835188.03/LA                                                         -8-
                                    INTERIM REPORT OF RECEIVER
                                    INTERIM REPORT OF RECEIVER

1  noteholders.  The financial condition of each of the MP's, and the collateral securing

2  obligations to noteholders, is addressed in more detail in section IV.B. below.

3      Generally, based on the Receiver's preliminary investigation to date, it

4  appears that the defaults were the result of a number of factors, including but not

5  limited to, certain non-accounts receivable loans and investments that are in default

6  and/or have generated little or no returns; interfund transfers of accounts receivable

7  at prices that appear to be inflated; failure to foreclose on collateral or exercise other

8  rights under governing agreements; and the apparent diversion by healthcare

9  provider clients of payments on receivables purchased by the MPs.  As a result, it

10  appears that noteholders will almost certainly suffer significant losses on their

11  investments.

12      B.    Current Financial Condition of the MPs

13      The flow of funds into the Receivership Entities from the collection of

14  accounts receivable has slowed to a trickle.  As of June 30, 2009, MCC reported

15  collateral securing obligations to noteholders with an aggregate value of over

16  $1.1 billion, but in July 2009 collected only approximately $317,000.  MP VI

17  collected only approximately $282,000 from collateral with a stated aggregate value

18  of nearly $80 million.  The following table provides the June and July monthly

19  collections by MP in comparison to the stated value of the collateral.

| Entity | JUNE | JULY | 6/30/09 Collateral Report |
|---|---|---|---|
| MP I | 5,000 | - | - |
| MP II | 1,000 | - | 122,441,000 |
| MP III | 115,000 | 17,000 | 153,141,000 |
| MP IV | 15,000 | 5,000 | 425,180,000 |
| MP V | | | |

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

-9-

|  |  | 11,000 | 13,000 | 407,032,000 |
|---|---|---|---|---|
|  | MP VI | 365,000 | 282,000 | 79,531,000 |
|  | TOTAL | 512,000 | 317,000 | 1,187,325,000 |

The Receiver found the existing financial records of the Receivership Entities to be generally unreliable based on, among other things, the failure to comply with GAAP accounting rules. Additionally, it appears that the accountants were in some cases given specific instructions as to how to account for various matters, which calls into question the resulting figures. The Receiver is in the process of generating independent financial records on a cash basis for each entity.

     1.   MP I

MP I received total funds from investors in the amount of approximately $254 million. In return, the investors received principal in the amount of $254 million and interest in the amount of $40.054 million  MCC was paid administrative fees of approximately $91 million or more than one-third of the amount raised from investors.

MCC and trustee records indicate that approximately $375,000 remains due and owing to investors, however, all of the assets of MP I have been liquidated and distributed.

     2.   MP II

MP II received total funds from investors in the amount of approximately $251 million. In return, the investors received principal in the amount of $162.7 million and interest in the amount of $87.6 million. MCC was paid administrative fees of approximately $55.6 million.

As of June 30, 2009, reports by MCC indicate that the outstanding balance payable on issued notes was approximately $88 million, and that the value of the cash and collateral securing such obligation was approximately $122 million. However, based on the Receiver's investigation to date, it appears that MCC's stated

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

-10-

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

1 | valuation of the collateral is unreliable. For example, MCC's report values the
2 | collateral identified as "SMB King – Acquisition Note" at $30 million, but the
3 | facility in question is now the subject of a proposed sale at a proposed purchase
4 | price of $14.4 million (see section IV.C.12).

5 |          3.    <u>MP III</u>

6 |     MP III, which is divided in to two series, received total funds from investors
7 | in the amount of approximately $354 million. In return, the investors received
8 | principal in the amount of $244.6 million and interest in the amount of $43.639
9 | million. MCC was paid administrative fees of approximately $48.6 million.

10 |     As of June 30, 2009, reports by MCC indicate that the outstanding balance
11 | payable on issued notes was approximately $109 million, and that the value of the
12 | cash and collateral securing such obligation was approximately $153 million.
13 | However, based on the Receiver's investigation to date, it appears that MCC's stated
14 | valuation of the collateral is unreliable. For example, MCC's report values the
15 | collateral identified as "Trace Life Science, Inc." at $30 million, but the facility in
16 | question is not operating, is unable to pay its bills, and appears to have made interest
17 | payments on the pertinent loan by using an MP III line of credit (see section V.D).

18 |          4.    <u>MP IV</u>

19 |     MP IV, which is divided into two series, received total funds from investors
20 | in the amount of approximately $407 million. In return, the investors received
21 | principal in the amount of $6.416 million and interest in the amount of $58 million.
22 | MCC was paid administrative fees of approximately $56.6 million.

23 |     As of June 30, 2009, reports by MCC indicate that the outstanding balance
24 | payable on issued notes was approximately $401 million, and that the value of the
25 | cash and collateral securing such obligation was approximately $425 million.
26 | However, based on the Receiver's investigation to date, it appears that MCC's stated
27 | valuation of the collateral is unreliable. For example, MCC's report values the
28 | collateral related to the Legacy Medical Center in Georgia at $40 million, but the

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

-11-

1  facility in question has been foreclosed and is not currently operating (see section

2  IV.C.8).

3         5.    <u>MP V</u>

4      MP V received total funds from investors in the amount of approximately

5  $403 million.  In return, the investors received principal in the amount of $2.32

6  million and interest in the amount of $41.063 million.  MCC was paid

7  administrative fees of approximately $48 million.

8      As of June 30, 2009, reports by MCC indicate that the outstanding balance

9  payable on issued notes was approximately $401 million, and that the value of the

10  cash and collateral securing such obligation was approximately $407 million.

11  However, based on the Receiver's investigation to date, it appears that MCC's stated

12  valuation of the collateral is unreliable.  For example, approximately $20 million in

13  medical accounts receivable relate to the Georgia facility referenced above that was

14  foreclosed and shut down.

15         6.    <u>MP VI</u>

16      MP VI received total funds from investors in the amount of approximately

17  $75 million.  In return, the investors received principal in the amount of $.914

18  million and interest in the amount of $3.688 million.  Of the amount raised by

19  investors, $9.326 million was used to purchase new accounts receivable and make

20  other investments, and $41.715 million was used to purchase assets from prior MP's.

21  MCC was paid administrative fees of approximately $24.4 million, approximately

22  one-third of the amount raised from investors.

23      As of June 30, 2009, reports by MCC indicate that the outstanding balance

24  payable on issued notes was approximately $74 million, and that the value of the

25  cash and collateral securing such obligation was approximately $80 million.

26  However, based on the Receiver's investigation to date, it appears that MCC's stated

27  valuation of the collateral is unreliable.  For example, millions of dollars of listed

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

1  medical receivables appear to be old, uncollectible receivables that have been

2  systematically sold from MP to MP (see section V.B).

3      C.    Investment/Operating Entities

4      As referenced above, MCC was the chief operating company for the Medical

5  Capital entities. It appears that in addition to the MP's, MCH and/or MCC hold

6  interests in a number of other entities, either as operating subsidiaries or as entities

7  formed to hold title to collateral on which one or more of the MP's foreclosed.

8          1.    Medical Capital Corporation

9      MCC is a wholly owned subsidiary of MCH. The directors of MCC are

10  Defendants Sidney Field and Joseph Lampariello, as well as Lawrence J. Edwards.

11  Mr. Field also serves as MCC's Chief Executive Officer. Mr. Lampariello also

12  serves as MCC's President and Chief Operating Officer. Other key employees of

13  MCC included Alan Meister (Treasurer and Chief Financial Officer), Thomas Fazio

14  (General Counsel). MCC's operations are discussed above. MCC's primary source

15  of revenue was the Administrative Fees paid through various SPC's.

16          2.    Medical Tracking Services, Inc.

17      Medical Tracking Services, Inc. ("MTS") is a wholly owned subsidiary of

18  MCH. MTS is a Nevada Corporation. The President is Juan Roncal and as of the

19  Appointment Date it had approximately 6 employees. MTS provided data entry of

20  receivables and receivable payments for the MP's. When the MP's received batches

21  of receivables under receivable purchase agreements, claim information was directly

22  uploaded from the provider to MTS which audited the information for errors,

23  duplication, etc., and input the data into customized tracking software. As

24  receivable payments came in from insurance companies, MTS would enter data on

25  the payments into the tracking program. MTS would then generate and provide

26  reports to MCC and the MP's on receivable collections.

27      Given the lack of funding for operations and the low volume of receivable

28  collections, the Receiver has terminated the employees of MTS. To the extent there

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

-13-

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

1   is an ongoing need for the services previously provided by MTS, the Receiver

2   intends to employ selected former employees of MCC to perform those services.

3           3.    National Health Benefits Corporation

4           National Health Benefits Corporation ("NHBC") is a Nevada Corporation

5   whose principal place of business is in Scottsdale, Arizona. It is a wholly owned

6   subsidiary of MCH. The President of NHBC is John Morris, and the company

7   currently has 32 employees. NHBC contracts with companies that are self-insured

8   and assists such companies in identifying an appropriate Preferred Provider

9   Organization (PPO) and in administering claims. NHBC's revenues come from

10  access fees paid by its clients, which entitle the clients to use NHBC's database of

11  PPO information, and from fees based on claims cost savings achieved by NHBC.

12          NHBC has been in existence since 2001 and has apparently operated at a loss

13  each year. The Receiver understands that MCH and/or MCC has provided a line of

14  credit to NHBC, a significant portion of which has been used to develop the

15  database of PPO information. It appears that MCC has directly withdrawn

16  approximately $700,000 from NHBC revenues in the last two months.

17          In addition, NHBC recently had judgment entered against it in an action

18  pending in the U.S. District Court for the Northern District of Georgia in an amount

19  of approximately $2.7 million. In a recent interview, Mr. Morris informed the

20  Receiver that the company needs capital, but based on anticipated reductions in

21  costs and expected revenues, the company expects to operate at a profit in the near

22  future.

23          Given the potential value of the tangible and intangible assets of NHBC as an

24  operating company, including the database of PPO information and relationships

25  with insurers, the Receiver has elected to maintain NHBC's operations for the time

26  being, subject to further review and analysis.

27

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

-14-

4.    Healthcare Financial Management & Acquisitions, Inc.

Healthcare Financial Management & Acquisitions, Inc. ("HFMA") is a Nevada corporation whose principal place of business was in New York, New York. The President of HFMA is Gary Urbanowicz and as of the Appointment Date the company had approximately 5 employees, including Mr. Urbanowicz. Through its subsidiaries, which include both wholly owned and partially owned entities, HFMA provided billing and collections services for healthcare providers.

The Receiver has discussed the operations and financial condition of HFMA with Mr. Urbanowicz. HFMA was unable to pay rent due under its office lease, and therefore was forced to vacate its office space on May 31, 2009. Mr. Urbanowicz and four employees were working out of their homes after that date. All work ceased as of about July 31, 2009. The Receiver has suspended operations of HFMA and terminated its employees. Any remaining business of HFMA will be handled and wound up by the Receiver and his staff. HFMA operated through the following subsidiaries:

(a)    Integrative Healthcare Solutions, LLC

Integrative Healthcare Solutions, LLC ("IHS") is a Nevada limited liability corporation that is a wholly owned subsidiary of HFMA. IHS, in turn, owns 80% of Integrated Medical MSO, LLC, a Connecticut limited liability corporation ("IMMSO"), the other 20% of which is owned by Michael Gerstenfeld, M.D. It is believed that IMMSO was formed to manage billing and collections for Dr. Gerstenfeld's medical practice, and that IMMSO is now bankrupt.

As of June 30, 2009 MCC listed as collateral for MP IV.1 a receivable owed by IHS in the amount of approximately $616,000, and listed as collateral for MP IV.2 a receivable owed by IMMSO in the amount of approximately $1.7 million. These figures are subject to further investigation and verification by the Receiver.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

-15-

1                   (b)    Integrative Medical Management, LLC

2        Integrative Medical Management, LLC ("IMM") is a Nevada limited liability

3 corporation whose owners are HFMA (51%) and Bioquest International, Inc. (49%).

4 IMM owns 100% of the stock of Integrative Medical Centers of America,

5 Virginia LLC, and Integrative Medical Centers of America, New York, Inc.  It is

6 believed that these two entities managed separate medical practices in Virginia and

7 New York, respectively.  According to Mr. Fazio, IMM obtained a judgment in

8 Virginia against a prior physician relating to the New York practice, and counsel is

9 pursuing collection of that judgment.  This information is subject to further

10 investigation and verification by the Receiver.

11        As of June 30, 2009 MCC listed as collateral for MP V a receivable owed by

12 IMM in the amount of approximately $2 million, which is subject to further

13 investigation and verification by the Receiver.

14              5.    The Perfect Game, LLC

15        The Perfect Game, LLC ("TPG") is a Nevada limited liability corporation

16 whose primary asset is the rights to a film entitled The Perfect Game.  MP IV

17 appears to own a percentage of TPG, the exact amount of which has not yet been

18 ascertained by the Receiver.  The Receiver understands, however, that MCH

19 controls a majority of the voting shares.  TPG formed High Road Entertainment

20 Group, LLC ("High Road") to produce the film.  MP IV owns a controlling interest

21 in High Road.

22        Company records indicate that more than $20 million was invested in or

23 loaned to this venture.  The film is apparently completed, but additional capital is

24 needed for printing and advertising.  The Receiver and his counsel have met with

25 the producers from High Road and have had preliminary discussions with a

26 contemplated investor.

27        According to Mr. Fazio, an entity named TPG Soundtrack, LLC, which

28 appears to be owned by MCC (80%) and TPG (20%), owns the rights to the

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

-16-

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

1   soundtrack album for the film.  One or two original songs on the soundtrack are

2   owned by TPG Publishing, LLC, a wholly owned subsidiary of TPG Soundtrack,

3   LLC.  The Receiver is investigating the potential value of the rights owned by these

4   entities.

5          As of June 30, 2009, MCC listed as collateral for MP IV.1 a "Non AR

6   Purchase" owed by "TPG-LSA" in the amount of approximately $16 million, and

7   listed as collateral for MP IV.2 a "Non AR Purchase" owed by "TPG" in the amount

8   of approximately $8 million.  These figures and the identification of the specific

9   entities that owe such amounts are subject to further investigation and verification

10  by the Receiver.

11             6.    Vivavision, Inc.

12         Vivavision, Inc. ("VVI") is a California corporation whose primary business

13  is marketing content for mobile phone applications.  According to Mr. Fazio, the

14  initial content being marketed by VVI was a live video feed of a hamster in a cage.

15  VVI is apparently developing additional content.  It appears that MCH or MP III.2

16  purchased stock in VVI over time, beginning in November of 2005, and that MCH

17  or MP III.2 now owns 99.4% of the company.  VVI was also provided with a line of

18  credit.  As of June 30, 2009 MCC listed as collateral for MP III.2 a "Non AR

19  Purchase" owed by "Vivavision" in the amount of approximately $6.9 million.  It

20  appears Vivavision is in default on its line of credit, and no efforts have been made

21  by MCC to date to execute on any collateral.  Mr. Fazio stated that this account was

22  handled personally by Mr. Lampariello and that Mr. Fazio was not permitted to

23  undertake collection activities.

24         It appears that either VVI or MCH pledged a $150,000 Certificate of Deposit

25  as collateral for an Irrevocable Letter of Credit to VVI's former landlord, and that

26  VVI defaulted on the lease.  The Receiver is investigating whether it can obtain a

27  release of the CD from the bank.

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

-17-

7.     Single Touch Interactive, Inc.

Single Touch Interactive, Inc. ("STI") is a Nevada corporation whose primary business is providing mobile phone applications such as "shortcut" dialing and ringtones.  It appears that loans were made to STI and its former majority shareholder Anthony Macaluso that were secured by 25 million shares of STI. According to Mr. Fazio, this account was handled personally by Mr. Lampariello and that after loan defaults occurred there was a consensual foreclosure on the STI shares.  There is conflicting information in the MCC documents as to the percentage ownership interest in STI held by MCC affiliates.  As of June 30, 2009, MCC listed as collateral for MP IV.1 under "All Other Receivables, Supporting Receivables" an amount owed by STI of approximately $5.4 million, and listed a "Non AR Purchase" owed by Mr. Macaluso in the amount of approximately $10.5 million.

The Receiver is investigating the ownership interests in STI  held by any MCC affiliate and the value of such interests.

8.     Georgia Medical Provider Financial Corporation

According to Mr. Fazio, Georgia Medical Provider Financial Corporation ("GMPF") is a Georgia corporation and a wholly owned subsidiary of MP IV. Originally, loans were made to Southwest Doctors Group, LLC that were secured by an Atlanta hospital named Legacy Medical Center.  When the borrower defaulted on the loans, the property was foreclosed.  However, under Georgia law, a separate medical provider entity was required to own an operating hospital, and GMPF was formed to hold title to the property and comply with Georgia law.  There have been discussions with third parties concerning the potential purchase of the hospital, but no offers to purchase have been made to date.  The hospital is not currently operating.

As of June 30, 2009, MCC listed as collateral for MP IV.1 a "Non AR Purchase" in the name of "Legacy/Southwest Doctors Group, LLC" in the amount of

1  approximately $21 million.  The Receiver has not discovered any appraisals of this

2  collateral in the files of MCC.

3      9.    Gulf Pines Hospital, Inc.

4      This interest originated as a loan to Gulf Pines Hospital, Inc. ("GPH") which

5  was secured by a stock pledge from the owner of the company.  GPH owned a

6  hospital building and the land on which it was built in Florida.  The land had been

7  given to GPH by the city, but the grant of the land contained a clause reverting

8  ownership to the city if the property is ever used as anything other than a hospital.

9  The borrower defaulted on the loan and MCC foreclosed on the stock.  According to

10  Mr. Fazio, GPH is now in bankruptcy.

11      As of June 30, 2009, MCC listed as collateral for MP II a "Non AR Purchase"

12  in the name of "Gulf Pines Hospital/Real Estate" in the amount of approximately

13  $6.6 million.  The Receiver has not discovered any appraisals of this collateral in the

14  files of MCC.

15      10.    Corporate Impressions, LLC

16      Corporate Impressions, LLC  ("CI") is a Delaware limited liability

17  corporation and a wholly owned subsidiary of MCH.  The primary purpose of CI is

18  to hold title to, and maintain, a 118 foot yacht named the Home Stretch, which is

19  moored in Newport Beach, California.  CI periodically employs a captain and crew

20  for sailing excursions, the principal beneficiaries of which appear to have been

21  Mr. Field and Mr. Lampariello.  The Receiver has taken action to secure the yacht.

22      11.    15101 Red Hill Holdings, LLC

23      15101 Red Hill Holdings, LLC ("15101 Red Hill") is a wholly owned

24  subsidiary of MCH formed for the purpose of holding title to the MCC office

25  property located 15101 Red Hill Avenue in Tustin.  The purchase of the 15101 Red

26  Hill property was financed in part by Lone Oak Fund, who took a deed of trust on

27  the property.  15101 Red Hill leased the building to MCC.

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

-19-

1   15101 Red Hill has defaulted on the loan and a Notice of Default was

2   recorded. On the same day that the TRO was entered, August 3, 2009, the lender

3   obtained an order from the Orange County Superior Court appointing a receiver

4   over the property. The Receiver promptly gave notice of the TRO to Loan Oak

5   Fund and the state court receiver and met briefly with the state court receiver at the

6   premises. The Receiver anticipates engaging a broker to liquidate this asset.

7          12.   Castle Hill Investors

8          The MP II fund made a loan to LAV Care Corporation for the purpose of

9   purchasing a senior living facility located in Thousand Oaks, California called

10  Castle Hill Retirement Village.[3] LAV Care Corporation defaulted on the note, and

11  MCC, as administrator for the MP II fund, foreclosed on the property and formed

12  Castle Hill Investors, Inc. to hold title to the property. The facility is currently being

13  operated by Autumn Senior Living. The property was the subject of a proposed sale

14  at a proposed purchase price of $14.4 million. As of June 30, 2009, MCC listed as

15  collateral for MP II a "Non AR Purchase" in the name of "SMB King" in the amount

16  of approximately $30 million. The Receiver has been advised that the SMB King

17  loan was for the Castle Hill transaction.

18  **V.   AREAS OF CONCERN**

19         During his preliminary investigation, the Receiver has identified numerous

20  areas of concern with respect to the operations, assets and financial condition of the

21  Receivership Entities. The following are a few of these areas of concern.

22         A.   Diversion/Withholding of Accounts Receivable Payments by Providers

23         Although he has yet to confirm or quantify the scope of this potential issue,

24  the Receiver has been advised that certain healthcare providers with receivable

25  purchase agreements with one or more of the MP's have diverted payments from

26  insurance carriers to themselves in breach of the relevant purchase agreements. As

27

28  [3]  The Receiver understands that, separately, MP IV.1 made loans to an apparently
    related entity, SMB King, secured by medical and/or other receivables.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER
-20-

1    noted above, the Receiver has taken initial action to stop any such diversion by

2    contacting the relevant insurance carriers and instructing them to send all payments

3    on claims for services provided by the relevant healthcare providers to the lockboxes

4    established by MCC for receipt of payments by the relevant MP fund.  Healthcare

5    providers have also been advised by the Receiver that any such diversion breaches

6    the relevant purchase agreements and violates the TRO.

7        One entity that appears to have engaged in such conduct is Integrated

8    Healthcare Holdings, Inc. ("IHHI").  In approximately March of 2005, Medical

9    Capital financed the acquisition of four Southern California hospitals from Tenet

10   Healthcare by a group of doctors who formed IHHI.  The total amount loaned to

11   IHHI was approximately $90 million, and proceeds from MP II and MP IV.1 were

12   used to make the loans, which are secured by, among other things, deeds of trust on

13   the hospital properties.  Proceeds from various MP's appear to have been used to

14   purchase medical receivables from IHHI hospitals.  Payments of such receivables

15   were made to specified lockbox accounts, which were swept daily and ultimately

16   deposited in the appropriate trust accounts.  Beginning in approximately April of

17   2009, deposits into the trust accounts from the lockboxes assigned to IHHI

18   essentially ceased.  It is the Receiver's understanding that IHHI claims that MCC

19   defaulted on the payment of so-called reserves.  However, it is not clear at this time

20   whether there is any justification for the diversion of payments from the

21   Receivership Entities.[4]

22       Separately, IHHI has been involved in various suits with its shareholders, the

23   company that sold the hospitals to IHHI, Tenet Healthcare, a group of physicians

24   that work at the hospitals, Orange County Physicians Investment Network, and other

25   parties.  In connection with these lawsuits, it was apparently alleged that an

26

---

[4]  Since the Receiver's appointment, two Federal Express boxes have arrived at the
27   Medical Capital offices in Tustin, containing large volumes of check copies
     apparently for payments made directly to the IHHI hospitals for receivables
28   purchased by MP V.  The check copies contained in these two boxes total
     $3,660,918.94.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

1  improper relationship existed between Mr. Lampariello and Bruce Mogul, the

2  former CEO of IHHI.  The Receiver presently has limited information with regard to

3  this matter.  However, given the size of IHHI's obligations to the Receivership

4  Entities, the Receiver intends to promptly investigate the claims by and against

5  IHHI.

6       B.   <u>Transfer of Accounts Receivable Between SPC's</u>

7      The Receiver's preliminary review of MCC records indicates that accounts

8  receivable were regularly transferred from older SPC's to newer SPC's.  At this

9  point, the Receiver has identified 301 such transfers.  The following table reflects

10  monies paid from one SPC to another:

| Fund | Cash Received | Cash Paid |
|------|--------------:|----------:|
| Carlmont Capital I | 9,925,038 | - |
| Carlmont Capital II | 88,920,332 | 11,535,848 |
| MCC SPC I | 18,710,166 | - |
| MCC SPC 3 | 2,080,988 | - |
| MCC SPC 4 | 1,342,215 | - |
| MCC SPC 7 | 27,013,275 | 6,675,438 |
| MCC SPC 8 | 1,151,487 | - |
| MCH | 6,758,969 | 2,080,988 |
| MCM | 43,459,777 | - |
| MP I | 189,207,505 | 171,542,787 |
| MP 2 | 150,992,919 | 77,217,290 |
| MP 3 | 124,658,478 | 76,261,222 |
| MP 3.2 | 7,002,809 | 8,680,804 |
| MP 4 | 84,193,881 | 156,462,019 |
| MP 4.2 | 62,020,331 | 76,883,451 |
| MP 5 | 12,012,571 | 189,271,650 |
| MP 6 | - | 52,839,241 |
| Total | 829,450,739 | 829,450,739 |

23      Attached as Exhibit "2" is an MCC report listing intercompany transfers

24  through May 2009.  The Receiver's investigation into these transfers has uncovered

25  a number of potential issues.  First, it appears that some of the receivables being

26  purchased were already aged when purchased by the newer SPC.  It is common

27  sense that receivables lose value as they age.  As discussed above, under the

28  Security Agreements, receivables are only eligible to be included as collateral for

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

-22-

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

1 the purposes of calculating the Net Collateral Coverage Ratio if they were purchased

2 within 180 days of when the claim was submitted to the payor.  It is an Event of

3 Default under the Security Agreements if the Net Collateral Coverage Ratio is less

4 than 100%.  Additionally, MCC apparently based its requests for administrative fees

5 on Collateral Reports showing a ratio of more than 100%.

6      Second, it appears from MCC's records that at least some of the receivables

7 purchased by newer SPC's did not actually exist at the time of that purchase.  If true,

8 such a transaction would reflect even more obvious problems.  Third, it appears that

9 the values of accounts receivable were overstated on Collateral Reports to the

10 trustees, based on which MCC asserted the right to be paid administrative fees.[5]

11 Some examples that illustrate these concerns are as follows:

12      Advanced Radiology.  Sometime prior to 2004, Carlmont Capital II, an SPC

13 created by MCH prior to the MP Series, appears to have purchased accounts

14 receivable from healthcare provider Advanced Radiology.  From February to

15 April 2004, Carlmont Capital II sold these accounts receivable to MP I for

16 $14,958,812.  MP I received no payments from these accounts receivable, nor were

17 any additional accounts receivable purchased from Advanced Radiology.  Then,

18 more than three years later in July, 2007, MP I sold these same accounts receivable

19 to MP IV for $18,547,869; an increase of nearly $3.6 million.  It the Receiver's

20 understanding that no payments had been collected on the accounts in the preceding

21 three years.  Approximately 16 months later in October 2008, MP IV sold the same

22 accounts receivable to MP VI for $20,587,851, an increase of over $2 million even

23 though the accounts receivable were now over four years old.  Exhibit "3" provides

24 reports extracted from the general ledger of MPs I, IV and VI reflecting the

25 aforementioned intercompany transfers.  As of June 30, 2009, MCC listed

26 approximately $10.6 million of receivables purchased from Advanced Radiology on

27

28 [5]  The concern regarding overstated collateral values is discussed further below
     with respect to non-receivable loans and investments.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

-23-

1    the MP VI Collateral Report.  As of that date, the receivables appear to have been

2    approximately four and a half years old.

3        Monsour Medical.  The Receiver's preliminary investigation indicates that in

4    March 2006, MP II purchased accounts receivable from healthcare provider

5    Monsour Medical for $574,955.  In May 2006, MP II apparently collected $339,299

6    and the balance of the accounts receivable was reduced to $235,656 accordingly.

7    During the ensuing year, it appears that MP II did not receive any additional

8    payments on the accounts receivable.  Then, in May 2007, MP II sold the accounts

9    receivable to MP III for $430,613, nearly $200,000 more than the current balance.

10   It appears that no additional accounts receivable were purchased from Monsour

11   Medical and no money had been collected in the preceding year.  At that point, the

12   receivables were approximately 15 months old.  In August 2008, MP III sold the

13   same accounts receivable to MP VI for $599,569.  As of June 30, 2009, MCC listed

14   $578,000 of receivables purchased from Monsour Medical on the MP VI Collateral

15   Report.  As of that date, it appears that the receivables were more than three years

16   old.

17       NLV, Inc.  In January 2004, MP I bought accounts receivable for provider

18   NLV, Inc. from Carlmont Capital II for $3,222,088.  In the ensuing three and a half

19   years, it appears that no advances were made to NLV, nor were any funds collected.

20   Yet, in August 2007, MP IV bought the accounts receivable from MP I for

21   $3,729,006.  In January 2008, MP V bought the same accounts receivable from

22   MP IV for $3,815,149.  Again there appears to have been no activity with the

23   accounts receivable, which at that point were approximately 4 years old.  In

24   August 2008, MP VI bought these accounts receivable from MP V for $4,242,802

25   and apparently has received no collections since the transfer.  On July 2, 2009, MCC

26   apparently sent a collection letter to NLV stating an unpaid balance of $154,222.71

27   and enclosing an accounts receivable aging report substantiating the amount owing.

28   As of June 30, 2009, the value of the NLV accounts receivable listed on the MP VI

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA                                                    -24-

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

1  Collateral Report was $4,154,222.71, exactly $4 million higher than the unpaid

2  balance reported to NLV.

3      <u>Total Family Care</u>. In May 2004, MP I bought accounts receivable for Total

4  Family Care from Carlmont Capital II for $2,539,619. In August 2007, MP IV

5  bought the accounts receivable from MP I for $3,840,945. During that period, there

6  was apparently no collections or new receivable purchases from Total Family. In

7  August 2008, MP VI bought the same receivables from MP IV for $4,402,587. It

8  appears that in October 2008, MCC wrote-up the value of the accounts receivable by

9  $2,007,596 to $6,410,184, despite the fact that there were apparently no collections

10  or new receivable purchases. As of June 30, 2009, MCC listed $6,451,576 of

11  receivables purchased from Total Family on the MP VI Collateral Report. As of

12  that date, it appears that the receivables were more than five years old.

13      The transfer of receivables from one SPC to another at values that appear to

14  be inflated strongly suggests the use of newer investor monies to pay older

15  investors. All of the examples above involve receivables listed on the June 30, 2009

16  Collateral Report for MP VI. As discussed above, the Receiver's preliminary review

17  indicates that MP VI raised approximately $75 million from investors and used

18  approximately $53 million of such funds to purchase receivables from older SPC's.

19  MCC was paid approximately $24 million in administrative fees from the MP VI

20  fund. The Receiver continues to investigate these issues.

21      C.   <u>Other Intercompany Transfers</u>

22      In addition to the sale transactions between SPC's discussed above, the

23  Receiver has seen evidence of various other transactions between and among

24  various Medical Capital entities that could involve the comingling of funds between

25  entities and/or the overpayment for assets. The Receiver will need to conduct a

26  forensic accounting to determine whether such issues exist.

27

28

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

-25-

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

D.    Trace Life Science

    1.    Use of Loan Accounts

Loans appear to have been made using proceeds from MP III.2 for the purchase of a Texas facility that made nuclear isotopes for medical purposes. The company is named Trace Life Science, Inc. ("Trace"). The acquisition loan was secured, at least in part, by a pledge of stock in the company and an irrevocable proxy which could permit MP III.1 to exercise certain rights in the event of a default. MP III.1 proceeds also appear to have been used to fund a Line of Credit ("LOC") to Trace.

It appears from the Receiver's preliminary investigation that Trace periodically drew down funds from its LOC and used those funds, in part, to make interest payments on its acquisition loan. Such payments may have given the false appearance that Trace was performing on the acquisition loan.

    2.    Environmental/Asset Value Issues

Shortly before the filing of this Report, the Receiver was told by counsel for Trace and/or its principals that the staff at the Texas facility had ceased working, that critical maintenance (including having a charge of dry nitrogen placed in the facility's linear accelerator) had to be done immediately, and that the local utility was prepared to shut off power to the facility for non-payment of invoices, which could indirectly cause the facility to be decommissioned. The Receiver has also been given conflicting information concerning the exact nature of MP III.1's interest in Trace. The Receiver is investigating these issues and addressing the most immediate concerns.

E.    Overstatement of Collateral Values

It appears from the Receiver's investigation to date that the values of certain assets that constitute the collateral for repayment of Notes issued by the MPs have been overstated in MCC's reporting to the trustees, and in some instances

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

-26-

1  significantly overstated.  The overstatement of accounts receivable values is
2  discussed above.

3          1.    Non-AR Collateral

4       The values of a number of non-medical receivable assets appear to have been
5  consistently overstated in MCC's reports to the trustees.  For example, as discussed
6  above, the Trace acquisition loan was listed at the amount of its outstanding balance
7  despite the fact that apparently it could only make interest payments by drawing
8  down its LOC.  In addition, it appears that MCC listed the entire balance due on
9  certain loans after foreclosure on the collateral, rather than the post-foreclosure
10 value of the asset.  For example, as discussed above, the Castle Hill Retirement
11 Village in Thousand Oaks, California secured a loan to LAV Care Corporation.
12 After the property was foreclosed, MCC apparently obtained an appraisal assessing
13 its value at approximately $23 million, and later entered into a proposed sale of the
14 property for $14.4 million.  Despite such evidence of lower value, it appears that
15 MCC continued to list the value of the collateral at approximately $30 million in its
16 Collateral Reports.  The Receiver has identified a number of assets for which
17 internal MCC tracking reports and other documents suggest a significantly lower
18 value than that stated in Collateral Reports.  It appears that MCC obtained
19 significant Administrative Fees based on the submission of such Collateral Reports.

20         2.    Potential Non-Arms Length Loan Transactions

21      The Receiver has reviewed evidence indicating that certain loan transactions
22 may not have been arms length transactions.  Mr. Fazio, who was responsible for
23 addressing defaults, indicated that a number of loan accounts were handled
24 personally by Mr. Lampariello, and that Mr. Fazio was not authorized by
25 Mr. Lampariello to execute on all collateral for certain loans.  For example, a loan
26 appears to have been made from MP IV.2 to Spherios Holdings, LLC, which was
27 owned by Dr. Gez Agoli, a prior associate of Mr. Lampariello.  When Sperios
28 defaulted on the loan, according to Mr. Fazio, he was not given the "green light" to

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

-27-

1   pursue any collection efforts.  Mr. Fazio indicated that Mr. Lampariello had made

2   "bad" settlements on prior loans to Dr. Agoli.  There are additional loans to certain

3   doctors and their operating companies that bear a similar potential appearance of

4   impropriety (i.e. defaults without collection efforts).  The Receiver continues to

5   investigate these issues.

6       F.      Mischaracterization of Assets as Medical Receivables

7           The Receiver has identified a number of assets listed as medical receivables

8   in the MCC Collateral Reports that, upon closer inspection, do not appear to be

9   medical receivables.  For example, in its June 30, 2009 Collateral Report for MP VI,

10  MCC includes an entry for Trace in the amount of $15.8 million as a medical

11  receivable asset.  As discussed above, the monies provided to Trace were in the

12  form of an acquisition loan and an LOC.  It is the Receiver's understanding that

13  Trace has not been operational since approximately September 2008, and likely

14  could not have generated any receivables, much less medical receivables.  In the

15  same MP VI Collateral Report, MCC has an entry for "EMARK" in the amount of

16  $17.2 million as a medical receivable asset.  It is the Receiver's understanding that

17  "EMARK" is an internet advertising company that provides "spam e-mail" services

18  to its customers, and does not provide any medical services.

19      G.      Potential Violation of the Security Agreements

20          As discussed above, it appears that under the Security Agreements, the MP's

21  were to have all non-receivable assets independently appraised on an annual basis,

22  and were to have used the values from the most recent appraisals in their reports to

23  the trustees.  It appears that MCC, as Administrator of the MP's, has not regularly

24  conducted such appraisals.  This calls into question the values in the reports from

25  MCC to the trustees.  The Receiver continues to investigate this issue.

26      H.      Failure to Preserve Collateral Value

27          It appears that in recent years, MCC has failed to make payments necessary to

28  protect the value of certain assets securing obligations to noteholders.  For example,

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

-28-

1  with respect to the film, The Perfect Game, it appears MCC failed to make promised

2  payments to a distributor in Mexico, who has apparently threatened to distribute the

3  film there immediately, which could significantly reduce the value of the film in the

4  United States. Additionally, as discussed above, MCC appears to have failed to take

5  steps to protect the value of the Trace facility. Similar issues appear to have

6  developed with respect to maintenance of the Legacy Medical Center in Georgia.

7        I.      Administration of the Receivership

8        Notwithstanding the apparent overstatement of asset values by MCC, it does

9  appear to the Receiver that there are assets of significant value to the Receivership

10  Estate <u>if</u> such assets can be protected and ultimately liquidated in a reasonable

11  manner. However, given the existing structure and financial condition of the

12  Receivership Entities, the Receiver has insufficient funds to undertake the actions

13  that are required to protect, and ultimately liquidate, all assets. Accordingly, the

14  Receiver, after consultation with interested parties to explore all options for funding

15  the necessary activities, anticipates filing a motion in the coming weeks that

16  addresses this situation.

17  **VI.    PENDING LITIGATION INVOLVING RECEIVERSHIP ENTITIES**[6]

18        The Receiver has contacted outside counsel representing the Receivership

19  Entities in various pending matters, advised them of his appointment and of the stay

20  of proceedings against the Receivership Entities, and asked that they promptly file

21  with the relevant courts and give notice to the relevant parties of the TRO. Through

22  these conversations, the Receiver has become aware of the following actions, which

23  are believed to be currently pending:

24

25

26

27

28

---

[6]   The Receiver has become aware of other potential claims against one or more of
the Receivership Entities that have not resulted in litigation. The Receiver is
investigating the validity and potential effect of such claims.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

-29-

A.    Actions Brought by the Receivership Entities

1.    New Life Sciences

This is understood to be an action pending in the United States District Court for the District of Nevada to collect amounts owed and enforce rights under a receivables purchase agreement.  The New Life Sciences receivables at issue are apparently part of MP IV.

2.    Concept 1 Academies

This is understood to be an action pending in the United States District Court for the District of Nevada to collect amounts owed and enforce rights under a receivables purchase agreement, promissory note and/or line of credit.  The Concept 1 Academies receivables, loan and line of credit at issue are apparently part of MP III.2.

3.    Trace Life Sciences

The Receiver understands that there are actions pertaining to Trace pending in both Nevada state court (Clark County District Court) and Texas state court.  These actions pertain to loans made to Trace by the MP entities.  There are loans to Trace included in both MP III.1 and MP VI.

4.    Dermacia

This is understood to be an action pending in Nevada state court to collect amounts owed and enforce rights under separate receivables purchase and loan agreements.  The Dermacia receivables and loan at issue are apparently part of MP IV.1.

B.    Actions Brought Against Receivership Entities

1.    Coalition America

This is understood to be a suit brought by Coalition America against MCH subsidiary NHBC in United States District Court for the Northern District of Georgia, alleging misappropriation of trade secrets and related claims.  Shortly before entry of the TRO, a jury verdict in favor of Coalition America in the amount

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

-30-

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

1  of approximately $2.2 million was entered, together with a court award of

2  exemplary damages in the amount of $500,000. Upon entry of the TRO, outside

3  counsel for NHBC promptly filed notice of the TRO with the district court. The

4  district court issued an order finding that the TRO did not prevent it from entering

5  judgment, and therefore entered judgment against NHBC in the amount of

6  approximately $2.7 million on August 5, 2009.

7             2.     Progressive Insurance

8        This is understood to be a suit brought by Progressive Insurance in New York

9  state court alleging that Deajess Medical Imaging, Preferred Medical Imaging

10 and/or Boston Post Road Medical Imaging, healthcare providers located in New

11 York, violated New York law by transferring medical receivable payments to

12 MP IV.1 and 2, and MP V. The Receiver has been advised that an order dismissing

13 the action is expected to be entered soon.

14             3.     State Farm Insurance

15       This is understood to be a suit brought by State Farm Insurance in New York

16 state court involving the same allegations as the action brought by Progressive

17 Insurance. The Receiver understands that MCC and/or MP IV sued State Farm in a

18 separate action alleging that State Farm improperly diverted receivable payments.

19 The Receiver has been advised that settlement discussions with State Farm have

20 taken place and that a consensual resolution of both matters may be possible.

21             4.     Loan Oak Fund

22       As noted above, Loan Oak Fund made a purchase-money loan to 15101 Red

23 Hill in connection with the purchase of the 15101 Red Hill property and took a

24 promissory note and deed of trust on the property. 15101 Red Hill defaulted on the

25 note and, shortly before the TRO was entered, Loan Oak Fund commenced a

26 foreclosure action in Orange County Superior Court. On the same day that the TRO

27 was entered, Loan Oak Fund obtained an order appointing a receiver over the

28 property.

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

-31-

# VII. **RECOMMENDATIONS**

Based on his preliminary investigation and analysis, the Receiver recommends that the receivership continue, and has the following additional recommendations:

1. The Receiver has conducted a preliminary review of the books and records and financial condition of the Receivership Entities. However, a complete forensic accounting is necessary to address the extent of commingling among the funds and the impact of intercompany transfers upon the investors and the enterprise (e.g. whether early investors substantially benefited from money invested by later investors) Accordingly, the Receiver recommends completing a more thorough accounting to address these and other areas of concern, and that such accounting be filed within 120 days.

2. The Receiver recommends investigating the activities of third parties who may have substantially benefitted from their relationship with the principals, including, but not limited to, those individuals who received substantial loans from Receivership Entities; those who received disproportionately large returns on their investments as compared to other similarly situated investors, including at times when there were insufficient proceeds in the fund to permit such returns; and those individuals and entities that made side agreements with the principals which allowed for diversion of receivable payments or other funds.

3. The Receiver recommends investigating and addressing the numerous assets of the Receivership Entities and developing a comprehensive plan for maximizing the recovery from each asset for the benefit of investors and creditors of the receivership estate.

4. The TRO provides that the Receivership Entities and their subsidiaries and affiliates are included within the purview of the receivership. The Receiver understood this language to be broad enough to encompass MP I through V, and the Receiver recommends formally including such entities within the scope of the

LAW OFFICES
Allen Matkins Leck Gamble
Mallory & Natsis LLP

835188.03/LA

-32-

INTERIM REPORT OF RECEIVER
INTERIM REPORT OF RECEIVER

1    receivership.  As discussed above, all of the MPs are currently in default on their

2    obligations to noteholders, there has been a systematic transfer of receivables among

3    the MPs and prior SPC's, and multiple MPs have made loans to and/or investments

4    in the same companies.  Additionally, as a practical matter, none of the MP's can

5    function independently from MCC – they have no employees, no offices and no

6    ability to act except through MCC.  Finally, based on the Receiver's preliminary

7    investigation, it is possible that a complete accounting may yield evidence that the

8    business was operated as a unitary enterprise, or that equity calls for such treatment.

9    While the Receiver has not reached such a conclusion, it is evident that certain of

10    the administrative procedures currently in place are costly and may be unnecessary

11    in light of the Court-supervised receivership.

12

13    Dated this 12 day of August, 2009

14                                          ALLEN MATKINS LECK GAMBLE
15                                          MALLORY & NATSIS LLP

16
17                                    By: _____
18                                          David R. Zaro,
                                            CA Bar No. 124334
19                                          Telephone:  (213) 622-5555
                                            Attorneys for Receiver
20                                          Thomas A. Seaman

21

22

23

24

25

26

27

28

# EXHIBIT "1"

EXHIBIT 1 PAGE 34

## Administrative Fees paid to MCC from MPFC
### (in 000's)

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | TOTAL |
|---|---|---|---|---|---|---|---|---|
| MPFC I | | $ 10,900 | $ 27,200 | $ 16,100 | $ 9,100 | $ 27,700 | $ 30 | $ 91,030 |
| MPFC II | $ - | $ 7,000 | $ 24,784 | $ 16,800 | $ 4,125 | $ 2,950 | $ - | $ 55,659 |
| MPFC III | | | $ 3,650 | $ 24,850 | $ 14,775 | $ 5,375 | $ - | $ 48,650 |
| MPFC IV | | | | $ 1,500 | $ 38,635 | $ 16,430 | $ - | $ 56,565 |
| MPFC V | | | | | $ 6,350 | $ 37,450 | $ 4,230 | $ 48,030 |
| MPFC VI | | | | | | $ 18,405 | $ 6,035 | $ 24,440 |
| TOTAL | | $ 17,900 | $ 55,634 | $ 59,250 | $ 72,985 | $ 108,310 | $ 10,295 | $ 324,374 |

EXHIBIT 1 PAGE 35

# EXHIBIT "2"

EXHIBIT 2 PAGE 36

**Medical Capital Special Purpose Corporations**
**Intercompany Transactions**
**From 2003 thru May 2009**

| Transaction Date | Seller | Buyer | Provider | | ENR Balance | | Cash Paid |
|---|---|---|---|---|---|---|---|
| 11/5/2003 | SP3 | MCH | Metabolic Disease | $ | 2,601,235.06 | $ | 2,080,988.05 |
| 11/5/2003 | MCH | SP7 | Forum Medical | $ | 2,747,567.47 | $ | 2,198,053.98 |
| 11/13/2003 | MCM | CC2 | Progressive Path of Fort Myers | | 3,103,599.94 | | 2482879.96 |
| 12/15/2003 | MCH | SP7 | Forum Medical | -$ | 997,460.84 | $ | 797,968.68 |
| 12/18/2003 | Carl2 | MP1 | Cambridge Point | $ | 231,962.37 | $ | 185,569.90 |
| 12/18/2003 | Carl2 | MP1 | Healthcare for Women | $ | 328,638.48 | $ | 262,910.79 |
| 12/18/2003 | Carl2 | MP1 | Omega Healthcare | $ | 1,183,489.61 | $ | 946,791.69 |
| 12/18/2003 | Carl2 | MP1 | Vision Medical | $ | 685,857.86 | $ | 548,686.29 |
| 12/23/2003 | SP7 | CC2 | Metabolic Treatment | | 997,639.64 | | 798111.64 |
| 12/23/2003 | SP1 | MP1 | Mobile Nursing | $ | 1,153,638.71 | $ | 922,910.97 |
| 12/24/2003 | MCM | CC2 | Progressive Medical | | 6,049,141.03 | | 3888529.78 |
| 1/5/2004 | MCH | MP1 | Caring Solutions | $ | 69,235.65 | $ | 55,388.52 |
| 1/6/2004 | MCH | MP1 | Medical Staffing | $ | 76,807.65 | $ | 61,446.12 |
| 1/14/2004 | Carl2 | MP1 | NLV, Inc. | $ | 3,222,088.13 | $ | 2,577,670.51 |
| 1/28/2004 | SP4 | MP1 | Creative Medical | $ | 386,513.01 | $ | 309,210.41 |
| 1/28/2004 | SP4 | MP1 | Mobile Nursing Care | $ | 649,081.47 | $ | 519,265.18 |
| 1/30/2004 | MCH | MP1 | Metabolic Disease | $ | 2,594,577.76 | $ | 2,075,662.21 |
| 1/30/2004 | MCH | SP7 | Alpha Exams, LLC | $ | 66,705.11 | $ | 53,364.09 |
| 1/30/2004 | MCH | SP7 | Leonard Manor | $ | 71,232.31 | $ | 56,985.85 |
| 2/17/2004 | SP7 | MP2 | American Medequip | $ | 1,550,127.10 | $ | 1,240,101.68 |
| 2/18/2004 | SP4 | SP7 | Valley Wellness | $ | 642,173.63 | $ | 513,738.91 |
| 2/27/2004 | MCM | MP1 | Advanced Radiology | $ | 5,746,263.01 | $ | 4,597,010.41 |
| 2/27/2004 | MCM | MP1 | MRI | $ | 12,976,780.27 | $ | 10,381,424.21 |
| 2/27/2004 | SP7 | MP2 | Alpha Exams LLC | $ | 87,914.80 | $ | 70,331.84 |
| 2/27/2004 | Carl2 | MP2 | Cashflow Solutions | $ | 230,383.46 | $ | 184,306.77 |
| 2/27/2004 | SP7 | MP2 | Effingham | $ | 292,362.90 | $ | 233,890.32 |
| 3/4/2004 | SP1 | MP2 | Carter Medical | $ | 1,286,753.37 | $ | 1,029,402.70 |
| 3/16/2004 | Carl2 | MP1 | Oaks Diagnostics | $ | 3,446,161.87 | $ | 2,756,929.50 |
| 4/16/2004 | Carl2 | MP1 | Advance Radiology | $ | 3,712,242.42 | $ | 2,969,793.94 |
| 4/16/2004 | SP1 | MP2 | Carter Medical | $ | 1,485,768.36 | $ | 1,188,614.69 |
| 4/30/2004 | Carl2 | MP1 | Advanced Radiology | $ | 4,986,579.11 | $ | 3,989,263.29 |
| 4/30/2004 | Carl2 | MP1 | Oaks Diagnostic | $ | 1,237,393.96 | $ | 989,915.17 |
| 4/30/2004 | Carl1 | MP2 | Eastern Medical | $ | 833,945.47 | $ | 667,156.38 |
| 4/30/2004 | MCH | SP7 | Forum | $ | 1,311,396.02 | $ | 1,049,116.82 |
| 5/26/2004 | SP1 | MP1 | Community Healthcare Specialist Medical | $ | 1,549,090.28 | $ | 1,239,272.22 |
| 5/28/2004 | MCH | MP1 | Advanced Radiology | $ | 513,727.87 | $ | 410,982.30 |
| 5/28/2004 | SP1 | MP1 | Community Healthcare | $ | 1,237,393.96 | $ | 989,915.17 |
| 5/28/2004 | Carl2 | MP1 | Total Family Care | $ | 2,539,619.93 | $ | 2,031,695.94 |
| 5/28/2004 | Carl2 | MP1 | Vision MRI-Oakbrook | $ | 2,042,980.06 | $ | 1,634,384.05 |
| 5/28/2004 | MCM | MP2 | Southwest Hospital | $ | 7,283,478.49 | $ | 6,107,019.24 |
| 5/28/2004 | Carl2 | MP2 | Valley Diagnostic | $ | 4,210,421.79 | $ | 3,368,337.43 |
| 5/28/2004 | Carl2 | MP2 | Valley Health Care | $ | 469,954.21 | $ | 375,963.37 |
| 5/28/2004 | SP7 | MP2 | Valley Wellness Center | $ | 633,523.62 | $ | 506,818.90 |
| 6/30/2004 | SP7 | MP1 | American Medequip Corp | $ | 2,617,111.08 | $ | 2,093,688.86 |
| 7/29/2004 | SP1 | MP1 | Get Well | $ | 4,056,704.41 | $ | 3,245,363.53 |
| 7/30/2004 | Carl2 | MP1 | Daejess Medical | $ | 23,929,892.00 | $ | 19,143,913.60 |
| 8/25/2004 | SP1 | MP1 | Global Testing Group | $ | 11,216,318.58 | $ | 10,094,686.72 |
| 9/10/2004 | MCM | MP1 | Boston Post | $ | 12,929,540.44 | $ | 11,636,586.40 |
| 9/29/2004 | MCM | CC2 | Robert Scott Schepp (Boston?) | | 4,851,474.44 | | 4366327 |
| 10/19/2004 | Carl2 | MP2 | Associated Rehab | $ | 3,264,995.38 | $ | 2,938,495.84 |
| 10/26/2004 | SP7 | MP1 | First Response | $ | 55,831.31 | $ | 44,665.05 |
| 10/26/2004 | SP7 | MP1 | Forum | $ | 14,196,420.65 | $ | 11,357,136.52 |
| 10/27/2004 | Carl2 | MP1 | Robert Scott Schepp, MC | $ | 4,842,569.31 | $ | 4,358,312.38 |
| 11/18/2004 | Carl2 | MP1 | Preferred Medical Imaging | $ | 2,347,005.91 | $ | 1,877,604.73 |

EXHIBIT 2 PAGE 37

Medical Capital Special Purpose Corporations
Intercompany Transactions
From 2003 thru May 2009

| Transaction Date | Seller | Buyer | Provider | | ENR Balance | | Cash Paid |
|---|---|---|---|---|---|---|---|
| 11/30/2004 | Carl2 | MP2 | Friendship | $ | 131,344.63 | $ | 105,571.70 |
| 11/30/2004 | Carl2 | MP2 | Integra Sleep | $ | 115,648.53 | $ | 92,518.82 |
| 11/30/2004 | Carl2 | MP2 | Mobile Medic | $ | 151,198.57 | $ | 120,958.86 |
| 11/30/2004 | Carl2 | MP2 | Neuro Motive Inc | $ | 132,646.65 | $ | 106,117.32 |
| 11/30/2004 | Carl2 | MP2 | Visiting Nurse | $ | 2,831,964.83 | $ | 2,265,571.86 |
| 12/7/2004 | Carl1 | MP2 | Southwest Medical | $ | 2,585,787.20 | $ | 2,068,629.76 |
| 12/14/2004 | Carl1 | MP2 | AmeriCare MedServices | $ | 3,259,612.54 | $ | 2,607,690.03 |
| 12/14/2004 | Carl1 | MP2 | Lincoln Hospital | $ | 5,726,952.58 | $ | 4,581,562.06 |
| 01/07/2005 | Carl 2 | MP2 | Executive Medical Testing | $ | 2,859,091.81 | $ | 2,287,273.45 |
| 02/16/2005 | Carl 2 | MP1 | Oceanaire Residential | $ | 391,751.79 | $ | 313,401.43 |
| 02/16/2005 | Carl 2 | MP1 | Quality Care, LLC | $ | 418,539.73 | $ | 334,831.79 |
| 02/16/2005 | Carl 2 | MP1 | Orcasita Oceanaire - Plaza | $ | 134,512.58 | $ | 107,610.06 |
| 02/23/2005 | MP2 | MP1 | Carter Medical | $ | 3,564,282.24 | $ | 2,851,425.79 |
| 02/23/2005 | MP2 | MP1 | Executive Medical Testing | $ | 2,990,951.41 | $ | 2,392,761.13 |
| 02/24/2005 | MP2 | MP1 | American Medequip | $ | 2,305,069.77 | $ | 1,844,055.82 |
| 02/24/2005 | MP2 | MP1 | Associate Rehabilitation | $ | 3,332,369.21 | $ | 2,665,895.37 |
| 02/24/2005 | MP2 | MP1 | Lincoln Hospital | $ | 5,726,952.58 | $ | 4,581,562.06 |
| 02/24/2005 | MP2 | MP1 | Visiting Nurse Group | $ | 3,020,967.04 | $ | 2,416,773.63 |
| 02/28/2005 | Carl 2 | MP1 | Associated Chiropractic | $ | 2,644,895.58 | $ | 2,115,916.46 |
| 02/28/2005 | Carl 2 | MP1 | Assured Home Health | $ | 560,147.58 | $ | 448,118.06 |
| 02/28/2005 | Carl 2 | MP1 | F & Y Surgical Supplies | $ | 3,849,159.60 | $ | 3,079,327.68 |
| 02/28/2005 | Carl 2 | MP1 | NCIA | $ | 1,332,151.36 | $ | 1,065,721.09 |
| 02/28/2005 | Carl 2 | MP1 | Metabolic Treatment | $ | 1,384,368.04 | $ | 1,107,494.43 |
| 02/28/2005 | Carl 2 | MP1 | PMC Medical | $ | 781,735.92 | $ | 625,388.74 |
| 02/28/2005 | Carl 2 | MP1 | Progressive Path - FM | $ | 4,288,279.69 | $ | 3,430,623.75 |
| 02/28/2005 | Carl 2 | MP1 | Progressive Path - Pines | $ | 5,461,788.43 | $ | 4,369,430.74 |
| 02/28/2005 | Carl 2 | MP1 | Preferred Medical Imaging | $ | 2,260,008.02 | $ | 1,808,006.42 |
| 02/28/2005 | Carl 2 | MP1 | Statewide Medical System | $ | 3,795,436.19 | $ | 3,036,348.95 |
| 02/28/2005 | Carl 2 | MP1 | Trinity Medical Supply | $ | 547,829.76 | $ | 438,263.81 |
| 03/01/2005 | Carl 2 | MP1 | Progressive Path Florida | $ | 3,012,615.73 | $ | 2,410,092.58 |
| 03/01/2005 | Carl 2 | MP1 | Progressive Path Palm | $ | 2,964,570.21 | $ | 2,371,656.17 |
| 03/01/2005 | Carl 2 | MP1 | Progressive Path Medical | $ | 6,796,785.31 | $ | 5,437,428.25 |
| 03/01/2005 | Carl 2 | MP1 | PTS Healthcare | $ | 378,262.55 | $ | 302,610.04 |
| 04/12/2005 | SPC7 | MP1 | Preferred Medical Imaging | $ | 2,175,643.49 | $ | 1,740,514.79 |
| 06/01/2005 | SPC7 | MP2 | Alpha Omega - Riverside | $ | 1,891,904.93 | $ | 1,513,523.94 |
| 06/01/2005 | SPC7 | MP2 | Alpha Omega - San Diego | $ | 2,225,130.02 | $ | 1,780,104.02 |
| 06/01/2005 | SPC7 | MP2 | Clay Medical Services, Inc. | $ | 657,661.00 | $ | 526,128.80 |
| 06/01/2005 | SPC7 | MP2 | Pain Management | $ | 1,560,015.49 | $ | 1,248,012.39 |
| 06/01/2005 | SPC7 | MP2 | Plaza Appliance | $ | 1,547,852.61 | $ | 1,238,282.09 |
| 06/01/2005 | SPC7 | MP2 | Plaza Therapy | $ | 1,613,791.67 | $ | 1,291,033.34 |
| 06/01/2005 | SPC7 | MP2 | Quality Healthcare | $ | 980,627.61 | $ | 784,501.85 |
| 06/01/2005 | SPC7 | MP2 | Home Care Medical Equip | $ | 683,036.09 | $ | 546,428.87 |
| 06/28/2005 | SPC8 | MP2 | First Choice Health Services | $ | 200,895.06 | $ | 200,895.06 |
| 06/28/2005 | SPC8 | MP2 | Hughson Paramedic | $ | 654,439.59 | $ | 654,439.59 |
| 06/28/2005 | SPC8 | MP2 | Adams Family Medical | $ | 134,479.82 | $ | 134,479.82 |
| 06/28/2005 | SPC8 | MP2 | Access Medical Associates | $ | 161,672.86 | $ | 161,672.86 |
| 06/29/2005 | MP1 | MP2 | Boston Post Road | $ | 12,188,796.29 | $ | 9,751,037.03 |
| 06/29/2005 | MP1 | MP2 | Forum Medical | $ | 13,580,176.84 | $ | 10,864,141.47 |
| 06/30/2005 | MP1 | MP2 | MRI Global Imaging Services | $ | 11,416,169.60 | $ | 9,132,935.68 |
| 09/21/2005 | MP 1 | SP7 | Leonard Manor, Inc. | $ | 327,548.71 | $ | 262,038.97 |
| 09/21/2005 | MP 1 | SP7 | Fort Worth Manor, Inc. | $ | 844,167.31 | $ | 675,333.85 |
| 09/21/2005 | MP 1 | SP7 | Vidor Manor, Inc. | $ | 344,619.60 | $ | 275,695.68 |
| 09/21/2005 | MP 1 | SP7 | Kilgore Manor, Inc. | $ | 675,918.80 | $ | 540,735.04 |
| 09/21/2005 | MP 1 | SP7 | Mason Convalescent Care | $ | 315,508.02 | $ | 252,406.41 |

**Medical Capital Special Purpose Corporations**
**Intercompany Transactions**
**From 2003 thru May 2009**

| Transaction Date | Seller | Buyer | Provider | ENR Balance | Cash Paid |
|---|---|---|---|---|---|
| 10/21/2005 | MP 3 | MP3 | Michael T. Parrra | $ 5,853,167.63 | $ 4,682,534.10 |
| 11/21/2005 | MP 2 | MP3 | Southwest Hospital | $ 7,713,757.11 | $ 6,174,005.69 |
| 02/28/2006 | MP 1 | MP2 | Preferred Medical Imaging | $ 6,554,795.80 | $ 5,243,836.64 |
| 02/28/2006 | MP 1 | MP3 | PMG - Path of Florida | $ 3,372,346.65 | $ 2,697,877.32 |
| 02/28/2006 | MP 1 | MP3 | PMG - Path of Fort Myers | $ 4,711,480.47 | $ 3,769,184.38 |
| 02/28/2006 | MP 1 | MP3 | PMG - Path of Palm Beach | $ 3,462,057.07 | $ 2,769,645.66 |
| 02/28/2006 | MP 1 | MP3 | PMG - Path of Pines | $ 6,301,937.05 | $ 5,041,549.64 |
| 02/28/2006 | MP 1 | MP3 | Progressive Medical Group | $ 7,348,095.62 | $ 5,878,476.50 |
| 05/31/2006 | MP 2 | MP3 | Valley Diagnostic Center | $ 7,829,454.39 | $ 6,263,563.51 |
| 07/28/2006 | MP 1 | MP3 | Boston Post | $ 6,208,462.97 | $ 4,966,770.38 |
| 07/28/2006 | MP 1 | MP3 | Global Testing | $ 12,620,282.42 | $ 10,096,225.94 |
| 07/28/2006 | MP 2 | MP3 | Plaza Appliance | $ 2,234,193.88 | $ 1,787,355.10 |
| 07/28/2006 | MP 2 | MP3 | Plaza Therapy | $ 2,195,167.53 | $ 1,756,134.02 |
| 07/28/2006 | MP 1 | MP3 | PMC of America | $ 933,366.19 | $ 746,692.95 |
| 07/28/2006 | MP 2 | MP3 | Home Care Medical Equip | $ 1,098,066.93 | $ 878,453.54 |
| 09/29/2006 | MP 1 | MP3 | American Equip - HCFA | $ 3,454,895.62 | $ 2,763,916.50 |
| 09/29/2006 | MP 1 | MP3 | American Equip - HCFA | $ 3,204,859.64 | $ 2,563,887.71 |
| 09/29/2006 | MP 2 | MP3 | Alpha Omega - Riverside | $ 3,401,598.25 | $ 2,721,278.60 |
| 09/29/2006 | MP 2 | MP3 | Alpha Omega - San Diego | $ 3,625,978.25 | $ 2,900,782.60 |
| 09/29/2006 | MP 1 | MP3 | Carter Medical Group | $ 3,297,255.96 | $ 4,121,569.95 |
| 09/29/2006 | MP 2 | MP3 | Pain Management Rehab | $ 3,039,522.52 | $ 2,431,618.02 |
| 09/29/2006 | MP 2 | MP3 | Plaza Appliance | $ 655,106.16 | $ 524,084.93 |
| 09/29/2006 | MP 2 | MP3 | Plaza Therapy | $ 907,018.83 | $ 725,615.06 |
| 12/22/2006 | MP 3 | MP4 | PMG - Path of Fort Meyers | $ 6,661,771.94 | $ 5,329,417.55 |
| 01/04/2007 | MP 1 | MP4 | Lincoln Hospital | $ 6,849,752.67 | $ 5,479,802.14 |
| 01/04/2007 | MP 1 | MP4 | Metabolic Disease Foundation | $ 4,497,580.48 | $ 3,598,064.38 |
| 01/26/2007 | MP 1 | MP4 | Associated Chiropractic | $ 3,795,842.28 | $ 3,036,673.82 |
| 01/26/2007 | MP 3 | MP4 | PMG - Path of Florida | $ 5,219,645.22 | $ 4,175,716.18 |
| 02/01/2007 | MP 3 | MP4 | Progressive Medical Equip | $ 10,209,974.58 | $ 8,167,979.66 |
| 02/02/2007 | MP 3 | MP4 | American Medequip-Invoice | $ 3,601,852.94 | $ 2,881,482.35 |
| 02/02/2007 | MP 3 | MP4 | Carter Medical Group | $ 4,214,785.49 | $ 3,371,828.39 |
| 02/02/2007 | MP 1 | MP4 | Executive Medical Testing | $ 3,895,048.59 | $ 3,116,038.87 |
| 02/02/2007 | MP 3 | MP4 | PMC Medical of America | $ 882,284.79 | $ 705,827.83 |
| 02/02/2007 | MP 3 | MP4 | PMG - Path of Palm Beach | $ 5,224,794.90 | $ 4,179,835.92 |
| 02/02/2007 | MP 2 | MP4 | Southwest Medical Supply | $ 3,194,879.94 | $ 2,555,903.95 |
| 02/02/2007 | MP 2 | MP4 | Quality Healthcare, Inc. | $ 2,301,596.58 | $ 1,841,277.26 |
| 02/02/2007 | MP 2 | MP4 | Home Care Medical Equip | $ 1,017,199.98 | $ 813,759.98 |
| 02/20/2007 | MP 1 | MP4 | Oaks Diagnostic | $ 7,858,485.26 | $ 6,286,788.21 |
| 02/23/2007 | MP 3 | MP4 | American Medequip-HCFA | $ 3,351,208.59 | $ 2,680,966.87 |
| 02/23/2007 | MP 1 | MP4 | Associate Rehabilitation | $ 4,387,956.28 | $ 3,510,365.02 |
| 02/23/2007 | MP 3 | MP4 | Pain Management Rehab | $ 3,241,642.18 | $ 2,593,313.74 |
| 02/23/2007 | MP 1 | MP4 | Statewide Medical System, Inc. | $ 4,610,489.64 | $ 3,688,391.71 |
| 03/05/2007 | MP 3 | MP4 | Plaza Appliance | $ 3,124,895.64 | $ 2,499,916.51 |
| 03/05/2007 | MP 3 | MP4 | Plaza Therapy | $ 3,304,587.49 | $ 2,643,669.99 |
| 03/09/2007 | MP 3 | MP4 | Alpha Omega - Riverside | $ 3,542,158.94 | $ 2,833,727.15 |
| 03/09/2007 | MP 2 | MP4 | Hughson Paramedic Ambulance | $ 612,174.66 | $ 489,739.73 |
| 03/09/2007 | MP 2 | MP4 | Strategic Government Solutions | $ 748,304.02 | $ 598,643.22 |
| 03/19/2007 | MP 2 | MP4 | Paramed EMS | $ 437,291.71 | $ 349,833.37 |
| 03/19/2007 | MP 2 | MP4 | Friday's Place | $ 488,993.15 | $ 391,194.52 |
| 03/20/2007 | MP 3 | MP4 | PMG - Path of Pines | $ 8,340,158.94 | $ 6,672,127.15 |
| 03/23/2007 | MP 2 | MP4 | Alpha Omega - San Diego | $ 3,745,985.46 | $ 2,996,788.30 |
| 03/23/2007 | MP 2 | MP4 | Clay Medical Services | $ 819,717.44 | $ 655,773.95 |
| 03/23/2007 | MP 1 | MP4 | Get Well Medical Supply | $ 5,357,808.89 | $ 4,286,247.11 |
| 04/05/2007 | MP 3 | MP4 | Boston Post Road | $ 10,425,073.66 | $ 8,340,058.93 |

**Medical Capital Special Purpose Corporations**
**Intercompany Transactions**
**From 2003 thru May 2009**

| Transaction Date | Seller | Buyer | Provider | ENR Balance | Cash Paid |
|---|---|---|---|---|---|
| 04/05/2007 | MP 3 | MP4 | Southwest Hospital | $ 8,236,112.90 | $ 6,588,890.32 |
| 04/09/2007 | MP 2 | MP4 | Lifecare Ambulance | $ 127,258.15 | $ (101,806.52) |
| 04/09/2007 | MP 2 | MP4 | Mobile Medic Ambulance | 206777.93 | $ 165,422.34 |
| 04/09/2007 | MP 2 | MP4 | Adams Family Medical | $ 74,676.10 | $ 59,740.88 |
| 04/09/2007 | MP 2 | MP4 | Access Medical Associates | $ 161,080.42 | $ 128,864.34 |
| 04/09/2007 | MP 2 | MP4 | Aslan | $ (91,971.66) | $ 73,577.33 |
| 04/09/2007 | MP 2 | MP4 | Aslan WIP | $ 692,335.32 | $ 553,868.26 |
| 04/10/2007 | MP 2 | MP4 | Alpha Exams, LLC | $ 81,770.55 | $ 65,416.44 |
| 04/10/2007 | MP 2 | MP4 | Medcare Transport, Inc. | $ 379,823.32 | $ 303,858.66 |
| 04/10/2007 | MP 2 | MP4 | Neuro Motive,Inc. | $ 181,703.84 | $ 145,363.07 |
| 04/10/2007 | MP 2 | MP4 | Vantage Services Corporation | $ 339,405.73 | $ 271,524.58 |
| 04/10/2007 | MP 1 | MP4 | Visiting Nurse Group | $ 3,588,496.51 | $ 2,870,797.21 |
| 04/10/2007 | MP 2 | MP4 | New Life Centers, LLC | $ 373,065.03 | $ 298,452.02 |
| 04/13/2007 | MP 3 | MP4 | Dermacia, Inc. | $ 3,270,731.80 | $ 2,216,585.44 |
| 04/20/2007 | MP 1 | MP4 | F & Y Surgical | $ 4,795,478.54 | $ 3,836,382.83 |
| 04/20/2007 | MP 2 | MP4 | Friendship Community Healthcare | $ 175,130.10 | $ 140,104.08 |
| 04/20/2007 | MP 3 | MP4 | Global Testing Group | $ 12,906,874.52 | $ 2,325,499.62 |
| 04/20/2007 | MP 2 | MP4 | Bethesda Pediatrics | $ 165,879.21 | $ 132,703.37 |
| 04/20/2007 | MP 2 | MP4 | Richard Linchitz, MD | $ 263,102.10 | $ 210,481.68 |
| 04/20/2007 | MP 2 | MP4 | Robert B. Johnson | $ 360,025.89 | $ 288,020.71 |
| 05/09/2007 | MP2 | MP4 | Integra Sleep Solutions, LLC | $ 163,760.63 | $ 131,008.50 |
| 05/09/2007 | MP2 | MP4 | Monsour Medical Center | $ 430,613.23 | $ 344,490.58 |
| 05/10/2007 | MP2 | MP4 | First Choice Health Services | $ 200,895.06 | $ 160,716.05 |
| 05/10/2007 | MP2 | MP4 | San Diego Center For Women | $ 67,512.13 | $ 54,009.70 |
| 05/10/2007 | MP2 | MP4 | Rose Medical Group | $ 112,004.19 | $ 89,603.43 |
| 05/10/2007 | MP2 | MP4 | Spherios of Roswell | $ 154,342.75 | $ 123,474.20 |
| 05/14/2007 | MP2 | MP4 | Preferred Medical Imagining -#1 | $ 1,263,456.99 | $ 1,010,765.59 |
| 05/15/2007 | MP2 | MP4 | Breathing Disorder | $ 740,066.67 | $ 592,053.34 |
| 05/21/2007 | MP1 | MP4 | Community Healthcare | $ 4,274,487.22 | $ 3,419,589.78 |
| 05/21/2007 | MP2 | MP4 | Preferred Medical Imagining PC | $ 6,240,472.21 | $ 4,992,377.77 |
| 05/23/2007 | MP1 | MP4 | Creative Medical | $ 1,263,653.75 | $ 1,010,923.00 |
| 05/29/2007 | MP2 | MP4 | Boston Post Road Medical | $ 14,318,899.31 | $ 11,455,119.45 |
| 05/29/2007 | MP1 | MP4 | Caring Solutions, LLC | $ 1,322,142.23 | $ 1,057,713.78 |
| 05/29/2007 | MP1 | MP4 | Health Care For Woman | $ 430,902.02 | $ 344,721.62 |
| 05/30/2007 | MP1 | MP4 | Peoples Community Health Center | $ 817,835.23 | $ 654,268.18 |
| 06/01/2007 | MP4 #1 | MP4.2 | Alpha Omega - San Diego | $ 3,825,694.51 | $ 3,060,555.61 |
| 06/04/2007 | MP1 | MP4.2 | Omega Healthcare Network, Inc. | $ 1,734,001.13 | $ 1,387,200.90 |
| 06/07/2007 | MP3 | MP3.2 | Valley Healthcare/ Valley Diagnostic | $ 6,862,508.99 | $ 1,090,007.19 |
| 06/11/2007 | MP1 | MP4.2 | Metabolic Treatment Center | $ 2,245,840.59 | $ 1,796,672.47 |
| 06/11/2007 | MP1 | MP4.2 | Mobile Nursing | $ 3,098,758.50 | $ 2,479,006.80 |
| 06/18/2007 | MP1 | MP4.2 | Vision MRI - Oatbrook | $ 3,675,495.54 | $ 2,940,396.43 |
| 06/26/2007 | MP1 | MP4.2 | National Health Service, Inc. | $ 11,045,975.82 | $ 8,836,780.66 |
| 07/03/2007 | MP2 | MP4.2 | Forum Medical Management | $ 17,199,349.91 | $ 13,759,479.93 |
| 07/06/2007 | MP4 #1 | MP4.2 | Alpha Omega - Riverside | $ 3,695,745.21 | $ 2,956,596.17 |
| 07/09/2007 | MP1 | MP4.2 | Advance Radiology | $ 18,547,869.54 | $ 14,838,296.63 |
| 08/06/2007 | MP3 | MP3.2 | Valley Healthcare | $ 3,527,384.80 | $ 2,821,907.84 |
| 08/24/2007 | MP1 | MP4.2 | Assured Home Health | $ 988,597.51 | $ 790,878.01 |
| 08/27/2007 | MP1 | MP4.2 | Total Family Care | $ 3,840,975.35 | $ 3,072,780.28 |
| 08/30/2007 | MP1 | MP4.2 | NLV, Inc. | $ 3,779,232.85 | $ 3,023,386.28 |
| 09/24/2007 | MP1 | MP4.2 | MRI Global Imagining | $ 25,705,489.96 | $ 3,564,391.97 |
| 10/04/2007 | MP2 | MP4.2 | MRI Global Imaging Services | $ 9,958,803.95 | $ 7,967,043.16 |
| 10/29/2007 | MP2 | MP4.2 | MRI Gloabal - Store #2 | $ 8,012,482.54 | $ 6,409,986.03 |
| 12/07/2007 | MP4 | MP5 | Get Well Medical Supply | $ 6,368,404.12 | $ 5,094,723.30 |
| 12/10/2007 | MP3 | MP5 | Healthcare for Women | $ 512,500.74 | $ 410,000.59 |

EXHIBIT 2 PAGE 40

Medical Capital Special Purpose Corporations
Intercompany Transactions
From 2003 thru May 2009

| Transaction Date | Seller | Buyer | Provider | ENR Balance | Cash Paid |
|---|---|---|---|---|---|
| 12/10/2007 | MP1 | MP5 | Trinity Medical Supply | $ 1,285,946.25 | $ 1,028,757.00 |
| 12/10/2007 | MP1 | MP5 | Vision Medical Group | $ 837,200.62 | $ 669,760.50 |
| 12/19/2007 | MP4 | MP5 | Quality Healthcare Inc. | $ 2,729,380.08 | $ 2,183,504.06 |
| 12/19/2007 | MP1 | MP5 | Western Medical center - Ana | $ 12,130,250.26 | $ 9,704,200.21 |
| 12/19/2007 | MP4 | MP5 | Chapman Medical Center | $ 5,098,046.19 | $ 4,078,436.95 |
| 01/02/2008 | MP1 | MP5 | Penisula Podiatry | $ 438,648.00 | $ 350,919.00 |
| 01/02/2008 | MP1 | MP5 | Pharmacon Pharmacy | $ 307,954.82 | $ 246,363.86 |
| 01/02/2008 | MP1 | MP5 | LAV Care Coporation | $ 1,480,567.96 | $ 1,184,454.37 |
| 01/02/2008 | MP3 #1 | MP5 | Parkway Hospital, Inc. | $ 7,847,602.51 | $ 6,278,082.01 |
| 01/08/2008 | MP3 #2 | MP5 | Creative Medical, Inc. | $ 1,476,744.94 | $ 1,181,395.95 |
| 01/08/2008 | MP4 #1 | MP5 | Metabolic Disease Foundation | $ 5,118,263.34 | $ 4,094,610.67 |
| 01/08/2008 | MP4 #2 | MP5 | NLV, Inc. | $ 3,815,149.11 | $ 3,052,119.29 |
| 01/11/2008 | MP3 #1 | MP5 | Parkway Hospital, Inc. | $ 5,054,640.74 | $ 4,043,712.59 |
| 01/16/2008 | MP4 #2 | MP5 | Alpha Omega - San Diego | $ 4,484,625.33 | $ 3,587,700.26 |
| 01/18/2008 | MP2 | MP5 | Kingwood Pines Hospital | $ 4,211,498.44 | $ 3,369,198.75 |
| 01/23/2008 | MP4 #2 | MP5 | People's Community Health Center | $ 831,660.37 | $ 665,328.30 |
| 01/25/2008 | MP2 | MP5 | Kingwood Pines Hospital | $ 2,198,080.01 | $ 1,752,064.01 |
| 01/25/2008 | MP3 #1 | MP5 | Parkway Hospital, Inc. | $ 3,558,740.98 | $ 2,870,992.78 |
| 01/31/2008 | MP4 | MP5 | Breathing Disorders service, Inc. | $ 906,154.54 | $ 724,923.63 |
| 02/01/2008 | MP4 #1 | MP5 | F & Y Surgical | $ 5,487,668.77 | $ 4,390,135.02 |
| 02/01/2008 | MP2 | MP5 | Kingwood Pines Hospital | $ 3,460,922.25 | $ 2,768,737.80 |
| 02/01/2008 | MP3 #1 | MP5 | Parkway Hospital, Inc. | $ 4,166,766.67 | $ 3,333,413.34 |
| 02/08/2008 | MP4 #2 | MP5 | Assured Home Health | $ 1,504,791.73 | $ 1,203,833.38 |
| 02/08/2008 | MP3 #2 | MP5 | Caring Solutions, LLC | $ 1,887,621.88 | $ 1,510,097.50 |
| 02/11/2008 | MP2 | MP5 | Kingwood Pines Hospital | $ 4,668,016.37 | $ 3,734,413.10 |
| 02/12/2008 | MP3 #1 | MP5 | Parkway Hospital, Inc. | $ 2,967,794.65 | $ 2,374,235.72 |
| 02/13/2008 | MP4 #2 | MP5 | Boston Post Road Medical | $ 7,613,948.07 | $ 6,091,079.26 |
| 02/13/2008 | MP4 #2 | MP5 | Omega Healthcare Network, Inc. | $ 1,631,412.80 | $ 1,305,130.24 |
| 02/20/2008 | MP2 | MP5 | Kingwood Pines Hospital | $ 1,560,734.16 | $ 1,248,587.33 |
| 02/26/2008 | MP2 | MP5 | Kingwood Pines Hospital | $ 3,067,736.63 | $ 2,454,189.30 |
| 02/27/2008 | MP2 | MP5 | Kingwood Pines Hospital | $ 12,435,532.39 | $ 9,948,425.91 |
| 02/29/2008 | MP3 #2 | MP5 | Community Healthcare Specialist | $ 4,789,574.34 | $ 3,831,659.47 |
| 03/03/2008 | MP4 # 2 | MP5 | Metabolic Treatment Center | $ 1,384,368.04 | $ 1,107,494.43 |
| 03/03/2008 | MP4 # 1 | MP5 | Statewide Medical System | $ 1,343,910.29 | $ 1,075,128.23 |
| 03/04/2008 | MP1 | MP1 | Gulf Pines Hospital | $ 3,426,613.56 | $ 2,741,290.85 |
| 03/04/2008 | MP3 | MP1 | Parkway Hospital | $ 3,865,239.15 | $ 3,092,191.32 |
| 03/11/2008 | MP4 #2 | MP4 | Mobile Nursing | $ 3,673,272.16 | $ 2,938,617.73 |
| 03/25/2008 | MP3 #1 | MP5 | Parkway Hospital, Inc. | $ 3,316,477.41 | $ 2,653,181.93 |
| 03/27/2008 | MP4 #2 | MP1 | MRI Oakbrook | $ 4,274,805.61 | $ 3,419,844.49 |
| 04/14/2008 | MP4 # 2 | MP5 | Metabolice Treatment Center | $ 1,535,319.11 | $ 1,228,255.29 |
| 04/14/2008 | MP4 # 1 | MP5 | Pain Management Rehab | $ 3,863,616.40 | $ 3,090,893.13 |
| 04/14/2008 | MP4 # 1 | MP5 | Statewide Medical System | $ 4,185,103.43 | $ 3,348,082.74 |
| 04/25/2008 | MP2 | MP5 | Gulf Pines Hospital | $ 5,247,376.99 | $ 4,197,901.59 |
| 05/05/2008 | MP4 # 1 | MP5 | Global Testing Group | $ 13,284,569.52 | $ 10,627,655.62 |
| 05/05/2008 | MP4 # 1 | MP5 | Lincoln Hospital | $ 7,543,843.89 | $ 6,035,075.11 |
| 05/05/2008 | MP4 # 1 | MP5 | Oaks Diagnostic | $ 8,892,487.63 | $ 7,140,390.10 |
| 05/09/2008 | MP4 # 2 | MP5 | Alpha Omega - Riverside | $ 4,401,509.85 | $ 3,521,207.88 |
| 05/14/2008 | MP4 # 2 | MP5 | Boston Post Medical Imaging | $ 7,863,248.95 | $ 6,290,599.16 |
| 06/06/2008 | MP4 # 1 | MP5 | PMG - Path of Pines | $ 9,201,458.94 | $ 7,361,167.15 |
| 06/06/2008 | MP4 # 1 | MP5 | PMG - Progressive Medical Corp | $ 11,580,426.91 | $ 9,264,341.53 |
| 06/06/2008 | MP4 # 2 | MP5 | Total Family Care | $ 4,368,349.55 | $ 3,494,679.64 |
| 06/20/2008 | MP3 # 1 | MP4 | Trace Life Sciences, Inc. | $ 193,956.19 | $ 6,737,665.65 |
| 06/20/2008 | MP3 | MP5 | Valley Healthcare Medical | $ 2,333,434.48 | $ 1,866,747.58 |
| 06/23/2008 | MP2 | MP1 | Gulf Pines Hospital | $ 8,357,680.74 | $ 6,686,144.59 |

Medical Capital Special Purpose Corporations
Intercompany Transactions
From 2003 thru May 2009

| Transaction Date | Seller | Buyer | Provider | | ENR Balance | | Cash Paid |
|---|---|---|---|---|---|---|---|
| 06/29/2008 | MP2 | MP5 | Legacy Medical Center | $ | 909,491.15 | $ | 4,696,751.18 |
| 07/07/2008 | MP2 | MP5 | Legacy Medical Center | $ | 4,829,735.96 | $ | 3,863,788.77 |
| 07/07/2008 | MP3 # 1 | MP5 | Trace Life Science | $ | 3,361,469.33 | $ | 2,689,175.46 |
| 07/09/2008 | MP4 # 2 | MP3.2 | National Health Services | $ | 2,828,895.69 | $ | 2,263,116.55 |
| 07/14/2008 | MP3 # 1 | MP3.2 | Concept I Academies, LLC | $ | 3,132,215.80 | $ | 2,505,772.64 |
| 08/14/2008 | MPFC5 | MP6 | NLV, Inc. | $ | 4,242,802.40 | $ | 3,394,241.92 |
| 08/15/2008 | MPFC4 #2 | MP6 | Total Family Care | $ | 4,402,587.94 | $ | 3,522,062.35 |
| 08/19/2008 | MPFC5 | MP6 | Peoples's Community Health Center | $ | 682,867.47 | $ | 546,293.98 |
| 08/19/2008 | MPFC5 | MP6 | LAV Care | $ | 1,029,063.06 | $ | 823,250.45 |
| 08/19/2008 | MPFC5 | MP6 | Breathing Disorder Service | $ | 803,583.94 | $ | 642,867.15 |
| 08/20/2008 | MPFC3 #1 | MP6 | Sherios of Roswell | $ | 504,917.02 | $ | 403,933.62 |
| 08/21/2008 | MPFC3 #1 | MP6 | Trace Life Sciences | $ | 492,232.38 | $ | 393,786.38 |
| 08/26/2008 | MPFC3 #1 | MP6 | Valley Healthcare | $ | 11,345,348.88 | $ | 9,076,279.10 |
| 08/26/2008 | MPFC5 | MP6 | Valley Healthcare | $ | 2,333,434.48 | $ | 1,866,474.58 |
| 08/26/2008 | MPFC3 #2 | MP6 | Monsour Medical Center | $ | 599,569.59 | $ | 479,655.67 |
| 08/26/2008 | MPFC2 | MP6 | Legacy Medical Center | $ | 3,978,815.45 | $ | 3,183,052.36 |
| 08/29/2008 | MPFC5 | MP6 | Trace Life Science | $ | 3,352,144.18 | $ | 2,681,715.34 |
| 09/08/2008 | MPFC5 | MP6 | Assured Home Health | $ | 2,572,158.94 | $ | 2,057,727.15 |
| 09/11/2008 | MPFC4 #2 | MP5 | National Health Center | $ | 2,135,738.94 | $ | 1,708,591.15 |
| 09/18/2008 | MPFC4 #2 | MP5 | National Health Center | $ | 640,800.68 | $ | 512,640.54 |
| 09/19/2008 | MPFC4 #1 | MP6 | Trace Life Sciences | $ | 8,921,207.91 | $ | 7,136,966.33 |
| 10/21/2008 | MPFC4 #1 | MP6 | Home Care Medical | $ | 653,628.85 | $ | 522,903.08 |
| 10/23/2008 | MPFC4 #2 | MP6 | Advanced Radiology | $ | 20,135,038.88 | $ | 16,108,031.10 |
| 12/09/2008 | MPFC4#1 | MP5 | National Health Services | $ | 132,058.31 | $ | 105,646.65 |
| 12/10/2008 | MPFC4#1 | MP5 | National Health Services | $ | 402,288.06 | $ | 502,860.08 |
| 12/12/2008 | MPFC4#1 | MP5 | National Health Services | $ | 400,539.59 | $ | 500,674.49 |
| 12/15/2008 | MPFC4#1 | MP5 | National Health Services | $ | 318,079.33 | $ | 254,463.46 |
| 12/16/2008 | MPFC4#1 | MP5 | National Health Services | $ | 307,759.17 | $ | 246,207.34 |
| 12/29/2008 | MPFC4#1 | MP5 | National Health Services | $ | 307,179.96 | $ | 245,743.97 |
| 12/30/2008 | MPFC4#1 | MP5 | National Health Services | $ | 250,508.77 | $ | 200,407.02 |
| 01/05/2009 | MPFC4#1 | MP5 | National Health Services | $ | 407,996.24 | $ | 326,396.99 |
| 01/06/2009 | MPFC4#1 | MP5 | National Health Services | $ | 437,895.16 | $ | 350,316.13 |
| | | | Grand Total | $ | 1,054,285,244.97 | $ | 829,450,738.89 |

EXHIBIT 2 PAGE 42

# EXHIBIT "3"

EXHIBIT 3 PAGE 43

Date: Monday, August 10, 2009
Time: 02:26PM
User: HOWARDC

# MP Financial Corp I
## Detail General Ledger - Standard
Periods: 12-03 Through 05-09 As of: 8/10/2009 Ledger ID: ACTUAL

Page: 1 of 3
Report: 01520.rpt
Company: 71MPFC1

**Acct: 11030101    Medical receivable providers 1**

| Jrnl Type | Tran Type | Bat Nbr | Per Ent | Reference Nbr | Vendor | Tran Date | Tran Description | Beginning Balance | Debit Amount | Credit Amount | Ending Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CA | ZZ | 200390 | 02-04 | | | | Sub: 0-00-00-00003-00-00 Sub Acct Added During Posting | 0.00 | 5,746,263.01 | 0.00 | 5,746,263.01 |
| | | | | | | Period 02-04 | Total | 0.00 | 5,746,263.01 | 0.00 | 5,746,263.01 |
| CA | ZZ | 200869 | 03-04 | | | 2/27/2004 | Interco Trans. Advance Rad. | 5,746,263.01 | 0.00 | 0.00 | 5,746,263.01 |
| | | | | | | Period 03-04 | Total | 5,746,263.01 | 0.00 | 0.00 | 5,746,263.01 |
| ^ CA | ZZ | 200942 | 04-04 | | | 4/15/2004 | Interco trans fr MCH/Carl2-Adv | | 3,712,242.42 | 0.00 | |
| CA | ZZ | | 04-04 | | | 4/30/2004 | Interco trans Advanced Radiolo | | 4,986,579.11 | 0.00 | |
| | | | | | | Period 04-04 | Total | 5,746,263.01 | 8,698,821.53 | 0.00 | 14,445,084.54 |
| CA | ZZ | 201263 | 05-04 | | | 5/28/2004 | Interco trans Advanced Radio | | 513,727.87 | 0.00 | |
| | | | | | | Period 05-04 | Total | 14,445,084.54 | 513,727.87 | 0.00 | 14,958,812.41 |
| | | | | | | Period 06-04 | Total | 14,958,812.41 | 0.00 | 0.00 | 14,958,812.41 |
| | | | | | | Period 07-04 | Total | 14,958,812.41 | 0.00 | 0.00 | 14,958,812.41 |
| | | | | | | Period 08-04 | Total | 14,958,812.41 | 0.00 | 0.00 | 14,958,812.41 |
| | | | | | | Period 09-04 | Total | 14,958,812.41 | 0.00 | 0.00 | 14,958,812.41 |
| | | | | | | Period 10-04 | Total | 14,958,812.41 | 0.00 | 0.00 | 14,958,812.41 |
| | | | | | | Period 11-04 | Total | 14,958,812.41 | 0.00 | 0.00 | 14,958,812.41 |
| | | | | | | Period 12-04 | Total | 14,958,812.41 | 0.00 | 0.00 | 14,958,812.41 |
| | | | | | | Period 01-05 | Total | 14,958,812.41 | 0.00 | 0.00 | 14,958,812.41 |
| GJ | GL | 103427 | 02-05 | | | 2/28/2005 | | 14,958,812.41 | 0.00 | 248,240.69 | |
| | | | | | | Period 02-05 | Total | 14,958,812.41 | 0.00 | 248,240.69 | 14,710,571.72 |
| | | | | | | Period 03-05 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 04-05 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 05-05 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 06-05 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 07-05 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 08-05 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 09-05 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 10-05 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 11-05 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 12-05 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 01-06 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |

*[handwritten annotation near 2/28/2005 row: A/C adjust]*



EXHIBIT 3 PAGE 44

Date: Monday, August 10, 2009
Time: 02:26PM
User: HOWARDC

**MP Financial Corp I**
**Detail General Ledger - Standard**
Periods: 12-03 Through 05-09 As of: 8/10/2009 Ledger ID: ACTUAL

Page: 2 of 3
Report: 01620.rpt
Company: 71MPFC1

| Jrnl Type | Tran Type | Bat Nbr | Per Ent | Reference Nbr | Vendor | Tran Date | Tran Description | Beginning Balance | Debit Amount | Credit Amount | Ending Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CA | ZZ | 215801 | 07-07 | | | 7/9/2007 | Interco trans Advance Radiolog | 0.00 | 18,547,869.54 | 0.00 | -3,837,297.82 |
| | | | | | | Period 07-07 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 06-07 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 05-07 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 04-07 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 03-07 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 02-07 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 01-07 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 12-06 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 11-06 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 10-06 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 09-06 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 08-06 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 07-06 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 06-06 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 05-06 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 04-06 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 03-06 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 02-06 | Total | 14,710,571.72 | 0.00 | 0.00 | 14,710,571.72 |
| | | | | | | Period 05-08 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Period 04-08 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Period 03-08 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Period 02-08 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Period 01-08 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Period 12-07 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Period 11-07 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Period 10-07 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Period 09-07 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Period 08-07 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |

EXHIBIT 3 PAGE 45

Date: Monday, August 10, 2009
Time: 02:26PM
User: HOWARDC

## MP Financial Corp I
### Detail General Ledger - Standard
Periods: 12-03 Through 05-09 As of: 8/10/2009   Ledger ID: ACTUAL

Page: 3 of 3
Report: 01920.rpt
Company: 71MPFC1

| Jrnl Type | Tran Type | Bat Nbr | Per Ent | Ref Nbr | Vendor | Tran Date | Tran Description | Beginning Balance | Debit Amount | Credit Amount | Ending Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Period 06-08 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Period 07-08 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Period 08-08 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Period 09-08 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Period 10-08 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Period 11-08 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Period 12-08 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Period 01-09 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Period 02-09 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Period 03-09 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Period 04-09 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Period 05-09 | Total | -3,837,297.82 | 0.00 | 0.00 | -3,837,297.82 |
| | | | | | | Acct 11030101 | Total | 0.00 | 14,958,812.41 | 18,796,110.23 | -3,837,297.82 |
| | | | | | | | Total Assets | 0.00 | 14,958,812.41 | 18,796,110.23 | -3,837,297.82 |

▲   Indicates the period entered is different from the period posted.
•   Indicates there are no GL transactions to support summarized AcctHist period activity.
**  Indicates the calculated period ending balance does not match the YTD balance on AcctHist.
*** Indicates the calculated account balance does not match the account balance on AcctHist.
#   Indicates Assets do not match Liabilities or Net Income does not equal the YTD Net Income account.

EXHIBIT 3 PAGE 46

Date: Monday, August 10, 2009
Time: 02:26PM
User: HOWARDC

# MP Financial Corp IV
## Detail General Ledger - Standard
Periods: 12-03 Through 05-09 As of: 8/10/2009 Ledger ID: ACTUAL

Page: 1 of 2
Report: 01620.rpt
Company: 74MPFC4

**Acct: 11030101 Medical receivable providers 1**

| Jrnl Type | Tran Type | Bat Nbr | Per Ent | Reference Nbr | Vendor | Tran Date | Tran Description | Beginning Balance | Debit Amount | Credit Amount | Ending Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Sub: 0-00-00-00003-00-00 Interco trans Advance Radio. Sub Acct Added During Posting | | | | |
| CA | ZZ | 215804 | 07-07 | Sll | | 7/9/2007 | Total | 0.00 | 18,547,869.54 | 0.00 | 18,547,869.54 |
| | | | | | | | Period 07-07 Total | 0.00 | 18,547,869.54 | 0.00 | 18,547,869.54 |
| | | | | | | | Period 08-07 Total | 18,547,869.54 | 0.00 | 0.00 | 18,547,869.54 |
| | | | | | | | Period 09-07 Total | 18,547,869.54 | 0.00 | 0.00 | 18,547,869.54 |
| | | | | | | | Period 10-07 Total | 18,547,869.54 | 0.00 | 0.00 | 18,547,869.54 |
| | | | | | | | Period 11-07 Total | 18,547,869.54 | 0.00 | 0.00 | 18,547,869.54 |
| | | | | | | | Period 12-07 Total | 18,547,869.54 | 0.00 | 0.00 | 18,547,869.54 |
| | | | | | | | Period 01-08 Total | 18,547,869.54 | 0.00 | 0.00 | 18,547,869.54 |
| | | | | | | | Period 02-08 Total | 18,547,869.54 | 0.00 | 0.00 | 18,547,869.54 |
| | | | | | | | Period 03-08 Total | 18,547,869.54 | 0.00 | 0.00 | 18,547,869.54 |
| | | | | | | | Period 04-08 Total | 18,547,869.54 | 0.00 | 0.00 | 18,547,869.54 |
| | | | | | | | Period 05-08 Total | 18,547,869.54 | 0.00 | 0.00 | 18,547,869.54 |
| | | | | | | | Period 06-08 Total | 18,547,869.54 | 0.00 | 0.00 | 18,547,869.54 |
| | | | | | | | Period 07-08 Total | 18,547,869.54 | 0.00 | 0.00 | 18,547,869.54 |
| | | | | | | | Period 08-08 Total | 18,547,869.54 | 0.00 | 0.00 | 18,547,869.54 |
| | | | | | | | Period 09-08 Total | 18,547,869.54 | 0.00 | 0.00 | 18,547,869.54 |
| CA | ZZ | 224296 | 10-08 | S2 | | 10/22/2008 | I/C trans Advanced Radiology | 18,547,869.54 | 0.00 | 20,135,038.88 | -1,587,169.34 |
| | | | | | | | Period 10-08 Total | 18,547,869.54 | 0.00 | 20,135,038.88 | -1,587,169.34 |
| | | | | | | | Period 11-08 Total | -1,587,169.34 | 0.00 | 0.00 | -1,587,169.34 |
| | | | | | | | Period 12-08 Total | -1,587,169.34 | 0.00 | 0.00 | -1,587,169.34 |
| | | | | | | | Period 01-09 Total | -1,587,169.34 | 0.00 | 0.00 | -1,587,169.34 |
| | | | | | | | Period 02-09 Total | -1,587,169.34 | 0.00 | 0.00 | -1,587,169.34 |
| | | | | | | | Period 03-09 Total | -1,587,169.34 | 0.00 | 0.00 | -1,587,169.34 |
| | | | | | | | Period 04-09 Total | -1,587,169.34 | 0.00 | 0.00 | -1,587,169.34 |
| | | | | | | | Period 05-09 Total | -1,587,169.34 | 0.00 | 0.00 | -1,587,169.34 |
| | | | | | | | Acct 11030101 Total | 0.00 | 18,547,869.54 | 20,135,038.88 | -1,587,169.34 |
| | | | | | | | Total Assets | 0.00 | 18,547,869.54 | 20,135,038.88 | -1,587,169.34 |

EXHIBIT 3 PAGE 47

EXHIBIT 3 PAGE 48

Date:     Monday, August 10, 2009
Time:     02:26PM
User:     HOWARDC

## MP Financial Corp IV
## Detail General Ledger - Standard
Periods: 12-03 Through 05-09 As of: 8/10/2009  Ledger ID:   ACTUAL

Page:      2 of 2
Report:    01820.rpt
Company:   74MPFC4

| Jrnl Tran Bat | Per | Reference | Tran | Tran | Beginning | Debit | Credit | Ending |
|---|---|---|---|---|---|---|---|---|
| Type Type Nbr | Ent Nbr | Vendor | Date | Description | Balance | Amount | Amount | Balance |

^   Indicates the period entered is different from the period posted.

•   Indicates there are no GL transactions to support summarized Acct-Hist period activity.

••  Indicates the calculated period ending balance does not match the YTD balance on AcctHist.

••• Indicates the calculated account balance does not match the account balance on AcctHist.

#   Indicates Assets do not match Liabilities or Net Income does not equal the YTD Net Income account.

Date: Monday, August 10, 2009
Time: 02:26PM
User: HOWARDC

# MP Funding Corp VI
## Detail General Ledger - Standard
Periods: 12-03 Through 05-09 As of: 8/10/2009 Ledger ID: ACTUAL

Page: 1 of 1
Report: 01620.rpt
Company: 76MPFC6

**Acct: 11030101 Medical receivable providers 1**

**Sub: 0-00-00-00003-00-00 Sub Acct Added During Posting    Advanced Radiology**

| Jrnl Type | Tran Type | Bat Nbr | Per Ent | Reference Nbr | Vendor | Tran Date | Tran Description | Beginning Balance | Debit Amount | Credit Amount | Ending Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| CA | ZZ | 224295 | 10-08 | | | 10/23/2008 | I/C trans Advanced Radiology | 20,135,038.88 | | | |
| | | | | | | | Period 10-08 Total | 0.00 | 20,135,038.88 | 0.00 | 20,135,038.88 |
| GJ | GL | 111530 | 11-08 | | | 11/30/2008 | close sus 08/08 | | 287,596.25 | | |
| | | | | | | | Period 11-08 Total | 20,135,038.88 | 287,596.25 | 0.00 | 20,422,635.13 |
| GJ | GL | 111710 | 12-08 | | | 12/31/2008 | close sus 12/08 | | 21,721.52 | | |
| | | | | | | | Period 12-08 Total | 20,422,635.13 | 21,721.52 | 0.00 | 20,444,356.65 |
| GJ | GL | 111928 | 01-09 | | | 1/31/2009 | close sus 12/08 | | 134,317.69 | | |
| | | | | | | | Period 01-09 Total | 20,444,356.65 | 134,317.69 | 0.00 | 20,578,674.34 |
| | | | | | | | Period 02-09 Total | 20,578,674.34 | 0.00 | 0.00 | 20,578,674.34 |
| GJ | GL | 112264 | 03-09 | | | 3/31/2009 | adjust AR balances | | 82,787.85 | | |
| | | | | | | | Period 03-09 Total | 20,578,674.34 | 82,787.85 | 0.00 | 20,661,462.19 |
| GJ | GL | 112495 | 04-09 | | | 4/30/2009 | Adjust AR - Apr 09 | | 0.00 | 82,787.85 | |
| | | | | | | | Period 04-09 Total | 20,661,462.19 | 0.00 | 82,787.85 | 20,578,674.34 |
| GJ | GL | 112679 | 05-09 | | | 5/31/2009 | Adjust AR - May 09 | | 41,177.08 | 0.00 | |
| | | | | | | | Period 05-09 Total | 20,578,674.34 | 41,177.08 | 0.00 | 20,619,851.42 |
| | | | | | | | Acct 11030101 Total | 0.00 | 20,702,639.27 | 82,787.85 | 20,619,851.42 |
| | | | | | | | **Total    Assets** | **0.00** | **20,702,639.27** | **82,787.85** | **20,619,851.42** |

^ Indicates the period entered is different from the period posted.
* Indicates there are no GL transactions to support summarized AcctHist period activity.
** Indicates the calculated period ending balance does not match the YTD balance on AcctHist.
*** Indicates the calculated account balance does not match the account balance on AcctHist.
# Indicates Assets do not match Liabilities or Net Income does not equal the YTD Net Income account.

EXHIBIT 3 PAGE 49

# CERTIFICATE OF SERVCE

I hereby certify that on August 12, 2009, I electronically filed

10 DAY REPORT AND ACCOUNTING OF RECEIVER THOMAS A. SEAMAN

with the Clerk of the Court using the CM/ECF system which will send notification of such filing

to the following

| Name of Counsel(s)/Law Firm(s) | Electronic Notification Address |
|---|---|
| **John F. Libby, Esq.**<br>**Manatt, Phelps & Phillips, LLP** | **jlibby@manatt.com** |
| **Sirena P. Castillo, Esq.**<br>**Manatt, Phelps & Phillips, LLP** | **scastillo@manatt.com** |
| **John B. Bulgozdy, Esq.** | **bulgozdyj@sec.gov** |
| **Nicholas S. Chung, Esq.** | **chungni@sec.gov** |
| **Morgan B. Ward Doran, Esq.** | **warddoranm@sec.gov** |

I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction the service was made and that the foregoing is true and correct.

Executed on August 12, 2009, at Los Angeles, California.

_____
Luci V. Benavidez
(Type or print name)

_____
(Signature)