JOHN B. BULGOZDY, Cal Bar No. 219897
Email: bulgozdyj@sec.gov
MORGAN B. WARD DORAN, Cal. Bar No. 246107
Email: warddoranm@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Rosalind R. Tyson, Regional Director
Andrew G. Petillon, Associate Regional Director
John M. McCoy III, Regional Trial Counsel
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036-3648
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

FILED

2009 NOV -9 PM 3:48

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY:

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

vs.

MEDICAL CAPITAL HOLDINGS, INC.; MEDICAL CAPITAL CORPORATION; MEDICAL PROVIDER FUNDING CORPORATION VI; SIDNEY M. FIELD; and JOSEPH J. LAMPARIELLO,

Defendants.

Case No. SACV 09-818 DOC (RNBx)

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

**SUMMARY**

1. This matter concerns fraud in the offer and sale of over $1.7 billion of securities in the form of notes by Defendants: Medical Capital Holdings, Inc. ("MCHI"); Medical Capital Corporation ("MCC"); Sidney M. Field; and

BY FAX ORIGINAL

Joseph J. Lampariello, including fraud in the offer and sale of $74.7 million in securities in the form of notes by Defendants MCHI, MCC, Field, Lampariello, and Medical Provider Funding Corporation VI ("MP VI"). MCHI is a medical receivables financing company that operates through MCC, its wholly-owned subsidiary, to administer several Special Purpose Corporations ("SPCs"), including MP VI, and its predecessor entities Medical Provider Funding Corporations I through V ("MP I" through "MP V"). Defendants Field and Lampariello were directors of MCHI, MCC, and MP I through MP VI. Field served as the Chief Executive Officer ("CEO"), and Lampariello as the president and Chief Operating Officer ("COO"), of MCHI, MCC, and MP I through MP VI. Since 2003, MCHI, MCC, Fields, and Lampariello have raised over $1.7 billion through offerings of notes in MP I through VI. As of November, 2009, MP I through VI have over $1 billion in notes outstanding. Since August 2008, five of the SPCs have been in default or late in paying principal and/or interest on $992.5 million in notes. Defendants MCC, MCHI, and MP VI, as well as MP I through MP V, have been placed into Receivership by the Court.

2. The Defendants committed fraud in the offer and sale of MP VI notes. As of June 19, 2009, the Defendants misappropriated approximately $20.4 million of the $74.7 million raised through the sale of MP VI notes to pay purported administrative fees to MCC. These fee payments were contrary to representations in MP VI's original private placement memorandum ("PPM"), which stated that administrative fees would not be paid out of the offering proceeds, as well as representations in MP VI's May 27, 2009 supplemental PPM ("Supplemental PPM") that less than $4 million of offering proceeds had been used for purposes other than purchasing accounts receivables. The Defendants also misrepresented that none of the SPCs affiliated with MP VI had defaulted on, or been late in making payments of, principal and/or interest to their respective investors. In fact, two MP VI-affiliated SPCs began defaulting on interest and/or principal payments

in the same month that MP VI began its offering, and thereafter two other MP VI-affiliated SPCs have defaulted or been late in making interest payments.

3. Moreover, Defendants Field, Lampariello, MCC, and MCHI engaged in fraud in the offer and sale of securities in the form of notes issued by MP I through MP V, by misappropriating over $300 million of investor funds through payments of administrative fees, contrary to representations in the PPMs for those offerings which contained restrictions substantially similar to those in the PPM for MP VI. Defendants' financing activities were not profitable and were resulting in substantial cash outflows for each fund, so that as Defendants paid themselves administrative fees the only cash source were investor funds. Field, Lampariello, and MCC orchestrated intercompany transfers of new investor funds to earlier offerings, through the sale of fake, overstated, and/or aged and worthless receivables, to make those new investor funds available to pay principal and interest to investors in prior offerings, as well as to pay administrative fees to MCC. Defendants Field, Lampariello, and MCC inflated the asset values on "collateral coverage reports" ("CCRs") submitted to the administrator of trust accounts for the MP entities to obtain administrative fees to which MCC, Field, and Lampariello were not entitled.

4. The Defendants, by engaging in the conduct described in this Complaint, have violated, or aided and abetted, and unless enjoined will continue to violate, or aid and abet, the antifraud provisions of the federal securities laws. By this First Amended Complaint, the Commission seeks permanent injunctions, disgorgement with prejudgment interest, and civil penalties.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1),

78u(d)(3)(A), 78u(e), and 78aa. The Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

6. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district, and all of the defendants reside and/or are located in this district.

## DEFENDANTS

7. **Medical Capital Holdings, Inc.**, a Nevada corporation with its principal place of business in Tustin, California, is currently in Court ordered Receivership. Through various wholly-owned operating subsidiaries and SPCs, MCHI provided financing to healthcare providers by purchasing their accounts receivables and making secured loans to them. MCHI used its special purpose corporations to raise money from investors to fund the purchase of receivables and other lending activity. MCHI used its operating subsidiaries to underwrite, monitor, administer, and service the financing. MCHI is not registered with the Commission in any capacity. MCHI received over $70 million from MCC during the period from 2003 through 2009. In February 2001, the California Department of Corporations issued a Desist and Refrain Order against MCHI from the further offer or sale of securities in the State of California.

8. **Medical Capital Corporation**, a Nevada corporation and wholly-owned subsidiary of MCHI, with its principal place of business in Tustin, California, is currently in Court ordered Receivership. MCC was the administrator for each of MCHI's SPCs and provided management, underwriting, and administrative services, such as bookkeeping, payroll, and accounting services, including administration of all investor promissory notes and interest payments. MCC is not registered with the

Commission in any capacity. Between 2003 and 2009, MCC received over $320 million in administrative fees from MP I through MP VI.

9. **Medical Provider Funding Corporation VI**, a Nevada corporation and wholly-owned SPC of MCHI that was formed in April 2008, is currently in Court ordered Receivership. From August 2008 through June 2009, MP VI conducted a note offering that raised $74.7 million through the issuance of notes to about 700 investors. MP VI has never been registered with the Commission in any capacity, nor has it registered an offering of securities under the Securities Act or a class of securities under the Exchange Act. From May to June 2009, MP VI was late on interest payments to investors by several days.

10. **Sidney M. Field**, age 63, resides in Villa Park, California. Field was the CEO and a director of MCC since 1994, and served as the CEO and a director of MCHI and other of its subsidiaries since 1996, until the entities were placed into Receivership. Field also served as the CEO and Director of MPI through MP VI, from the inception of each entity until they were placed into Receivership. Field received a salary from MCC, and was paid dividends by MCHI.

11. **Joseph J. Lampariello**, age 55, resides in Huntington Station, New York, and Newport Beach, California. Lampariello was the president, COO, and a director of MCHI and its subsidiaries from 1996 until the entities were placed into receivership. Lampariello also served as the president, COO, and a director of MP I through MP VI, from the inception of each entity until they were placed into Receivership. Lampariello was responsible for the day-to-day operations of MCC, which included funding underwriting, collections and all computer information services. Lampariello received a salary from MCC, and was paid dividends by MCHI.

## RELATED ENTITIES

12. **Medical Provider Financial Corporation I** ("MP I") is a Nevada corporation and wholly-owned special purpose subsidiary of MCHI that was formed in September 2003. From December 2003 to August 2007, MP I

conducted a note offering, raising approximately $253 million through the issuance of about 3,821 notes to investors. As of May 31, 2009, MP I had repaid all but $375,000 of its investors' principal.

13. **Medical Provider Financial Corporation II** ("MP II") is a Nevada corporation and wholly-owned SPC of MCHI that was formed in October 2003. From January 2004 to December 2005, MP II raised approximately $250.7 million through the issuance of about 3,458 notes to investors. As of May 27, 2009, MP II had $88 million in outstanding notes and had defaulted in paying $43 million in principal and $1.3 million in interest to its investors.

14. **Medical Provider Financial Corporation III** ("MP III") is a Nevada corporation and wholly-owned SPC of MCHI that was formed in February 2005. From July 2005 to January 2008, MP III conducted two series of note offerings, raising a total of about $352.2 million by issuing 4,532 notes to investors. As of March 31, 2009, MP III had $110.7 million in outstanding notes, and as May 27, 2009, MP III had defaulted in paying principal on $26.5 million in outstanding notes.

15. **Medical Provider Financial Corporation IV** ("MP IV") is a Nevada corporation and wholly-owned SPC of MCHI that was formed in July 2005 and commenced operations in October 2006. From November 2006 through February 2008, MP IV conducted two series of note offerings, raising a total of $405.2 million by issuing 4,222 notes to investors. As of May 27, 2009, MP IV had $403.8 million in outstanding notes and defaulted on interest payments in January 2009 and since March 2009.

16. **Medical Provider Funding Corporation V** ("MP V") is a Nevada corporation and wholly-owned SPC of MCHI that was formed in September 2007. From November 2007 to about July 2008, MP V conducted a note offering, raising $402.7 million by issuing 4,323 notes that begin to mature in November 2009. As of March 31, 2009, MP V had $401.1 million in outstanding notes issued to 4,270 investors. In May 2009, interest payments to investors were delayed by several days.

## THE FRAUDULENT SCHEME

### A. MCHI's Business and SPC Note Offerings

17. MCHI provides financing to healthcare providers by purchasing accounts receivables from, and making secured loans to, medical providers. MCHI funds its healthcare financing by offering notes issued by its SPCs. Between November 2003 and July 2009, MCHI raised approximately $1.7 billion from over 20,000 investors from the offerings of MP I through MP VI. MCHI managed the operations of each of the SPCs through its operating subsidiary, MCC, which essentially ran the SPCs and administered their day to day operations, provided underwriting services and originated purchases of accounts receivable, and performed marketing, sales and client support functions. In addition, MCC provided bookkeeping, payroll, and accounting services, including administration of all promissory notes and interest payments. MCC also opened, maintained, and directed bank accounts and lock box accounts for the SPCs.

18. For each offering and series, Defendants MCHI, MCC, Field, and Lampariello prepared a PPM which described the offering and made numerous representations to investors concerning management of the offering. Field and Lampariello reviewed, edited, and approved each PPM. The PPMs for the notes sold by MP I through MP VI contained many substantially similar representations and statements concerning the management and operation of the MP. Defendants MCHI, MCC, Field, and Lampariello provided the PPMs and related subscription documents to various registered broker-dealers, who in turn were to provide them to investors.

19. The PPM for each MP offering disclosed that MCC was to be paid "administrative fees" from each of the SPCs to which it provided services. In each PPM for each offering made by MP I through MP VI, Defendants MCHI, MCC, Field, and Lampariello represented that the proceeds from the sale of notes to investors would not be used to pay administrative fees to MCC. The PPMs for each offering by MP I through MP VI contained a section titled "Restriction on

Use of Proceeds," which were substantially similar. The statement in the PPM for MP VI is typical, and stated, in part: "We will not use any proceeds from the sale of notes to pay administrative fees to Medical Capital Corporation for the services it provides as administrator or to pay servicing fees to MediTrak as the servicer of the receivables."

20. The PPMs also explained how administrative fees were calculated using a "collateral coverage ratio" ("CCR"). Each MP purportedly acquired batches of accounts receivables from medical providers, or made secured loans to borrowers, which were collateral for the notes issued by the MP. When Defendants acquired batches of receivables, they paid less than face value – or the billed amount – of the receivables, and Defendants called this lower purchase price for a batch the "expected net receivable," or "ENR." In the PPMs, Defendants stated that they did not "expect to be able to collect anything more than the ENR" of receivables. The administrative fees paid to MCC were to be "equal to the amount in the trust account that exceeds the amount needed for the collateral coverage ratio to equal 100%, after all required payments to trustee, servicer and lockbox fees, and all principal and interest then due on the notes." The PPMs defined the CCR as the ratio of (A) the ENR of all eligible accounts receivable included in the collateral plus the value of other assets plus funds and investments in the lockbox and trust accounts, to (B) the aggregate outstanding principal amount of all notes. MCC, as administrator, was responsible for certifying to the trustee that the CCR equaled or exceeded 100% in connection with any application for administrative fees. The PPM further stated that it was an event of default if the CCR fell below 100% at the beginning of any month, and remained below 100% for five consecutive days after such information was reported to the trustee.

21. The SPCs sold the notes through registered broker-dealers to accredited investors under Rule 506 of Regulation D. 17 C.F.R. §§ 230.501–230.508. In the offerings, the SPCs sold notes with various maturities (one to

seven years) and interest rates (8.5% to 10.5%). In the PPMs, Defendants MCHI, MCC, Field, and Lampariello represented that after paying offering expenses, generally limited to 4% to 8% of total proceeds, the net offering proceeds would be used to purchase healthcare receivables and make investments in other businesses. The notes are securities in the form of notes as investment contracts.

22. Defendants MCC, Field, and Lampariello managed the funds of each MP I through VI using an individual bank account for each MP, controlled by a trustee (the "Trust Account"), through which all funds for the particular MP were to flow. Investor funds, collections on receivables deposited into lockbox accounts, loan repayments, and all other receipts were supposed to be deposited into each particular MP's Trust Account. From each particular MP's Trust Account, disbursements were made for purchases of receivables, loans, administrative fees, interest payments, redemptions of principal, trust account fees, servicing fees, and any other disbursements for the benefit of the particular MP. Field and Lampariello, among others at MCC, received daily cash reports which detailed the cash balance in each of the MPs' Trust Accounts. The various MP's also had other master accounts, such as tax accounts, which were included on the daily cash reports.

23. In the PPMs for MP I through MP VI, Defendants MCHI, MCC, Field, and Lampariello represented that the majority of the offering proceeds would be used to purchase healthcare receivables and to make loans to or investments in healthcare-related businesses. Field, Lampariello, and a third individual comprised the "Selection Committee" which reviewed and approved each provider and borrower that obtained financing from the SPCs. With regard to purchases of batches of accounts receivables, Medical Tracking Services, Inc. ("MediTrak"), a wholly-owned subsidiary of MTS, provided servicing for all accounts receivable transaction data, and monitored, tracked, and posted all asset purchases and collections. MediTrak processed data and prepared reports which showed for each account, batch by batch, all activity in terms of purchases and

collections. MediTrak provided MCC with detailed reports on the performance of each provider, which MCC reviewed on a weekly basis. Field and Lampariello monitored the performance of each provider through these batch reports, and monitored payments and collections through the daily cash reports for each MP I through MP VI. In addition, Field and Lampariello communicated directly with providers and borrowers about the status of loans, and personally approved extensions of credit and loan advances for borrowers from MP I through MP VI.

24. Defendants Field, Lampariello, MCHI, and MCC did not prepare or keep the SPCs' financial statements in accordance with GAAP, or even keep their accounting records in a manner that would allow GAAP financial statements to be generated for each SPC.

**B. Misrepresentations in the Offer and Sale of Notes**

**1. Misappropriation of Offering Proceeds to Pay Fees to MCC**

25. In MP VI's original August 5, 2008 PPM and supplemental May 27, 2009 PPM, Defendants disclosed that MCC would be MP VI's administrator, providing management, underwriting of receivables, and administrative services, such as bookkeeping, payroll, and accounting services. Defendants also disclosed in the PPMs that MCC received a fee for such services, and that MCC was an affiliate and that the administrative agreement was not made through independent arm's length negotiations. Defendants also represented in the PPMs that MP VI believed that the administrative fees paid to MCC would be "no greater than those an independent third-party would charge for providing similar services."

26. Defendants MCC, Field, and Lampariello further represented in the MP VI PPMs, under the heading "Restrictions on Use of Proceeds," that MP VI would not use "any proceeds from the sales of notes to pay administrative fees to [MCC] for the services it provides as administrator" and that such fees would rather be "paid out of amounts collected from the accounts receivable and proceeds from other investments." Indeed, Defendants represented in MP VI's PPMs that the majority of

the note offering's proceeds would be used to: purchase account receivables, make secured loans, pay sales commissions and other operating costs, provide funds for general operating purposes, and pay principal and interest on the notes.

27. Defendants MCC, Field, and Lampariello did not use MP VI's offering proceeds as represented in the PPMs and instead misappropriated a substantial amount of the investor funds to pay administrative fees to MCC. In fact, as shown on Table 1 below, as of June 19, 2009, MP VI's administrative fees exceeded its collections by approximately $20.4 million, in direct contravention to its PPMs' representations that administrative fees would not be paid out of proceeds from the sale of notes, but would solely be "paid out of amounts collected from the accounts receivable and proceeds from other investments."

28. In the May 27, 2009 Supplemental PPM, Defendants MCHI, MCC, Field, and Lampariello further misrepresented how the note offering's proceeds had been used. Specifically, Defendants represented:

> As of February 28, 2009, we have issued notes in the face amount of $69,331,558.90. We have used $65,558,703.02 of the proceeds to finance accounts receivable. We have applied $3,264,410.12 to commissions and other expenses. The balance is on deposit in our trust account awaiting additional accounts receivable financing.

In fact, as shown on Table 1 below, as of February 28, 2009, Defendants had paid $21.7 million in administrative fees, which exceeded MP VI's collections by $18.6 million. In addition, Defendants actually spent approximately $48.8 million for the purchase of purported receivables, rather than the $65.5 million stated in the Supplemental PPM.

29. The magnitude of the Defendants' misappropriation of investor funds to pay themselves fees is illustrated in the table below. Defendants took approximately 24% of the amount raised from investors to pay themselves administrative fees, which was far in excess of the collections on receivables.

*Table 1: MP VI Actual Administrative Fees Paid*

| Date | Collections on Receivables | Administrative Fees Paid to MCC | Excess Administrative Fees |
|---|---|---|---|
| Actual as of 2/28/09 | $3.1 million | $21.7 million | $18.6 million |
| Actual as of 6/19/2009 | $4.6 million | $25 million | $20.4 million |

30. Of the amount of MP VI investor funds purportedly used to purchase receivables, approximately $41.7 million was used to fund intercompany transfers of purported assets from prior offerings. As alleged below, many such transfers were accomplished using fake, overstated, and/or aged and worthless assets. Defendants MCHI, MCC, Field, and Lampariello failed to disclose that they were engaging in sham intercompany transactions in order to use funds from the MP VI offering to pay administrative fees to MCC, and/or principal and interest to investors in prior offerings.

31. In September 2008, MCC, Field, and Lampariello orchestrated intercompany transfers of over $16 million of MP VI investor funds to prior offerings. Defendants transferred $2 million from MP VI to MP II through an intercompany transfer, and MP II paid over $5.4 million in redemptions and $1.48 million in interest to investors during the same month. Defendants transferred $5.7 million from MP VI to MP III, series 1, which paid over $7.8 million in redemptions and $700,000 in interest to investors. Defendants transferred $2.3 million from MP VI to MP III, series 2, which paid over $3.5 million in redemptions and $680,000 in interest to investors. Defendants transferred over $4.1 million from MP VI to MP IV, series 1, which paid $3.825 million to MCC in administrative fees.

///

///

32. In September 2008, MCC, Field, and Lampariello orchestrated intercompany transfers of over $3.2 million from MP V and MP VI, to MP IV, series 2, which in turn paid $1.9 million in administrative fees to MCC. MCC, Field, and Lampariello knew, or were reckless in not knowing, that they were transferring investor funds from later offerings to earlier offerings to then pay administrative fees to MCC from the investor proceeds, contrary to the representations in the PPMs that administrative fees would not be paid from investor proceeds. MCC, Field, and Lampariello knew, or were reckless in not knowing, that they were transferring funds from later offerings to earlier offerings to then make principal and interest payments to investors in the prior offerings.

2. **Misrepresentation Regarding Defaults of Other SPCs**

33. In MP VI's original PPM, Defendants disclosed that MP VI had no operating history but represented that MP VI had "several experienced affiliates that ha[d] completed offerings of debt securities backed by accounts receivable," and that the "affiliates ha[d], since 1994, financed accounts receivable having an aggregate face amount of over $5 billion." The PPM further stated that "[MP VI's] affiliates have never defaulted in the payment of their obligations on those debt securities, and all interest payments on those securities were made when due."

34. In fact, MCHI, MCC, MP VI, Field, and Lampariello knew, or were reckless in not knowing, that during the MP VI offering several of the affiliated SPCs had defaulted on their obligations. The May 27, 2009 Supplemental PPM represents that MP II, MP III, and MP IV are each in default. Since August 2008 (the same month that the MP VI offering began), MP II defaulted on $43 million in principal payments and $1.3 million in interest payments, and MP III defaulted on $26.5 million in principal payments. MP IV missed interest payments in January 2009 and from March 2009 through the present. MCC, Lampariello, and Field knew that the prior offerings were in default at the time that the MP VI PPM was distributed.

///

35. Although Defendants MCC, Field, and Lampariello notified MP II and MP III investors about the defaults beginning in August 2008, they did not notify purchasers of MP VI notes about the defaults until about June 2009. On or about June 8, 2009, MCC, Field, and Lampariello sent the Supplemental PPM to broker-dealers who had previously sold MP VI notes, which disclosed the principal and interest payment defaults by MP II, MP III, and MP IV.

**3. Defendants Failed to Disclose That Fake, Overstated, and/or Aged Receivables Were Being Used to Transfer Investor Funds from Later Offerings to Earlier Offerings**

36. As disclosed in the PPMs, from time to time defendants Field and Lampariello, though MCC, arranged to sell receivables from earlier offerings to later offerings, which resulted in the transfer of cash from later offerings to the Trust Accounts of earlier offerings. However, MCC, Field, and Lampariello failed to disclose that substantial amounts of the receivables transferred in these intercompany transactions were fake, overstated, and/or aged receivables supported by falsified batch reports. Defendants MCC, Field, and Lampariello then listed the fake receivables as collateral on CCR worksheets used to obtain administrative fees for MCC. The investor funds transferred from later offerings to earlier offerings were then used to pay principal and interest on the earlier offerings, as well as administrative fees to MCC.

**a. Trace Life Sciences Fake Receivables**

37. In August and September 2008, Field and Lampariello directed MP VI to acquire receivables from, among other providers, Trace Life Sciences. In a letter dated August 21, 2008, signed by Lampariello, MP VI informed the trustee that it was purchasing receivables of Trace Life Sciences with a face value of $1.9 million, which was supported by an Administrators Criteria Letter signed by Lampariello, and a batch report dated 8/15/2008 ("8/15 batch report") for the receivables being purchased. In a letter September 4, 2008, again signed by

Lampariello, MP VI informed the trustee that it was purchasing from MP V receivables of Trace Life Sciences with a face value of $8.867 million, which was supported by an Administrators Criteria Letter signed by Lampariello, and a batch report dated 8/28/2008 ("8/28 batch report") for the $8.867 million in receivables.

38. In fact, the 8/28 batch report is a fake, created by altering the 8/15 batch report by taking the first 72 lines of the 8/15 batch report, and (1) adding the line number plus 1045 to the Batch No. to create a new Batch No. (e.g., 7660 + 1 + 1045 = 8706; 7675 + 2 + 1045 = 8722, etc.), and (2) adding $100,000 to the Billed Amount, and (3) making similar adjustments to the remaining columns. As a result of this manipulation, Defendants orchestrated the "transfer" of $7.2 million in fake receivables to MP VI, and the transfer over $2.6 million of MP VI investor funds to MP V.

39. In a letter dated September 19, 2008, signed by Lampariello, MP VI acquired over $17 million of receivables from Trace Life from MP IV, series 1, in exchange for a total of $7.136 million in cash. Defendants supported this intercompany transaction with a batch report dated 9/18/2008 ("9/18 batch report").

40. In fact, the 9/18 batch report is fake, created by altering the 8/15 batch report, by taking the first 71 lines of the 8/15 batch report, adding $200,000 to the amounts, and making corresponding adjustments to the remaining columns. Through this alteration, Defendants MCC, Field, and Lampariello created at least $14.2 million in fake receivables, and then used the altered batch report to "transfer" at least $14.2 million of fake receivables to MP VI, and move over $7 million of MP VI investor funds to earlier MP offerings.

41. Field and Lampariello knew, or were reckless in not knowing, that the Trace Life batch reports had been altered and the total amount of receivables falsely inflated, and that MCC was manufacturing false batch reports that were being submitted as support for the acquisition of accounts receivable and intercompany transfers. In fact, Field and Lampariello knew that Trace Life Sciences had defaulted on prior loans made by entities controlled by MCC, Field,

and Lampariello, that Trace Life had not generated sufficient revenue to fund its operations, and was surviving with money provided by Field and Lampariello through the various entities they controlled.

**b. NLV, Inc.**

42. In a letter dated August 22, 2008, signed by Lampariello, MP VI acquired from MP V receivables of provider NLV, Inc. with an ENR balance of $4.2 million, in return for over $3.394 million in cash. The intercompany transaction was supported by an Administrators Criteria Letter signed by Lampariello. In fact, the ENR balance was fake. NLV lost its corporate existence in 2004. A July 2008 email to Lampariello listing "corrective action accounts" stated that NLV's ENR balance was $139,969.90, that MCC was not going to pursue a collection case against NLV, and its corporate status was revoked in 2004. MCC, Field, and Lampariello knew, or were reckless in not knowing, that the NLV ENR balance of $4.2 million was falsely inflated. MCC, Field, and Lampariello knew, or were reckless in not knowing, that at the time of the transaction, NLV had been out of business for at least four years and that MCC and its subsidiaries had not purchased any new receivables from NLV during that period.

**c. Advanced Radiology**

43. Beginning on or about October 23, 2008, defendants Lampariello and Field orchestrated the sale of overstated and worthless receivables from provider Advanced Radiology to MP VI. In a letter dated October 23, 2008, signed by Lampariello, defendants orchestrated the transfer of receivables of Advanced Radiology with a purported ENR of $20.135 million, from MP IV, series II, to MP VI, in return for $16 million in cash. In fact, Field and Lampariello were signatories on a lockbox account opened by MCC in 2001 at Comerica Bank to collect Advanced Radiology receivables, and bank statements show that there was no activity in the lockbox account from January 1, 2003 through May 31, 2008. MediTrak reports show that only 9 batches of receivables were purchased from

Advanced Radiology between January 2002 and December 2003, and there was an outstanding balance of approximately $5.5 million. MCC, Field, and Lampariello knew, or were reckless in not knowing, that the Advanced Radiology receivables purportedly being sold to MP VI were fake and worthless.

**d. <u>Carter Medical, Plaza Therapy, Plaza Appliance</u>**

44. During the period from November 2003 through June 2009, Field and Lampariello orchestrated numerous intercompany transactions which involved, in whole or in part, fake, overstated, or worthless receivables of Carter Medical, Plaza Appliance, and Plaza Therapy. For example, Lampariello executed a "Receivable Acquisition Certificate," dated February 8, 2007, for MP IV to purchase "Eligible Receivables" of Carter Medical with a face amount of $13.1 million, an adjusted value of $4.2 million, which defendants allegedly advanced $3.3 million to purchase. However, MCC, Field, and Lampariello knew that in 1998, an entity managed by MCC, Field, and Lampariello named MCC Special Corporation I obtained a judgment against Carter Medical, Plaza Therapy, and Plaza Appliance. In addition, although Field and Lampariello opened a lockbox account in July 2005 for MP I/Carter Medical at Comerica Bank, there was no activity in the account from August 4, 2005 through May 31, 2008, other than two deposits in 2005 totaling $608 to pay service fees. MCC, Field, and Lampariello knew, or were reckless in not knowing, that the intercompany transactions involving Carter Medical, Plaza Therapy, and Plaza Appliance used fake ENR amounts, and that these were sham transactions.

**e. <u>Metabolic Disease Foundation</u>**

45. Another provider passed from offering to offering was Metabolic Disease Foundation. On or about January 2007, defendants had MP I sell a purported ENR balance of $4.497 million in receivables to MP IV, series 1, for $3.598 million in cash. On or about January 2008, defendants had MP IV, series 1 sell a purported ENR balance of $5.1 million to MP V in return for $4.04 million

in cash. However, MCC had obtained a default judgment against Metabolic Disease Foundation in 1998, in the amount of $2.1 million. In fact, MTS has no record of any activity related to any account of Metabolic Disease Foundation. MCC, Field, and Lampariello knew, or were reckless in not knowing, that the ENR balances were false, and that the intercompany transfers of purported receivables of Metabolic Disease Foundation were a sham.

f. **Progressive Medical Group (PMG)**

46. Defendants also passed from offering to offering purported receivables from a series of providers named Progressive Medical Group; PMG – Path of Florida; PMG – Path of Palm Beach; PMG – Path of Ft. Myers; and PMG – Path of Pines. For example, on or about January 26, 2007, defendants had MP IV pay $4.175 million in cash to MP III for receivables of "PMG – Path of Florida" against which Defendants had advanced $4.1 million, in return for $4.175 million in cash. Lampariello signed a "receivable Acquisition Certificate" dated January 26, 2007, attesting that MCC was transferring eligible receivables. Only a few days later, on or about February 2, 2007, Defendants arranged to have MP IV pay $4.179 million to MP III for receivables of "PMG – Path of Palm Beach" which purportedly had a face value of over $16.56 million. The next month, on or about March 20, 2007, Defendants arranged to have MP IV pay $6.6 million in cash to MP III for yet another batch or receivables, this time from provider "PMG- Path of Pines." Lampariello signed a "Receivable Acquisition Certificate" certifying the legitimacy and value of each transaction. Subsequently, in June 2008, Defendants arranged to have MP V pay $16.625 million in cash to MP IV for receivables from "PMG - Path of Pines" and "PMG – Progressive Medical Group."

47. In fact, bank statements for lockboxes for MP I/PMG – Path of Palm Beach; MP I/PMG – Path of Pines; MP I/PMG – Path of Fort Meyers; and MP I/PMG, show that there was no activity in any of these accounts from June 2005 through January 2009. Indeed, in July 2008, Lampariello was informed that

"corrective action accounts" included PMG, Path Medical of Florida; and Path Medical of Palm Beach, and the total ENR balance for these providers was just over $2 million. Defendants caused MP V to pay over $16.625 million in cash for receivables with an ENR of approximately $2 million. MCC, Lampariello, and Field had access to these ENR balances through MediTrak. MCC, Field and Lampariello knew, or were reckless in not knowing, that the intercompany transactions involving the various PMG entities used fake or overstated receivable values and were sham transactions.

48. The chart below shows the cash paid out from MP to MP in the 2007 and 2008 transfers, and the ENR balances provided to Lampariello in July 2008 – which are substantially less than the cash paid.

*Table 2: Overstated Amounts of Provider PMG in Intercompany Transfers*

| Provider | 1/2007 transfer | 2/2007 transfer | 3/2007 transfer | 6/2008 transfer | 7/2008 email values |
|---|---|---|---|---|---|
| PMG | | | | $9,264.342 | $1,497,906 |
| Florida | $4,175,716 | | | | $313.636 |
| Palm Beach | | $4,179,835 | | | $237,723 |
| Pines | | | $6,672,127 | $7,361,167 | |

49. MCC, Field, and Lampariello knew, or were reckless in not knowing, that intercompany transfers of fake, overstated, and/or worthless accounts receivable violated representations in the PPMs that any such transfers of accounts receivable would "generally be priced at the sum of the total amount advanced on the outstanding receivables or assets as of the date the portfolio of assets is purchased or financed by such affiliate, less any collections already received on the accounts receivable."

///

50. Defendants engaged in these sham intercompany transfers as a mechanism to transfer funds from newer investors to pay principal and interest to investors in prior offerings, as well as to provide funds to pay themselves administrative fees. In fact, under Defendants' management, each MP suffered net outflows of cash from the accounts receivable and other financing, and from intercompany transfers. Nonetheless, Defendants MCC, Field, and Lampariello instructed the MPs to pay substantial administrative fees to MCC during that time. Because Defendants were not generating cash from the financing business, the only source of cash to pay the administrative fees was investor funds. Defendants MCHI, MCC, Field, and Lampariello knew, or were reckless in not knowing, that when financing activities failed to generate a positive cash flow into the Trust Accounts for each MP, then the only source of funds in the Trust Accounts to pay administrative fees was investor funds, which the PPMs represented would not be used to pay administrative fees. The chart below shows, in millions, the amount raised, the financing profit or loss, intercompany transfers, and administrative fees for MP I through MP V.

///

///

///

///

///

///

///

///

///

///

///

///

*Table 3: Amounts Raised, Net Financing Proceeds, Intercompany Transfers, and Administrative Fees for MP I through MP V (in millions)*

| MP (period) | Investor Funds Raised | Net Financing profit/(loss) | Intercompany Transfers Net Inflow/(outflow) | Administrative Fees Paid to MCC |
|---|---|---|---|---|
| MP I (11/03 – 12/04) | $176 | ($9.2) | ($104.5) | ($11.1) |
| MP II (1/04 – 12/05) | $250 | ($101) | ($52.3) | ($32.9) |
| MP III Series 1 (7/05 – 8/06) | $243 | ($52.9) | ($57.5) | ($20.9) |
| MP IV Series 1 (11/06-11/07) | $252 | ($70.2) | ($133.3) | ($24.9) |
| MP III Series 2 (4/07 – 1/08) | 100 | ($6.7) | ($80.9) | ($8.0) |
| MP IV Series 2 (5/07 – 5/08) | $152 | ($47.2) | ($79) | ($15.745) |
| MP V (11/07 – 9/08) | $402 | ($100.7) | ($240) | ($40.0) |

**4. Defendants Included Fake, Overstated, and/or Worthless Assets on CCR Reports to Pay Themselves Improper Administrative Fees**

51. Defendants transferred overvalued and/or fake receivables between offerings to artificially inflate the assets held by a particular MP in calculating the CRR, which Field and Lampariello then used as a purported basis to pay MCC administrative fees.

52. In September 2008, defendants directed MP VI to pay $7.85 million in administrative fees to MCC. Defendants approved and submitted a CCR

worksheet to the trustee which stated that MP VI had total accounts receivable and other assets in the amount of $21,448,551.34, cash held by the trustee in the amount of $3,475,981.06, and liabilities of $18,008,199.48. Included in the assets were $3,544,376.56 in receivables from provider Trace Life Sciences, and $4,242,802.40 in receivables from provider NLV, Inc. In fact, actual receivables purchased from Trace Life were, at best, valued at only $387,814.37. All of the NLV receivables were fake. Eliminating just these two receivables, totaling over $7 million in value, reduces the CCR below 100%. In fact, the actual value of the receivables held by MP VI at the time of this CCR calculation was about $2.95 million, and Defendants MCC, Field, and Lampariello overstated the collateral of MP VI by $18.5 million. MCC, Field, and Lampariello knew, or were reckless in not knowing, that the collateral was overstated and the CCR was incorrect. Defendants MCC, Field, and Lampariello knew that reporting a CCR of less than 100% would not entitle MCC to take administrative fees, and could precipitate an event of default.

53. For September 2008, Defendants similarly overvalued the assets of MP IV, series 1; MP IV, series 2; and MP V in CCR calculations used to obtain administrative fees:

- Defendants obtained $3.825 million in administrative fees from MP IV, series 1, based on claimed assets of $257 million against $250 million in liabilities; in fact, actual assets were only $128 million, and the actual CCR was only about 51%.
- Defendants obtained $1.9 million in administrative fees from MP IV, series 2, based on claimed assets of over $172 million against $153 in liabilities; in fact, actual assets were only about $73.7 million, and the actual CCR was only about 47.5%.
- Defendants obtained $4.1 million in administrative fees from MP V, based on claimed assets of over $417 million against

*Table 3: Amounts Raised, Net Financing Proceeds, Intercompany Transfers, and Administrative Fees for MP I through MP V (in millions)*

| MP (period) | Investor Funds Raised | Net Financing profit/(loss) | Intercompany Transfers Net Inflow/(outflow) | Administrative Fees Paid to MCC |
|---|---|---|---|---|
| MP I (11/03 – 12/04) | $176 | ($9.2) | ($104.5) | ($11.1) |
| MP II (1/04 – 12/05) | $250 | ($101) | ($52.3) | ($32.9) |
| MP III Series 1 (7/05 – 8/06) | $243 | ($52.9) | ($57.5) | ($20.9) |
| MP IV Series 1 (11/06-11/07) | $252 | ($70.2) | ($133.3) | ($24.9) |
| MP III Series 2 (4/07 – 1/08) | 100 | ($6.7) | ($80.9) | ($8.0) |
| MP IV Series 2 (5/07 – 5/08) | $152 | ($47.2) | ($79) | ($15.745) |
| MP V (11/07 – 9/08) | $402 | ($100.7) | ($240) | ($40.0) |

**4. Defendants Included Fake, Overstated, and/or Worthless Assets on CCR Reports to Pay Themselves Improper Administrative Fees**

51. Defendants transferred overvalued and/or fake receivables between offerings to artificially inflate the assets held by a particular MP in calculating the CRR, which Field and Lampariello then used as a purported basis to pay MCC administrative fees.

52. In September 2008, defendants directed MP VI to pay $7.85 million in administrative fees to MCC. Defendants approved and submitted a CCR

worksheet to the trustee which stated that MP VI had total accounts receivable and other assets in the amount of $21,448,551.34, cash held by the trustee in the amount of $3,475,981.06, and liabilities of $18,008,199.48. Included in the assets were $3,544,376.56 in receivables from provider Trace Life Sciences, and $4,242,802.40 in receivables from provider NLV, Inc. In fact, actual receivables purchased from Trace Life were, at best, valued at only $387,814.37. All of the NLV receivables were fake. Eliminating just these two receivables, totaling over $7 million in value, reduces the CCR below 100%. In fact, the actual value of the receivables held by MP VI at the time of this CCR calculation was about $2.95 million, and Defendants MCC, Field, and Lampariello overstated the collateral of MP VI by $18.5 million. MCC, Field, and Lampariello knew, or were reckless in not knowing, that the collateral was overstated and the CCR was incorrect. Defendants MCC, Field, and Lampariello knew that reporting a CCR of less than 100% would not entitle MCC to take administrative fees, and could precipitate an event of default.

53. For September 2008, Defendants similarly overvalued the assets of MP IV, series 1; MP IV, series 2; and MP V in CCR calculations used to obtain administrative fees:

- Defendants obtained $3.825 million in administrative fees from MP IV, series 1, based on claimed assets of $257 million against $250 million in liabilities; in fact, actual assets were only $128 million, and the actual CCR was only about 51%.
- Defendants obtained $1.9 million in administrative fees from MP IV, series 2, based on claimed assets of over $172 million against $153 in liabilities; in fact, actual assets were only about $73.7 million, and the actual CCR was only about 47.5%.
- Defendants obtained $4.1 million in administrative fees from MP V, based on claimed assets of over $417 million against

liabilities of $405 million; in fact, actual assets were only about $94.8 million, and the actual CCR was only about 21%.

MCC, Field, and Lampariello knew, or were reckless in not knowing, that the asset values used to calculate the CCR for the payment of administrative fees were substantially overstated, and that correct CCR calculations would not entitle MCC to administrative fees.

54. In October 2008, Defendants again overvalued assets of MP IV, series 2; MP V; and MP VI to obtain improper payment of administrative fees.

- Defendants obtained $1.4 million in administrative fees from MP IV, series 2, based on claimed assets of $170 million against $153 million in liabilities; in fact, actual assets were only $83 million, and the actual CCR was only about 53%.
- Defendants obtained $1.45 million in administrative fees from MP V based on claimed assets of over $409 million against $405 million in liabilities; in fact, actual assets were only about $79.7 million, and the actual CCR was only about 19%.
- Defendants obtained $4.1 million in administrative fees from MP VI, based on claimed assets of over $49 million against liabilities of $45 million; in fact, actual assets were only about $3 million, and the actual CCR was only about 12%.

MCC, Field, and Lampariello knew, or were reckless in not knowing, that the asset values used to calculate the CCR for the payment of administrative fees were substantially overstated.

///

///

///

///

///

**FIRST CLAIM FOR RELIEF**

**Fraud In The Offer Or Sale Of Securities**

**Violations of Section 17(a) of the Securities Act**

**(Against All Defendants)**

55. The Commission realleges and incorporates by reference paragraphs 1 through 54 above.

56. The Defendants, and each of them, by engaging in the conduct described above, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:

a. with scienter, employed devices, schemes, or artifices to defraud;

b. obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c. engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

57. By engaging in the conduct described above, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

**SECOND CLAIM FOR RELIEF**

**Fraud In Connection With The Purchase Or Sale Of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

**(Against All Defendants)**

58. The Commission realleges and incorporates by reference paragraphs 1 through 54 above.

59. The Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

a. employed devices, schemes, or artifices to defraud;

b. made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

c. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

60. By engaging in the conduct described above, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## THIRD CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

**(Against Defendant MCC)**

61. The Commission realleges and incorporates by reference paragraphs 1 through 54 above.

62. In the alternative, by engaging in the conduct described above, MCC, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

a. employed devices, schemes, or artifices to defraud;

b. made untrue statements of material facts or omitted to state

material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

c. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

63. By engaging in the conduct described above, MCC knowingly provided substantial assistance to violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and therefore is liable as an aider and abettor pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

64. Unless restrained and enjoined, MCC will continue to violate and aid and abet violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

**I.**

Issue findings of fact and conclusions of law that the Defendants committed the alleged violations.

**II.**

Issue judgments, in forms consistent with Fed. R. Civ. P. 65(d), temporarily, preliminarily, and permanently enjoining the Defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and with regard to MCC, in the alternative, from aiding and abetting violations of Section

10(b) and Rule 10b-5.

III.

Issue, in a form consistent with Fed. R. Civ. P. 65, a temporary restraining order and a preliminary injunction freezing the assets of MCHI, MCC, and MP VI and any entity affiliated with any of them, appointing a receiver over MCHI, MCC, and MP VI, prohibiting each of the Defendants from destroying documents, granting expedited discovery, and requiring accountings from each of the Defendants.

IV.

Order each of the Defendants to disgorge all ill-gotten gains from their illegal conduct, together with prejudgment interest thereon.

V.

Order each of the Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: November 9, 2009

Respectfully submitted,

John B. Bulgozdy

John B. Bulgozdy
Morgan B. Ward Doran
Attorneys for Plaintiff
Securities and Exchange Commission

# PROOF OF SERVICE

I am over the age of 18 years and not a party to this action. My business address is:

[X] U.S. SECURITIES AND EXCHANGE COMMISSION, 5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036-3648

Telephone No. (323) 965-3998; Facsimile No. (323) 965-3908.

On November 9, 2009, I caused to be served the document entitled **FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** on all the parties to this action addressed as stated on the attached service list:

[ ] **OFFICE MAIL:** By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices. I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

[ ] **PERSONAL DEPOSIT IN MAIL:** By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

[ ] **EXPRESS U.S. MAIL:** Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

[ ] **HAND DELIVERY:** I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

[ ] **FEDERAL EXPRESS:** By placing in sealed envelope(s) designated by Federal Express with delivery fees paid or provided for, which I deposited in a facility regularly maintained by Federal Express or delivered to a Federal Express courier, at Los Angeles, California.

[X] **ELECTRONIC MAIL:** By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

[ ] **FAX:** By transmitting the document by facsimile transmission. The transmission was reported as complete and without error.

[X] **(Federal)** I declare under penalty of perjury that I am a member of the bar of this Court and that the foregoing is true and correct.

Date: November 9, 2009

John B. Bulgozdy

**SEC v. MEDICAL CAPITAL HOLDINGS, INC., et al.**
**United States District Court – Central District of California**
**Case No. SACV 09-818 DOC (RNBx)**
**LA-3474**

SERVICE LIST

Alan A. Greenberg, Esq.
Michael A. Piazza, Esq.
Greenberg Traurig, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA 92612
Email: *greenbergal@gtlaw.com*
Email: *piazzam@gtlaw.com*
***Attorneys for Defendants Sidney M. Field and Joseph J. Lampariello***

David Zaro, Esq.
Allen Matkins Leck Gamble Mallory & Natsis LLP
515 S. Figueroa Street, 7th Floor
Los Angeles, CA 90071
Email: *dzaro@allenmatkins.com*
***Attorney for Receiver Thomas Seaman over Defendants Medical Capital Holdings, Inc., Medical Capital Corporation, and Medical Provider Funding Corporation VI***

Edward T. Wahl, Esq.
Stephen M. Mertz, Esq.
Theresa H. Dykoschak, Esq.
Faegre & Benson LLP
90 S. Seventh Street, Suite 2200
Minneapolis, MN 55402-3901
Email: *ewahl@faegre.com*
Email: *smertz@faegre.com*
Email: *thykoschak@faegre.com*
***Attorneys for Wells Fargo Bank, N.A.***

Lawrence Bass, Esq.
Faegre & Benson LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, CO 80203-4532
Email: *lbass@faegre.com*
***Attorney for Wells Fargo Bank, N.A.***