JOHN B. BULGOZDY, Cal Bar No. 219897
Email: bulgozdyj@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Rosalind R. Tyson, Regional Director
Andrew G. Petillon, Associate Regional Director
John M. McCoy III, Regional Trial Counsel
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036-3648
Telephone: (323) 965-3998
Facsimile: (323) 965-3908

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>       Plaintiff,<br><br>   vs.<br><br>MEDICAL CAPITAL HOLDINGS, INC.; MEDICAL CAPITAL CORPORATION; MEDICAL PROVIDER FUNDING CORPORATION VI; SIDNEY M. FIELD; and JOSEPH J. LAMPARIELLO,<br><br>      Defendants. | Case No. SACV 09-818 DOC (RNBx)<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

### SUMMARY

1. This matter concerns fraud in the offer and sale of over $1.7 billion of securities in the form of notes by Defendants: Medical Capital Holdings, Inc. ("MCHI"); Medical Capital Corporation ("MCC"); Sidney M. Field; and

ORIGINAL

1   Joseph J. Lampariello, including fraud in the offer and sale of $74.7 million in

2   securities in the form of notes by Defendants MCHI, MCC, Field, Lampariello, and

3   Medical Provider Funding Corporation VI ("MP VI").  MCHI is a medical

4   receivables financing company that operates through MCC, its wholly-owned

5   subsidiary, to administer several Special Purpose Corporations ("SPCs"), including

6   MP VI, and its predecessor entities Medical Provider Funding Corporations I through

7   V ("MP I" through "MP V").  Defendants Field and Lampariello were directors of

8   MCHI, MCC, and MP I through MP VI.  Field served as the Chief Executive Officer

9   ("CEO"), and Lampariello as the president and Chief Operating Officer ("COO"), of

10  MCHI, MCC, and MP I through MP VI.  Since 2003, MCHI, MCC, Fields, and

11  Lampariello have raised over $1.7 billion through offerings of notes in MP I through

12  VI.  As of November, 2009, MP I through VI have over $1 billion in notes

13  outstanding.  Since August 2008, five of the SPCs have been in default or late in

14  paying principal and/or interest on $992.5 million in notes.  Defendants MCC,

15  MCHI, and MP VI, as well as MP I through MP V, have been placed into

16  Receivership by the Court.

17      2.      The Defendants committed fraud in the offer and sale of MP VI notes.

18  As of June 19, 2009, the Defendants misappropriated approximately $20.4 million

19  of the $74.7 million raised through the sale of MP VI notes to pay purported

20  administrative fees to MCC.  These fee payments were contrary to representations

21  in MP VI's original private placement memorandum ("PPM"), which stated that

22  administrative fees would not be paid out of the offering proceeds, as well as

23  representations in MP VI's May 27, 2009 supplemental PPM ("Supplemental

24  PPM") that less than $4 million of offering proceeds had been used for purposes

25  other than purchasing accounts receivables.  The Defendants also misrepresented

26  that none of the SPCs affiliated with MP VI had defaulted on, or been late in

27  making payments of, principal and/or interest to their respective investors.  In fact,

28  two MP VI-affiliated SPCs began defaulting on interest and/or principal payments

1   in the same month that MP VI began its offering, and thereafter two other MP VI-

2   affiliated SPCs have defaulted or been late in making interest payments.

3       3.     Moreover, Defendants Field, Lampariello, MCC, and MCHI engaged

4   in fraud in the offer and sale of securities in the form of notes issued by MP I

5   through MP V, by misappropriating over $300 million of investor funds through

6   payments of administrative fees, contrary to representations in the PPMs for those

7   offerings which contained restrictions substantially similar to those in the PPM for

8   MP VI.  Defendants' financing activities were not profitable and were resulting in

9   substantial cash outflows for each fund, so that as Defendants paid themselves

10  administrative fees the only cash source were investor funds.  Field, Lampariello,

11  and MCC orchestrated intercompany transfers of new investor funds to earlier

12  offerings, through the sale of fake, overstated, and/or aged and worthless

13  receivables, to make those new investor funds available to pay principal and

14  interest to investors in prior offerings, as well as to pay administrative fees to

15  MCC.  Defendants Field, Lampariello, and MCC inflated the asset values on

16  "collateral coverage reports" ("CCRs") submitted to the administrator of trust

17  accounts for the MP entities to obtain administrative fees to which MCC, Field,

18  and Lampariello were not entitled.

19      4.     The Defendants, by engaging in the conduct described in this

20  Complaint, have violated, or aided and abetted, and unless enjoined will continue

21  to violate, or aid and abet, the antifraud provisions of the federal securities laws.

22  By this First Amended Complaint, the Commission seeks permanent injunctions,

23  disgorgement with prejudgment interest, and civil penalties.

24                    **JURISDICTION AND VENUE**

25      5.     This Court has jurisdiction over this action pursuant to Sections 20(b),

26  20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C.

27  §§ 77t(b), 77t(d)(1), and 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e), and 27

28  of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1),

                                  3

1  78u(d)(3)(A), 78u(e), and 78aa. The Defendants have, directly or indirectly, made

2  use of the means or instrumentalities of interstate commerce, of the mails, or of the

3  facilities of a national securities exchange in connection with the transactions, acts,

4  practices and courses of business alleged in this Complaint.

5        6.     Venue is proper in this district pursuant to Section 22(a) of the

6  Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C.

7  § 78aa, because certain of the transactions, acts, practices and courses of conduct

8  constituting violations of the federal securities laws occurred within this district,

9  and all of the defendants reside and/or are located in this district.

10  **DEFENDANTS**

11        7.    **Medical Capital Holdings, Inc.,** a Nevada corporation with its

12  principal place of business in Tustin, California, is currently in Court ordered

13  Receivership. Through various wholly-owned operating subsidiaries and SPCs,

14  MCHI provided financing to healthcare providers by purchasing their accounts

15  receivables and making secured loans to them. MCHI used its special purpose

16  corporations to raise money from investors to fund the purchase of receivables and

17  other lending activity. MCHI used its operating subsidiaries to underwrite,

18  monitor, administer, and service the financing. MCHI is not registered with the

19  Commission in any capacity. MCHI received over $70 million from MCC during

20  the period from 2003 through 2009. In February 2001, the California Department

21  of Corporations issued a Desist and Refrain Order against MCHI from the further

22  offer or sale of securities in the State of California.

23        8.    **Medical Capital Corporation**, a Nevada corporation and wholly-

24  owned subsidiary of MCHI, with its principal place of business in Tustin, California,

25  is currently in Court ordered Receivership. MCC was the administrator for each of

26  MCHI's SPCs and provided management, underwriting, and administrative services,

27  such as bookkeeping, payroll, and accounting services, including administration of

28  all investor promissory notes and interest payments. MCC is not registered with the

4

1  Commission in any capacity.  Between 2003 and 2009, MCC received over $320

2  million in administrative fees from MP I through MP VI.

3      9.   **Medical Provider Funding Corporation VI**, a Nevada corporation

4  and wholly-owned SPC of MCHI that was formed in April 2008, is currently in

5  Court ordered Receivership.  From August 2008 through June 2009, MP VI

6  conducted a note offering that raised $74.7 million through the issuance of notes to

7  about 700 investors.  MP VI has never been registered with the Commission in any

8  capacity, nor has it registered an offering of securities under the Securities Act or a

9  class of securities under the Exchange Act.  From May to June 2009, MP VI was

10  late on interest payments to investors by several days.

11      10.  **Sidney M. Field**, age 63, resides in Villa Park, California.  Field was

12  the CEO and a director of MCC since 1994, and served as the CEO and a director

13  of MCHI and other of its subsidiaries since 1996, until the entities were placed into

14  Receivership.  Field also served as the CEO and Director of MPI through MP VI,

15  from the inception of each entity until they were placed into Receivership.  Field

16  received a salary from MCC, and was paid dividends by MCHI.

17      11.  **Joseph J. Lampariello**, age 55, resides in Huntington Station, New York,

18  and Newport Beach, California.  Lampariello was the president, COO, and a director

19  of MCHI and its subsidiaries from 1996 until the entities were placed into receivership.

20  Lampariello also served as the president, COO, and a director of MP I through MP VI,

21  from the inception of each entity until they were placed into Receivership.

22  Lampariello was responsible for the day-to-day operations of MCC, which included

23  funding underwriting, collections and all computer information services.  Lampariello

24  received a salary from MCC, and was paid dividends by MCHI.

25                    **RELATED ENTITIES**

26      12.  **Medical Provider Financial Corporation I** ("MP I") is a Nevada

27  corporation and wholly-owned special purpose subsidiary of MCHI that was

28  formed in September 2003.  From December 2003 to August 2007, MP I

5

1   conducted a note offering, raising approximately $253 million through the issuance
2   of about 3,821 notes to investors.  As of May 31, 2009, MP I had repaid all but
3   $375,000 of its investors' principal.

4          13.    **Medical Provider Financial Corporation II** ("MP II") is a Nevada
5   corporation and wholly-owned SPC of MCHI that was formed in October 2003.
6   From January 2004 to December 2005, MP II raised approximately $250.7 million
7   through the issuance of about 3,458 notes to investors.  As of May 27, 2009, MP II
8   had $88 million in outstanding notes and had defaulted in paying $43 million in
9   principal and $1.3 million in interest to its investors.

10         14.    **Medical Provider Financial Corporation III** ("MP III") is a Nevada
11  corporation and wholly-owned SPC of MCHI that was formed in February 2005.
12  From July 2005 to January 2008, MP III conducted two series of note offerings,
13  raising a total of about $352.2 million by issuing 4,532 notes to investors.  As of
14  March 31, 2009, MP III had $110.7 million in outstanding notes, and as May 27,
15  2009, MP III had defaulted in paying principal on $26.5 million in outstanding notes.

16         15.    **Medical Provider Financial Corporation IV** ("MP IV") is a Nevada
17  corporation and wholly-owned SPC of MCHI that was formed in July 2005 and
18  commenced operations in October 2006.  From November 2006 through February
19  2008, MP IV conducted two series of note offerings, raising a total of $405.2
20  million by issuing 4,222 notes to investors.  As of May 27, 2009, MP IV had
21  $403.8 million in outstanding notes and defaulted on interest payments in January
22  2009 and since March 2009.

23         16.    **Medical Provider Funding Corporation V** ("MP V") is a Nevada
24  corporation and wholly-owned SPC of MCHI that was formed in September 2007.
25  From November 2007 to about July 2008, MP V conducted a note offering, raising
26  $402.7 million by issuing 4,323 notes that begin to mature in November 2009.  As
27  March 31, 2009, MP V had $401.1 million in outstanding notes issued to 4,270
28  investors.  In May 2009, interest payments to investors were delayed by several days.

6

## THE FRAUDULENT SCHEME

**A.     MCHI's Business and SPC Note Offerings**

17.     MCHI provides financing to healthcare providers by purchasing accounts receivables from, and making secured loans to, medical providers. MCHI funds its healthcare financing by offering notes issued by its SPCs. Between November 2003 and July 2009, MCHI raised approximately $1.7 billion from over 20,000 investors from the offerings of MP I through MP VI. MCHI managed the operations of each of the SPCs through its operating subsidiary, MCC, which essentially ran the SPCs and administered their day to day operations, provided underwriting services and originated purchases of accounts receivable, and performed marketing, sales and client support functions. In addition, MCC provided bookkeeping, payroll, and accounting services, including administration of all promissory notes and interest payments. MCC also opened, maintained, and directed bank accounts and lock box accounts for the SPCs.

18.     For each offering and series, Defendants MCHI, MCC, Field, and Lampariello prepared a PPM which described the offering and made numerous representations to investors concerning management of the offering. Field and Lampariello reviewed, edited, and approved each PPM. The PPMs for the notes sold by MP I through MP VI contained many substantially similar representations and statements concerning the management and operation of the MP. Defendants MCHI, MCC, Field, and Lampariello provided the PPMs and related subscription documents to various registered broker-dealers, who in turn were to provide them to investors.

19.     The PPM for each MP offering disclosed that MCC was to be paid "administrative fees" from each of the SPCs to which it provided services. In each PPM for each offering made by MP I through MP VI, Defendants MCHI, MCC, Field, and Lampariello represented that the proceeds from the sale of notes to investors would not be used to pay administrative fees to MCC. The PPMs for each offering by MP I through MP VI contained a section titled "Restriction on

1   Use of Proceeds," which were substantially similar.  The statement in the PPM for

2   MP VI is typical, and stated, in part:  "We will not use any proceeds from the sale

3   of notes to pay administrative fees to Medical Capital Corporation for the services

4   it provides as administrator or to pay servicing fees to MediTrak as the servicer of

5   the receivables."

6        20.    The PPMs also explained how administrative fees were calculated

7   using a "collateral coverage ratio" ("CCR").  Each MP purportedly acquired

8   batches of accounts receivables from medical providers, or made secured loans to

9   borrowers, which were collateral for the notes issued by the MP.  When

10   Defendants acquired batches of receivables, they paid less than face value – or the

11   billed amount – of the receivables, and Defendants called this lower purchase price

12   for a batch the "expected net receivable," or "ENR."  In the PPMs, Defendants

13   stated that they did not "expect to be able to collect anything more than the ENR"

14   of receivables.  The administrative fees paid to MCC were to be "equal to the

15   amount in the trust account that exceeds the amount needed for the collateral

16   coverage ratio to equal 100%, after all required payments to trustee, servicer and

17   lockbox fees, and all principal and interest then due on the notes."  The PPMs

18   defined the CCR as the ratio of (A) the ENR of all eligible accounts receivable

19   included in the collateral plus the value of other assets plus funds and investments

20   in the lockbox and trust accounts, to (B) the aggregate outstanding principal

21   amount of all notes.  MCC, as administrator, was responsible for certifying to the

22   trustee that the CCR equaled or exceeded 100% in connection with any application

23   for administrative fees.  The PPM further stated that it was an event of default if

24   the CCR fell below 100% at the beginning of any month, and remained below

25   100% for five consecutive days after such information was reported to the trustee.

26        21.    The SPCs sold the notes through registered broker-dealers to

27   accredited investors under Rule 506 of Regulation D.  17 C.F.R. §§ 230.501–

28   230.508.  In the offerings, the SPCs sold notes with various maturities (one to

1   seven years) and interest rates (8.5% to 10.5%).  In the PPMs, Defendants MCHI,

2   MCC, Field, and Lampariello represented that after paying offering expenses,

3   generally limited to 4% to 8% of total proceeds, the net offering proceeds would be

4   used to purchase healthcare receivables and make investments in other businesses.

5   The notes are securities in the form of notes as investment contracts.

6        22.   Defendants MCC, Field, and Lampariello managed the funds of each

7   MP I through VI using an individual bank account for each MP, controlled by a

8   trustee (the "Trust Account"), through which all funds for the particular MP were to

9   flow.  Investor funds, collections on receivables deposited into lockbox accounts,

10  loan repayments, and all other receipts were supposed to be deposited into each

11  particular MP's Trust Account.  From each particular MP's Trust Account,

12  disbursements were made for purchases of receivables, loans, administrative fees,

13  interest payments, redemptions of principal, trust account fees, servicing fees, and

14  any other disbursements for the benefit of the particular MP.  Field and Lampariello,

15  among others at MCC, received daily cash reports which detailed the cash balance

16  in each of the MPs' Trust Accounts.  The various MP's also had other master

17  accounts, such as tax accounts, which were included on the daily cash reports.

18       23.   In the PPMs for MP I through MP VI, Defendants MCHI, MCC,

19  Field, and Lampariello represented that the majority of the offering proceeds

20  would be used to purchase healthcare receivables and to make loans to or

21  investments in healthcare-related businesses.  Field, Lampariello, and a third

22  individual comprised the "Selection Committee" which reviewed and approved

23  each provider and borrower that obtained financing from the SPCs.  With regard to

24  purchases of batches of accounts receivables, Medical Tracking Services, Inc.

25  ("MediTrak"), a wholly-owned subsidiary of MTS, provided servicing for all

26  accounts receivable transaction data, and monitored, tracked, and posted all asset

27  purchases and collections.  MediTrak processed data and prepared reports which

28  showed for each account, batch by batch, all activity in terms of purchases and

1  collections.  MediTrak provided MCC with detailed reports on the performance of

2  each provider, which MCC reviewed on a weekly basis.  Field and Lampariello

3  monitored the performance of each provider through these batch reports, and

4  monitored payments and collections through the daily cash reports for each MP I

5  through MP VI.  In addition, Field and Lampariello communicated directly with

6  providers and borrowers about the status of loans, and personally approved

7  extensions of credit and loan advances for borrowers from MP I through MP VI.

8      24.    Defendants Field, Lampariello, MCHI, and MCC did not prepare or

9  keep the SPCs' financial statements in accordance with GAAP, or even keep their

10  accounting records in a manner that would allow GAAP financial statements to be

11  generated for each SPC.

12  **B.   Misrepresentations in the Offer and Sale of Notes**

13      **1.    Misappropriation of Offering Proceeds to Pay Fees to MCC**

14      25.    In MP VI's original August 5, 2008 PPM and supplemental May 27,

15  2009 PPM, Defendants disclosed that MCC would be MP VI's administrator,

16  providing management, underwriting of receivables, and administrative services,

17  such as bookkeeping, payroll, and accounting services.  Defendants also disclosed

18  in the PPMs that MCC received a fee for such services, and that MCC was an

19  affiliate and that the administrative agreement was not made through independent

20  arm's length negotiations.  Defendants also represented in the PPMs that MP VI

21  believed that the administrative fees paid to MCC would be "no greater than those

22  an independent third-party would charge for providing similar services."

23      26.    Defendants MCC, Field, and Lampariello further represented in the MP

24  VI PPMs, under the heading "Restrictions on Use of Proceeds," that MP VI would

25  not use "any proceeds from the sales of notes to pay administrative fees to [MCC] for

26  the services it provides as administrator" and that such fees would rather be "paid out

27  of amounts collected from the accounts receivable and proceeds from other

28  investments."  Indeed, Defendants represented in MP VI's PPMs that the majority of

1    the note offering's proceeds would be used to:  purchase account receivables, make

2    secured loans, pay sales commissions and other operating costs, provide funds for

3    general operating purposes, and pay principal and interest on the notes.

4           27.      Defendants MCC, Field, and Lampariello did not use MP VI's

5    offering proceeds as represented in the PPMs and instead misappropriated a

6    substantial amount of the investor funds to pay administrative fees to MCC.  In

7    fact, as shown on Table 1 below, as of June 19, 2009, MP VI's administrative fees

8    exceeded its collections by approximately $20.4 million, in direct contravention to

9    its PPMs' representations that administrative fees would not be paid out of

10    proceeds from the sale of notes, but would solely be "paid out of amounts collected

11    from the accounts receivable and proceeds from other investments."

12           28.      In the May 27, 2009 Supplemental PPM, Defendants MCHI, MCC,

13    Field, and Lampariello further misrepresented how the note offering's proceeds

14    had been used.  Specifically, Defendants represented:

15        As of February 28, 2009, we have issued notes in the face amount of

16        $69,331,558.90.  We have used $65,558,703.02 of the proceeds to

17        finance accounts receivable.  We have applied $3,264,410.12 to

18        commissions and other expenses.  The balance is on deposit in our

19        trust account awaiting additional accounts receivable financing.

20    In fact, as shown on Table 1 below, as of February 28, 2009, Defendants had paid

21    $21.7 million in administrative fees, which exceeded MP VI's collections by

22    $18.6 million.  In addition, Defendants actually spent approximately $48.8 million

23    for the purchase of purported receivables, rather than the $65.5 million stated in the

24    Supplemental PPM.

25           29.      The magnitude of the Defendants' misappropriation of investor funds

26    to pay themselves fees is illustrated in the table below.  Defendants took

27    approximately 24% of the amount raised from investors to pay themselves

28    administrative fees, which was far in excess of the collections on receivables.

*Table 1:  MP VI Actual Administrative Fees Paid*

| Date | Collections on Receivables | Administrative Fees Paid to MCC | Excess Administrative Fees |
|---|---|---|---|
| Actual as of 2/28/09 | $3.1 million | $21.7 million | $18.6 million |
| Actual as of 6/19/2009 | $4.6 million | $25 million | $20.4 million |

30.    Of the amount of MP VI investor funds purportedly used to purchase receivables, approximately $41.7 million was used to fund intercompany transfers of purported assets from prior offerings.  As alleged below, many such transfers were accomplished using fake, overstated, and/or aged and worthless assets. Defendants MCHI, MCC, Field, and Lampariello failed to disclose that they were engaging in sham intercompany transactions in order to use funds from the MP VI offering to pay administrative fees to MCC, and/or principal and interest to investors in prior offerings.

31.    In September 2008, MCC, Field, and Lampariello orchestrated intercompany transfers of over $16 million of MP VI investor funds to prior offerings.  Defendants transferred $2 million from MP VI to MP II through an intercompany transfer, and MP II paid over $5.4 million in redemptions and $1.48 million in interest to investors during the same month.  Defendants transferred $5.7 million from MP VI to MP III, series 1, which paid over $7.8 million in redemptions and $700,000 in interest to investors.  Defendants transferred $2.3 million from MP VI to MP III, series 2, which paid over $3.5 million in redemptions and $680,000 in interest to investors.  Defendants transferred over $4.1 million from MP VI to MP IV, series 1, which paid $3.825 million to MCC in administrative fees.

///

///

32.     In September 2008, MCC, Field, and Lampariello orchestrated intercompany transfers of over $3.2 million from MP V and MP VI, to MP IV, series 2, which in turn paid $1.9 million in administrative fees to MCC. MCC, Field, and Lampariello knew, or were reckless in not knowing, that they were transferring investor funds from later offerings to earlier offerings to then pay administrative fees to MCC from the investor proceeds, contrary to the representations in the PPMs that administrative fees would not be paid from investor proceeds. MCC, Field, and Lampariello knew, or were reckless in not knowing, that they were transferring funds from later offerings to earlier offerings to then make principal and interest payments to investors in the prior offerings.

### 2.     **Misrepresentation Regarding Defaults of Other SPCs**

33.     In MP VI's original PPM, Defendants disclosed that MP VI had no operating history but represented that MP VI had "several experienced affiliates that ha[d] completed offerings of debt securities backed by accounts receivable," and that the "affiliates ha[d], since 1994, financed accounts receivable having an aggregate face amount of over $5 billion." The PPM further stated that "[MP VI's] affiliates have never defaulted in the payment of their obligations on those debt securities, and all interest payments on those securities were made when due."

34.     In fact, MCHI, MCC, MP VI, Field, and Lampariello knew, or were reckless in not knowing, that during the MP VI offering several of the affiliated SPCs had defaulted on their obligations. The May 27, 2009 Supplemental PPM represents that MP II, MP III, and MP IV are each in default. Since August 2008 (the same month that the MP VI offering began), MP II defaulted on $43 million in principal payments and $1.3 million in interest payments, and MP III defaulted on $26.5 million in principal payments. MP IV missed interest payments in January 2009 and from March 2009 through the present. MCC, Lampariello, and Field knew that the prior offerings were in default at the time that the MP VI PPM was distributed.

///

13

35.     Although Defendants MCC, Field, and Lampariello notified MP II
and MP III investors about the defaults beginning in August 2008, they did not
notify purchasers of MP VI notes about the defaults until about June 2009.  On or
about June 8, 2009, MCC, Field, and Lampariello sent the Supplemental PPM to
broker-dealers who had previously sold MP VI notes, which disclosed the principal
and interest payment defaults by MP II, MP III, and MP IV.

### 3.     Defendants Failed to Disclose That Fake, Overstated, and/or Aged Receivables Were Being Used to Transfer Investor Funds from Later Offerings to Earlier Offerings

36.     As disclosed in the PPMs, from time to time defendants Field and
Lampariello, though MCC, arranged to sell receivables from earlier offerings to
later offerings, which resulted in the transfer of cash from later offerings to the
Trust Accounts of earlier offerings.  However, MCC, Field, and Lampariello failed
to disclose that substantial amounts of the receivables transferred in these
intercompany transactions were fake, overstated, and/or aged receivables
supported by falsified batch reports.  Defendants MCC, Field, and Lampariello
then listed the fake receivables as collateral on CCR worksheets used to obtain
administrative fees for MCC.  The investor funds transferred from later offerings to
earlier offerings were then used to pay principal and interest on the earlier
offerings, as well as administrative fees to MCC.

### a.     Trace Life Sciences Fake Receivables

37.     In August and September 2008, Field and Lampariello directed MP
VI to acquire receivables from, among other providers, Trace Life Sciences.  In a
letter dated August 21, 2008, signed by Lampariello, MP VI informed the trustee
that it was purchasing receivables of Trace Life Sciences with a face value of $1.9
million, which was supported by an Administrators Criteria Letter signed by
Lampariello, and a batch report dated 8/15/2008 ("8/15 batch report") for the
receivables being purchased.  In a letter September 4, 2008, again signed by

14

1  Lampariello, MP VI informed the trustee that it was purchasing from MP V

2  receivables of Trace Life Sciences with a face value of $8.867 million, which was

3  supported by an Administrators Criteria Letter signed by Lampariello, and a batch

4  report dated 8/28/2008 ("8/28 batch report") for the $8.867 million in receivables.

5       38.    In fact, the 8/28 batch report is a fake, created by altering the 8/15 batch

6  report by taking the first 72 lines of the 8/15 batch report, and (1) adding the line

7  number plus 1045 to the Batch No. to create a new Batch No. (e.g., 7660 + 1 + 1045 =

8  8706; 7675 + 2 + 1045 = 8722, etc.), and (2) adding $100,000 to the Billed Amount,

9  and (3) making similar adjustments to the remaining columns. As a result of this

10  manipulation, Defendants orchestrated the "transfer" of $7.2 million in fake receivables

11  to MP VI, and the transfer over $2.6 million of MP VI investor funds to MP V.

12       39.    In a letter dated September 19, 2008, signed by Lampariello, MP VI

13  acquired over $17 million of receivables from Trace Life from MP IV, series 1, in

14  exchange for a total of $7.136 million in cash. Defendants supported this

15  intercompany transaction with a batch report dated 9/18/2008 ("9/18 batch report").

16       40.    In fact, the 9/18 batch report is fake, created by altering the 8/15 batch

17  report, by taking the first 71 lines of the 8/15 batch report, adding $200,000 to the

18  amounts, and making corresponding adjustments to the remaining columns.

19  Through this alteration, Defendants MCC, Field, and Lampariello created at least

20  $14.2 million in fake receivables, and then used the altered batch report to

21  "transfer" at least $14.2 million of fake receivables to MP VI, and move over $7

22  million of MP VI investor funds to earlier MP offerings.

23       41.    Field and Lampariello knew, or were reckless in not knowing, that the

24  Trace Life batch reports had been altered and the total amount of receivables

25  falsely inflated, and that MCC was manufacturing false batch reports that were

26  being submitted as support for the acquisition of accounts receivable and

27  intercompany transfers. In fact, Field and Lampariello knew that Trace Life

28  Sciences had defaulted on prior loans made by entities controlled by MCC, Field,

15

1    and Lampariello, that Trace Life had not generated sufficient revenue to fund its

2    operations, and was surviving with money provided by Field and Lampariello

3    through the various entities they controlled.

4            **b.    NLV, Inc.**

5            42.    In a letter dated August 22, 2008, signed by Lampariello, MP VI

6    acquired from MP V receivables of provider NLV, Inc. with an ENR balance of

7    $4.2 million, in return for over $3.394 million in cash.  The intercompany

8    transaction was supported by an Administrators Criteria Letter signed by

9    Lampariello.  In fact, the ENR balance was fake.  NLV lost its corporate existence

10   in 2004.  A July 2008 email to Lampariello listing "corrective action accounts"

11   stated that NLV's ENR balance was $139,969.90, that MCC was not going to

12   pursue a collection case against NLV, and its corporate status was revoked in 2004.

13   MCC, Field, and Lampariello knew, or were reckless in not knowing, that the NLV

14   ENR balance of $4.2 million was falsely inflated.  MCC, Field, and Lampariello

15   knew, or were reckless in not knowing, that at the time of the transaction, NLV had

16   been out of business for at least four years and that MCC and its subsidiaries had

17   not purchased any new receivables from NLV during that period.

18           **c.    Advanced Radiology**

19           43.    Beginning on or about October 23, 2008, defendants Lampariello and

20   Field orchestrated the sale of overstated and worthless receivables from provider

21   Advanced Radiology to MP VI.  In a letter dated October 23, 2008, signed by

22.  Lampariello, defendants orchestrated the transfer of receivables of Advanced

23   Radiology with a purported ENR of $20.135 million, from MP IV, series II, to MP

24   VI, in return for $16 million in cash.  In fact, Field and Lampariello were

25   signatories on a lockbox account opened by MCC in 2001 at Comerica Bank to

26   collect Advanced Radiology receivables, and bank statements show that there was

27   no activity in the lockbox account from January 1, 2003 through May 31, 2008.

28   MediTrak reports show that only 9 batches of receivables were purchased from

1    Advanced Radiology between January 2002 and December 2003, and there was an

2    outstanding balance of approximately $5.5 million.  MCC, Field, and Lampariello

3    knew, or were reckless in not knowing, that the Advanced Radiology receivables

4    purportedly being sold to MP VI were fake and worthless.

5         **d.    Carter Medical, Plaza Therapy, Plaza Appliance**

6         44.    During the period from November 2003 through June 2009, Field and

7    Lampariello orchestrated numerous intercompany transactions which involved, in

8    whole or in part, fake, overstated, or worthless receivables of Carter Medical, Plaza

9    Appliance, and Plaza Therapy.  For example, Lampariello executed a "Receivable

10   Acquisition Certificate," dated February 8, 2007, for MP IV to purchase "Eligible

11   Receivables" of Carter Medical with a face amount of $13.1 million, an adjusted

12   value of $4.2 million, which defendants allegedly advanced $3.3 million to

13   purchase.  However, MCC, Field, and Lampariello knew that in 1998, an entity

14   managed by MCC, Field, and Lampariello named MCC Special Corporation I

15   obtained a judgment against Carter Medical, Plaza Therapy, and Plaza Appliance.

16   In addition, although Field and Lampariello opened a lockbox account in July 2005

17   for MP I/Carter Medical at Comerica Bank, there was no activity in the account

18   from August 4, 2005 through May 31, 2008, other than two deposits in 2005

19   totaling $608 to pay service fees.  MCC, Field, and Lampariello knew, or were

20   reckless in not knowing, that the intercompany transactions involving Carter

21   Medical, Plaza Therapy, and Plaza Appliance used fake ENR amounts, and that

22   these were sham transactions.

23        **e.    Metabolic Disease Foundation**

24        45.    Another provider passed from offering to offering was Metabolic

25   Disease Foundation.  On or about January 2007, defendants had MP I sell a

26   purported ENR balance of $4.497 million in receivables to MP IV, series 1, for

27   $3.598 million in cash.  On or about January 2008, defendants had MP IV, series 1

28   sell a purported ENR balance of $5.1 million to MP V in return for $4.04 million

in cash.  However, MCC had obtained a default judgment against Metabolic

Disease Foundation in 1998, in the amount of $2.1 million.  In fact, MTS has no

record of any activity related to any account of Metabolic Disease Foundation.

MCC, Field, and Lampariello knew, or were reckless in not knowing, that the ENR

balances were false, and that the intercompany transfers of purported receivables

of Metabolic Disease Foundation were a sham.

### f.  **Progressive Medical Group (PMG)**

46.    Defendants also passed from offering to offering purported receivables

from a series of providers named Progressive Medical Group; PMG – Path of

Florida; PMG – Path of Palm Beach; PMG – Path of Ft. Myers; and PMG – Path of

Pines.  For example, on or about January 26, 2007, defendants had MP IV pay

$4.175 million in cash to MP III for receivables of "PMG – Path of Florida" against

which Defendants had advanced $4.1 million, in return for $4.175 million in cash.

Lampariello signed a "receivable Acquisition Certificate" dated January 26, 2007,

attesting that MCC was transferring eligible receivables.  Only a few days later, on

or about February 2, 2007, Defendants arranged to have MP IV pay $4.179 million

to MP III for receivables of "PMG – Path of Palm Beach" which purportedly had a

face value of over $16.56 million.  The next month, on or about March 20, 2007,

Defendants arranged to have MP IV pay $6.6 million in cash to MP III for yet

another batch or receivables, this time from provider "PMG- Path of Pines."

Lampariello signed a "Receivable Acquisition Certificate" certifying the legitimacy

and value of each transaction.  Subsequently, in June 2008, Defendants arranged to

have MP V pay $16.625 million in cash to MP IV for receivables from "PMG - Path

of Pines" and "PMG – Progressive Medical Group."

47.    In fact, bank statements for lockboxes for MP I/PMG – Path of Palm

Beach; MP I/PMG – Path of Pines; MP I/PMG – Path of Fort Meyers; and MP

I/PMG, show that there was no activity in any of these accounts from June 2005

through January 2009.  Indeed, in July 2008, Lampariello was informed that

1  "corrective action accounts" included PMG, Path Medical of Florida; and Path

2  Medical of Palm Beach, and the total ENR balance for these providers was just

3  over $2 million.  Defendants caused MP V to pay over $16.625 million in cash for

4  receivables with an ENR of approximately $2 million.  MCC, Lampariello, and

5  Field had access to these ENR balances through MediTrak.  MCC, Field and

6  Lampariello knew, or were reckless in not knowing, that the intercompany

7  transactions involving the various PMG entities used fake or overstated receivable

8  values and were sham transactions.

9        48.    The chart below shows the cash paid out from MP to MP in the 2007

10  and 2008 transfers, and the ENR balances provided to Lampariello in July 2008 –

11  which are substantially less than the cash paid.

12  *Table 2:  Overstated Amounts of Provider PMG in Intercompany Transfers*

13

| Provider | 1/2007 transfer | 2/2007 transfer | 3/2007 transfer | 6/2008 transfer | 7/2008 email values |
|---|---|---|---|---|---|
| PMG | | | | $9,264.342 | $1,497,906 |
| Florida | $4,175,716 | | | | $313.636 |
| Palm Beach | | $4,179,835 | | | $237,723 |
| Pines | | | $6,672,127 | $7,361,167 | |

21        49.    MCC, Field, and Lampariello knew, or were reckless in not knowing,

22  that intercompany transfers of fake, overstated, and/or worthless accounts

23  receivable violated representations in the PPMs that any such transfers of accounts

24  receivable would "generally be priced at the sum of the total amount advanced on

25  the outstanding receivables or assets as of the date the portfolio of assets is

26  purchased or financed by such affiliate, less any collections already received on the

27  accounts receivable."

28  ///

50. Defendants engaged in these sham intercompany transfers as a mechanism to transfer funds from newer investors to pay principal and interest to investors in prior offerings, as well as to provide funds to pay themselves administrative fees. In fact, under Defendants' management, each MP suffered net outflows of cash from the accounts receivable and other financing, and from intercompany transfers. Nonetheless, Defendants MCC, Field, and Lampariello instructed the MPs to pay substantial administrative fees to MCC during that time. Because Defendants were not generating cash from the financing business, the only source of cash to pay the administrative fees was investor funds. Defendants MCHI, MCC, Field, and Lampariello knew, or were reckless in not knowing, that when financing activities failed to generate a positive cash flow into the Trust Accounts for each MP, then the only source of funds in the Trust Accounts to pay administrative fees was investor funds, which the PPMs represented would not be used to pay administrative fees. The chart below shows, in millions, the amount raised, the financing profit or loss, intercompany transfers, and administrative fees for MP I through MP V.

///
///
///
///
///
///
///
///
///
///
///
///

*Table 3:  Amounts Raised, Net Financing Proceeds, Intercompany Transfers, and Administrative Fees for MP I through MP V (in millions)*

| MP (period) | Investor Funds Raised | Net Financing profit/(loss) | Intercompany Transfers Net Inflow/(outflow) | Administrative Fees Paid to MCC |
|---|---|---|---|---|
| MP I (11/03 – 12/04) | $176 | ($9.2) | ($104.5) | ($11.1) |
| MP II (1/04 – 12/05) | $250 | ($101) | ($52.3) | ($32.9) |
| MP III Series 1 (7/05 – 8/06) | $243 | ($52.9) | ($57.5) | ($20.9) |
| MP IV Series 1 (11/06-11/07) | $252 | ($70.2) | ($133.3) | ($24.9) |
| MP III Series 2 (4/07 – 1/08) | 100 | ($6.7) | ($80.9) | ($8.0) |
| MP IV Series 2 (5/07 – 5/08) | $152 | ($47.2) | ($79) | ($15.745) |
| MP V (11/07 – 9/08) | $402 | ($100.7) | ($240) | ($40.0) |

4.    **Defendants Included Fake, Overstated, and/or Worthless Assets on CCR Reports to Pay Themselves Improper Administrative Fees**

51.    Defendants transferred overvalued and/or fake receivables between offerings to artificially inflate the assets held by a particular MP in calculating the CRR, which Field and Lampariello then used as a purported basis to pay MCC administrative fees.

52.    In September 2008, defendants directed MP VI to pay $7.85 million in administrative fees to MCC.  Defendants approved and submitted a CCR

21

1 | worksheet to the trustee which stated that MP VI had total accounts receivable and
2 | other assets in the amount of $21,448,551.34, cash held by the trustee in the
3 | amount of $3,475,981.06, and liabilities of $18,008,199.48. Included in the assets
4 | were $3,544,376.56 in receivables from provider Trace Life Sciences, and
5 | $4,242,802.40 in receivables from provider NLV, Inc. In fact, actual receivables
6 | purchased from Trace Life were, at best, valued at only $387,814.37. All of the
7 | NLV receivables were fake. Eliminating just these two receivables, totaling over
8 | $7 million in value, reduces the CCR below 100%. In fact, the actual value of the
9 | receivables held by MP VI at the time of this CCR calculation was about $2.95
10 | million, and Defendants MCC, Field, and Lampariello overstated the collateral of
11 | MP VI by $18.5 million. MCC, Field, and Lampariello knew, or were reckless in
12 | not knowing, that the collateral was overstated and the CCR was incorrect.
13 | Defendants MCC, Field, and Lampariello knew that reporting a CCR of less than
14 | 100% would not entitle MCC to take administrative fees, and could precipitate an
15 | event of default.

16 |     53.    For September 2008, Defendants similarly overvalued the assets of
17 | MP IV, series 1; MP IV, series 2; and MP V in CCR calculations used to obtain
18 | administrative fees:

19 |        ●    Defendants obtained $3.825 million in administrative fees
20 |               from MP IV, series 1, based on claimed assets of $257
21 |               million against $250 million in liabilities; in fact, actual
22 |               assets were only $128 million, and the actual CCR was only
23 |               about 51%.

24 |        ●    Defendants obtained $1.9 million in administrative fees
25 |               from MP IV, series 2, based on claimed assets of over $172
26 |               million against $153 in liabilities; in fact, actual assets were
27 |               only about $73.7 million, and the actual CCR was only
28 |               about 47.5%.

- Defendants obtained $4.1 million in administrative fees from MP V, based on claimed assets of over $417 million against liabilities of $405 million; in fact, actual assets were only about $94.8 million, and the actual CCR was only about 21%.

MCC, Field, and Lampariello knew, or were reckless in not knowing, that the asset values used to calculate the CCR for the payment of administrative fees were substantially overstated, and that correct CCR calculations would not entitle MCC to administrative fees.

54.    In October 2008, Defendants again overvalued assets of MP IV, series 2; MP V; and MP VI to obtain improper payment of administrative fees.

- Defendants obtained $1.4 million in administrative fees from MP IV, series 2, based on claimed assets of $170 million against $153 million in liabilities; in fact, actual assets were only $83 million, and the actual CCR was only about 53%.

- Defendants obtained $1.45 million in administrative fees from MP V based on claimed assets of over $409 million against $405 million in liabilities; in fact, actual assets were only about $79.7 million, and the actual CCR was only about 19%.

- Defendants obtained $4.1 million in administrative fees from MP VI, based on claimed assets of over $49 million against liabilities of $45 million; in fact, actual assets were only about $3 million, and the actual CCR was only about 12%.

1   MCC, Field, and Lampariello knew, or were reckless in not knowing, that the

2   asset values used to calculate the CCR for the payment of administrative fees

3   were substantially overstated.

4        **5.**    **The False Statements in the PPM and SPPM Were Made in**

5             **Connection with the Offer, Purchase, or Sale of Securities**

6       55.    The MP VI PPM was distributed by Defendants MCHI, MCC, MP VI,

7   Field, and Lampariello, in connection with the offer, sale, and purchase of MP VI

8   notes, beginning in or about August 2008 through May 2009.  The MP VI SPPM

9   was distributed by Defendants MCHI, MCC, MP VI, Field, and Lampariello, in

10  connection with the offer, sale, and purchase of MP VI notes, beginning in May

11  2009 through at least June 2009.

12      56.    The MP VI PPM was used by the Defendants to offer and sell

13  securities in MP VI.  The MP VI PPM specifically states, in pertinent part: "This

14  Private Placement Memorandum has been prepared solely for use in connection

15  with the private placements of notes offered hereby . . . ."  Subsequently,

16  Defendants MCHI, MCC, MP VI, Field, and Lampariello replaced the MP VI PPM

17  with the MP VI SPPM, which was used by Defendants to continue to offer and sell

18  securities in MP VI.  The MP VI SPPM also states that it was prepared "solely for

19  use in connection with the private placement of notes offered hereby . . . ."

20      57.    Purchasers of MP VI notes made their purchases by subscribing to the

21  offering pursuant to the MP VI PPM and MP VI SPPM.  Both the MP VI PPM and

22  SPPM contain a section titled: "How to Subscribe," which informs potential

23  purchasers of the securities: "You must read the Private Placement Memorandum

24  and must complete, execute, and return the subscription agreement to [MP VI]. . ."

25      58.    The MP VI PPM and MP VI SPPM include a form of the

26  "Subscription Agreement" that investors were required to use to purchase

27  securities from Defendants in the MP VI offering.  The Subscription Agreement

28  provided by Defendants to prospective investors states that the MP VI notes are

being offered and purchased "pursuant to the [MP VI's] Confidential Private Placement Memorandum [PPM]. . . distributed . . . in connection with the offering of the Notes."

59.     The MP VI PPM was disseminated by Defendants MCHI, MCC, MP VI, Field, and Lampariello, in interstate commerce, for the sale of securities in the MP VI offering through broker-dealers located throughout the United States. Defendants MCHI, MCC, MP VI, Field, and Lampariello caused the MP VI PPM to be disseminated to selling broker-dealers through email and other mail delivery services, and in so doing utilized means and instrumentalities of interstate commerce. The selling brokers provided the MP VI PPM to prospective investors in connection with the offer, purchase, and sale of MP VI securities, and pursuant to their agreement with Defendants.

60.     Defendants described the plan of distribution for the MP VI securities in the MP VI PPM and MP VI SPMM, in a section titled "Plan of Distribution," which states that Defendants "expect to retain FINRA member broker-dealers and other appropriately licensed agents to sell the notes." To accomplish this plan of distribution, Defendants executed "broker-dealer agreements" for the offer and sale of MP VI notes to investors. In the broker-dealer agreement, Defendants specifically represented and warranted to selling broker-dealers that the MP VI PPM provided by Defendants "is true, complete and correct and does not contain any untrue statement of a material fact or omit to state a material fact required by any applicable law or regulation or necessary in order to make the statements contained therein, in light of the circumstances under which they are made, not misleading." Defendants entered into numerous such agreements. For example: (a) on or about July 31, 2008, Defendants entered into a broker-dealer agreement with Capital Financial Securities, Inc., for the offer and sale of MP VI securities, signed by defendant Field as CEO of MP VI; (b) on or about August 1, 2008, Defendants entered into broker-dealer agreement with Cullum & Burks Securities,

1    located in Texas, for the offer and sale of MP VI securities, signed by defendant

2    Field as CEO of MP VI; (c) on or about August 14, 2008, defendants entered into a

3    broker-dealer agreement with Intervest International Equities Corporation, located

4    in Colorado, for the offer and sale of MP VI securities, signed by defendant Field

5    as CEO of MP VI.

6        61.    Defendants MCHI, MCC, MP VI, Field, and Lampariello used the

7    means and instrumentalities of interstate commerce, including email and mail

8    delivery services, to send copies of the MP VI PPM to the broker-dealers who were

9    selling MP VI securities for Defendants.

10       62.    Defendants MCHI, MCC, MP VI, Field, and Lampariello

11   disseminated the MP VI SPPM beginning on or about June 2009 in connection

12   with the continuing offer of MP VI securities, using the means and

13   instrumentalities of interstate commerce, including mail delivery services.  Under

14   cover of a letter dated June 8, 2009, signed by defendant MP VI and disseminated

15   by defendant MCC, Defendants sent copies of the MP VI SPPM to broker-dealers

16   throughout the United States who were selling MP VI securities for Defendants.

17   Defendants stated in the letter that the MP VI SPPM "updates and replaces the

18   original PPM for MPFC VI.  The number of [SPPM]s enclosed exceeds the

19   number of customers who purchased MPFC VI notes through your firm and its

20   registered representatives.  We suggest that you send this [SPPM] to all those

21   customers who purchased notes from MPFC VI in order to update them on the

22   status and disclosures in MPFC VI.  There is a sufficient number of [SPPMs]

23   enclosed that you can send updated PPMs to your customers and still have new

24   [SPPMs] for your files and sales departments."

25       63.    Defendants MCHI, MCC, Field, and Lampariello caused the MP V

26   PPM to be disseminated to investors, using the means and instrumentalities of

27   interstate commerce including email and mail delivery services.  Defendants

28   disseminated the MP V PPM, dated on or about October 8, 2007, for the offer,

1    sale, and purchase of notes in MP V.  Defendants offered the MP V notes from

2    approximately November 2007 through July 2008.

3          64.    Defendants MCHI, MCC, Field, and Lampariello caused the MP IV

4    PPMs to be disseminated to investors, using the means and instrumentalities of

5    interstate commerce including email and mail delivery services.  Defendants

6    disseminated the PPM for MP IV, Series I, dated on or about October 23, 2006, for

7    the offer, sale, and purchase of notes in MP IV, Series I; and the PPM for MP IV,

8    Series II, dated on or about May 2, 2007, for the offer, sale, and purchase of notes

9    in MP IV, Series II.  Defendants offered the two series of MP IV notes from

10   approximately November 2006 through February 2008.

11         65.    Defendants MCHI, MCC, Field, and Lampariello caused the MP III

12   PPMs to be disseminated to investors, using the means and instrumentalities of

13   interstate commerce including email and mail delivery services.  Defendants

14   disseminated the PPM for MP III, Series I, dated on or about June 20, 2005, for the

15   offer, sale, and purchase of notes in MP III, Series I; and the PPM for MP III,

16   Series II, dated on or about April 10, 2007, for the offer, sale, and purchase of

17   notes in MP III, Series II.  Defendants offered the two series of MP III notes from

18   approximately July 2005 through January 2008.

19         66.    Defendants MCHI, MCC, Field, and Lampariello caused the MP II

20   PPM to be disseminated to investors, using the means and instrumentalities of

21   interstate commerce including email and mail delivery services.  Defendants

22   disseminated the MP II PPM, dated on or about January 16, 2004, for the offer,

23   sale, and purchase of notes in MP II.  Defendants offered the MP II notes from

24   approximately January 2004 through December 2005.

25         67.    Defendants MCHI, MCC, Field, and Lampariello caused the MP I

26   PPM to be disseminated to investors, using the means and instrumentalities of

27   interstate commerce including email and mail delivery services.  Defendants

28   disseminated the MP I PPM, dated on or about November 3, 2003, and updated for

1 changes in structure as of November 15, 2004, for the offer, sale, and purchase of

2 notes in MP I. Defendants offered the MP I notes from approximately December

3 2003 through August 2007.

### FIRST CLAIM FOR RELIEF

#### Fraud In The Offer Or Sale Of Securities

#### Violations of Section 17(a) of the Securities Act

#### (Against All Defendants)

8   68.   The Commission realleges and incorporates by reference paragraphs

9 1 through 67 above.

10   69.   The Defendants, and each of them, by engaging in the conduct

11 described above, in the offer or sale of securities by the use of means or

12 instruments of transportation or communication in interstate commerce or by use

13 of the mails directly or indirectly:

14   a.   with scienter, employed devices, schemes, or artifices to

15       defraud;

16   b.   obtained money or property by means of untrue statements of a

17       material fact or by omitting to state a material fact necessary in

18       order to make the statements made, in light of the

19       circumstances under which they were made, not misleading; or

20   c.   engaged in transactions, practices, or courses of business which

21       operated or would operate as a fraud or deceit upon the

22       purchaser.

23   70.   By engaging in the conduct described above, the Defendants violated,

24 and unless restrained and enjoined will continue to violate, Section 17(a) of the

25 Securities Act, 15 U.S.C. § 77q(a).

26 ///

27 ///

28 ///

## SECOND CLAIM FOR RELIEF

### Fraud In Connection With The Purchase Or Sale Of Securities
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Against All Defendants)

71.     The Commission realleges and incorporates by reference paragraphs 1 through 67 above.

72.     The Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

      a.    employed devices, schemes, or artifices to defraud;

      b.    made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

      c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

73.     By engaging in the conduct described above, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

///
///
///
///
///
///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## THIRD CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 10(b) of the
### Exchange Act and Rule 10b-5 Thereunder
### (Against Defendant MCC)

74. The Commission realleges and incorporates by reference paragraphs 1 through 67 above.

75. In the alternative, by engaging in the conduct described above, MCC, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

    a.    employed devices, schemes, or artifices to defraud;

    b.    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

    c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

76. By engaging in the conduct described above, MCC knowingly provided substantial assistance to violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, and therefore is liable as an aider and abettor pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e).

77. Unless restrained and enjoined, MCC will continue to violate and aid and abet violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5.

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that the Defendants committed the alleged violations.

### **II.**

Issue judgments, in forms consistent with Fed. R. Civ. P. 65(d), temporarily, preliminarily, and permanently enjoining the Defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and with regard to MCC, in the alternative, from aiding and abetting violations of Section 10(b) and Rule 10b-5.

### **III.**

Issue, in a form consistent with Fed. R. Civ. P. 65, a temporary restraining order and a preliminary injunction freezing the assets of MCHI, MCC, and MP VI and any entity affiliated with any of them, appointing a receiver over MCHI, MCC, and MP VI, prohibiting each of the Defendants from destroying documents, granting expedited discovery, and requiring accountings from each of the Defendants.

### **IV.**

Order each of the Defendants to disgorge all ill-gotten gains from their illegal conduct, together with prejudgment interest thereon.

### **V.**

Order each of the Defendants to pay civil penalties under Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

**VI.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VII.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  March 16, 2010                         Respectfully submitted,

_John B. Bulgozdy_
John B. Bulgozdy
Attorney for Plaintiff
Securities and Exchange Commission

## PROOF OF SERVICE

I am over the age of 18 years and not a party to this action. My business address is:

[X]   U.S. SECURITIES AND EXCHANGE COMMISSION, 5670 Wilshire Boulevard, 11th Floor, Los Angeles, California 90036-3648

Telephone No. (323) 965-3998; Facsimile No. (323) 965-3908.

On March 16, 2010, I caused to be served the document entitled **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** on all the parties to this action addressed as stated on the attached service list:

[X]   **OFFICE MAIL:** By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices. I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

[ ]   **PERSONAL DEPOSIT IN MAIL:** By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service. Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

[ ]   **EXPRESS U.S. MAIL:** Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

[ ]   **HAND DELIVERY:** I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

[ ]   **FEDERAL EXPRESS:** By placing in sealed envelope(s) designated by Federal Express with delivery fees paid or provided for, which I deposited in a facility regularly maintained by Federal Express or delivered to a Federal Express courier, at Los Angeles, California.

[X]   **ELECTRONIC MAIL:** By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

[ ]   **FAX:** By transmitting the document by facsimile transmission. The transmission was reported as complete and without error.

[X]   **(Federal)** I declare under penalty of perjury that I am a member of the bar of this Court and that the foregoing is true and correct.

Date: _March 16, 2010_

_John B. Bulgozdy_
John B. Bulgozdy

33

1

**SEC v. MEDICAL CAPITAL HOLDINGS, INC., et al.**
**United States District Court – Central District of California**
**Case No. SACV 09-818 DOC (RNBx)**
**LA-3474**

2

3

4

SERVICE LIST

5

6

Alan A. Greenberg, Esq.
Michael A. Piazza, Esq.
Greenberg Traurig, LLP
3161 Michelson Drive, Suite 1000
Irvine, CA 92612
Email: *greenbergal@gtlaw.com*
Email: *piazzam@gtlaw.com*
***Attorneys for Defendants Sidney M. Field and Joseph J.***
***Lampariello***

7

8

9

10

David Zaro, Esq.
Allen Matkins Leck Gamble Mallory & Natsis LLP
515 S. Figueroa Street, 7th Floor
Los Angeles, CA 90071
Email: *dzaro@allenmatkins.com*
***Attorney for Receiver Thomas Seaman over Defendants Medical***
***Capital Holdings, Inc., Medical Capital Corporation, and Medical***
***Provider Funding Corporation VI***

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28