DAVID R. ZARO (BAR NO. 124334)
MICHAEL R. FARRELL (BAR NO. 173831)
EDWARD G. FATES (BAR NO. 227809)
ALLEN MATKINS LECK GAMBLE
  MALLORY & NATSIS LLP
515 South Figueroa Street, Ninth Floor
Los Angeles, California 90071-3309
Phone:  (213) 622-5555
Fax:  (213) 620-8816
E-Mail:  dzaro@allenmatkins.com
          mfarrell@allenmatkins.com
          tfates@allenmatkins.com

Attorneys for Receiver
THOMAS A. SEAMAN

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>            Plaintiff,<br><br>    v.<br><br>MEDICAL CAPITAL HOLDINGS, INC.; MEDICAL CAPITAL CORPORATION; MEDICAL PROVIDER FUNDING CORPORATION VI; SIDNEY M. FIELD; and JOSEPH J. LAMPARIELLO,<br><br>            Defendants. | Case No. SA CV09-0818 DOC (RNBx)<br><br>RECEIVER'S SIXTIETH REPORT TO THE COURT |

Thomas A. Seaman ("Receiver"), the court-appointed Permanent Receiver for Medical Capital Holdings, Inc., Medical Capital Corporation, Medical Provider Funding Corporation VI, and their subsidiaries and affiliates (collectively the

LAW OFFICES
**Allen Matkins Leck Gamble
Mallory & Natsis LLP**

993579.01/LA

-1-

Receiver's Sixtieth
Report to the Court

1  "Receivership Entities"), submits herewith the Receiver's Sixtieth Report to the

2  Court.

3  Dated:  July 10, 2014                    ALLEN MATKINS LECK GAMBLE

4                                                              MALLORY & NATSIS LLP

5

6                                                              By: */s/ Michael R. Farrell*

7                                                                     Michael R. Farrell
                                                                       Attorneys for Receiver

8                                                                     THOMAS A. SEAMAN

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION

SECURITIES AND EXCHANGE COMMISSION

vs.

MEDICAL CAPITAL HOLDINGS, INC.;
MEDICAL CAPITAL CORPORATION;
MEDICAL CAPITAL PROVIDER FUNDING CORPORATION VI;
SIDNEY M. FIELD; and JOSEPH LAMPARIELLO

RECEIVER'S SIXTIETH REPORT
For the Honorable David O. Carter

Thomas Seaman, CFA
Thomas Seaman Company
3 Park Plaza, Suite 550
Irvine, California 92614
Tel: (949) 222-0551
Fax: (949) 222-0661
tom@thomasseaman.com

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................5

II.     SUMMARY OF RECEIVER'S ACTIONS ...........................................5

III.    INVENTORY OF KEY ASSETS ....................................................8

IV.     RECEIVER'S ACCOUNTING AS OF JUNE 30, 2014.....................................8

## <u>EXHIBITS</u>

Exhibit A – Medical Capital Receivership Inventory of Significant Assets
Exhibit B – Financial Statements for the Receivership Estate through June 30, 2014

## I.     INTRODUCTION

       This sixtieth report was prepared by Thomas Seaman, Permanent Receiver ("Receiver") for Medical Capital Holdings, Inc. ("MCH"), Medical Capital Corporation ("MCC"), Medical Provider Funding Corporation VI ("MPFC VI"), and their subsidiaries and affiliates (collectively, the "Receivership Entities," "Medical Capital" or "MedCap").  At the hearing on September 8, 2009, the Court ordered that the Receiver submit monthly reports, on or before the 10th day of each month, to address the status of the receivership estate and its assets.  The Receiver submits this report per the Court's order.

## II.     SUMMARY OF RECEIVER'S ACTIONS

       During the preceding month, the Receiver continued to administer a high volume of inquiries regarding the first interim distribution to claimants which was made in February 2014.  The Receiver also worked to recover funds from Medical Capital's assets, including collection efforts on various loan and other debt obligations owed by Medical Capital's borrowers and marketing and sale of the remaining assets.  The Receiver also managed and administered three pending lawsuits against Medical Capital attorneys, including fulfilling discovery and document requests, damage analysis, and supporting experts retained to assist in the litigation.  During June, 2014 the Receiver settled the matter against former counsel Fazio, with Court approval, for a net recovery of $665,000 after payment of the contingent legal fees.  The pending two matters are both on a contingent fee basis.  The Receiver's actions more specifically include the following:

- During June, 2014, the Receiver collected $674,817.86 which is comprised of accounts receivable collections of $1,550.00, loan collections of $8,178.77, and the aforementioned settlement proceeds of $665,000.  Since the inception of the case through June 30, 2014, the Receiver has collected $176,390,838.25, which is comprised of the following sources:

|   |   |   |
|---|---|---|
| o | Accounts Receivable collections | $    2,667,380.80 |
| o | Loan payments | $  14,999,513.43 |
| o | NHBC revenue | $  20,787,479.75 |
| o | Viva Vision Revenue | $    1,147,361.49 |
| o | Perfect Game revenue | $    1,393,662.91 |
| o | Insurance proceeds | $       201,404.38 |
| o | Rental income | $       561,519.34 |
| o | Asset sales | $ 115,840,807.69 |
| o | Settlement proceeds | $    1,981,572.50 |
| o | Turnover /seizure of bank accounts | $    4,550,029.73 |

| | | | |
|---|---|---|---|
| o | Income tax returns | $ | 11,554,861.60 |
| o | Property tax refunds | $ | 501,184.58 |
| o | Interest income | $ | 204,060.05 |

- The Receiver and his team continue to pursue collection of debts from various borrowers.  Most of the loans are impaired or otherwise non-performing.

- Pursuant to authority previously granted by the Court, the Receiver filed a complaint on May 2, 2011 against the firm of Sedgwick LLP, former counsel to various Medical Capital entities, for $200,000,000 in damages arising out of the prior representation.  After significant motion practice relating to prior complaints, the Receiver filed his Third Amended Complaint on July 30, 2013, and Sedgwick answered the complaint on August 15, 2013.  The Court issued a scheduling order on December 4, 2013 setting the matter for a jury trial on March 3, 2015.  Per the order, the discovery cut-off is September 25, 2014.  A mediation was held in early February, 2014 which did not result in a resolution.

- The Receiver was also granted Court approval to bring an action against other former counsel for Medical Capital, which matter is pending in private arbitration and being prosecuted on a contingent fee basis.

- In May of 2013, Interstate Restoration LLC filed a complaint against the Receiver arising out of certain repair work done at the Trace Life Sciences, Inc. facility in Denton, Texas.  The matter is currently pending before the Court. Depositions of various witnesses were conducted from February through May of 2014.  Interstate, after the Receiver's motions to dismiss were granted in part, filed its Second Amended Complaint on April 16, 2014, adding allegations of concealment against the Receiver.  The trial and related dates were continued based on the new pleading.  Trial is set to occur on August 12, 2014.  The Receiver filed a motion for summary judgment which was heard on June 23, 2014.  On July 9, 2014, the Court issued its order granting in part and denying in part the motion.  The parties will proceed to trial as to the remaining claims on August 12, 2014.

- As previously reported, the Receiver conducted a forensic accounting of the sources and uses of all Medical Capital funds.  There were over twenty billion dollars of transactions in 258 separate bank accounts to account for, covering the period from November 2003 through the time of the Receiver's appointment. Over 15,000 bank statements were input and reconciled.  The Receiver filed his Forensic Accounting Report in December, 2011.  The accounting is organized in a relational database and allows the Receiver to account for and identify assets and recipients of ill-gotten gains for the purpose of recovering funds for the benefit of the receivership estate.  A summary level sources and uses funds analysis excerpted from the forensic accounting follows.

- **Summary Sources and Uses of Funds**

|                                              | (in $ millions) |
|----------------------------------------------|-----------------|
| • Amount raised from note holders            | 1,760.5         |
| • Interest income                            | 8.2             |
| • Total Cash In                              | 1,768.7         |
| • Use of Funds:                              |                 |
| • Principal returned to note holders         | 682.9           |
| • Administrative Fees paid to MCC            | 329.3           |
| • Administrative Fees recycled to the MPFCs  | (62.2)          |
| • Interest paid to note holders              | 309.8           |
| • Money lost on lending and investing activity | 298.6         |
| • Cash paid to pre MPFC money raising entities | 186.3         |
| • Payments to or on behalf of defendants     | 12.1            |
| • Servicing Fees                             | 4.8             |
| • Operating expenses and miscellaneous       | 2.4             |
| • Commissions                                | 1.2             |
| • Trustee fees                               | .6              |
| • Sub-total                                  | 1,765.8         |
| • Ending Cash Balance                        | 2.9             |

## III.   INVENTORY OF KEY ASSETS

Exhibit A provides an inventory of some of the largest and most significant assets of the Receivership Entities, together with individual summaries more fully describing each asset.  The summaries included in the Receiver's prior report will remain in each report until disposition of the asset and updates will be provided as appropriate.  It should be noted that the Receiver's

investigation is continuing, and that this Report should be considered preliminary and subject to change.

## IV.   RECEIVER'S ACCOUNTING AS OF JUNE 30, 2014

Exhibit B provides financial statements for the receivership estate through June 30, 2014. An Income and Expense Statement, Balance Sheet and General Ledger are provided.  To date, the estate has received funds in the amount of $176,390,838.25, including interest income of $204,060.05.  The Receiver has disbursed funds in the amount of $169,253,719.29, including the $117,500,000 to claimants and $51,573,719.29 for operating expenses of Receivership Entities and expenses of administering the receivership estate.  The cash being held increased to $7,137,118.96 as of June 30, 2014.

Dated:  July 11, 2014                                Respectfully submitted

                                                    *Thomas A. Seaman*

                                                    THOMAS A. SEAMAN, as Receiver for
                                                    MEDICAL CAPITAL HOLDINGS, INC.

# EXHIBIT A

## Medical Capital Receivership
## Inventory of Significant Assets

| Asset | Description | (in $ millions) Amount owed to or invested in by MedCap | Exhibit A Page |
|-------|-------------|-----------|--------|
| Acct. Rec. Loans | Accounts receivable loans to medical care providers | 82.4 | 10 |
| Legacy Medical Center | Non-operating hospital and medical office bldg in Atlanta | 36.6 | 12 |
| Parkway Hospital | Non-operating hospital in New York | 76.0 | 17 |
| Perfect Game | Completed film | 18.1 | 21 |
| Other Assets | Variety of loans and investments in non-medical ventures | | 26 |

## Medical Accounts Receivable

| Medical Capital Stated Value of A/R Accounts | 104 Accounts | $625,332,141.00[1] |
|---|---|---|
| **Verifiable Accounts Receivable** | **42 Accounts** | **$80,637,383.00** |
| −   A/R aged under 180 days | 6 Accounts | 6,114,233.00 |
| −   A/R aged more than 180 days | 39 Accounts | 74,523,150.00 |
| **Non-Existent Accounts Receivable** | **53 Accounts** | **$ 542,894,528.00** |
| −   Accounts that no longer exist | 46 Accounts | 450,987,914.00 |
| −   Accounts with a negative balance | 3 Accounts | 1,597,491.00 |
| −   Accounts with collateral transferred to term loans | 4 Accounts | 90,209,123.33 |
| **Judgments on Accounts Receivable** | **9 Accounts** | **$1,800,230.00** |

*Status as of September 8, 2009:*

o   The Receiver has identified and contacted all of the Providers who are parties to an active medical receivable Purchase Agreement.  In each case the Receiver has ascertained the status of the Purchase Agreement and payments due thereunder.  Demand has been made for payments where due and collections are proceeding using re-hired employees of Medical Capital.

Significant obstacles to collections of accounts receivable exist.

o   Some Providers are diverting collections in order to survive following MedCap's cessation of receivables purchases under its Purchase Agreement and several Providers are now defunct or insolvent.

o   Of the 104 medical accounts receivable clients listed on the various NCCR reports by Medical Capital, 53 of these accounts (totaling $542,894,528) are not viable or no longer exist.  In other words, it appears these 53 accounts may have been valid accounts at one time many years ago, but this is no longer the case.  The Receiver has identified numerous instances where MedCap manipulated the external reporting to leave out the age of the batch of receivables, which obfuscated the value of same.  In some cases, the actual amount of the batch has been inflated in MedCap's records.  There are no MediTrak reports to support such accounts as MediTrak reports either indicate that the accounts are closed or do not list the accounts at all.  There are no active UCC-1 filings for these accounts.  There have been no collections or advances on these accounts for

---

[1]     The value of assets in the company's financial records is vastly less than the amounts set forth in the Net Collateral Coverage Ratio report which formed the basis for payment of Administrative fees by the MPFC trusts to MCC.

many years.  It is unlikely the Receiver will make significant collections on these accounts.

o   MCC may have been collecting receivables it did not fund.  MCC ran out of cash in early May 2009, and therefore stopped lending money and purchasing accounts receivable as required under its Purchase Agreements with Providers.  Several Providers are asserting claims for moneys that MCC collected while in default under Purchase Agreements.

o   Of the verifiable accounts receivable, many Providers have stale and aged receivables.  Of the 104 accounts listed on the various NCCR reports by Medical Capital, 39 have severely aged receivables.  Of the 39 accounts with aged receivables, 31 report that the newest receivables were purchased between 2002 and 2006, totaling $52,055,679.  Only two of these accounts show any accounts receivable purchased in 2008.  There were no batches purchased in 2009 for any of these 39 accounts.  Thirty-three of the accounts were aged well beyond 180 days prior to their subsequent purchase via InterCompany Transfer.  Given the age of those receivables, it is unclear how much, if any, can be collected on these accounts.  Of the $80,637,383 of real accounts receivable, a mere $6,114,233 are under 180 days old and therefore potentially collectible.

## **Legacy Medical Center**

*Description:*

A non-operating hospital, medical office building and 75.3 acres of land in Atlanta, Georgia.

*The Receivership Entities Interest:*

In 2007, MedCap started foreclosure proceedings and ultimately bought the asset free and clear of liens as a credit bid in connection with a sale under 11 U.S.C. § 363.  MedCap briefly operated the facility at a significant loss, retaining a third party operator and facilities manager.  While these figures have not been verified, the Receiver understands that MCC spent $10 million to renovate and operate the facility.  The facility failed to attract sufficient business and in January 2009 operations at the hospital ceased.

*Status as of August 3, 2009*

As of August 3, 2009, the facility had been abandoned and was without security.  MedCap was allegedly in debt to the property management company in excess of $500,000 and the management company had ceased providing services.  MedCap had not paid its electric bills and the utility provided a notice of termination of service.  There were deferred maintenance issues involving plumbing, the boiler and electric system.  Three doctors were occupying three small offices in the medical office building and the Receiver was collecting their rent.  Receivership Entities loaned at least $36.6 million to the hospital and millions more to hold and operate the facility.

*Status as of September 8, 2009:*

After his appointment, the Receiver dispatched an agent to Atlanta to secure the facility.  The Receiver hired two key employees and reinstated the property management company in order to secure and preserve the asset.  The Receiver also met with brokers and confirmed insurance.  The Receiver was given an offer of $5 million to purchase the property which appeared to be far too low.

*Status as of October 9, 2009:*

The Receiver executed a listing agreement with Grubb & Ellis, who had been marketing the property on MedCap's behalf prior to the appointment of the receiver, and instructed the brokers to establish a deadline of October 9, 2009 for best and final offers.  Two offers to purchase were made.  The Receiver anticipated that a Purchase and Sale Agreement would be executed and the property would be in escrow within the following few weeks.  Once a Purchase and Sale Agreement was finalized, the Receiver anticipated filing the appropriate pleadings seeking Court approval to sell the property utilizing an overbid procedure.

*Status as of November 9, 2009:*

The Receiver has executed a Letter of Intent to sell the property for $9.5 million.  A Purchase and Sale Agreement has been drafted and negotiations concerning its terms are ongoing.  The Receiver anticipates concluding such negotiations shortly, executing the agreement, and filing a motion for Court approval in the next two weeks.  The motion will seek approval of the sale utilizing an overbid procedure, and the Receiver anticipates collecting the net proceeds from such sale by year end.

*Status as of December 10, 2009:*

The purchase and sale agreement was executed.  The due diligence period concluded on December 9, 2009 and it appeared that the buyer was withdrawing from the sale.  The Receiver gave a one day extension.  No overbids were received.  The Receiver was pursuing parallel paths in the event that the buyer did not perform including hiring counsel to petition the Department of Community Health for an extension and locating potential operators.  While the Receiver was in discussions with two potential operators, the risks associated operating a hospital, underscored by the defendants' prior unsuccessful operating the hospital which resulted in the loss of millions of dollars, appeared to be high.  The Receiver also continued to aggressively market the property for sale.

*Status as of January 11, 2010:*

The December, 2009 sale did not occur, as the Buyer withdrew.  The Receiver had discussions with a new potential buyer, and entered into a short term lease with the new party to facilitate a potential purchase.  The lease allowed the lessee time to apply for provisional license to operate, a critical step to keep the Certificate of Need, which was set to expire on January 16, 2010, active.  The Receiver's agents, as well as representatives of the new buyer, were in contact with the Department of Community Health with respect to a potential extension of the hospital's Certificate of Need.  The Receiver was negotiating an option agreement whereby the new buyer would have the option to purchase the property.  In the event the parties executed an agreement and the option to purchase is exercised, which would occur in the next few weeks, the Receiver anticipated immediately filing the necessary motion papers with the Court to approve the sale subject to an overbid process.

*Status as of February 10, 2010:*

The Department of Community Health allowed the Certificate of Need to expire.  However, the prospective buyers were in discussions with DCH to have consideration of a new application for a CON occur on an expedited basis.  The Receiver was negotiating a letter of intent to sell the facility to such buyers for a net price of $9.5 million subject to Court approval and an overbid procedure.  Once the LOI was signed, the Receiver's team anticipated negotiating the terms of a Purchase and Sale Agreement, and hoped that an agreement would be reached within the next few weeks.  The Receiver would then seek Court approval for the sale subject to overbid procedures.

*Status as of April 12, 2010:*

The Receiver executed a letter of intent for the sale of the facility for a net price of approximately $9.5 million, and negotiated the terms of a Purchase and Sale Agreement.  The Receiver expected to execute the final agreement shortly and would thereafter file the appropriate papers to obtain Court approval of the sale subject to overbid procedures.

*Status as of May 10, 2010:*

The Receiver entered into a Purchase and Sale Agreement for the facility with a purchase price of $9.5 million.  The Receiver anticipated filing the appropriate papers, seeking Court approval of overbid procedures and the sale, shortly.  The Receiver anticipated the hearing on the motion to approve the sale will take place on June 21, 2010.  The buyer provided an initial deposit of $50,000, with a further deposit required promptly after the hearing.  The Receiver continued to solicit overbidders through various marketing efforts.

*Status as of June 10, 2010:*

On May 21, 2010, the Receiver filed the appropriate papers seeking Court approval of proposed overbid procedures and the sale itself.  On June 2, 2010, the Court granted the ex parte application seeking approval of the overbid procedures.  The deadline for submission of overbids was June 16, 2010, and the hearing on the motion to approve the sale was set to occur on June 21, 2010.

 *Status as of August 10, 2010:*

Prior to the hearing on the sale approval motion, the parties to the action filed, and the Court approved, a stipulation continuing the hearing date to September 13, 2010.  The continuance was necessary to accommodate the buyer's financing, including financing from the Department of Housing and Urban Development, which was subject to unforeseen delays.  The Receiver anticipated that buyer's financing will be confirmed in advance of the new hearing date and that the hearing will go forward on September 13, 2010.

*Status as of October 11, 2010:*

The Georgia Department of Community Health (DCH) issued a unilateral extension of its deadline to complete review of the buyer's application for a Certificate of Need.  Buyer confirmed financing for the purchase, which was conditioned on obtaining a Certificate of Need.  Therefore, the parties stipulated to extend the hearing date on the Receiver's sale approval motion to October 18, 2010 to accommodate the DCH's need for additional time.  The Court had not yet ruled on the parties' stipulated request for a hearing continuance.

*Status as of December 10, 2010:*

The Georgia Department of Community Health denied buyer's application for a Certificate of Need.  The Receiver's motion to approve the sale was withdrawn, and the Receiver was negotiating an amended purchase agreement.  Buyer is appealing the denial of its application.

*Status as of March 10, 2011:*

An amended Purchase and Sale Agreement was executed.  Buyer continued to pursue its appeal of the denial of a Certificate of Need.  Once the appeal is determined, the Receiver will take appropriate action.

*Status as of April 11, 2011:*

Pursuant to the Amended Purchase and Sale Agreement, the buyer's non-refundable $100,000 earnest money deposit was turned over to the Receiver.  Buyer recently defaulted on its lease obligations, and the Receiver was taking appropriate actions to enforce the lease.  Attempts to find alternative buyers for overbids, or to purchase the property in the event the buyer cannot conclude the sale, were continuing.

*Status as of August 10, 2011:*

Buyer has withdrawn from the purchase transaction.  The Receiver has re-secured the property, and restarted direct sale marketing efforts.

*Status as of September 12, 2011:*

The Receiver entered into a listing agreement with new brokers to sell the property.  These efforts have resulted in a letter of intent to purchase the property for $6 million subject to Court approval and overbid.  There is no contingency for the buyer obtaining a Certificate of Need, nor is there a financing contingency.  Including a sixty day post Court approval appeal period, the Receiver anticipates closing the sale in approximately 180 days.

*Status as of November 10, 2011:*

The Receiver was working with the prospective buyer, however, the buyer had not executed the Purchase and Sale Agreement, and had not submitted its deposit.  Therefore, the Receiver could not predict the timing of an approval motion or potential closing of the sale.

*Status as of June 11, 2012:*

Given the prospective buyer's failure to execute an agreement or provide a deposit, the Receiver has engaged in discussions with additional parties.

*Status as of September 10, 2012:*

The Receiver received an offer to purchase and made a counteroffer.  The Receiver hopes to enter into a letter of intent within the next few weeks.

*Status as of October 10, 2012:*

The Receiver entered into a Purchase and Sale Agreement to sell the property for $5 million, subject to overbid and Court approval.  Due diligence was to be concluded in early November, after which the Receiver will file a motion to approve the sale.

*Status as of November 12, 2012:*

The due diligence period contemplated by the Purchase and Sale Agreement has expired.  The Receiver will be filing a motion to approve the sale, subject to overbid, in the next week, with a hearing to be set in December 2012.

*Status as of December 10, 2012:*

The Receiver's motion to approve the sale of Southwest Hospital was filed on November 16, 2012.  It was originally set to be heard on December 17, 2012.  Given the Court's unavailability on that date, the hearing was continued at the Court's request to December 27, 2012.

*Status as of January 10, 2013:*

The Court granted the Receiver's motion and approved the sale, which is expected to close in early March, 2013.

*Status as of February 11, 2013:*

The buyer requested an extension of the closing date for 45 days.  The Receiver agreed, conditioned upon payment of a fee of $10,000, an additional non-refundable deposit of $90,000, and Court approval.  An application requesting such approval was to be filed shortly.

*Status as of April 10, 2013:*

An application requesting approval of an amended sale agreement was filed, and was granted by the Court on February 15, 2013.  The buyer submitted $100,000 to the Receiver per the terms of the amended agreement.  The sale was expected to close in mid-April 2013.

*Status as of June 10, 2013:*

The sale closed in mid-April and the Receiver was paid the remainder of the purchase price.

*Status as of July 10, 2013:*

Inamax Medical Staffing, Inc. filed a motion for an order granting its lien priority over the lien of MPFC IV and Bank of New York Mellon.  The motion was fully briefed and set to be heard on July 15, 2013.

*Status as of June 10, 2014:*

The motion regarding lien priority filed by Inamax Medical Staffing, Inc. was taken under submission by the Court.

*Current Status:*

The Court granted the Inamax motion confirming its secured status.  The Receiver has issued supplemental checks to Inamax and another claimant affected by the Court's ruling.

**Parkway Hospital**

*Description:*

A non-operating hospital located in Queens, New York.

*The Receivership Entities Interest:*

MPFC III.2 and MPFC IV.2 provided Debtor-in-Possession ("DIP") financing to the hospital to allow it to exit bankruptcy and additional loans and lines of credit for operating capital and to acquire an ambulance company post-bankruptcy. The loans were secured by, among other things, real property, stock in the hospital's operating company and a personal guaranty by the company's owner, Dr. Aquino. The total loans and lines of credit extended to Parkway Hospital and Dr. Aquino totaled over $65 million.

*Status as of August 3, 2009*

The loans were in default, with an outstanding balance, including interest, of approximately $76 million. The hospital ceased operating in November 2008, upon the expiration of its operating license, pursuant to the recommendation of the Berger Commission and implementation by the New York State Department of Health ("DOH"), under a plan to streamline capacity and resources of the New York State healthcare system. Prior to the Receivership, MedCap had retained counsel to assist with getting a new Certificate of Need, which is a prerequisite to operate the hospital. The counsel's fees had not been paid.

*Status as of September 8, 2009:*

The Receiver had communicated with all interested parties and secured the hospital. The Receiver was investigating how best to maximize the value of this asset, including the possibility of either foreclosing on the collateral or taking a deed in lieu of foreclosure. The Receiver was also investigating whether to resume the application process for the necessary regulatory approvals to re-open the hospital.

*Status as of October 9, 2009:*

The Receiver confirmed that the collateral is insured. The Receiver was in discussions with representatives of the borrower who has filed suit in U.S. District Court seeking a preliminary injunction to force the State of New York Department of Health to restore Parkway Hospital's operating certificate. The Receiver reviewed Parkway's pleadings and considered intervening in the action, and considered other means of assisting the hospital in its efforts to obtain a new Certificate of Need. Obtaining the certificate would increase the likelihood the loan will be repaid. Alternatively, the value of the hospital would be maximized if foreclosure becomes necessary. The Receiver was also in the process of hiring New York counsel for a potential foreclosure action in the event such action was deemed appropriate.

*Status as of November 9, 2009:*

Borrower's motion for injunctive relief was denied by the U.S. District Court; however, Parkway has informed the Receiver that it intends to renew the motion based on newly discovered evidence.  The Receiver has retained New York counsel to commence a foreclosure action in the event Parkway is unsuccessful in its renewed motion for preliminary injunction or an acceptable proposal for workout of the loans is not received.

*Status as of December 10, 2009:*

The foreclosure action was proceeding.

*Status as of January 11, 2010:*

The Receiver was investigating sale of the note and was in discussions with one potential buyer.  The Receiver's counsel was working through complications with respect to foreclosure of the property.

*Status as of April 12, 2010:*

The Receiver continued to engage in discussions for the sale of MedCap's interest in Parkway, while simultaneously pursuing foreclosure of the real property.

*Status as of June 10, 2010:*

The Receiver was working with the trustee to obtain the necessary documentation to proceed with foreclosure.  The Receiver visited the property and took steps to maintain appropriate insurance on this asset.  The Receiver anticipated commencing foreclosure within the next 30-60 days.

*Status as of October 11, 2010:*

The Receiver's team continued to investigate and address title and bankruptcy issues that have prevented foreclosure proceedings from going forward, and expected foreclosure to be commenced shortly.  The Receiver received and was considering a proposal for a discounted loan payoff, and engaged in discussions with third parties as to the potential sale of MedCap's interest in Parkway.

*Status as of November 10, 2010:*

The Receiver's counsel filed appropriate papers in the pertinent bankruptcy actions seeking relief from stay to proceed with foreclosure.  Court action was expected in December.

*Status as of December 10, 2010:*

The bankruptcy court granted relief from stay, and foreclosure proceedings were to commence shortly.

*Status as of March 10, 2011:*

The foreclosure complaint was filed.  The Receiver continued discussions with potential purchasers of the loans or property.

*Status as of April 11, 2011:*

In the foreclosure action, the Receiver filed motions to dismiss and/or strike counterclaims filed by Parkway Acquisition.  As to the potential sale of the loans, the Receiver selected a stalking horse buyer and expected to enter into a Letter of Intent in the near future at a proposed sales price of $5,050,000.

*Status as of May 10, 2011:*

The Receiver entered into a Letter of Intent with the stalking horse buyer.  The Receiver negotiated a settlement with Century Ambulance concerning a deposit of MedCap funds made by Dr. Aquino for the purchase of licenses.  The Receiver expected to seek Court approval of the settlement, which would net $168,000 to the receivership estate, shortly.   The Receiver also filed an action in Nevada against Dr. Aquino on April 14, 2011.

*Status as of July 10, 2011:*

A new stalking horse buyer has been selected and has executed a Letter of Intent.  The Receiver expects to seek Court approval of the sale in the coming weeks.  The Court approved the Receiver's settlement concerning Century Ambulance, and the net proceeds should be received shortly.

*Status as of September 12, 2011:*

Proceeds of $168,000 were received as to the settlement with Century Ambulance.

*Status as of October 11, 2011:*

Due to delays caused by the prospective buyer, a Purchase and Sale Agreement has not yet been executed.  The Receiver continues discussions with the prospective buyer and other interested parties.

*Status as of January 10, 2012:*

The Receiver identified another buyer and a Purchase and Sale Agreement (subject to Court approval) was being negotiated at a purchase price of $6.2 with no due diligence period and a non-refundable deposit of $1 million due upon execution of the agreement.

*Status as of February 10, 2012:*

The Purchase and Sale Agreement has been completed and executed.  The Receiver has filed a motion for an order approving the sale, set to be heard on March 5, 2012, as well as an ex parte application for approval of overbid procedures.

*Status as of April 10, 2012*:

An overbid in the amount of $6.5 million was received, and there was no further bidding.  At the hearing on March 5, 2012, the Court approved the sale of the Parkway Hospital note to the overbidder.  An Amended Order approving the sale was entered on March 7, 2012.  The sale is expected to close within the next sixty days.

*Status as of March 11, 2013:*

The sale transaction closed on May 8, 2012, with the remaining $5.39 million of the purchase price deposited with the Receiver.  Dr. Aquino, against whom the Receiver obtained a default judgment in the amount of $26,000,000, declared bankruptcy on April 16, 2012.

*Status as of April 10, 2013:*

In the bankruptcy of related entity Capitol Health, a hearing was set for April 12, 2013 on a distribution motion.  The Receiver expected to receive a distribution of funds if the motion is granted.

*Current Status:*

In mid-April 2013, the Receiver received distributions from the Capitol Health bankruptcy estate totaling approximately $271,000.  One additional distribution is expected sometime in 2014.

## The Perfect Game

*Description:*

The Perfect Game is a feature film relating to a Little League team from Mexico that won the Little League World Series in 1957.

*The Receivership Entities' Interest:*

The film is owned by The Perfect Game, LLC ("TPG").  MPFC IV owns an approximate 39.3% economic interest in TPG and holds certain priority rights as to distribution of profits.  MCH holds 75% of the voting rights (separate from the economic interest held by MPFC IV) in TPG.  MPFC IV also made loans to TPG in the approximate total amount of over $18 million, secured by all of TPG's assets, including its rights in the film.

*Status as of August 3, 2009:*

The film was completed in 2008 and attempts were made to distribute it in the summer of 2008, which did not occur.  Various efforts to distribute the film thereafter also failed.  Continuing efforts to market and distribute the film had been undertaken by Christian Tureaud and David Salzburg, who are affiliated with High Road Entertainment Group, Inc. (an entity in which Medical Capital also holds a stake).  As of August 3rd, various entities and individuals claimed an interest in the film, and/or had claims related to the film.  In addition, money was needed to make prints and pay for advertising to facilitate domestic distribution.  A Mexican company that had certain distribution rights and possessed copies of the film was threatening to unilaterally release the film in Mexico if it was not paid certain amounts owed by TPG, which would likely have had a material adverse effect on the value of domestic distribution rights.

*Status as of September 8, 2009:*

The Receiver had communicated with the various parties claiming rights in the film and/or attempting to secure its distribution.  An investor was located to pay off the Mexican entity and avoid unilateral distribution in Mexico, thereby preserving the value of the domestic distribution rights, in exchange for foreign distribution rights.  The investor entity was also attempting to raise the money needed for prints and advertising necessary for domestic distribution.  The Receiver retained a consultant with extensive experience in the production and distribution of independent films to advise him as to all actions necessary to fully exploit the film and maximize the film's profits.

*Status as of October 9, 2009:*

The Receiver's team engaged in various discussions concerning exploitation of the film going forward.  The Receiver retained two individuals previously involved in the production of the film to provide continuing services for the film, including completion of production (i.e. finalizing prints, music, soundtrack, etc.), distribution and marketing.  The Receiver also negotiated an amendment to a prior agreement that addresses securing prints and advertising funds and domestic distribution of the film.  The Receiver anticipated finalizing the amendment and filing appropriate pleadings seeking Court approval of the amendment.  If sufficient prints and advertising money is timely raised, it is anticipated that foreign and domestic theatrical distribution of the film will occur in late spring 2010.

*Status as of December 10, 2009:*

The Receiver filed an ex parte application seeking Court approval of the amendment to the contract for prints and advertising funds and domestic distribution, which was granted.  The Receiver continued consulting with potential new sources of prints and advertising funds and domestic distribution and addressing various issues for finalizing and marketing the film.  The Receiver, with the assistance of his consultants, continued to work toward a spring 2010 release of the film.

*Status as of January 11, 2010:*

The Receiver was negotiating the terms of a domestic distribution agreement, which also addresses the funding of prints and advertising.  The Receiver anticipated executing the distribution agreement this week and seeking court approval of the agreement.  The film's release date of April 2, 2010 has been set.

*Status as of February 10, 2010:*

The Receiver completed negotiations and executed a Distribution Agreement.  The Distribution Agreement was approved by the Court and the Receiver's team continued to work toward the theatrical release of the film in April, 2010.

*Status as of March 10, 2010:*

The film remained on track to be released on April 2, 2010 in Mexico and April 16, 2010 in the United States.  The film was expected to be shown initially in approximately 450-525 theaters, with potential expansion thereafter, and previews of the film have been showing on over 1000 screens since December.  The Receiver and Coca Cola entered into a promotion and marketing agreement pursuant to which Coke will be permitted to use the name of the film and promote the film in its beverage sales, sales of Ole' Taco chips and other Coke-affiliated products.  The Receiver was also in discussions with certain merchandizing companies who have an interest in using the film to promote their products.  These agreements provide a cost free means of promoting and marketing the film and enhancing its success.

*Status as of April 12, 2010:*

The film held its World Premiere in Monterrey, Mexico on March 21, 2010, and was released in Mexico on April 2, 2010.  As of April 5, 2010, the film had box office receipts of over 10 million pesos in Mexico [note, this figure was erroneously identified as dollars in the prior report].  The U.S. Premiere was held on April 5, 2010 in Los Angeles, California, and the film will be released in the U.S. and Canada on April 16, 2010.  In addition to the previously mentioned marketing agreement with Coke, the Receiver's team has continued discussions with certain merchandizing companies who have an interest in using the film to promote their products.

*Status as of May 10, 2010:*

The film was released in the United States and Canada on April 16, 2010.  While box office receipts did not meet projections, the film was well received by critics.  The film continued to be shown in many theatres.  The distribution team is currently investigating and negotiating potential deals with a number of major distributors to exploit the film in the home entertainment market.

*Status as of June 30, 2010:*

Box office receipts did not meet projections and the Receiver does not expect a return from the theatrical sales of the film.  The distribution team continued to investigate and negotiate potential deals with a number of distributors to exploit the film in the home entertainment market in Mexico and domestically.

*Status as of July 12, 2010:*

The Receiver, amid concerns as to MIP Films' performance under the Court-approved Distribution Agreement, engaged in detailed discussions with MFP as to prints and advertising expenditures, box office receipts, unpaid vendor invoices and related issues.  The Receiver provided notice of his exercise of audit rights under the Distribution Agreement and planned to conduct an audit beginning on July 16, 2010.  The Receiver's team continued to work with MFP to explore home entertainment distribution options, including a conference call with MFP's proposed domestic DVD distributor.  Discussions as to home entertainment distribution were ongoing.

*Status as of August 10, 2010:*

The Receiver conducted an audit of MFP's books and records on July 16, 2010.  On July 26, 2010, based on the results of the audit and various other information concerning breaches of the Distribution Agreement, the Receiver provided notice of the termination of the agreement to MFP.  All rights in the film have reverted to TPG and the Receiver's team is evaluating various options for further exploitation of the film.

*Status as of October 11, 2010:*

Due to the failure of MFP to make certain payments due to the writer of the film, who also owns the life story rights of the individuals depicted in the film, TPG's right to exploit such life story rights via the film expired and reverted to the writer. The Receiver's team was negotiating with the writer concerning future exploitation of the film. TPG also filed a demand for arbitration against MFP concerning the termination of the Distribution Agreement.

*Status as of November 10, 2010:*

The Receiver was proceeding with the arbitration against MFP, which filed a counterclaim against TPG. An arbitrator was appointed and the claims were being finalized. The Receiver's team continued to negotiate with the writer and explore options for future exploitation of the film.

*Status as of January 10, 2011:*

TPG filed an answer to the counterclaim and participated in a scheduling conference with the Arbitrator. The arbitration hearing was set to begin on February 15, 2011. The parties were to conduct appropriate discovery in advance of the hearing. The Receiver's team continued to take all other necessary actions to protect the estate's interests in the film.

*Status as of April 11, 2011:*

On January 11, 2011, the Receiver filed an ex parte application seeking Court approval of new distribution agreements with Image Entertainment and Camelot Distribution Group, as well as a Reaquisition of Rights Agreement with the film's writer pursuant to which TPG acquired the life story rights of the individuals depicted in the film. The Court approved the application. With respect to the pending arbitration, MFP provided the Receiver with a written acknowledgment that TPG's July 26, 2010 termination of the Distribution Agreement based on MFP's breaches thereof was valid and effective. MFP also withdrew its answer to TPG's demand for arbitration, and dismissed its counterclaim against TPG (seeking damages of over $5 million) with prejudice. Based on MFP's unqualified acknowledgment as to the validity of the termination, the withdrawal of its answer and the dismissal of its counterclaim, the arbitrator determined that TPG had obtained all of the relief it sought, and dismissed the arbitration as moot. The arbitrator awarded TPG all of the costs it had incurred with respect to the arbitration.

*Status as of June 10, 2011:*

Home entertainment distribution of the film is expected to commence this summer. The Receiver's team has been forced to take various actions to protect the receivership estate's interest in the film, including actions in Mexico to prevent a terminated sub-distributor from distributing the film in the Mexican home entertainment market.

*Status as of July 10, 2011:*

The film is currently available to the home entertainment market in Mexico, and a domestic home entertainment release was expected in August.

*Status as of August 10, 2011:*

The film was released in the U.S. home entertainment market on August 2, 2011.  The final minimum guarantee payment from Image Entertainment is expected to be received shortly. Nominal additional revenues from the film have been received.

*Status as of December 12, 2011:*

The final minimum guarantee payment was received from Image Entertainment.  Recently, the Receiver's counsel obtained formal resolutions from the appropriate Mexican agency recognizing the Receiver's rights in the film.

*Status as of July 10, 2013:*

The final minimum guarantee payment for sub-distribution rights in Mexico was received from Camelot Distribution Group.

*Current Status:*

In July 2013, after issuing several letters to Camelot Distribution Group regarding its failure to provide quarterly reports and pay amounts due to TPG under the Distribution Agreement, the Receiver terminated the Distribution Agreement with Camelot.

## Other Assets Under Review

### Lavipharm

MPFC III made a loan of $30 million to Lavipharm Corporation/Lavipharm Laboratories, Inc. secured by stock warrants, patents, inventory and equipment, among other things.  Lavipharm is a pharmaceutical company that has developed a patented patch for the delivery of medication that is pending FDA approval.  A lump sum payment of $4.5 million was due on March 31, 2010 or five days after FDA regulatory approval, whichever is earlier.  The Receiver entered into a forbearance agreement with Lavipharm.  In September 2010, Lavipharm made the final of its six equal installment payments of $750,000, which payments have reduced the principal balance from $30 million to $25.5 million.  Pursuant to the terms of the forbearance agreement, the Repayment Period Commencement Date shall not be later than the date which is first to occur of (a) 90 days following the Commercial Launch Date, or (b) July 1, 2011.   The first of ten equal installment payments to pay off the balance of the note shall then be due 180 days after the Repayment Period Commencement Date and subsequent payments due every 180 days thereafter.  The Repayment Period Commencement Date may be extended for up to four three month periods upon the payment of $750,000 on the first day of each three month period extension.  On January 3, 2012, Lavipharm paid $750,000, thereby extending the Repayment Period Commencement Date.  Due to issues with the FDA approval process, Lavipharm has wound up its operations.  The Receiver is actively marketing the loan for sale.

### E Mark

MPFC  III made a loan to this internet advertising company.  The Receiver has found evidence that MedCap was allowing payments to be made to an account not controlled by MedCap.  Subpoenas to banks were issued and numerous documents were produced and analyzed by the Receiver.  The Receiver's investigation into this asset is ongoing.

### Pyramid Technologies, Inc.

MPFC IV made a loan to Pyramid Technologies secured by, among other things, stock and personal guaranties.  The loan is in default and there is an outstanding principal balance of approximately $14 million.  The Receiver is aware of a purported insurance claim, the proceeds of which were assigned to Medical Capital, and met with prospective counsel for the borrower in connection with a pending lawsuit between Pyramid and Hartford Insurance Company.  The Receiver filed a Complaint against Pyramid and various individuals on January 20, 2010.  The Receiver filed a Motion for Partial Summary Judgment which was granted by the Court.  The remaining claims were subsequently dismissed by the Court pursuant to the parties' stipulation.  The defendants filed a Notice of Appeal contesting various court rulings.  The appeal was subsequently dismissed for failure to file an opening brief.  The individual defendants filed bankruptcy, and the Receiver is pursuing an adversary action in the bankruptcy to declare the debt non-dischargeable.

## EXHIBIT B

**Financial Statements for the Receivership Estate
Through June 30, 2014**

**Medical Capital Holdings, Inc.**
# Monthly Profit & Loss
### June 2014

Cash Basis

|  | Jun 14 |
|---|---:|
| **Ordinary Income/Expense** | |
| **Income** | |
| **Account Receivable Collection** | 1,550.00 |
| **Loan Collections** | 8,178.77 |
| **Settlement Proceeds** | 665,000.00 |
| **Total Income** | 674,728.77 |
| **Gross Profit** | 674,728.77 |
| **Expense** | |
| **Bank Service Charges** | 234.90 |
| **Business Operating Expenses** | |
| **Outside Services** | 54.80 |
| **Rent Expense** | 1,441.40 |
| **Repair & Maintenance** | 806.25 |
| **Utilities** | 401.41 |
| **Total Business Operating Expenses** | 2,703.86 |
| **Computer and Internet Expenses** | 2,402.50 |
| **Dues and Subscriptions** | 3,160.00 |
| **Payroll Expenses** | |
| **Payroll and Taxes** | 5,158.34 |
| **Total Payroll Expenses** | 5,158.34 |
| **Postage and Delivery** | 16.83 |
| **Professional Fees** | |
| **Consultant/legal fees (misc)** | 18,583.00 |
| **Litigation Expense -Manatt** | 570.00 |
| **Litigation Expense -Sedgwick** | 10,142.50 |
| **Receiver's Counsel** | 163,180.15 |
| **Receiver's fees** | 121,215.60 |
| **Receiver's IT Consultant** | 52,301.76 |
| **Total Professional Fees** | 365,993.01 |
| **Total Expense** | 379,669.44 |
| **Net Ordinary Income** | 295,059.33 |
| **Other Income/Expense** | |
| **Other Income** | |
| **Interest Income** | 89.09 |
| **Total Other Income** | 89.09 |
| **Net Other Income** | 89.09 |
| **Net Income** | **295,148.42** |

## Medical Capital Holdings, Inc.
# ITD Profit & Loss
### August 3, 2009 through June 30, 2014

Cash Basis

| | Aug 3, '09 - Jun 30, 14 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Account Receivable Collection | 2,667,380.80 |
| Income Tax Refunds | 11,554,861.60 |
| Insurance Proceeds | 201,404.38 |
| Loan Collections | 14,999,513.43 |
| **Operating Company Revenue** | |
| NHBC Revenue | 20,787,479.75 |
| Perfect Game Revenue | 1,393,662.91 |
| Viva-Vision Revenue | 1,147,361.49 |
| **Total Operating Company Revenue** | 23,328,504.15 |
| Property Tax Refunds | 501,184.58 |
| Rental Income | 561,519.34 |
| Sale of Assets/Disposition | 115,840,807.69 |
| Settlement Proceeds | 1,981,572.50 |
| Turnover/Seizure | 4,550,029.73 |
| **Total Income** | 176,186,778.20 |
| **Gross Profit** | 176,186,778.20 |
| **Expense** | |
| Advertising and Promotion | 69,009.88 |
| Annual registration / renewal | 425.00 |
| Appraisal Fees | 126,614.34 |
| Bank Service Charges | 94,592.66 |
| BMS Distribution funding | 0.00 |
| **Business Operating Expenses** | |
| Business Licenses and Permits | 279,430.62 |
| Consulting services | 166,984.19 |
| Management fees | 209,518.48 |
| Outside Services | 1,121,958.71 |
| Rent Expense | 850,371.41 |
| Repair & Maintenance | 523,107.29 |
| Supplies | 29,214.12 |
| Utilities | 1,428,981.91 |
| **Total Business Operating Expenses** | 4,609,566.73 |
| Computer and Internet Expenses | 79,217.54 |
| Cost of sales | 3,500.00 |
| **Distributions to Claimants** | |
| Non-Priority -Employee Claimant | 38,682.80 |
| Non-Priority -Noteholders | 114,877,990.13 |
| Non-Priorty -Creditor | 1,703,807.95 |
| Priority -Creditors | 607,897.38 |
| Priority -Employee Claimants | 271,621.74 |
| **Total Distributions to Claimants** | 117,500,000.00 |
| Dues and Subscriptions | 6,809.95 |
| Employee moral | 1,450.00 |
| Home Stretch Other | 20,187.60 |
| Homestretch Slip rental | 93,221.47 |
| Homestretch Utilities | 24,297.47 |
| Insurance Expense | 816,832.00 |
| Liens & Debt payments | 1,854,055.21 |
| Moving & Storage | 12,466.92 |
| Office Supplies | 18,062.72 |
| **Operating Company Expense** | |
| **NHBC - Direct Expenses** | |
| Client fees | 1,069,844.83 |
| Client refunds | 61,531.22 |
| Commissions | 355,602.08 |
| Network fees | 6,829,526.29 |
| Office Expense | 83,817.23 |
| PEPM Network fee | 1,929,699.74 |
| **Total NHBC - Direct Expenses** | 10,330,021.39 |

-29-

**Medical Capital Holdings, Inc.**
# ITD Profit & Loss
### August 3, 2009 through June 30, 2014

Cash Basis

| | Aug 3, '09 - Jun 30, 14 |
|---|---|
| **Perfect Game Operating Expenses** | |
| Consultants - Entertainment | 343,981.06 |
| Consultants - Legal | 54,948.27 |
| Copyright & Licenses | 126,136.14 |
| Distribution Expenses | 375,425.92 |
| Materials | 10,387.00 |
| Operating Expenses | 24,385.31 |
| Rent | 88,136.43 |
| **Total Perfect Game Operating Expenses** | 1,023,400.13 |
| Viva Vision Revenue Sharing | 534,319.22 |
| **Total Operating Company Expense** | 11,887,740.74 |
| Operating Expenses | 431,577.76 |
| **Payroll Expenses** | |
| 401K | 223,667.89 |
| ADP Payroll Service | 50,890.13 |
| Medical Capital Payroll taxes | 1,804.97 |
| Medical Insurance | 628,984.48 |
| **Payroll and Taxes** | |
| Homestretch Crew | 91,717.00 |
| MCC | 2,677,714.44 |
| NHBC | 7,457,025.24 |
| Trace | 797,902.29 |
| Viva Vision | 321,879.39 |
| Payroll and Taxes - Other | 88,012.68 |
| **Total Payroll and Taxes** | 11,434,251.04 |
| **Total Payroll Expenses** | 12,339,598.51 |
| Postage and Delivery | 88,548.71 |
| Printing and Reproduction | 176,368.97 |
| **Professional Fees** | |
| Consultant/legal fees (misc) | 1,208,568.95 |
| Litigation Expense -Manatt | 1,242.84 |
| Litigation Expense -Sedgwick | 86,856.51 |
| Receiver's Counsel | 8,962,645.57 |
| Receiver's expenses | 82,056.58 |
| Receiver's fees | 4,220,964.57 |
| Receiver's IT Consultant | 2,307,581.36 |
| Tax professionals | 223,179.60 |
| **Total Professional Fees** | 17,093,095.98 |
| Radiation Monitoring | 2,712.89 |
| Security Services | 104,600.01 |
| **Taxes** | |
| Corporate Taxes | 222,567.89 |
| Property tax | 1,419,174.73 |
| **Total Taxes** | 1,641,742.62 |
| Telephone Expense | 758.05 |
| Travel Expense | 5,536.88 |
| Trustee fees & Expenses | 149,818.68 |
| **Total Expense** | 169,252,409.29 |
| **Net Ordinary Income** | 6,934,368.91 |
| **Other Income/Expense** | |
| **Other Income** | |
| Interest Income | 204,060.05 |
| **Total Other Income** | 204,060.05 |
| **Net Other Income** | 204,060.05 |
| **Net Income** | **7,138,428.96** |

# Medical Capital Holdings, Inc.
# Balance Sheet
### As of June 30, 2014

Cash Basis

| | Jun 30, 14 |
|---|---:|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| **BMS_RABO** | |
| RABO_Pay Agent Turnover_2872 | 302,405.60 |
| **Total BMS_RABO** | 302,405.60 |
| | |
| **EW Savings** | |
| EW MPFC 3, Series II | 252,928.33 |
| EW MPFC 5 | 252,928.33 |
| **Total EW Savings** | 505,856.66 |
| **ML_CDARS** | |
| ML MCH CDARS | 5,572,121.26 |
| **Total ML_CDARS** | 5,572,121.26 |
| **Wells Fargo** | |
| WF MCC/MCH Operating Acct. | 756,735.44 |
| **Total Wells Fargo** | 756,735.44 |
| **Total Checking/Savings** | 7,137,118.96 |
| **Total Current Assets** | 7,137,118.96 |
| **Other Assets** | |
| MCH Security Deposit | 1,310.00 |
| **Total Other Assets** | 1,310.00 |
| **TOTAL ASSETS** | **7,138,428.96** |
| **LIABILITIES & EQUITY** | |
| **Equity** | |
| Retained Earnings | 124,808,987.47 |
| Net Income | -117,670,558.51 |
| **Total Equity** | 7,138,428.96 |
| **TOTAL LIABILITIES & EQUITY** | **7,138,428.96** |

# Medical Capital Holdings, Inc.
## Monthly General Ledger
### As of June 30, 2014

**Cash Basis**

| Type | Date | Num | Name | Memo | Debit | Credit | Balance |
|------|------|-----|------|------|-------|--------|---------|
| **Bank of America - NHBC** | | | | | | | 0.00 |
| Total Bank of America - NHBC | | | | | | | 0.00 |
| **BMS_BNY BANK** | | | | | | | 0.00 |
| **BMS_MPFC 2_3771** | | | | | | | 0.00 |
| Total BMS_MPFC 2_3771 | | | | | | | 0.00 |
| **BMS_MPFC 3, Series I_3768** | | | | | | | 0.00 |
| Total BMS_MPFC 3, Series I_3768 | | | | | | | 0.00 |
| **BMS_MPFC 3, Series II_3769** | | | | | | | 0.00 |
| Total BMS_MPFC 3, Series II_3769 | | | | | | | 0.00 |
| **BMS_MPFC 6_3770** | | | | | | | 0.00 |
| Total BMS_MPFC 6_3770 | | | | | | | 0.00 |
| **BMS_MPFC_5_3767** | | | | | | | 0.00 |
| Total BMS_MPFC_5_3767 | | | | | | | 0.00 |
| **BMS_Operating Account** | | | | | | | 0.00 |
| Total BMS_Operating Account | | | | | | | 0.00 |
| **BMS_Pay Agent Turnover_3772** | | | | | | | 0.00 |
| Total BMS_Pay Agent Turnover_3772 | | | | | | | 0.00 |
| **BMS_BNY BANK - Other** | | | | | | | 0.00 |
| Total BMS_BNY BANK - Other | | | | | | | 0.00 |
| Total BMS_BNY BANK | | | | | | | 0.00 |
| **BMS_RABO** | | | | | | | 302,405.60 |
| **RABO-MCC/MCH Holding Acct_2873** | | | | | | | 0.00 |
| Total RABO-MCC/MCH Holding Acct_2873 | | | | | | | 0.00 |
| **RABO-Payroll Account** | | | | | | | 0.00 |
| Total RABO-Payroll Account | | | | | | | 0.00 |
| **RABO Payroll Account _2874** | | | | | | | 0.00 |
| Total RABO Payroll Account _2874 | | | | | | | 0.00 |
| **RABO_MPFC 2_2871** | | | | | | | 0.00 |
| Total RABO_MPFC 2_2871 | | | | | | | 0.00 |
| **RABO_MPFC 3, Series I_2868** | | | | | | | 0.00 |
| Total RABO_MPFC 3, Series I_2868 | | | | | | | 0.00 |
| **RABO_MPFC 3, Series II_2869** | | | | | | | 0.00 |
| Total RABO_MPFC 3, Series II_2869 | | | | | | | 0.00 |
| **RABO_MPFC 5_2867** | | | | | | | 0.00 |
| Total RABO_MPFC 5_2867 | | | | | | | 0.00 |
| **RABO_MPFC 6_2870** | | | | | | | 0.00 |
| Total RABO_MPFC 6_2870 | | | | | | | 0.00 |
| **RABO_Operating Account_2866** | | | | | | | 0.00 |
| Total RABO_Operating Account_2866 | | | | | | | 0.00 |
| **RABO_Pay Agent Turnover_2872** | | | | | | | 302,405.60 |
| Total RABO_Pay Agent Turnover_2872 | | | | | | | 302,405.60 |
| **BMS_RABO - Other** | | | | | | | 0.00 |
| Total BMS_RABO - Other | | | | | | | 0.00 |
| Total BMS_RABO | | | | | | | 302,405.60 |
| **CNB** | | | | | | | 0.00 |
| Total CNB | | | | | | | 0.00 |
| **Comerica** | | | | | | | 0.00 |

# Medical Capital Holdings, Inc.
# Monthly General Ledger
### As of June 30, 2014

**Cash Basis**

| Type | Date | Num | Name | Memo | Debit | Credit | Balance |
|---|---|---|---|---|---|---|---|
| Total Comerica | | | | | | | 0.00 |
| **EW Savings** | | | | | | | 505,772.92 |
| **EW MPFC 3, Series II** | | | | | | | 252,886.46 |
| Deposit | 6/30/2014 | | | Deposit | 41.87 | | 252,928.33 |
| Total EW MPFC 3, Series II | | | | | 41.87 | 0.00 | 252,928.33 |
| **EW MPFC 5** | | | | | | | 252,886.46 |
| Deposit | 6/30/2014 | | | Deposit | 41.87 | | 252,928.33 |
| Total EW MPFC 5 | | | | | 41.87 | 0.00 | 252,928.33 |
| **EW Savings - Other** | | | | | | | 0.00 |
| Total EW Savings - Other | | | | | | | 0.00 |
| Total EW Savings | | | | | 83.74 | 0.00 | 505,856.66 |
| **ML_CDARS** | | | | | | | 5,572,115.91 |
| **ML MCH CDARS** | | | | | | | 5,572,115.91 |
| Deposit | 6/30/2014 | | | Deposit | 5.35 | | 5,572,121.26 |
| Total ML MCH CDARS | | | | | 5.35 | 0.00 | 5,572,121.26 |
| **ML MPFC 2, CDARS** | | | | | | | 0.00 |
| Total ML MPFC 2, CDARS | | | | | | | 0.00 |
| **ML MPFC 3, Series I, CDARS** | | | | | | | 0.00 |
| Total ML MPFC 3, Series I, CDARS | | | | | | | 0.00 |
| **ML MPFC 3, Series II, CDARS** | | | | | | | 0.00 |
| Total ML MPFC 3, Series II, CDARS | | | | | | | 0.00 |
| **ML MPFC 5, CDARS** | | | | | | | 0.00 |
| Total ML MPFC 5, CDARS | | | | | | | 0.00 |
| **ML_CDARS - Other** | | | | | | | 0.00 |
| Total ML_CDARS - Other | | | | | | | 0.00 |
| Total ML_CDARS | | | | | 5.35 | 0.00 | 5,572,121.26 |
| **Wells Fargo** | | | | | | | 461,676.11 |
| **WF MCC/MCH Operating Acct.** | | | | | | | 461,676.11 |
| Check | 6/3/2014 | 2099 | Thomas Seaman Co... | May 2014 Fedex reimburs... | | 16.83 | 461,659.28 |
| Check | 6/3/2014 | 2103 | Thomas Seaman Co... | May 2014 PACER Reimb... | | 54.80 | 461,604.48 |
| Check | 6/3/2014 | 2100 | Orange County Netw... | multiple invoices | | 1,452.50 | 460,151.98 |
| Check | 6/3/2014 | 2101 | CA EDD | State ID 025-1711-8, Q1 ... | | 5,158.34 | 454,993.64 |
| Check | 6/3/2014 | 2102 | Huron Consulting Gro... | Inv# 1034391, services re... | | 52,301.76 | 402,691.88 |
| Check | 6/10/2014 | 2104 | Lexis Nexis Risk Ass... | Account 115439, Invoice ... | | 2,620.50 | 400,071.38 |
| Check | 6/10/2014 | 2105 | WTI Communications | Account #90190 6/1/14 in... | | 181.93 | 399,889.45 |
| Check | 6/11/2014 | 2106 | Lexis Nexis Risk Ass... | Account 115439, Invoice ... | | 539.50 | 399,349.95 |
| Check | 6/11/2014 | | | Service Charge | | 234.90 | 399,115.05 |
| Check | 6/12/2014 | Wire | Trachenberg Rodes &... | 7th Interim Fee Application | | 7,230.47 | 391,884.58 |
| Check | 6/12/2014 | 2107 | Jetty Electric Inc. | Inv #9148 -Santa Ana offi... | | 806.25 | 391,078.33 |
| Deposit | 6/13/2014 | | | Deposit | 665,000.00 | | 1,056,078.33 |
| Check | 6/13/2014 | 2108 | The Sall Law Firm | Retainer for Seaman vs. ... | | 10,000.00 | 1,046,078.33 |
| Check | 6/13/2014 | 2109 | Irvine Self Storage | Unit C196 July 2014 | | 81.40 | 1,045,996.93 |
| Check | 6/16/2014 | 2110 | Southern California E... | Acct# 2-31-868-1665 | | 219.48 | 1,045,777.45 |
| Check | 6/17/2014 | 2111 | Orange County Netw... | multiple invoices | | 1,662.50 | 1,044,114.95 |
| Check | 6/18/2014 | 2112 | Thomas Seaman Co... | 17th Interim Fee Application | | 121,215.60 | 922,899.35 |
| Check | 6/18/2014 | Wire | Allen Matkins | 17th Interim Fee Application | | 155,949.68 | 766,949.67 |
| Check | 6/23/2014 | 2113 | Martin Investment Co... | Unit # 001006-11-CU, Jul... | | 1,360.00 | 765,589.67 |
| Deposit | 6/23/2014 | | | Deposit | 9,728.77 | | 775,318.44 |
| Check | 6/26/2014 | 2114 | Upstream Partners, Inc. | Inv # ThomasSeam-14-00... | | 17,500.00 | 757,818.44 |
| Check | 6/30/2014 | 2115 | Zabel Freeman | Inv # 5373 -Trace Life Sci... | | 1,083.00 | 756,735.44 |
| Total WF MCC/MCH Operating Acct. | | | | | 674,728.77 | 379,669.44 | 756,735.44 |
| **WF MCC/MCH Payroll Acct.** | | | | | | | 0.00 |
| Total WF MCC/MCH Payroll Acct. | | | | | | | 0.00 |
| **WF MPFC 1** | | | | | | | 0.00 |
| Total WF MPFC 1 | | | | | | | 0.00 |

# Medical Capital Holdings, Inc.
# Monthly General Ledger
### As of June 30, 2014

Cash Basis

| Type | Date | Num | Name | Memo | Debit | Credit | Balance |
|------|------|-----|------|------|-------|--------|---------|
| **WF MPFC 2** | | | | | | | 0.00 |
| Total WF MPFC 2 | | | | | | | 0.00 |
| **WF MPFC 2_Treasury** | | | | | | | 0.00 |
| Total WF MPFC 2_Treasury | | | | | | | 0.00 |
| **WF MPFC 3, Series I_#5647** | | | | | | | 0.00 |
| Total WF MPFC 3, Series I_#5647 | | | | | | | 0.00 |
| **WF MPFC 3, Series II_#5654** | | | | | | | 0.00 |
| Total WF MPFC 3, Series II_#5654 | | | | | | | 0.00 |
| **WF MPFC 4, Series I_#5613** | | | | | | | 0.00 |
| Total WF MPFC 4, Series I_#5613 | | | | | | | 0.00 |
| **WF MPFC 4, Series II_5621** | | | | | | | 0.00 |
| Total WF MPFC 4, Series II_5621 | | | | | | | 0.00 |
| **WF MPFC 5** | | | | | | | 0.00 |
| Total WF MPFC 5 | | | | | | | 0.00 |
| **WF MPFC 6** | | | | | | | 0.00 |
| Total WF MPFC 6 | | | | | | | 0.00 |
| **WF NHBC - AP Disbursement Act** | | | | | | | 0.00 |
| Total WF NHBC - AP Disbursement Act | | | | | | | 0.00 |
| **WF NHBC - Operating Acct.** | | | | | | | 0.00 |
| Total WF NHBC - Operating Acct. | | | | | | | 0.00 |
| **WF NHBC - Payroll** | | | | | | | 0.00 |
| Total WF NHBC - Payroll | | | | | | | 0.00 |
| **WF Viva-Vision Operating Acct.** | | | | | | | 0.00 |
| Total WF Viva-Vision Operating Acct. | | | | | | | 0.00 |
| **Wells Fargo - Other** | | | | | | | 0.00 |
| Total Wells Fargo - Other | | | | | | | 0.00 |
| Total Wells Fargo | | | | | | 674,728.77 | 379,669.44 | 756,735.44 |
| **WF MPFC 3, Series I_Treasury** | | | | | | | 0.00 |
| Total WF MPFC 3, Series I_Treasury | | | | | | | 0.00 |
| **WF MPFC 3, Series II_Treasury** | | | | | | | 0.00 |
| Total WF MPFC 3, Series II_Treasury | | | | | | | 0.00 |
| **WF MPFC 4, Series I_Treasury** | | | | | | | 0.00 |
| Total WF MPFC 4, Series I_Treasury | | | | | | | 0.00 |
| **WF MPFC 5_Treasury** | | | | | | | 0.00 |
| Total WF MPFC 5_Treasury | | | | | | | 0.00 |
| **WF NHBC - Cigna Holding account** | | | | | | | 0.00 |
| Total WF NHBC - Cigna Holding account | | | | | | | 0.00 |
| **WF Viva-Vision AP disbursement** | | | | | | | 0.00 |
| Total WF Viva-Vision AP disbursement | | | | | | | 0.00 |
| **WF Viva-Vision Payroll Acct.** | | | | | | | 0.00 |
| Total WF Viva-Vision Payroll Acct. | | | | | | | 0.00 |
| **Accounts Receivable** | | | | | | | 0.00 |
| Total Accounts Receivable | | | | | | | 0.00 |
| **BMS_Transfer Clearing Account** | | | | | | | 0.00 |
| Total BMS_Transfer Clearing Account | | | | | | | 0.00 |
| **Earnest Money Deposit Refund** | | | | | | | 0.00 |

# Medical Capital Holdings, Inc.
# Monthly General Ledger
### As of June 30, 2014

**Cash Basis**

| Type | Date | Num | Name | Memo | Debit | Credit | Balance |
|------|------|-----|------|------|-------|--------|---------|
| Total Earnest Money Deposit Refund | | | | | | | 0.00 |
| **NOT USED - MPFC 5, Loan to NHBC** | | | | | | | 0.00 |
| Total NOT USED - MPFC 5, Loan to NHBC | | | | | | | 0.00 |
| **Undeposited Funds** | | | | | | | 0.00 |
| Total Undeposited Funds | | | | | | | 0.00 |
| **Accumulated Depreciation** | | | | | | | 0.00 |
| Total Accumulated Depreciation | | | | | | | 0.00 |
| **Furniture and Equipment** | | | | | | | 0.00 |
| Total Furniture and Equipment | | | | | | | 0.00 |
| **MCC Loan to MPFC 3, I** | | | | | | | 0.00 |
| Total MCC Loan to MPFC 3, I | | | | | | | 0.00 |
| **MCC Loan to MPFC 4, I** | | | | | | | 0.00 |
| Total MCC Loan to MPFC 4, I | | | | | | | 0.00 |
| **MCC Loan to MPFC 4, II** | | | | | | | 0.00 |
| Total MCC Loan to MPFC 4, II | | | | | | | 0.00 |
| **MCH Security Deposit** | | | | | | | 1,310.00 |
| Total MCH Security Deposit | | | | | | | 1,310.00 |
| **MPFC 2, Loan to MCC** | | | | | | | 0.00 |
| Total MPFC 2, Loan to MCC | | | | | | | 0.00 |
| **MPFC 2, Loan to MPFC 4, II** | | | | | | | 0.00 |
| Total MPFC 2, Loan to MPFC 4, II | | | | | | | 0.00 |
| **MPFC 3, I Loan to MCC** | | | | | | | 0.00 |
| Total MPFC 3, I Loan to MCC | | | | | | | 0.00 |
| **MPFC 3, II Loan to MCC** | | | | | | | 0.00 |
| Total MPFC 3, II Loan to MCC | | | | | | | 0.00 |
| **MPFC 4, I Loan to MPFC 4, II** | | | | | | | 0.00 |
| Total MPFC 4, I Loan to MPFC 4, II | | | | | | | 0.00 |
| **MPFC 5, Loan to MPFC 4, II** | | | | | | | 0.00 |
| Total MPFC 5, Loan to MPFC 4, II | | | | | | | 0.00 |
| **MPFC 5, Loan to NHBC** | | | | | | | 0.00 |
| Total MPFC 5, Loan to NHBC | | | | | | | 0.00 |
| **NHBC Loan to MCC** | | | | | | | 0.00 |
| Total NHBC Loan to MCC | | | | | | | 0.00 |
| **Utility Security Deposit** | | | | | | | 0.00 |
| Total Utility Security Deposit | | | | | | | 0.00 |
| **Accounts Payable** | | | | | | | 0.00 |
| Total Accounts Payable | | | | | | | 0.00 |
| **MCC loan from MPFC 2** | | | | | | | 0.00 |
| Total MCC loan from MPFC 2 | | | | | | | 0.00 |
| **MCC loan from MPFC 3 I** | | | | | | | 0.00 |
| Total MCC loan from MPFC 3 I | | | | | | | 0.00 |
| **MCC loan from MPFC 3 II** | | | | | | | 0.00 |
| Total MCC loan from MPFC 3 II | | | | | | | 0.00 |
| **MCC Loan from NHBC** | | | | | | | 0.00 |
| Total MCC Loan from NHBC | | | | | | | 0.00 |
| **MPFC 3, I Loan from MCC** | | | | | | | 0.00 |

# Medical Capital Holdings, Inc.
# Monthly General Ledger
### As of June 30, 2014

**Cash Basis**

| Type | Date | Num | Name | Memo | Debit | Credit | Balance |
|------|------|-----|------|------|-------|--------|---------|
| Total MPFC 3, I Loan from MCC | | | | | | | 0.00 |
| **MPFC 4, I Loan from MCC** | | | | | | | 0.00 |
| Total MPFC 4, I Loan from MCC | | | | | | | 0.00 |
| **MPFC 4, II Loan from MCC** | | | | | | | 0.00 |
| Total MPFC 4, II Loan from MCC | | | | | | | 0.00 |
| **MPFC 4, II Loan from MPFC 2** | | | | | | | 0.00 |
| Total MPFC 4, II Loan from MPFC 2 | | | | | | | 0.00 |
| **MPFC 4, II Loan from MPFC 4, I** | | | | | | | 0.00 |
| Total MPFC 4, II Loan from MPFC 4, I | | | | | | | 0.00 |
| **MPFC 4, II Loan from MPFC 5** | | | | | | | 0.00 |
| Total MPFC 4, II Loan from MPFC 5 | | | | | | | 0.00 |
| **NHBC Loan from MPFC 5** | | | | | | | 0.00 |
| Total NHBC Loan from MPFC 5 | | | | | | | 0.00 |
| **Payroll Liabilities** | | | | | | | 0.00 |
| Total Payroll Liabilities | | | | | | | 0.00 |
| **Pre-Paid Legal Fees** | | | | | | | 0.00 |
| Total Pre-Paid Legal Fees | | | | | | | 0.00 |
| **Security deposits held** | | | | | | | 0.00 |
| Total Security deposits held | | | | | | | 0.00 |
| **Capital Stock** | | | | | | | 0.00 |
| Total Capital Stock | | | | | | | 0.00 |
| **Dividends Paid** | | | | | | | 0.00 |
| Total Dividends Paid | | | | | | | 0.00 |
| **Opening Balance Equity** | | | | | | | 0.00 |
| Total Opening Balance Equity | | | | | | | 0.00 |
| **Retained Earnings** | | | | | | | -124,808,987.47 |
| Total Retained Earnings | | | | | | | -124,808,987.47 |
| **Account Receivable Collection** | | | | | | | -9,300.00 |
| Deposit | 6/23/2014 | 2265 | Mobile Medic/Haidar | 19th Installment | | 1,050.00 | -10,350.00 |
| Deposit | 6/23/2014 | 462 | Matilda C. Garcia | Bethesda Pediatrics | | 500.00 | -10,850.00 |
| Total Account Receivable Collection | | | | | 0.00 | 1,550.00 | -10,850.00 |
| **Brooklin Psychiatric Center INC** | | | | | | | 0.00 |
| Total Brooklin Psychiatric Center INC | | | | | | | 0.00 |
| **Commission Income** | | | | | | | 0.00 |
| Total Commission Income | | | | | | | 0.00 |
| **Film Proceeds** | | | | | | | 0.00 |
| Total Film Proceeds | | | | | | | 0.00 |
| **Income Tax Refunds** | | | | | | | -89,398.51 |
| Total Income Tax Refunds | | | | | | | -89,398.51 |
| **Insurance Proceeds** | | | | | | | 0.00 |
| Total Insurance Proceeds | | | | | | | 0.00 |
| **Loan Collections** | | | | | | | -54,267.33 |
| Deposit | 6/23/2014 | 14198 | Anthony Macaluso | Single Touch Interactive (... | | 5,171.90 | -59,439.23 |
| Deposit | 6/23/2014 | 567072 | Anthony Macaluso | Wells Fargo (Levy) | | 3,006.87 | -62,446.10 |
| Total Loan Collections | | | | | 0.00 | 8,178.77 | -62,446.10 |
| **Operating Company Revenue** | | | | | | | -202,257.83 |
| **NHBC Revenue** | | | | | | | |
| Total NHBC Revenue | | | | | | | 0.00 |

# Medical Capital Holdings, Inc.
# Monthly General Ledger
## As of June 30, 2014

Cash Basis

| Type | Date | Num | Name | Memo | Debit | Credit | Balance |
|------|------|-----|------|------|-------|--------|---------|
| **Perfect Game Revenue** | | | | | | | -202,257.83 |
| Total Perfect Game Revenue | | | | | | | -202,257.83 |
| **Viva-Vision Revenue** | | | | | | | 0.00 |
| Total Viva-Vision Revenue | | | | | | | 0.00 |
| **Operating Company Revenue - Other** | | | | | | | 0.00 |
| Total Operating Company Revenue - Other | | | | | | | 0.00 |
| Total Operating Company Revenue | | | | | | | -202,257.83 |
| **Property Tax Refunds** | | | | | | | 0.00 |
| Total Property Tax Refunds | | | | | | | 0.00 |
| **Rental Income** | | | | | | | 0.00 |
| Total Rental Income | | | | | | | 0.00 |
| **Royalties - Perfect Game** | | | | | | | 0.00 |
| Total Royalties - Perfect Game | | | | | | | 0.00 |
| **Sale of Assets/Disposition** | | | | | | | 0.00 |
| Total Sale of Assets/Disposition | | | | | | | 0.00 |
| **Services Income** | | | | | | | 0.00 |
| Total Services Income | | | | | | | 0.00 |
| **Settlement Proceeds** | | | | | | | 0.00 |
| Deposit | 6/13/2014 | 7016 | Fazio, Kysky Associat... | Fazio settlement proceeds | | 665,000.00 | -665,000.00 |
| Total Settlement Proceeds | | | | | 0.00 | 665,000.00 | -665,000.00 |
| **Turnover/Seizure** | | | | | | | 0.00 |
| Total Turnover/Seizure | | | | | | | 0.00 |
| **Unclassified Income** | | | | | | | 0.00 |
| Total Unclassified Income | | | | | | | 0.00 |
| **Revenue Sharing - Viva Vision** | | | | | | | 0.00 |
| Total Revenue Sharing - Viva Vision | | | | | | | 0.00 |
| **Advertising and Promotion** | | | | | | | 0.00 |
| Total Advertising and Promotion | | | | | | | 0.00 |
| **Annual registration / renewal** | | | | | | | 0.00 |
| Total Annual registration / renewal | | | | | | | 0.00 |
| **Appraisal Fees** | | | | | | | 0.00 |
| Total Appraisal Fees | | | | | | | 0.00 |
| **Automobile Expense** | | | | | | | 0.00 |
| Total Automobile Expense | | | | | | | 0.00 |
| **Bank Service Charges** | | | | | | | 1,609.92 |
| Check | 6/11/2014 | | | Service Charge | 234.90 | | 1,844.82 |
| Total Bank Service Charges | | | | | 234.90 | 0.00 | 1,844.82 |
| **BMS Distribution funding** | | | | | | | 0.00 |
| Total BMS Distribution funding | | | | | | | 0.00 |
| **Business Analyst Consulting** | | | | | | | 0.00 |
| Total Business Analyst Consulting | | | | | | | 0.00 |
| **Business Operating Expenses** | | | | | | | 22,536.18 |
| **Business Licenses and Permits** | | | | | | | 1,199.00 |
| Total Business Licenses and Permits | | | | | | | 1,199.00 |
| **Consulting services** | | | | | | | 0.00 |
| Total Consulting services | | | | | | | 0.00 |
| **Management fees** | | | | | | | 0.00 |

# Medical Capital Holdings, Inc.
## Monthly General Ledger
### As of June 30, 2014

**Cash Basis**

| Type | Date | Num | Name | Memo | Debit | Credit | Balance |
|------|------|-----|------|------|-------|--------|---------|
| **Total Management fees** | | | | | | | 0.00 |
| **Outside Services** | | | | | | | 2,536.83 |
| Check | 6/3/2014 | 2103 | Thomas Seaman Co... | Court document filing fee ... | 54.80 | | 2,591.63 |
| Total Outside Services | | | | | 54.80 | 0.00 | 2,591.63 |
| **Rent Expense** | | | | | | | 7,575.29 |
| Check | 6/13/2014 | 2109 | Irvine Self Storage | Unit C196 July 2014 | 81.40 | | 7,656.69 |
| Check | 6/23/2014 | 2113 | Martin Investment Co... | Unit # 001006-11-CU, Jul... | 1,360.00 | | 9,016.69 |
| Total Rent Expense | | | | | 1,441.40 | 0.00 | 9,016.69 |
| **Repair & Maintenance** | | | | | | | 392.39 |
| Check | 6/12/2014 | 2107 | Jetty Electric Inc. | Inv #9148 -Santa Ana offi... | 806.25 | | 1,198.64 |
| Total Repair & Maintenance | | | | | 806.25 | 0.00 | 1,198.64 |
| **Supplies** | | | | | | | 0.00 |
| Total Supplies | | | | | | | 0.00 |
| **Utilities** | | | | | | | 10,832.67 |
| Check | 6/10/2014 | 2105 | WTI Communications | Account #90190 6/1/14 in... | 181.93 | | 11,014.60 |
| Check | 6/16/2014 | 2110 | Southern California E... | Acct# 2-31-868-1665 | 219.48 | | 11,234.08 |
| Total Utilities | | | | | 401.41 | 0.00 | 11,234.08 |
| **Business Operating Expenses - Other** | | | | | | | 0.00 |
| Total Business Operating Expenses - Other | | | | | | | 0.00 |
| Total Business Operating Expenses | | | | | 2,703.86 | 0.00 | 25,240.04 |
| **Computer and Internet Expenses** | | | | | | | 2,042.50 |
| Check | 6/3/2014 | 2100 | Orange County Netw... | Invoice 7602 | 475.00 | | 2,517.50 |
| Check | 6/3/2014 | 2100 | Orange County Netw... | Invoice 7600 | 332.50 | | 2,850.00 |
| Check | 6/3/2014 | 2100 | Orange County Netw... | Invoice 7597 | 95.00 | | 2,945.00 |
| Check | 6/3/2014 | 2100 | Orange County Netw... | Invoice 7592 | 170.00 | | 3,115.00 |
| Check | 6/3/2014 | 2100 | Orange County Netw... | Invoice 7587 | 380.00 | | 3,495.00 |
| Check | 6/17/2014 | 2111 | Orange County Netw... | Invoice 7631 | 142.50 | | 3,637.50 |
| Check | 6/17/2014 | 2111 | Orange County Netw... | Invoice 7632 | 142.50 | | 3,780.00 |
| Check | 6/17/2014 | 2111 | Orange County Netw... | Invoice 7641 | 285.00 | | 4,065.00 |
| Check | 6/17/2014 | 2111 | Orange County Netw... | Invoice 7647 | 237.50 | | 4,302.50 |
| Check | 6/17/2014 | 2111 | Orange County Netw... | Invoice 7634 | 142.50 | | 4,445.00 |
| Total Computer and Internet Expenses | | | | | 2,402.50 | 0.00 | 4,445.00 |
| **Continuing Education** | | | | | | | 0.00 |
| Total Continuing Education | | | | | | | 0.00 |
| **Cost of sales** | | | | | | | 0.00 |
| Total Cost of sales | | | | | | | 0.00 |
| **Depreciation Expense** | | | | | | | 0.00 |
| Total Depreciation Expense | | | | | | | 0.00 |
| **Distributions to Claimants** | | | | | | | 117,300,000.00 |
| **Non-Priority -Employee Claimant** | | | | | | | 38,682.80 |
| Total Non-Priority -Employee Claimant | | | | | | | 38,682.80 |
| **Non-Priority -Noteholders** | | | | | | | 114,877,990.13 |
| Total Non-Priority -Noteholders | | | | | | | 114,877,990.13 |
| **Non-Priorty -Creditor** | | | | | | | 1,703,807.95 |
| Total Non-Priorty -Creditor | | | | | | | 1,703,807.95 |
| **Priority -Creditors** | | | | | | | 607,897.38 |
| Total Priority -Creditors | | | | | | | 607,897.38 |
| **Priority -Employee Claimants** | | | | | | | 71,621.74 |
| Total Priority -Employee Claimants | | | | | | | 71,621.74 |
| **Distributions to Claimants - Other** | | | | | | | 0.00 |
| Total Distributions to Claimants - Other | | | | | | | 0.00 |

**Medical Capital Holdings, Inc.**
# Monthly General Ledger
### As of June 30, 2014

**Cash Basis**

| Type | Date | Num | Name | Memo | Debit | Credit | Balance |
|------|------|-----|------|------|-------|--------|---------|
| Total Distributions to Claimants | | | | | | | 117,300,000.00 |
| **Dues and Subscriptions** | | | | | | | 189.00 |
| Check | 6/10/2014 | 2104 | Lexis Nexis Risk Ass... | Account 115439, Invoice ... | 2,620.50 | | 2,809.50 |
| Check | 6/11/2014 | 2106 | Lexis Nexis Risk Ass... | Account 115439, Invoice ... | 539.50 | | 3,349.00 |
| Total Dues and Subscriptions | | | | | 3,160.00 | 0.00 | 3,349.00 |
| **Earnest Money Deposi** | | | | | | | 0.00 |
| Total Earnest Money Deposi | | | | | | | 0.00 |
| **Employee moral** | | | | | | | 0.00 |
| Total Employee moral | | | | | | | 0.00 |
| **Facility Maintenance** | | | | | | | 0.00 |
| Total Facility Maintenance | | | | | | | 0.00 |
| **Home Stretch Other** | | | | | | | 0.00 |
| Total Home Stretch Other | | | | | | | 0.00 |
| **Homestretch Slip rental** | | | | | | | 0.00 |
| Total Homestretch Slip rental | | | | | | | 0.00 |
| **Homestretch Utilities** | | | | | | | 0.00 |
| Total Homestretch Utilities | | | | | | | 0.00 |
| **Insurance Expense** | | | | | | | -4,789.74 |
| Total Insurance Expense | | | | | | | -4,789.74 |
| **Interest Expense** | | | | | | | 0.00 |
| Total Interest Expense | | | | | | | 0.00 |
| **Legal Fees** | | | | | | | 0.00 |
| Total Legal Fees | | | | | | | 0.00 |
| **Liens & Debt payments** | | | | | | | 0.00 |
| Total Liens & Debt payments | | | | | | | 0.00 |
| **Movie Screening** | | | | | | | 0.00 |
| Total Movie Screening | | | | | | | 0.00 |
| **Moving & Storage** | | | | | | | 0.00 |
| Total Moving & Storage | | | | | | | 0.00 |
| **Office Supplies** | | | | | | | 988.00 |
| Total Office Supplies | | | | | | | 988.00 |
| **Operating Company Expense** | | | | | | | 16,136.26 |
| **NHBC - Direct Expenses** | | | | | | | -1.18 |
| **Client fees** | | | | | | | -1.18 |
| Total Client fees | | | | | | | -1.18 |
| **Client refunds** | | | | | | | 0.00 |
| Total Client refunds | | | | | | | 0.00 |
| **Commissions** | | | | | | | 0.00 |
| Total Commissions | | | | | | | 0.00 |
| **Network fees** | | | | | | | 0.00 |
| Total Network fees | | | | | | | 0.00 |
| **Office Expense** | | | | | | | 0.00 |
| Total Office Expense | | | | | | | 0.00 |
| **PEPM fees** | | | | | | | 0.00 |
| Total PEPM fees | | | | | | | 0.00 |
| **PEPM Network fee** | | | | | | | 0.00 |
| Total PEPM Network fee | | | | | | | 0.00 |
| **NHBC - Direct Expenses - Other** | | | | | | | 0.00 |

# Medical Capital Holdings, Inc.
## Monthly General Ledger
### As of June 30, 2014

**Cash Basis**

| Type | Date | Num | Name | Memo | Debit | Credit | Balance |
|------|------|-----|------|------|-------|--------|---------|
| Total NHBC - Direct Expenses - Other | | | | | | | 0.00 |
| Total NHBC - Direct Expenses | | | | | | | -1.18 |
| **Perfect Game Operating Expenses** | | | | | | | 16,137.44 |
| **Consultants - Entertainment** | | | | | | | 0.00 |
| Total Consultants - Entertainment | | | | | | | 0.00 |
| **Consultants - Legal** | | | | | | | 0.00 |
| Total Consultants - Legal | | | | | | | 0.00 |
| **Copyright & Licenses** | | | | | | | 0.00 |
| Total Copyright & Licenses | | | | | | | 0.00 |
| **Distribution Expenses** | | | | | | | 16,137.44 |
| Total Distribution Expenses | | | | | | | 16,137.44 |
| **Materials** | | | | | | | 0.00 |
| Total Materials | | | | | | | 0.00 |
| **Operating Expenses** | | | | | | | 0.00 |
| Total Operating Expenses | | | | | | | 0.00 |
| **Rent** | | | | | | | 0.00 |
| Total Rent | | | | | | | 0.00 |
| **Perfect Game Operating Expenses - Other** | | | | | | | 0.00 |
| Total Perfect Game Operating Expenses - Other | | | | | | | 0.00 |
| Total Perfect Game Operating Expenses | | | | | | | 16,137.44 |
| **Viva Vision Revenue Sharing** | | | | | | | 0.00 |
| Total Viva Vision Revenue Sharing | | | | | | | 0.00 |
| **Operating Company Expense - Other** | | | | | | | 0.00 |
| Total Operating Company Expense - Other | | | | | | | 0.00 |
| Total Operating Company Expense | | | | | | | 16,136.26 |
| **Operating Expenses** | | | | | | | 0.00 |
| Total Operating Expenses | | | | | | | 0.00 |
| **Payroll Expenses** | | | | | | | 83,228.74 |
| **401K** | | | | | | | 0.00 |
| Total 401K | | | | | | | 0.00 |
| **ADP Payroll Service** | | | | | | | 185.40 |
| Total ADP Payroll Service | | | | | | | 185.40 |
| **Medical Capital Payroll taxes** | | | | | | | 0.00 |
| Total Medical Capital Payroll taxes | | | | | | | 0.00 |
| **Medical Insurance** | | | | | | | 0.00 |
| **Cobra** | | | | | | | 0.00 |
| Total Cobra | | | | | | | 0.00 |
| **Medical Insurance - Other** | | | | | | | 0.00 |
| Total Medical Insurance - Other | | | | | | | 0.00 |
| Total Medical Insurance | | | | | | | 0.00 |
| **Payroll and Taxes** | | | | | | | 83,043.34 |
| **Homestretch Crew** | | | | | | | 0.00 |
| Total Homestretch Crew | | | | | | | 0.00 |
| **MCC** | | | | | | | 189.00 |
| Total MCC | | | | | | | 189.00 |
| **NHBC** | | | | | | | 0.00 |

# Medical Capital Holdings, Inc.
# Monthly General Ledger
### As of June 30, 2014

**Cash Basis**

| Type | Date | Num | Name | Memo | Debit | Credit | Balance |
|------|------|-----|------|------|-------|--------|---------|
| | | | Total NHBC | | | | 0.00 |
| | | | **Trace** | | | | 0.00 |
| | | | Total Trace | | | | 0.00 |
| | | | **Viva Vision** | | | | 0.00 |
| | | | Total Viva Vision | | | | 0.00 |
| | | | **Payroll and Taxes - Other** | | | | 82,854.34 |
| Check | 6/3/2014 | 2101 | CA EDD | State ID 025-1711-8, Q1 ... | 5,158.34 | | 88,012.68 |
| | | | Total Payroll and Taxes - Other | | 5,158.34 | 0.00 | 88,012.68 |
| | | | Total Payroll and Taxes | | 5,158.34 | 0.00 | 88,201.68 |
| | | | **Payroll Expenses - Other** | | | | 0.00 |
| | | | Total Payroll Expenses - Other | | | | 0.00 |
| | | | Total Payroll Expenses | | 5,158.34 | 0.00 | 88,387.08 |
| | | | **Postage and Delivery** | | | | 8,454.65 |
| Check | 6/3/2014 | 2099 | Thomas Seaman Co... | May 2014 Fedex Reimbur... | 16.83 | | 8,471.48 |
| | | | Total Postage and Delivery | | 16.83 | 0.00 | 8,471.48 |
| | | | **Pre-Receiver Expense** | | | | 0.00 |
| | | | Total Pre-Receiver Expense | | | | 0.00 |
| | | | **Printing and Reproduction** | | | | 5,359.49 |
| | | | Total Printing and Reproduction | | | | 5,359.49 |
| | | | **Professional Fees** | | | | 885,199.73 |
| | | | **Consultant/legal fees (misc)** | | | | 17,079.83 |
| Check | 6/26/2014 | 2114 | Upstream Partners, Inc. | Inv # ThomasSeam-14-00... | 17,500.00 | | 34,579.83 |
| Check | 6/30/2014 | 2115 | Zabel Freeman | Inv # 5373 -Trace Life Sci... | 1,083.00 | | 35,662.83 |
| | | | Total Consultant/legal fees (misc) | | 18,583.00 | 0.00 | 35,662.83 |
| | | | **Litigation Expense -Manatt** | | | | 672.84 |
| Check | 6/17/2014 | 2111 | Orange County Netw... | Invoice 7642 | 380.00 | | 1,052.84 |
| Check | 6/17/2014 | 2111 | Orange County Netw... | Invoice 7640 | 190.00 | | 1,242.84 |
| | | | Total Litigation Expense -Manatt | | 570.00 | 0.00 | 1,242.84 |
| | | | **Litigation Expense -Sedgwick** | | | | 30,889.93 |
| Check | 6/13/2014 | 2108 | The Sall Law Firm | Retainer for Seaman vs. ... | 10,000.00 | | 40,889.93 |
| Check | 6/17/2014 | 2111 | Orange County Netw... | Invoice 7650 | 142.50 | | 41,032.43 |
| | | | Total Litigation Expense -Sedgwick | | 10,142.50 | 0.00 | 41,032.43 |
| | | | **Receiver's Counsel** | | | | 612,375.21 |
| Check | 6/12/2014 | Wire | Trachenberg Rodes &... | 7th Interim Fee Application | 7,230.47 | | 619,605.68 |
| Check | 6/18/2014 | Wire | Allen Matkins | 17th Interim Fee Application | 155,949.68 | | 775,555.36 |
| | | | Total Receiver's Counsel | | 163,180.15 | 0.00 | 775,555.36 |
| | | | **Receiver's expenses** | | | | 7,122.71 |
| | | | Total Receiver's expenses | | | | 7,122.71 |
| | | | **Receiver's fees** | | | | 111,583.35 |
| Check | 6/18/2014 | 2112 | Thomas Seaman Co... | 17th Interim Fee Application | 121,215.60 | | 232,798.95 |
| | | | Total Receiver's fees | | 121,215.60 | 0.00 | 232,798.95 |
| | | | **Receiver's IT Consultant** | | | | 104,603.52 |
| Check | 6/3/2014 | 2102 | Huron Consulting Gro... | Inv# 1034391, services re... | 52,301.76 | | 156,905.28 |
| | | | Total Receiver's IT Consultant | | 52,301.76 | 0.00 | 156,905.28 |
| | | | **Tax professionals** | | | | 872.34 |
| | | | Total Tax professionals | | | | 872.34 |
| | | | **Professional Fees - Other** | | | | 0.00 |
| | | | Total Professional Fees - Other | | | | 0.00 |
| | | | Total Professional Fees | | 365,993.01 | 0.00 | 1,251,192.74 |
| | | | **Radiation Monitoring** | | | | 0.00 |

# Medical Capital Holdings, Inc.
## Monthly General Ledger
### As of June 30, 2014

**Cash Basis**

| Type | Date | Num | Name | Memo | Debit | Credit | Balance |
|------|------|-----|------|------|-------|--------|---------|
| Total Radiation Monitoring | | | | | | | 0.00 |
| **Security Services** | | | | | | | 0.00 |
| Total Security Services | | | | | | | 0.00 |
| **Taxes** | | | | | | | 1,497.19 |
| **Corporate Taxes** | | | | | | | 1,497.19 |
| Total Corporate Taxes | | | | | | | 1,497.19 |
| **Property tax** | | | | | | | 0.00 |
| Total Property tax | | | | | | | 0.00 |
| **Sanitary taxes** | | | | | | | 0.00 |
| Total Sanitary taxes | | | | | | | 0.00 |
| **Taxes - Other** | | | | | | | 0.00 |
| Total Taxes - Other | | | | | | | 0.00 |
| Total Taxes | | | | | | | 1,497.19 |
| **Telephone Expense** | | | | | | | 0.00 |
| Total Telephone Expense | | | | | | | 0.00 |
| **Travel Expense** | | | | | | | 0.00 |
| Total Travel Expense | | | | | | | 0.00 |
| **Trustee fees & Expenses** | | | | | | | 0.00 |
| Total Trustee fees & Expenses | | | | | | | 0.00 |
| **Asset Sales/Disposition** | | | | | | | 0.00 |
| Total Asset Sales/Disposition | | | | | | | 0.00 |
| **Interest Income** | | | | | | | -1,521.32 |
| Deposit | 6/30/2014 | | Merrill Lynch | Deposit | | 5.35 | -1,526.67 |
| Deposit | 6/30/2014 | | | Deposit | | 41.87 | -1,568.54 |
| Deposit | 6/30/2014 | | | Deposit | | 41.87 | -1,610.41 |
| Total Interest Income | | | | | 0.00 | 89.09 | -1,610.41 |
| **Ask My Accountant** | | | | | | | 0.00 |
| Total Ask My Accountant | | | | | | | 0.00 |
| **No accnt** | | | | | | | 0.00 |
| Total no accnt | | | | | | | 0.00 |
| **TOTAL** | | | | | 1,054,487.30 | 1,054,487.30 | 0.00 |